1
XAVIER BECERRA
Attorney General of California
2
MICHAEL L. NEWMAN
Senior Assistant Attorney General
3
SARAH E. BELTON
Supervising Deputy Attorney General
4
VIRGINIA CORRIGAN (SBN 292035)
VILMA PALMA-SOLANA (SBN 267992)
5
MARISOL LEÓN (SBN 298707)
REBEKAH A. FRETZ (SBN 300478)
6
JULIA HARUMI MASS (SBN 189649)
Deputy Attorneys General
7
  1515 Clay Street, 20th Floor
  P.O. Box 70550
8
  Oakland, CA  94612-0550
  Telephone:  (510) 879-3300
9
  Fax:  (510) 622-2270
  E-mail:  Julia.Mass@doj.ca.gov
10
*Attorneys for Plaintiff State of California*

11
(*Additional counsel listed on signature page*)

12

13
**IN THE UNITED STATES DISTRICT COURT**

14
**FOR THE CENTRAL DISTRICT OF CALIFORNIA**

15
**WESTERN DIVISION**

16

| | |
|---|---|
| 17 **STATE OF CALIFORNIA, COMMONWEALTH OF MASSACHUSETTS, STATE OF CONNECTICUT, STATE OF DELAWARE, DISTRICT OF COLUMBIA, STATE OF ILLINOIS, STATE OF MAINE, STATE OF MARYLAND, STATE OF MICHIGAN, STATE OF MINNESOTA, STATE OF NEVADA, STATE OF NEW JERSEY, STATE OF NEW MEXICO, STATE OF NEW YORK, STATE OF OREGON, COMMONWEALTH OF PENNSYLVANIA, STATE OF RHODE ISLAND, STATE OF VERMONT, COMMONWEALTH OF VIRGINIA, and STATE OF WASHINGTON,** | Case No. **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |
| Plaintiffs, | |
| **v.** | |

**KEVIN K. MCALEENAN,** in his official capacity as Acting Secretary of Homeland Security; **U.S. DEPARTMENT OF HOMELAND SECURITY, ALEX M. AZAR, II,** in his official capacity as Secretary of Health and Human Services; **U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES; MARK A. MORGAN,** in his official capacity as Acting Commissioner for U.S. Customs and Border Protection; **U.S. CUSTOMS AND BORDER PROTECTION; MATTHEW T. ALBENCE,** in his official capacity as Acting Director for U.S. Immigration and Customs Enforcement; **U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT; JONATHAN HAYES,** in his official capacity as Director of the Office of Refugee Resettlement; **OFFICE OF REFUGEE RESETTLEMENT,**

Defendants.

## INTRODUCTION

1.      Plaintiffs State of California, Commonwealth of Massachusetts, State of Connecticut, State of Delaware, District of Columbia, State of Illinois, State of Maine, State of Maryland, State of Michigan, State of Minnesota, State of Nevada, State of New Jersey, State of New Mexico, State of New York, State of Oregon, Commonwealth of Pennsylvania, State of Rhode Island, State of Vermont, Commonwealth of Virginia, and State of Washington (collectively, States) bring this action to challenge a new U.S. Department of Homeland Security and U.S. Department of Health and Human Services rule that purports to implement a long-standing settlement agreement that "sets out nationwide policy for the detention, release, and treatment of minors in [immigration] custody" for over 20 years. Stipulated Agreement, *Flores v. Reno*, Case No. CV 85-4544 RJK (Px) (C.D. Cal. filed Jan. 17, 1997) (the *Flores* Agreement).  In fact, the rule as promulgated

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

violates a number of the *Flores* Agreement's critical protections for immigrant children's safety and well-being, intrudes into the core state function of licensing care facilities for children, and will cause irreparable harm to immigrant children, their parents, and the States which will welcome them upon their release from federal custody.

2. The new rule, *Apprehension, Processing, Care, and Custody of Alien Minors and Unaccompanied Alien Children*, 84 Fed. Reg. 44,392 (Aug. 23, 2019), (Rule), contravenes the *Flores* Agreement's terms by stripping children in immigration custody of protections ensuring their placement in the least restrictive setting consistent with their best interests and their prompt release from federal custody whenever possible.  Instead, the Rule permits and calls for the prolonged and indefinite detention of immigrant children in detention facilities.

3. The Rule removes the *Flores* Agreement's core mechanism for ensuring the safety and well-being of children in immigration custody: state licensing and oversight.  By replacing state licensing and enforcement of state child welfare laws with audits by federal contractors, the Rule will prevent the States from fulfilling their historical and ongoing responsibility to protect the health, safety, and welfare of all children, including immigrant children held in care facilities and with foster care families within their boundaries.

4. The Rule's imposition of indefinite and prolonged detention of children and families in prison-like conditions will harm the mental and physical health of children and their parents, many of whom will ultimately be released to communities within the States.  The long-term impact of these harms will be borne by the States, which have robust programs and services to support the mental and physical health of their residents, including newly arrived immigrants.

5. Although the federal government claims these changes are required to avoid forcibly separating families that are apprehended together, this claim is belied by the Defendant agencies' disregard for compelling evidence that less restrictive

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF

alternatives to detention have proven effective at ensuring that families participate in their immigration proceedings.

6.     The Rule's creation of a parallel federal licensing scheme for the residential care of dependent children is *ultra vires*, outside Defendants' statutory authority, and intrudes on the States' sovereign interests—and the District of Columbia's quasi-sovereign interest—in enforcing their respective child welfare standards.

7.     Defendants' actions in promulgating the Rule are arbitrary and capricious, an abuse of discretion, contrary to law, in excess of statutory authority, and contrary to constitutional right in violation of the Administrative Procedure Act. The Rule is not justified by a change of circumstances or other reasoned basis for departing from the requirements and protections of the *Flores* Agreement.

8.     The Rule contemplates the indefinite and prolonged detention of families and children in prison-like facilities without individualized determinations regarding flight risk or danger to the community. Defendants' stated goal of deterring noncitizens from coming to the United States is also an impermissible and illegitimate basis for civil detention. As a result, the Rule violates the Due Process Clause of the U.S. Constitution.

9.     The States seek a preliminary and permanent relief to prohibit Defendants from implementing the Rule, an order vacating the Rule, and a declaratory judgment that the Rule is invalid.

## JURISDICTION

10.     This Court has jurisdiction over the claims alleged in this Complaint pursuant to 28 U.S.C. § 1331 (federal question), 28 U.S.C. § 2201 (declaratory relief), and 5 U.S.C. §§ 701-706 (Administrative Procedure Act).

## VENUE AND INTRA-DISTRICT ASSIGNMENT

11.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(e). This is a civil action in which Defendants are agencies of the United States or officers of

1    such an agency and Plaintiff State of California resides in this district.

2        12.    Under General Order 19-03, assignment to the Western Division is

3    proper because the Attorney General of California, counsel for Plaintiff State of

4    California, has an office in the Western Division but not in the other divisions of

5    the district.  The U.S. Attorney for the Central District of California also has its

6    main office in the Western Division.  In addition, a Notice of Related Case to a case

7    currently pending in the Western Division is being filed concurrently herewith, on

8    the grounds that this case requires resolution of substantially similar questions of

9    law as those presented in *Flores v. Barr*, Case No. 2:85-cv-04544-DMG.

10                                 **PARTIES**

11       13.    Plaintiff State of California is a sovereign state of the United States of

12   America.  California Attorney General Xavier Becerra brings this action in

13   furtherance of his duty, under art. V, § 13 of the California Constitution, to see that

14   the laws of the State are uniformly and adequately enforced.  This challenge is

15   brought pursuant to the Attorney General's independent constitutional, statutory,

16   and common law authority to represent the public interest.

17       14.    Plaintiff Commonwealth of Massachusetts is a sovereign state of the

18   United States of America.  Massachusetts Attorney General Maura Healey has both

19   statutory and common law authority to bring lawsuits to protect the interests of the

20   Commonwealth of Massachusetts and the public interest of the people.  *Feeney v.*

21   *Commonwealth*, 366 N.E.2d 1262, 1265-66 (Mass. 1977); Mass. Gen. Laws Ch. 12,

22   §§ 3, 10.

23       15.    Plaintiff State of Connecticut is a sovereign state of the United States

24   of America.  Connecticut Attorney General William Tong brings this action to

25   protect the interests of the state as the state's chief legal officer under Conn. Gen.

26   Stat. § 3-124 *et seq.*

27       16.    Plaintiff State of Delaware brings this action by and through its

28   Attorney General Kathleen Jennings.  The Attorney General is the chief law

enforcement officer of the State of Delaware and has the authority to file civil actions in order to protect public rights and interests.  Del. Const., art. III; Del. Code Ann. tit. 29, § 2504.

17.     Plaintiff the District of Columbia (the District) is a municipal corporation empowered to sue and be sued, and is the local government for the territory constituting the permanent seat of the federal government.  The District brings this case through the Attorney General for the District of Columbia, who is the chief legal officer for the District and possesses all powers afforded the Attorney General by the common and statutory law of the District.  The Attorney General is responsible for upholding the public interest and has the authority to file civil actions in order to protect the public interest. D.C. Code § 1-301.81(a)(1).

18.     Plaintiff State of Illinois is a sovereign state of the United States of America.  Attorney General Kwame Raoul is the chief legal officer of the State, Ill. Const. art. V, § 15, and is authorized to pursue this action under 15 Ill. Comp. Stat. 205/4.

19.     Plaintiff State of Maine, represented by and through its Attorney General, is a sovereign state of the United States of America.  The Attorney General of Maine, Aaron M. Frey, is a constitutional officer with the authority to represent the State of Maine in all matters and serves as its chief legal officer with general charge, supervision, and direction of the State's legal business.  Me. Const. art. IX, § 11; Me. Rev. Stat., tit. 5 §§ 191 *et seq.*  The Attorney General's powers and duties include acting on behalf of the State and the people of Maine in the federal courts on matters of public interest.  The Attorney General has the authority to file suit to challenge action by the federal government that threatens the public interest and welfare of Maine residents as a matter of constitutional, statutory, and common law authority.

20.     Plaintiff State of Maryland is a sovereign state of the United States of America.  Maryland is represented by and through its chief legal officer, Attorney

General Brian E. Frosh.  Under the Constitution of Maryland, and as directed by the Maryland General Assembly, the Attorney General has the authority to file suit to challenge action by the federal government that threatens the public interest and welfare of Maryland residents.  Md. Const. art. V, § 3(a)(2); 2017 Md. Laws, J. Res. 1.

21.     Plaintiff State of Michigan is a sovereign state of the United States of America.  In Michigan, the Attorney General, Dana Nessel, is the chief law enforcement of the State, *Fieger v. Cox*, 734 N.W.2d 602, 604 (Mich. Ct. App. 2007), and the Attorney General has the authority to intervene in any action in which the Attorney General believes the interests of the People of the State of Michigan are implicated, Mich. Comp. Laws § 14.28.

22.     Plaintiff State of Minnesota is a sovereign state of the United States of America.  Attorney General Keith Ellison is the chief legal officer of the State of Minnesota and his powers and duties include acting in federal court in matters of State concern and to protect Minnesota residents.  Minn. Stat. § 8.01.

23.     Plaintiff State of Nevada, represented by and through its Attorney General, is a sovereign state of the United States of America.  Attorney General Aaron D. Ford is the chief legal officer of the State of Nevada and has the authority to commence actions in federal court to protect the interests of Nevada.  Nev. Rev. Stat. 228.170.

24.     Plaintiff State of New Jersey, represented by and through its Attorney General, is a sovereign state of the United States of America.  Attorney General Gurbir S. Grewal is New Jersey's chief legal officer and is authorized to pursue this action on behalf of the State.  N.J. Stat. Ann. § 52:17A-4(e), (g).

25.     Plaintiff State of New Mexico is a sovereign state of the United States of America.  Attorney General Hector Balderas is the chief legal officer of the State of New Mexico.  He is authorized to prosecute all actions and proceedings on behalf of New Mexico when, in his judgment, the interest of the State requires such

action.  N.M. Stat. Ann. § 8-5-2(B).  This challenge is brought pursuant to Attorney General Balderas's statutory and common law authority.

26.     Plaintiff State of New York, represented by and through its Attorney General, Letitia James, is a sovereign state of the United States of America. The Attorney General is New York State's chief law enforcement officer, and is authorized to pursue this action pursuant to N.Y. Exec. Law § 63.

27.     Plaintiff State of Oregon is a sovereign state of the United States of America.  The Attorney General of Oregon, Ellen Rosenblum, is the chief law officer of Oregon and is empowered to bring this action on behalf of the State of Oregon, the Governor, and the affected state agencies under Or. Rev. Stat. §§ 180.060, 180.210, and 180.220.

28.     Plaintiff Commonwealth of Pennsylvania is a sovereign state of the United States of America.  This action is brought on behalf of the Commonwealth by Attorney General Josh Shapiro, the "chief law officer of the Commonwealth." Pa. Const. art. IV, § 4.1.  Attorney General Shapiro brings this action on behalf of the Commonwealth pursuant to his statutory authority.  71 Pa. Stat. § 732-204(c).

29.     Plaintiff State of Rhode Island is a sovereign state of the United States of America. Attorney General Peter Neronha has the authority to bring action on behalf of the State in accordance with the powers and duties of the Attorney General, as derived from Article IX, Section 12 of the Constitution of the State of Rhode Island, Chapter 9 of Title 42 of the General Laws of Rhode Island, as amended, and the Common Law.

30.     Plaintiff State of Vermont is a sovereign state of the United States of America.  The Attorney General is the State's chief legal officer and has the authority to file civil actions to protect Vermont's rights and interests.  Vt. Stat. Ann. tit. 3, §§ 152, 157.

31.     Plaintiff Commonwealth of Virginia is a sovereign state of the United States of America.  Attorney General Mark Herring is the chief legal adviser to the

Commonwealth of Virginia. His powers and duties include acting in federal court on behalf of the Commonwealth on matters of public concern.

32. Plaintiff State of Washington is a sovereign state of the United States of America. The Governor is the chief executive officer of the State, responsible for overseeing its operations and ensuring that its laws are faithfully executed. The Washington State Attorney General is the chief legal advisor to the State. The Washington State Attorney General's powers and duties include acting in federal court on matters of public concern. Wash. Rev. Code § 43.10.030(1).

33. Defendant Kevin V. McAleenan is the Acting Secretary of the U.S. Department of Homeland Security and is responsible for its functions and the functions of its component organizations. He is sued in his official capacity.

34. Defendant U.S. Department of Homeland Security (DHS) is a federal agency charged with, *inter alia*, the administration and enforcement of federal immigration law. DHS promulgated the rule entitled *Apprehension, Processing, Care, and Custody of Alien Minors and Unaccompanied Alien Children*, 84 Fed. Reg. 44,392 (Aug. 23, 2019), that is challenged in this litigation.

35. Defendant Alex M. Azar, II, is the Secretary of the U.S. Department of Health and Human Services and is responsible for its functions and the functions of its component organizations. He is sued in his official capacity.

36. Defendant U.S. Department of Health and Human Services (HHS) is a federal agency charged with, *inter alia*, the care and custody of unaccompanied immigrant children. HHS promulgated the rule entitled *Apprehension, Processing, Care, and Custody of Alien Minors and Unaccompanied Alien Children*, 84 Fed. Reg. 44,392 (Aug. 23, 2019), that is challenged in this litigation.

37. Defendant Mark A. Morgan is the Acting Commissioner of U.S. Customs and Border Protection and is responsible for its functions, including initial detention and transfer of immigrant children and families. He is sued in his official capacity.

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF

38.     Defendant U.S. Customs and Border Protection (CBP) is the component agency of DHS that is responsible for the temporary detention of children and families encountered at the border and for transfer of immigrant children and families to Immigration and Customs Enforcement or Office of Refugee Resettlement custody.  CBP is the successor to the U.S. Immigration and Naturalization Service with respect to the *Flores* Agreement's provisions regarding initial detention and transfer of immigrant children.

39.     Defendant Matthew T. Albence is the Acting Director of U.S. Immigration and Customs Enforcement and is responsible for its functions, including detention of immigrant children and families in its custody.  He is sued in his official capacity.

40.     Defendant U.S. Immigration and Customs Enforcement (ICE) is the component agency of DHS that is responsible for the custody of accompanied children and families that remain detained pending adjudication of their asylum or other applications or removal proceedings and the successor to the U.S. Immigration and Naturalization Service with respect to the *Flores* Agreement's application to accompanied immigrant children.

41.     Defendant Jonathan Hayes is the Director of the Office of Refugee Resettlement and is responsible for its functions, including the care and custody of unaccompanied immigrant children.  He is sued in his official capacity.

42.     Defendant Office of Refugee Resettlement (ORR) is the component agency of HHS that is responsible for the care and custody of unaccompanied immigrant children and the successor to the U.S. Immigration and Naturalization Service with respect to the *Flores* Agreement's application to unaccompanied immigrant children.

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF

# BACKGROUND

## I. THE STATES' ROLE IN ESTABLISHING AND ENFORCING STANDARDS OF CARE FOR DEPENDENT CHILDREN

43. The States have a compelling interest in protecting the physical, emotional, and psychological health of children within their borders.

44. Ensuring child welfare, including establishing and enforcing standards for care and licensing residential placements for dependent children, is a police power traditionally vested in and reserved to the states.

45. Each of the States has comprehensive standards and licensing procedures to ensure that residential placements for dependent children provide care and services in settings that further the best interests of the child.

46. Since 1997, the States' standards have also governed residential placements for children in federal immigration custody within each of the States for children placed in state-licensed facilities pursuant to the *Flores* Agreement and federal law. *See, e.g.*, *Flores v. Lynch*, 828 F.3d 898, 906 (9th Cir. 2016) ("obvious purpose" of requiring placement of unaccompanied immigrant children in state-licensed facilities is to "use the existing apparatus of state licensure to independently review detention conditions").

## II. *FLORES V. RENO* LITIGATION AND SETTLEMENT AGREEMENT

47. In 1984, the Western Region of the U.S. Immigration and Naturalization Service (INS), ICE's predecessor agency, adopted a policy prohibiting the release of detained children to anyone other than "a parent or lawful guardian, except in unusual and extraordinary cases." *Reno v. Flores*, 507 U.S. 292, 296 (1993) (internal quotations omitted).

48. The next year, four immigrant children filed a class action lawsuit in the U.S. District Court for the Central District of California, challenging the policy and the detention conditions to which they were subjected as a result of the policy.

49. After significant litigation, the parties reached an agreement, which

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF

1    was approved by the Court in 1997.  The *Flores* Agreement defined the plaintiff

2    class as "All minors who are detained in the legal custody of the INS."  *Flores*

3    Agreement ¶ 10.

4           50.    The *Flores* Agreement requires that the INS—and its successor

5    agencies, DHS and HHS—hold detained children in facilities that are safe and

6    sanitary and that are consistent with the agencies' concern for the particular

7    vulnerability of children.  *Id.* ¶ 12A.  Within five days of initial detention, the

8    agencies must transfer the child to a "licensed program," except "in the event of an

9    emergency of influx of minors into the United States," in which case the agencies

10   must make the required placement "as expeditiously as possible." *Id.*

11          51.    The *Flores* Agreement states a "general policy favoring release," such

12   that when detention is not required to secure a child's timely appearance in

13   immigration proceedings or to ensure the child's safety or the safety of others, "the

14   [agencies] shall release a minor from [their] custody without unnecessary delay, in

15   the following order of preference, to:

16               a.  a parent;

17               b.  a legal guardian;

18               c.  an adult relative (brother, sister, aunt, uncle, or grandparent);

19               d.  an adult individual or entity designated by the parent or legal

20                   guardian [in a signed declaration before an immigration or

21                   consular officer or with proof of paternity or guardianship];

22               e.  a licensed program willing to accept legal custody; or

23               f.  an adult individual or entity seeking custody, in the discretion of

24                   the INS, when it appears that there is no likely alternative to

25                   long term detention and family reunification does not appear to

26                   be a reasonable possibility." *Id. ¶* 14.

27          52.    The *Flores* Agreement defines the term "licensed program" as "any

28   program, agency or organization that is licensed by an appropriate State agency to

11                        COMPLAINT FOR DECLARATORY AND
                                       INJUNCTIVE RELIEF

provide residential, group, or foster care services for dependent children, including a program operating group homes, foster homes, or facilities for special needs minors," and states that all such programs "shall be non-secure as required under state law; provided however, that a facility for special needs minors may maintain that level of security permitted under state law which is necessary for the protection of minors or others in appropriate circumstances . . . ." *Id.* ¶ 6.

53.   The *Flores* Agreement requires Defendant agencies to make "reasonable efforts to provide licensed placements in those geographical areas where the majority of minors are apprehended," specifically including "southern California." *Id.* ¶ 6.

54.   In 2001, the parties to the *Flores* Agreement signed an addendum stipulating that the agreement would remain in place until 45 days after defendants' publication of final regulations implementing the agreement, and stating that notwithstanding the termination date, "the INS shall continue to house the general population of minors in INS custody in facilities that are state-licensed for the care of dependent minors."  The terms of this addendum were incorporated into a binding court order.

55.   A true and correct copy of the *Flores* Agreement is attached hereto as Exhibit A and incorporated by this reference.

### III.   THE HOMELAND SECURITY ACT AND THE WILLIAM WILBERFORCE TRAFFICKING VICTIMS PROTECTION REAUTHORIZATION ACT OF 2008

56.   With the Homeland Security Act of 2002, Congress dissolved the INS and transferred its authority to DHS.  Pub. L. No. 107-26, 116 Stat. 2135; *see* 6 U.S.C. §§ 111, 231, 291.  Congress also delegated the care and custody of unaccompanied immigrant children to ORR.  INS's obligations under the *Flores* Agreement were preserved and transferred to DHS and ORR through the savings provisions of the Homeland Security Act.  6 U.S.C. § 552(a)(1) (incorporated by reference into 6 U.S.C. § 279(f)(2)).

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF

57.     In 2008, Congress enacted the William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008 (TVPRA), Pub. L. No. 110-457, 122 Stat. 5044 (principally codified in relevant part at 8 U.S.C. § 1232).  The TVPRA conferred responsibility for the care and custody of "unaccompanied alien children" on the Secretary of HHS.  It also incorporated by reference and partially codified the *Flores* Agreement by creating statutory standards for the treatment of unaccompanied children.  The TVPRA did not diminish the federal government's obligations under the *Flores* Agreement with respect to unaccompanied *or* accompanied children.

58.     ORR contracts with state-licensed public and private facilities to provide care and custody to unaccompanied immigrant children until they can be placed with a sponsor.

59.     Under the TVPRA, a child's status as "unaccompanied" is established at the time of initial contact with immigration authorities.  Federal agencies such as the U.S. Citizenship and Immigration Service (USCIS) treated individuals initially designated unaccompanied as such for purposes of adjudicating applications for immigration benefits absent a change in designation.  In approximately 2017, as a matter of practice, USCIS began to reassess a child's status as unaccompanied at the time a child filed an application with USCIS.  USCIS formalized this change in a policy memorandum in 2019.  USCIS, *Updated Procedures for Asylum Applications Filed by Unaccompanied Alien Children* (May 31, 2019), https://www.uscis.gov/sites/default/files/USCIS/Refugee%2C%20Asylum%2C%20 and%20Int%27l%20Ops/Asylum/Memo_-_Updated_Procedures_for_I-589s_Filed_by_UACs_5-31-2019.pdf.

## IV.  FEDERAL FAMILY DETENTION

60.     Prior to 2001, families apprehended for entering the United States without authorization were most often released rather than detained.

61.     However, beginning in 2001, ICE began detaining a limited number of

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF

families in detention facilities (referred to as "Family Residential Centers" by ICE) in Pennsylvania, Texas, and New Mexico.

62. All of these family detention facilities have come under intense criticism for poor conditions that cause harm to children.

63. Whether or not the so-called Family Residential Centers are locked, immigrants detained there—including children—are not free to leave.

64. Legal advocates—including class counsel in *Flores*—have challenged family detention facilities as violating the *Flores* Agreement and other legal mandates.

65. In February 2007, the Women's Refugee Commission and Lutheran Immigration and Refugee Service published a report detailing "prison-like" conditions in family detention facilities in Pennsylvania and Texas, as well as developmental harm inflicted on children by being held in family detention.

66. In late 2007, pursuant to a settlement agreement that resolved a case challenging conditions at a 500-bed family detention facility in Texas, ICE adopted "ICE/DRO Residential Standards" for family detention  (ICE Residential Standards, also referred to as Family Residential Standards). USCIS, *Family Residential Standards*, https://www.ice.gov/detention-standards/family-residential (last updated Jan. 3, 2018).  These standards fall short of the requirements of the *Flores* Agreement by failing to provide for individual needs assessments; minimum hours of recreation; individual and group counseling services; and privacy for family visitation and correspondence, among other important protections.

67. In October 2014, the Women's Refugee Commission and Lutheran Immigration & Refugee Service published a report finding that family detention facilities in Artesia, New Mexico and Karnes City, Texas were inappropriate for mothers and children, traumatized families, undermined basic family structures, and had a devastating psycho-social impact.  The authors also reported that families were detained without an individualized assessment of flight or security risk and

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF

1    without adequate consideration of alternatives to detention.

2        68.    In 2015, Defendant DHS established the DHS Advisory Committee on

3    Family Residential Centers.  This committee's primary recommendation began:

4    "DHS's immigration enforcement practices should operationalize the presumption

5    that detention is generally neither appropriate nor necessary for families – and that

6    detention or the separation of families for purposes of immigration enforcement or

7    management, or detention is never in the best interest of children.  DHS should

8    discontinue the general use of family detention, reserving it for the rare cases when

9    necessary following an individualized assessment of the need to detain because of

10    danger or flight risk that cannot be mitigated by conditions of release."  DHS

11    Advisory Committee on Family Residential Centers, *Final Report*, 2, (2016),

12    https://www.ice.gov/sites/default/files/documents/Report/2016/ACFRC-sc-

13    16093.pdf.

14        69.    State licensing requirements that, for the most part, do not allow for

15    family detention have prevented ICE from subjecting children to prolonged

16    detention with their parents.

17        70.    In 2016, the Pennsylvania Department of Human Services revoked and

18    refused to renew the license for the only family detention facility in Pennsylvania,

19    the Berks County Residential Center.  This decision was reversed by an

20    administrative law judge.  The Pennsylvania Department of Human Services

21    requested consideration and the decision is currently under administrative

22    reconsideration.  The reconsideration itself has been stayed pending resolution of a

23    motion to intervene, which is currently before the Commonwealth Court of

24    Pennsylvania.

25        71.    By letter dated July 18, 2018, the medical and psychiatric subject

26    matter experts for DHS's Office of Civil Rights and Civil Liberties reported

27    "significant compliance issues resulting in harm to children" to the U.S. Senate

28    Whistleblowing Caucus, based on ten investigations of family detention facilities

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF

over four years.  Their findings included significant weight loss in children that went largely unnoticed by facility medical staff, dangerously inadequate medical care, and physically dangerous conditions, among other concerns.  These experts stated that "the fundamental flaw in family detention is not just the risk posed by the conditions of confinement," but in fact "no amount of programming that can ameliorate the harms created by the very act of confining children to detention centers."  Letter from Scott Allen & Pamela McPherson to Senator Charles Grassley & Senator Ron Wyden (July 17, 2018), https://www.wyden.senate.gov/imo/media/doc/Doctors%20Congressional%20Disclosure%20SWC.pdf.

## V.   *FLORES* ENFORCEMENT PROCEEDINGS AND THE FEDERAL GOVERNMENT'S EFFORTS TO MODIFY THE AGREEMENT

72.    In 2015, in response to a new ICE policy of detaining all female-headed families—including children—in secure, unlicensed facilities for the duration of their immigration proceedings, the plaintiffs in *Flores* sought to enforce the consent decree.  The federal government filed a motion to amend the *Flores* Agreement.  In its motion to amend, DHS sought to clarify, *inter alia*, that immigrant children who arrive in the United States accompanied by a parent or legal guardian do not have a right to be released to a parent, legal guardian, or adult relative; and that the state licensing requirement does not apply to family residential facilities.  The *Flores* Court held, *inter alia*, that the release provision of the *Flores* Agreement applied to children who come into federal immigration custody accompanied by their parents and that housing children in Family Residential Centers violated the Agreement because the facilities were both secure and unlicensed.  *Flores v. Johnson*, 212 F. Supp. 3d 864, 871, 877 (C.D. Cal. 2015).  The Court found the defendants in material breach and denied DHS's motion to modify the Agreement.  *Id.* at 875, 880, 882, 886.  The Ninth Circuit affirmed the district court's decision that modification of the consent decree was not warranted.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1   *Flores v. Lynch*, 828 F.3d 898, 910 (9th Cir. 2016).

2   73.   In 2017, the Ninth Circuit affirmed the *Flores* Court enforcing the

3   rights of unaccompanied immigrant children to seek bond redetermination in a

4   hearing before an immigration judge to challenge their placement in secure

5   facilities by ORR.  *Flores v. Sessions*, 862 F.3d 863 (9th Cir. 2017).

6   74.   On April 6, 2018, then-U.S. Attorney General Jefferson Beauregard

7   Sessions III, announced a new "zero tolerance" policy under which all adult non-

8   citizens entering the United States without permission would be subject to criminal

9   prosecution, with no exceptions for asylum seekers or those accompanied by

10  children.  The policy—which was later revealed to have been implemented prior to

11  its announcement—resulted in thousands of children being separated from their

12  parents and has since been enjoined.  *Ms. L. v. U.S. Immigration and Customs*

13  *Enforcement*, 310 F. Supp. 3d 1133, 1139, 1143, 1149 (S.D. Cal. 2018).

14  75.   On June 20, 2018, President Donald J. Trump issued Executive Order

15  13841 directing the Secretary of Homeland Security to "maintain custody of alien

16  families during the pendency of any criminal improper entry or immigration

17  proceedings involving their members," "to the extent permitted by law."  Exec.

18  Order No. 13841, 83 Fed. Reg. 29,435 (June 20, 2018).  The Executive Order also

19  directed the U.S. Attorney General to file a request with the U.S. District Court for

20  the Central District of California to modify the *Flores* Agreement in a manner that

21  would permit DHS "to detain alien families together throughout the pendency of

22  criminal proceedings for improper entry or any removal or other immigration

23  proceedings."  *Id.*

24  76.   On June 21, 2018, the federal government filed an *ex parte* application

25  requesting modification of the *Flores* Agreement to allow DHS to detain all

26  families with children for the duration of their immigration proceedings in facilities

27  that are not state-licensed.  *See Flores v. Sessions*, Case No. CV 85-4544-DMG,

28  2018 WL 4945000, at *1 (C.D. Cal. July 9, 2018).

77.     On July 9, 2018, the district court in *Flores* denied the federal government's *ex parte* application.  *Id.* at *5.

78.     On September 6, 2018, the defendants in *Flores* filed a notice of appeal from the district court's denial of the federal government's *ex parte* application for relief from the *Flores* Agreement.  On April 23, 2019, the defendants in *Flores* voluntarily dismissed their appeal, and on April 26, 2019, the Ninth Circuit dismissed the appeal.  *Flores v. Barr*, No. 18-55063, 2018 WL 3472723 (9th Cir. Apr. 26, 2019).

79.     In addition to these and several other actions and orders to enforce the *Flores* Agreement, the Ninth Circuit Court of Appeals recently upheld the district court's order (1) requiring CBP to provide basic hygiene products such as soap and toothbrushes to children in its custody; and (2) requiring the federal government to apply the *Flores* Agreement's release provisions to children in expedited removal proceedings.  *Flores v. Barr*, No. 17-56297, 2019 WL 3820265, at *5, *7 (9th Cir. Aug. 15, 2019).

## VI.   THE AGENCIES' FLAWED AND UNLAWFUL NEW RULE

80.     On September 7, 2018, Defendants DHS and HHS published a Notice of Proposed Rulemaking in the Federal Register entitled *Apprehension, Processing, Care, and Custody of Alien Minors and Unaccompanied Alien Children* (NPRM). Apprehension, Processing, Care and Custody of Alien Minors and Unaccompanied Alien Children, 83 Fed. Reg. 45, 486 (Sept. 7, 2019).  The NPRM gave notice of proposed regulations that purported to codify, and thereby terminate, the *Flores* Agreement.  The NPRM proposed, *inter alia*, removing provisions to allow for the release of children who are apprehended with a parent or legal guardian to anyone other than a parent or legal guardian.  The NPRM speculated that the *Flores* Agreement's release requirements for children and state-licensing requirements "may create a powerful incentive for adults to bring juveniles . . . to the United States," making family detention an important option to address the "significant and

ongoing influx of adults who have made the choice to enter the United States illegally with juveniles . . . ." *Id.* at 48,493.

81.     On November 6, 2018, the Attorneys Generals of the states of California, Delaware, Illinois, Iowa, Maryland, Massachusetts, Minnesota, New Jersey, New Mexico, New York, North Carolina, Oregon, Pennsylvania, Rhode Island, Vermont, Virginia, Washington, and the District of Columbia submitted joint comments opposing the NPRM.  Multistate Letter dated Nov. 6, 2018, https://oag.ca.gov/system/files/attachments/press-docs/2018.11.06-multistate-comment-letterdhs-docket-no.iceb-2018-0002-and-hhs-docket-no.hhs-os-2018-0023.pdf.

82.     In response to the NPRM, DHS and HHS received more than 100,000 comments, many describing a number of grave concerns about the proposed regulations and their impact.  Commenters raised concerns about dangerous conditions at CBP facilities; noted the serious harm that prolonged family detention would cause to children and families, including increased risk of anxiety, depression, and Post-Traumatic Stress Disorder (PTSD); and argued that indefinite civil detention of immigrant children and families would violate the Due Process Clause, particularly where the purpose of the detention was general deterrence. Numerous commenters, including the American Academy of Pediatrics, the National Disability Rights Network, and a group of 78 Members of Congress, urged the importance of state licensing standards in providing basic protections and accountability for the health and safety of children's residential facilities, and expressed concern that the proposed regulations would remove the state licensing requirement for facilities housing accompanied children.

83.     On January 4, 2019, President Donald J. Trump sent a letter to all Members of Congress "on the need to secure our borders." His letter named two "most pressing legal challenges," the first of which was: "Terminate the Flores Settlement Agreement—which is preventing families from being held together

COMPLAINT FOR DECLARATORY AND
                                                                    INJUNCTIVE RELIEF

through removal."  President Trump Letter dated Jan. 4, 2019,

https://www.whitehouse.gov/wp-content/uploads/2019/01/Border-Security-

Letter.pdf.  In an accompanying slide presentation, the administration clarified the

goal to be, "***OVERRIDE THE FLORES SETTLEMENT AGREEMENT***  Allow

the U.S. Government to keep parents and children together for the duration of their

immigration proceedings."  A Border Security and Humanitarian Crisis, slide 8,

https://www.whitehouse.gov/wp-content/uploads/2019/01/Border-Briefing.pdf (last

visited Aug. 25, 2019).

84.    On August 23, 2019, Defendants DHS and HHS published the final

rule that is the subject of this litigation, *Apprehension, Processing, Care, and

Custody of Alien Minors and Unaccompanied Alien Children*, 84 Fed. Reg. 44,392

(Aug. 23, 2019).

85.    According to the Rule, its "primary purpose" is to implement the

*Flores* Agreement while responding to changes in law and circumstances, "and in

turn to enable termination of the agreement . . . [and] move away from judicial

governance to executive governance via regulation."  84 Fed. Reg. 44,398.

86.    In doing so, the Rule eschews the *Flores* Agreement's most

fundamental provisions: its "general policy favoring release" of children, its general

principle that children shall be placed in the "least restrictive setting appropriate" to

their age and special needs, and its requirement that—to provide for their safety and

well-being—care for children in immigration custody shall be provided through

state-licensed programs for the care of dependent children.  *Flores* Agreement,

Section IV; ¶ 11.

87.    Throughout the Rule, Defendant agencies articulate an additional goal

of permitting immigration authorities to detain accompanied children and their

families in order to address the perceived "surge of adults who have made the

choice" to seek entry into the United States with their children.  84 Fed. Reg.

44,403.  The Rule posits that the release of children required under the *Flores*

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF

Agreement has "incentivized" travel to the United States and is responsible for increased migration of families to our borders.

88.     Due in part to the inherent tension between the *Flores* Agreement's clear requirements to foster release of immigrant children and Defendants' interest in using detention as a deterrent to migration, Defendant agencies' explanation of the Rule's provisions lack the reasoned bases necessary for agency action and, in many instances, run counter to the evidence before the agencies in the administrative record.  Moreover, in promulgating the Rule, Defendant agencies have failed to consider important aspects of the problems at issue.

89.     As a result, the Rule sets forth regulations governing the detention and release of immigrant children that are contrary to the *Flores* Agreement's binding obligations and which Defendant agencies attempt to justify by reference to erroneous statutory interpretations.  Without reasoned explanation, these regulations depart from prior agency practices and precursor regulations that provided greater freedoms and rights to immigrant children and their family members.

### A.   The Rule Eliminates, Substantially Alters, or Otherwise Undermines Critical Elements of the *Flores* Agreement and the TVPRA

90.     Although the Rule purports to "parallel the relevant and substantive terms" of the *Flores* Agreement, in fact the Rule systematically undermines, alters, and even eliminates key elements of the Agreement, stripping children of protections that are critical to their health, well-being, and constitutional rights. 84 Fed. Reg. 44,393.  The rule also contravenes the TVPRA's requirements that unaccompanied children be placed in the least restrictive setting that is in the best interests of the child.  8 U.S.C. § 1232(c)(2).

### 1.   The Rule Prevents Prompt Release of Children from Detention

91.     Without regard for the particular category of immigration charges a

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

child may be facing, the *Flores* Agreement requires immigration authorities to "release the minor without unnecessary delay," except as necessary to secure the child's appearance in immigration proceedings or to ensure his or her safety or the safety of others. *Flores* Agreement ¶ 14.

92.    By contrast, the Rule creates three new obstacles to release of children in DHS custody that were not contemplated by the *Flores* Agreement.

93.    First, the Rule amends an existing regulation to eliminate release on humanitarian or public interest parole for children in expedited removal proceedings under 8 U.S.C. § 1225(b). 84 Fed. Reg. 44,410-412 (describing changes to 8 C.F.R. § 212.5 to deny parole to children in expedited removal that have not received a credible fear determination absent a "medical emergency" or as required for a "legitimate law enforcement objective").

94.    Second, the Rule newly limits access to bond hearings for children in DHS custody, allowing them only for children in removal proceedings under section 240 of the Immigration and Naturalization Act, to the extent permitted by a separate regulation, 8 C.F.R. § 1003.19. 84 Fed. Reg. 44,529, (to be codified at 8 C.F.R. § 236.3(m)).  Under this provision children who are "arriving aliens"—such as asylum seekers that are encountered at a port of entry—will not be permitted to seek release on bond.

95.    Third, whereas the *Flores* Agreement required immigration authorities to release children to a parent, legal guardian, adult relative, or other adult seeking custody—and to "make prompt and continuous efforts" to do so, *Flores* Agreement ¶ 18—the Rule provides that DHS will "make prompt and continuous efforts" to release an accompanied child that is otherwise eligible for release to a parent or legal guardian who is available to provide care and physical custody.  84 Fed. Reg. 44,529, (to be codified at 8 C.F.R. § 236.3(j)(5)(i)).  If a parent or legal guardian is not available, the Rule permits but does not require DHS to facilitate release to another adult relative.  *Id.*  The Rule eliminates, for accompanied children, the

option to be released to an adult other than a sibling, uncle, aunt, or grandparent.

96. Thus, the Rule permits—and in some cases requires—the ongoing detention of accompanied children with their parents, which is a departure from the previous regulation allowing DHS to effectuate the release of a "parent, legal guardian, or adult relative" in immigration detention in order to allow for release of a child for whom there was no other suitable sponsor available. *Cf.* 8 C.F.R. § 236.3(b)(2).

97. By requiring indefinite detention of parent-child units together, the Rule does not facilitate—and in fact it contravenes—the familial liberty interests recognized in *Ms. L. v. U.S. Immigration and Customs Enforcement*, 302 F. Supp. 3d 1149 (S.D. Cal. 2018). Without any finding of unfitness, parents will be deprived of the ability to make choices for the care and custody of their children, as the federal government will maintain indefinite custody and control of both parent and child.

98. The Rule also fails to ensure that unaccompanied children in ORR custody will be released in accordance with the *Flores* Agreement and the TVPRA.

99. The Rule fails to incorporate procedural safeguards called for by commenters in the rulemaking process to ensure that the family reunification and release processes proceed in a timely manner and provide potential sponsors a meaningful opportunity to appeal a denial of release or finding of non-suitability. 84 Fed. Reg. 44,463.

100. Moreover, the Rule creates obstacles to release by adding onerous terms to the custodial release agreement that a sponsor must sign before obtaining custody of a child that are not required by the *Flores* Agreement or applicable law. The Rule fails to note or respond to comments made in the rulemaking process addressing these departures from the *Flores* Agreement, their potential effects on the timely release of children from ORR custody, and their impermissible intrusion on parental rights. 84 Fed. Reg. 44,464-465.

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF

101.   These and other aspects of the Rule that unnecessarily prolong the detention of children violate the *Flores* Agreement, conflict with statutory authority, and violate due process, as well causing grave and unnecessary harm to the health and well-being of children.

### 2. The Rule Eliminates State Licensing Protections and Fails to Ensure that Children Are Placed in the Least Restrictive Setting Appropriate to their Ages and Special Needs

102.   One of the *Flores* Agreement's core principles is that immigration authorities shall treat all children in custody "with dignity, respect and special concern for their vulnerability as minors," and "shall place each detained minor in the least restrictive setting" appropriate to his or her age and special needs that is consistent with securing the child's presence in his or her immigration proceedings. *Flores* Agreement ¶ 11.

103.   In order to ensure that children in immigration custody were held in the least restrictive setting, according to evolving child welfare standards, the *Flores* Agreement's threshold condition for placement of immigrant children is that their residential, group, or foster care programs be licensed by a *state* agency responsible for the care of dependent children.  *Flores* Agreement ¶ 6.

104.    States, who have traditionally had the sole purview over ensuring child welfare, have generally declined to license facilities for the detention of families.  Indeed, the policies of most, if not all, states is to minimize the use of congregate care and place children in family settings.  Even in group homes and shelters, state-licensed programs for dependent children allow children to attend public schools and participate in community life.  While curfews and other parameters for limited independence apply, children in state-licensed care are not housed in "secure," locked facilities except as necessary for the child's safety or safety of others, or in connection with a juvenile offense.  *See infra* ¶¶ 147-360.

105.   In order to detain families, the Rule purports to create a system for federal "licensing" of family detention centers, contravening state policy that

1  disallows facilities for the residential care of children to operate without state
2  licenses.

3      106.   Moreover, far from requiring the thorough application, review,
4  permitting, and enforcement processes required for state licensing of child
5  residential care, the Rule provides simply that "DHS shall employ an entity outside
6  of DHS that has relevant audit experience to ensure compliance with the family
7  residential standards established by ICE," that audits "shall take place at the
8  opening of a facility and on a regular, ongoing basis thereafter," and that DHS will
9  make the audit results available to the public.  84 Fed. Reg. 44,526 (to be codified
10  at 8 C.F.R. § 236.3(b)(9)).

11      107.   Unlike state licensing requirements, which, as described further below,
12  are codified in state law and regulation, ICE Residential Standards do not create
13  enforceable rights for detainees and nothing prevents ICE from changing its Family
14  Residential Standards in the future.  Currently, the ICE Residential Standards do
15  not include the minimum standards for licensed programs or facilities enumerated
16  in Exhibit 1 of the *Flores* Agreement.

17      108.   Although the Rule states that a child in DHS custody shall be held in a
18  "non-secure" facility absent probable cause of criminal or delinquent activity,
19  unacceptably disruptive conduct within a "licensed" facility, or posing an escape
20  risk or threat to his own safety, the Rule's limits application of state law
21  requirements to when the term "non-secure," is specifically defined under state law.
22  *See* 84 Fed. Reg. 44,527 (to be codified at 8 C.F.R. § 236.3(i)(1) (grounds for
23  placement of child in secure facility)); 84 Fed. Reg. 44,526 (to be codified at 8
24  C.F.R. § 236.3(b)(11) (definition of "non-secure facility")).  Moreover, DHS
25  concedes that current family detention facilities do not offer freedom of ingress and
26  egress that many states facilitate for children in residential placements.  *See* 84 Fed.
27  Reg. 44,486 (residents in family detention facilities "can exit them" but "doing so .
28  . . may give rise to arrest").

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF

109.    The Rule allows for the detention of children who can be held in secure custody in "a secure DHS detention facility, or DHS contracted facility having separate accommodations for minors," which appears to allow DHS detention of children *without* their parents in a secure adult facility, outside the contemplation of the *Flores* Agreement and unsupported by Defendants' claimed interest in detaining family units together.  84 Fed. Reg. 44,528 (to be codified at 8 C.F.R. § 236.3(i)(1)).

110.    The Rule's reliance on private contractors to provide oversight of family detention facilities and secure facilities in which DHS may detain children raises serious concerns, as the DHS Office of Inspector General has found ICE detention standards enforcement inspections to be insufficient to "ensure consistent compliance with detention standards" or "promote comprehensive deficiency corrections."  DHS, *ICE's Inspections and Monitoring of Detention Facilities Do Not Lead to Sustained Compliance or Systemic Improvements*, OIG-18-97 (June 26, 2018), https://www.oig.dhs.gov/sites/default/files/assets/2018-06/OIG-18-67-Jun18.pdf.

111.    The Rule also departs from the requirements of the *Flores* Agreement to transfer a child to a licensed placement within five days and of the TVPRA to place unaccompanied children promptly in the least restrictive setting consistent with their best interests by allowing ORR to hold unaccompanied children indefinitely in unlicensed and/or secure facilities if there is "no appropriate licensed program immediately available," 84 Fed. Reg. 44,531(to be codified at 8 C.F.R. § 410.201(e)), and permitting the placement of unaccompanied children in unlicensed facilities in the event of an emergency or influx, 84 Fed. Reg. 44,531(to be codified at 8 C.F.R. § 410.202).  These allowances can have devastating consequences as unlicensed facilities lack standards and oversight critical to protecting children's health and safety, and unnecessary placement in secure facilities is contrary to the best interests of children.

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF

112.   The *Flores* Agreement requires that a child in removal proceedings be "afforded a bond redetermination hearing . . . in every case, unless the minor indicates on the Notice of Custody Determination form that he or she refuses such a hearing." *Flores* Agreement ¶ 24A.  The purpose of these hearings is external review of "whether a child should remain detained or in a particular placement," and "[f]or minors in secure detention, bond hearings . . . provide an opportunity to contest the basis of such confinement" and "ensure that [unaccompanied minors] are not held in secure detention without cause." *Flores v. Sessions*, 862 F. 3d at 876-77, 868.

113.   Although the Rule requires that children be given notice of the reason for their placement in a secure or staff secure facility, the Rule provides no mechanism for children to challenge their placement in such facilities.  84 Fed. Reg. 44,532 (to be codified at 8 C.F.R. § 410.206).  The Rule replaces a bond redetermination hearing before an immigration judge with a so-called "810 hearing."  However, unlike a bond redetermination hearing, the Rule states that an 810 hearing "may not be invoked to determine the UAC's placement while in HHS custody" or "to determine level of custody for the UAC."  84 Fed. Reg. 44,535 (to be codified at 8 C.F.R. § 410.810(h)).

114.   In addition to undermining children's rights to release and to the least restrictive placement under the *Flores* Agreement, the Rule codifies and expands USCIS's recent change in policy and practice regarding the re-evaluation of a child's status as accompanied or unaccompanied.  Under the Rule, a child who arrived unaccompanied will lose that status based on the availability of a parent or guardian to provide care and physical custody or reaching the age of 18.  84 Fed. Reg. 44531 (to be codified at 45 C.F.R. § 410.101).  Once a child has been determined to be unaccompanied, he or she is entitled to certain protections under the TVPRA, including, for example, an exemption from the one-year filing deadline for an asylum claim.  Removing those protections disadvantages children

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF

in their removal or asylum hearing processes, and is inconsistent with Congressional intent.

### 3. The Rule Removes Oversight Mechanisms and Introduces Provisions that Render Key Protections Unenforceable

115.   In addition to weakening the protections afforded to children under the *Flores* Agreement and the TVPRA, the Rule removes oversight and enforcement mechanisms that have been critical to ensuring that Defendants comply with their legal obligations to children in their custody.

116.   Unlike the *Flores* Agreement, which was enforceable through individual actions in federal district court, the regulations promulgated by the Rule are not even framed as mandatory requirements.  Instead, language that is mandatory in the *Flores* Agreement has been replaced with descriptive or permissive language.  For example, where the *Flores* Agreement requires that "the INS *shall* release a minor from its custody without unnecessary delay," *Flores* Agreement ¶ 14 (emphasis added), the corresponding language in the Rule states that a "minor *may* be released."  84 Fed. Reg. 44,525 (to be codified at 8 C.F.R. § 212.5(b)(3)(i)).  Where the *Flores* Agreement requires that Defendants "*shall* place each detained minor in the least restrictive setting," *Flores* Agreement ¶ 11 (emphasis added), the corresponding language in the Rule states that "ORR places each UAC in the least restrictive setting."  84 Fed. Reg. 44,531(to be codified at § 410.201).

117.   Under the *Flores* Agreement, children are permitted to challenge Defendants' decision to place them in a particular type of facility and the conditions in the facility in which they are placed in the United States District Court with jurisdiction over the facility.  The Rule removes this element of the *Flores* Agreement.

118.   The *Flores* Agreement provides for robust oversight of conditions by counsel for *Flores* plaintiffs, including through access to facilities and monthly data

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

reports.  Despite the fact that this oversight has been crucial to holding Defendants to the requirements of the *Flores* Agreement, the Rule provides no similar mechanism for oversight by an outside body.  In particular, the Rule makes no provision for continuing external oversight of CBP's compliance with the requirement to hold children in facilities that are safe, sanitary, and consistent with their particular vulnerability, despite CBP's well-documented failures in this area.

119.   The Rule redefines "emergency" to include "an act or event [. . . that] impacts other conditions provided by this section."  84 Fed. Reg. 44,526 (to be codified at § 236.3(b)(5)).  The Rule indicates that this change was made to permit DHS and HHS to "delay compliance" or "excuse noncompliance" with provisions of the rule—including basic health and safety requirements, such as the requirements to provide children with food, drinking water, and adequate temperature control.  84 Fed. Reg. 44,451.  It could also permit DHS to house unaccompanied children with unrelated adults for more than 24 hours, which is explicitly prohibited by the *Flores* Agreement.

**B.**   **Defendant Agencies Did Not Comply with Well-Established Requirements for Reasoned Decision-Making.**

120.   In addition to issuing a Rule that conflicts with a binding settlement agreement and exceeds the Defendant agencies' statutory authority, the agencies' decision-making process gave insufficient consideration to critical issues and relied on improper premises and assertions that lack plausibility and consistency.

121.   For example, Defendants failed to consider any of the benefits of the *Flores* Agreement favoring release over detention, holding children in the least restrictive setting, and using state licensing to ensure the safety and well-being of children in federal immigration custody.

122.     Defendants also failed to assess—at all—the devastating impact that the Rule's failure to fully comply with the terms of the *Flores* Agreement will have

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1  on children, their families, the States, and the local communities that will welcome
2  the children and their families upon release.

3    123.   Similarly, while Defendant agencies attempted to justify eliminating
4  core protections in the *Flores* Agreement on the basis of changed circumstances,
5  they also claimed strict adherence to terms of the *Flores* Agreement to decline
6  changes recommended by commenters to the NPRM.  *See, e.g.*, 84 Fed. Reg.
7  44,462-463.

8    124.   DHS's failure to adopt standards ensuring safe and sanitary conditions
9  for children in CBP custody is one example.  Many commenters raised concerns
10  about medical neglect, icy temperatures, lack of bedding, and constant illumination
11  in CBP facilities.  But the agencies dismissed these concerns as irrelevant because
12  DHS had adopted the language of the *Flores* Agreement to require that such
13  facilities maintain conditions that are "safe and sanitary and that are consistent with
14  DHS's concern for [children's] particular vulnerability."  *See*, *e.g.*, 84 Fed. Reg.
15  44,438-39, 44,527 (to be codified at 8 C.F.R § 236.3(g)(2)).  The agencies'
16  continued assertion that CBP facilities *are* safe and sanitary despite an
17  administrative record citing media and expert reports of dangerous conditions for
18  children reveals the agencies' willingness to ignore the evidence in the record
19  before them.

20    **1.    The Rule Is Based on a False and Impermissible Premise:**
          **That Civil Detention Will Deter Migration**

21    125.   The Rule makes inferences based on migration trends that family
22  detention has a deterrent effect on migration.  But this analysis wrongly attributes a
23  policy-based causal relationship to different rates of migration that are seasonal in
24  nature.  A proper analysis of publicly available border apprehension data showed no
25  effect that could be attributed to United States family detention or family separation
26  policies.  Although commenters pointed out this mistake to Defendants DHS and
27  HHS in the notice-and-comment process, the agencies continued to rely on their

COMPLAINT FOR DECLARATORY AND
                                           INJUNCTIVE RELIEF

flawed statistical analysis to issue the Rule.

126.   Moreover, deterrence is a constitutionally impermissible justification for civil detention, which is permitted only to secure an individual's presence at a hearing or protect the community from harm.

### 2. Defendant Agencies Failed to Fully Address Harms Created by Expanding Detention of Children and Families

127.   In promulgating the Rule, Defendants declined to balance the government's interest in prolonging the detention of children for enforcement purposes against the physical health and mental health effects on children and families, as well as the cost of such injuries to the communities they will join upon release.

### a. Detention Is Extremely Harmful to Children

128.   Detention or institutionalized living is a major childhood traumatic stressor that causes long-term psychological harm.

129.   Conditions in family detention facilities do not allow parents and children to engage in the normal family dynamics that are important for child and adolescent development.  Families in immigration detention have reported being subject to punitive and verbally abusive treatment.  They also report being restricted from spending time together; adolescents may be assigned cells apart from their parents and be punished if they are found in their parent's cell at the time of the census count that occurs several times a day.

130.   Detaining families undermines familial roles, disrupting emotional attachment, parental authority, and children's security in their parents' power to care for them.  Studies have shown that infants and children who live in detention with their mothers often have more maladaptive social and emotional development, academic failure, and future criminal involvement compared to other children. Childhood trauma from maternal incarceration increases depressive symptoms in children and results in increased risks for dropping out of high school, depression,

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF

social withdrawal, and externalizing behaviors such as aggression and defiance.

131.  Institutional rearing—that is, growing up in detention for even short periods of time whether youth are incarcerated with their parents or in youth facilities—is one of the most adverse environments scientists have studied, involving powerful elements of trauma: deprivation (i.e. absence of developmentally appropriate environmental inputs and complexity) and threat (experiences that represent an immediate or ongoing threat to physical integrity and psychological security).  These traumatic elements cause prolonged and intense stress, affecting neural development which in turn harms cognitive and behavioral functioning in children and contributes to the development of chronic illnesses that can last into adulthood.

132.  Children and adolescents in immigration detention facilities report increased rates of deliberate self-harm and suicidal behavior, severe depression, sleep difficulties, anxiety, and PTSD, along with poor nutrition, regression in language development, bedwetting, and social withdrawal.

133.  Parents and children in ICE's family detention facilities have shown high levels of anxiety.  Children in these facilities suffer from separation anxiety, depression, and feelings of despair that manifest as developmental regression and major psychiatric disorders, including suicidal ideation.  Moreover, the ongoing stress, despair, and uncertainty of family detention specifically compromises children's intellectual and cognitive development and contributes to the development of chronic illness in ways that may be irreversible.  Prolonged family detention puts children at risk of recurrent and distressing memories, nightmares, dissociative reactions, prolonged psychological distress, and negative alterations in cognition.

134.  Both state child welfare policy and federal policy recognize that family-based care is better for children than institutionalized care.  *See* Family First Prevention Services Act, Pub. L. 115-123, 132 Stat 64 (2018) (limiting federal

payments for out-of-home placements that are not foster homes).

135.   In response to many comments, including comments from medical, mental health, and child welfare specialists opposing the NPRM based on concerns about the impact family detention will have on children and their families, DHS cited mental health services contemplated within the detention system and responded, "Enforcement of the immigration laws is a core DHS mission that cannot be ignored and must be balanced with the needs to ensure the care of minors in DHS custody and relevant legal obligations."  84 Fed. Reg. 44,504.

### b. The Agencies Are Aware of Less Restrictive Means to Ensure Families Participate in their Immigration Proceedings

136.   Contrary to Defendants' contention in the Rule, detention of families is unnecessary to secure their appearance at hearings.  Sound analysis of governmental data demonstrates that the overwhelming majority of families appear and participate in immigration court, and that the appearance rate is even higher where an immigrant is represented by counsel.  *See, e.g.*, Am. Immigr. Council, *Immigrants and Families Appear in Court: Setting the Record Straight* (July 2019), https://www.americanimmigrationcouncil.org/sites/default/files/research/immigrants_and_families_appear_in_court_setting_the_record_straight.pdf.  Moreover, Defendants' reliance on *in absentia* rates to attempt to justify prolonged detention of immigrant children and families is misplaced, as *in absentia* rates are not a reliable measurement of whether a family will appear in immigration court.

137.   In a memorandum dated May 11, 2005, ICE announced criteria for eligibility for enrollment in the Intensive Supervision Appearance and Electronic Monitoring Device Programs as alternatives to detention.  DHS, *Eligibility Criteria for Enrollment into the Intensive Supervision Appearance Program (ISAP) and the Electronic Monitoring Device (EMD) Program* (May 11, 2005), https://www.ice.gov/doclib/foia/dro_policy_memos/dropolicymemoeligibilityfordroisapandemdprograms.pdf.  These programs use supervision tools such as curfews

1   and electronic monitoring devices for individuals subject to, but released from,

2   immigration detention.  The Intensive Supervision Appearance and Electronic

3   Monitoring Program includes community-based supervision and case management

4   that result in high rates of immigration court respondents released from detention

5   appearing for their immigration court hearings.

6        138.   In September 2015, ICE established the Family Case Management

7   Program, with plans to enroll a maximum of 1500 families in five targeted

8   metropolitan locations.  The program was geared toward special populations, such

9   as pregnant women, nursing mothers, and families with young children.  As of

10  March 2017, ICE expended $17.5 million in program costs to enroll 781 active

11  participants, for a cost of about $36 per family per day.  The program resulted in 99

12  percent compliance for ICE check-ins and appointments and 100 percent attendance

13  at court hearings.  By contrast, the cost per bed in family detention is $319.37 per

14  day.

15       139.   Programs like the Family Case Management Program are therefore

16  proven cost-effective and less restrictive alternatives to detention in meeting the

17  government's objective of ensuring appearance at hearings.  Many commentators

18  called on DHS to use these kinds of programs rather than undertaking the human

19  and financial cost of family detention.

20       140.   ICE's Congressional Justification and Budget Overview for Fiscal

21  Year 2018 included the Family Case Management Program as one of several

22  Alternatives to Detention programs.  DHS, *U.S. Immigration and Customs*

23  *Enforcement Budget Overview,* (Fiscal Year 2018) pp. 182-183,

24  https://www.dhs.gov/sites/default/files/publications/ICE%20FY18%20Budget.pdf.

25  However, ICE ended the Family Case Management Program in the summer of

26  2017.

27

28

### 3. The Agencies Failed to Consider Allowing Parents to Determine Their Children's Best Interests

141. The Rule cites concerns about family separation as a basis for prohibiting the release of accompanied children to non-parent, non-guardian sponsors required by the *Flores* Agreement. But Defendants were aware that any parents who preferred to remain with their children in a family detention facility could waive their children's rights under the *Flores* Agreement, because the option was thoroughly explored in litigation concerning family separation. *See Ms. L. v. U.S. Immigration and Customs Enf't*, 310 F. Supp. 3d 1133 (S.D. Cal. 2018).

142. Defendants failed to provide a reasoned basis for terminating accompanied children's rights to release to an alternate care-giver, instead of continuing to allow parents the option of either allowing release to an alternate care-giver or keeping the family together while detained.

### 4. The Agencies Failed to Conduct an Analysis of Costs Associated with the Rule

143. Executive Orders 12866 (*Regulation and Regulatory Review*) and 13563 (*Improving Regulation and Regulatory Review*) require that agencies provide a detailed cost-benefit analysis for proposed rules that are economically significant, including an assessment of "potentially effective and reasonably feasible alternatives to the planned regulation."

144. In the NPRM, DHS and HHS stated that they did not consider the Rule economically significant. 83 Fed. Reg. 45,522. In the Rule, DHS concedes that the Rule may result in costs, benefits, or transfers in excess of $100 million in any given year and is therefore economically significant. 84 Fed. Reg. 44,505.

145. The agencies failed to conduct the cost-benefit analysis and consideration of alternatives that is required for an economically significant rule.

146. Given the cost effectiveness of the Family Case Management Program and other supervised release programs as compared to immigration detention, the Rule's failure to require individualized bases for detention, and the harms attendant

to the incarceration of children and families, the costs far outweigh the benefits of the Rule.

## VII. THE RULE UNDERMINES STATES' SOVEREIGN INTERESTS IN SETTING STANDARDS FOR RESIDENTIAL CARE OF DEPENDENT CHILDREN

147.   The Rule undermines the States' sovereign interests in enforcing their child welfare laws by setting up an alternative federal licensing scheme that allows children to be held in the respective States without State oversight as needed to ensure access to education, safety, and health in accordance with State law.

### A.   California's Policy, Licensing, and Enforcement of Protections for Children Far Exceed Those Provided by the Rule

148.   California has licensed and monitored residential placements for children as part of its child welfare system since 1973.  The State has a comprehensive licensing scheme for all placements used to house children within its boundaries, which is contained in the California Health and Safety Code, the California Welfare and Institutions Code, and Title 22 of the California Code of Regulations.

149.   As a matter of state policy, California seeks to prevent and reduce inappropriate institutional care for children by providing community-based care, home-based care, or other forms of less intensive care.  Cal. Welf. & Inst. Code § 13003(4).  Any out-of-home placement of children must be in the "least restrictive family setting," and should promote "normal childhood experiences that [are] suited to meet the child's or youth's individual needs."  *Id*. § 16000(a).  Under California law, children may not be placed in locked facilities except under very limited circumstances where a court has made specific findings regarding their danger to self or others.

150.   California has adopted "continuum of care" policies that minimize the use of congregate care facilities in favor of home-based placements.  This system relies on specialized care services being brought to resource family homes (known outside of California as "foster" care homes), reserving the use of group homes for

COMPLAINT FOR DECLARATORY AND
                                                      INJUNCTIVE RELIEF

specialized and temporary needs—for intervention rather than long-term placement. California's foster family agencies and county child welfare agencies are responsible for certifying or approving resource family homes.

151.   The California Department of Social Services is responsible for ensuring the health, safety, and welfare of children in out-of-home care facilities, which includes ensuring that children's statutory and regulatory personal rights are effectuated, including their rights to fair and equal treatment and to all available services, care, treatment, placements, and benefits.

152.   California's child welfare responsibilities include licensing and monitoring the residential conditions of children under state care who have pending civil immigration proceedings.  The state licenses all group homes and foster family agencies in California, including those that have contracts with ORR to provide housing to unaccompanied children in federal custody.  California currently licenses and monitors at least sixteen group homes and at least four foster family agencies with federal contracts to house immigrant children pending their immigration proceedings.

153.   To prevent predictable harm to children in care, California provides orientation prior to licensure, screens applicants, performs background checks, reviews staffing requirements, conducts pre-licensing visits to inspect facilities, and provides information regarding laws and regulations.  California provides consultation, education, and technical support, and monitors compliance with state child welfare standards through unannounced facility inspections.  The California Department of Social Services investigates complaints and enforces standards through notices of deficiency, fines, civil penalties, non-compliance office conferences, and administrative legal actions that can lead to license revocation.

154.   California prohibits persons and entities from operating community care facilities, which includes child residential programs and the foster family agencies that place children in resource family homes, without a license.  *See, e.g.*

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF

Cal. Health & Safety Code § 1508.  Operation without a license can lead to criminal prosecution and/or civil proceedings.  *See, e.g.* Cal. Code Regs. tit. 22, § 80006(c).

155.   Neither the Rule nor ICE's Residential Standards require the development of individualized plans to support each child's development, as required by the *Flores* Agreement and California law.

156.   The Rule and ICE's Residential Standards fail to allow children independence appropriate to their age, maturity, and capability—including the right to leave the facility in which they are housed—as required by California law.

157.   California does not have a statutory or regulatory licensing scheme for facilities that detain family units with adult parents or guardians.  Accordingly, there are no such facilities in California.

158.   By creating an alternate licensing scheme to allow family detention in locked facilities in California—to be overseen by a federal contractor rather than the California Department of Social Services and with standards far short of those required for facilities licensed for the care of dependent children under California law—the Rule undermines California's ability to enforce its state laws and procedures for ensuring child welfare.

159.   In addition, because of the Rule, children who otherwise might have been placed in California-licensed care will be held in federal family detention facilities either within or outside of California.

**B.    The Rule Conflicts with Massachusetts's Child Welfare Policy, Licensing, and Enforcement**

160.   Massachusetts statutes and regulations establish criteria and a comprehensive scheme to license and monitor out-of-home foster placements for children within its boundaries, set forth at Chapters 15D, 18B, and 119 of the Massachusetts General Laws and Titles 110 and 606 of the Code of Massachusetts Regulations.  The Massachusetts Department of Early Education and Care is responsible for licensing and monitoring residential programs serving children,

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF

while the Massachusetts Department of Children and Families guides the implementation of child welfare policy for the state and oversees children in state custody who have suffered abuse or neglect.

161.   It is the policy of Massachusetts to ensure that children have "a fair and full opportunity to reach [their] full potential."  Mass. Gen. Laws ch. 15D, § 1. The Massachusetts Department of Children and Families requires that placement decisions serve "the best interests of the child."  110 Mass. Code Regs. 7.101(1). Accordingly, Massachusetts Department of Children and Families placement determinations consider "the least restrictive setting for the child," the "ability for frequent visits between [the] child and his/her family," and "the child's individual needs." *Id.*

162.   Massachusetts law discourages the use of group residential facilities. Children in the state's child welfare system who need foster care are placed with individual families unless the particular needs of that child merit placement in a school or institution.  Mass. Gen. Laws ch. 119, § 32.  Prior to making a placement in a group residential facility, the Massachusetts Department of Children and Families must first consider placement with relatives, with a "child-specific" family with some relationship to the child, in a foster home, or in a short-term group home, in that order of priority.  *See* 110 Code Mass. Regs. 7.101(2).

163.   The Massachusetts Department of Early Education and Care has adopted regulations governing the licensure of all group residential care facilities for children, whether in state or federal custody.

164.   For children in group residential care, Massachusetts seeks to "provide each resident with the least intrusive intervention sufficient to insure his or her safety, the safety of others, and promote healthy growth and development." 606 Code Mass. Regs. 3.01(e).

165.   Massachusetts Department of Early Education and Care regulations for group residential care programs prohibit locking features even for rooms used for

the specific purpose of behavioral management and separation. 606 Code Mass. Regs. 3.07(7)(l).

166. Through its licensure regulations, the Massachusetts Department of Early Education and Care is responsible for ensuring the health, safety, and welfare of children in out-of-home care facilities in the child welfare system, which includes requiring that programs guarantee fair and equal access to all services and maintain procedures for protecting children in their care. *See, e.g.,* 606 Code Mass. Regs. 3.04(3)(l). By screening applicants, *see* Mass. Gen. Laws ch. 15D, § 6, performing background checks, *id*. § 7(a), providing consulting and technical assistance, *id*. § 2(o)-(p), conducting unannounced inspections, *id*. §§ 9, 16, and employing other measures, Massachusetts prevents harm and protects children in its care. The Massachusetts Department of Early Education and Care investigates compliance and enforces standards through sanctions, including fines and suspension, revocation, and nonrenewal of licenses. *See id*. § 10.

167. The responsibilities of the Massachusetts Department of Early Education and Care include overseeing the residential conditions of children in federal or state custody who have pending civil immigration proceedings and where no option for community release has been identified pursuant to the *Flores* Agreement. Massachusetts currently licenses and monitors one federally contracted foster agency which oversees placements for children in immigration proceedings who are in federal custody.

168. Massachusetts prohibits persons and entities from operating residential facilities or agencies that place children in residential facilities without a license. *See* Mass. Gen. Laws ch. 15D, § 6. Operation without a license can lead to fines or imprisonment, or both. *See id.* § 15(a).

169. Massachusetts regulations mandate that each resident have a comprehensive individual service plan, 606 Code Mass. Regs. 3.05(4), whereas neither the Rule nor ICE's Residential Standards contain such a requirement.

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF

170.   Massachusetts regulations mandate the minimum size of living quarters, 606 Code Mass. Regs. 3.08(7)(e), a requirement not contemplated in the Rule or ICE's Residential Standards.

171.   Contrary to ICE's Residential Standards, Massachusetts regulations require referrals for family planning services.  606 Code Mass. Regs. 3.06(4)(g)(4).

172.   Massachusetts regulations require that residential programs put in place a family visiting plan for each resident, an affirmative commitment to visitation by family and others not included in the Rule or ICE's Residential Standards.  606 Code Mass. Regs. 3.06(2)(a)(4).

173.   Massachusetts does not have a statutory or regulatory licensing scheme for facilities that detain family units with adult parents or guardians.  Accordingly, there are no such facilities in Massachusetts.

174.   By creating an alternate licensing scheme to allow family detention in locked facilities in Massachusetts—to be overseen by a federal contractor rather than the Massachusetts Department of Early Education and Care and with standards far short of those required for dependent children under Massachusetts law and regulations—the Rule undermines Massachusetts's ability to effectuate state policy and enforce state laws and regulations for ensuring child welfare.

175.   In addition, because of the Rule, children who otherwise may have been placed in Massachusetts-licensed care will be held in federal family detention facilities either within or outside of Massachusetts.

**C.     The Rule Conflicts with Connecticut's Child Welfare Policy, Licensing, and Enforcement**

176.   Connecticut believes that children should grow up in their own homes and communities wherever possible.  The state's Department of Children and Families, which cares for children in the abuse and neglect system, has developed and deployed a "Strengthening Families Practice Model" —a trauma-informed, strength-based approach that seeks to improve child well-being by engaging and

1   supporting families.  *See, e.g.,* Conn. Dep't of Child. & Fam., *Strengthening*

2   *Families Practice Model*, Pol'y 1-2 (Jan. 2, 2019).  Connecticut treats removal of

3   children from the home as a last resort, to be used only when removal is deemed

4   necessary for the child's safety and when other interventions have failed.

5       177.   In line with its commitment to providing developmentally appropriate

6   supports and services to children in their own homes and communities,

7   Connecticut's official policy is to "[p]rovide programs and services that are

8   community-based" and to "[r]etain and support" young people "within their homes

9   whenever possible and appropriate."  Conn. Office of Pol'y and Mgmt., *Juvenile*

10  *Justice System: System Philosophy and Goals*, https://portal.ct.gov/OPM/ CJ-

11  JJYD/Main-Navigation/Juvenile-Justice-System (last visited Aug. 21, 2019).

12      178.   When it is deemed necessary to place children in the care and custody

13  of the state, Connecticut strives to keep them healthy, safe, and learning. To further

14  that objective, Connecticut has developed and implemented a mandatory, exclusive,

15  and comprehensive system for licensing and monitoring residential placements of

16  children.

17      179.   In Connecticut, it is illegal to operate a residential placement for

18  children—including congregate care facilities, residential treatment facilities, and

19  temporary shelters—without a license from the Department of Children and

20  Families.  Conn. Gen. Stat. § 17a-145(a).  The Department licenses all of the state's

21  80 residential placements for children, including Connecticut's only group home

22  that contracts with ORR to house unaccompanied children in federal custody.

23      180.   Connecticut has adopted a two-stage licensing process for residential

24  facilities.  Prior to granting a provisional license, the Department of Children and

25  Families provides technical assistance to applicants; performs background checks;

26  conducts a complete review of proposals; and inspects facilities.  The Department

27  of Children and Families conducts a full reassessment of each facility before

28  converting a provisional license to a regular license.  Finally, after licensure, the

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF

Department of Children and Families provides ongoing consultation, education, and technical support, and monitors compliance with regulatory standards through both regular quarterly visits and unannounced facility inspections.

181.   Connecticut's licensing system's safety, health, and quality requirements for residential placements are detailed and specific, and strive to embody nationally-accepted best practices in caring for vulnerable children.  In critical areas, ICE's Residential Standards fall short of the standards embodied in Connecticut's system for the care and custody of out-of-home children. Connecticut law and regulations require that children are provided with a range of services and supports that are not required by the Rule or ICE's Residential Standards, and Connecticut guarantees children a range of rights and freedoms on which ICE's standards are silent.  For example, Connecticut law and policies require that transgender youth are housed in residential placements according to their gender identities, and not according to the sex that they were assigned at birth. The Rule and ICE's Residential Standards do not similarly protect the rights of transgender youth.

182.   Connecticut does not have a statutory or regulatory licensing scheme for facilities that detain family units with adult parents or guardians.  Accordingly, there are no such facilities in Connecticut.

183.   By creating an alternate licensing scheme to allow family detention in locked facilities in Connecticut—to be overseen by a federal contractor rather than the Connecticut Department of Children and Families and with standards far short of those required for dependent children under Connecticut law—the Rule undermines Connecticut's ability to enforce its state laws and procedures for ensuring child welfare.

184.   In addition, because of the Rule, children who otherwise might have been placed in Connecticut-licensed care will be held in federal family detention facilities either within or outside of Connecticut.

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF

### D.   The Rule Conflicts with Delaware's Child Welfare Policy, Licensing, and Enforcement

185.   The Delaware Department of Services for Children, Youth, and Their Families includes the Division of Family Services, the Division of Youth Rehabilitative Services, and the Division of Prevention and Behavioral Health Services.  The Delaware Department of Services for Children, Youth, and Their Families uses a continuum of care to provide services to children throughout the State of Delaware who are dependent, neglected, abused, delinquent, or in need of mental health services, and strives to safeguard the welfare of children by providing services to children and families in the least restrictive environment possible, in accordance with the child's health and safety needs.  *See* Del. Code Ann. tit. 29 § 9001.

186.   When circumstances require the Delaware Department of Services for Children, Youth, and Their Families to remove a child from their home for placement in an out-of-home setting, State policy requires the Department to develop an individualized written case plan for that child.  The case plan must outline the child's needs, the services provided to the child and family, and a plan for placement of the child "in the least restrictive setting available and in close proximity to the child's home, consistent with the best interests and special needs of the child."  Del. Code Ann. tit. 29 § 9003(a)(4).  When determining placement options for the child, the Division of Family Services must first attempt to locate a relative placement resource.  If no relatives are available, non-relative resources are explored before placing a child in a foster home.  Group home settings are considered only if no foster home placements are available or appropriate.  Per Division of Family Services policy, the child's age, relationship with their parents and siblings, and their physical, emotional, and intellectual composition are all factors used to determine the best placement for the child, in the least restrictive setting.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

187.   Delaware law prohibits children from being placed in secure facilities unless specific judicial findings are made to address the mental health needs of the child or as part of the delinquency proceedings of the child.  *See, e.g.*, Del. Code Ann. tit. 10 § 1007, *id*. tit. 16, §§ 5001-5011.

188.   The Delaware Department of Services for Children, Youth, and Their Families is responsible for licensing, registering, and monitoring all residential and nonresidential child care facilities in Delaware, as well as child placement and adoption agencies.  The Division of Family Services Office of Child Care Licensing licenses and provides regulations for child placing agencies, residential child care facilities, day treatment programs, and nonresidential facilities. Delaware's monitoring scheme includes, among other things, the right of entrance, inspection, and access to the papers of child care facilities operating within Delaware and entities that operate within Delaware and place children in other states.

189.   Delaware prohibits persons and entities from operating community care facilities, which includes residential and non-residential child care facilities without a license.  *See, e.g.*, Del. Code Ann. tit. 31, § 344.  The Office of Child Care Licensing's regulations focus on protecting the well-being, safety, and health of children.  They include requirements for background checks, child protection registry checks, ensuring the good character and intention of the applicant, and that the home or facility meets the child's physical, social, moral, mental, and educational needs.  *See, id*. § 344(b).  If the licensee is non-compliant with the regulations, their license can be denied, suspended, or revoked.

190.   Delaware law requires that all dependent, neglected, and abused children in the custody of the Department of Services for Children, Youth, and Their Families have individualized service plans and independent living and transition plans.  The children are required to be active participants in the formation of such plans.  Based on reasonable, prudent parent standards, Delaware children

are also required to have the opportunity to participate in age and developmentally appropriate activities and experiences, outside of their placement, which promote healthy development and allow for extra-curricular, social and cultural activities. *See, e.g.*, Del. Code Ann. tit. 13, §§ 2502, 2522.  These rights and freedoms are not required by the Rule or available under ICE's Residential Standards.

191.   Delaware does not have a statutory or regulatory licensing scheme for facilities that detain family units with adult parents or guardians.  Accordingly, there are no such facilities in Delaware.

192.   By creating an alternate licensing scheme to allow family detention in locked facilities in Delaware—to be overseen by a federal contractor rather than the Delaware Department of Services for Children, Youth, and Their Families and with standards far short of those required for dependent children under Delaware law— the Rule undermines Delaware's ability to enforce its state laws and procedures for ensuring child welfare.

193.   In addition, because of the Rule, children who otherwise may have been placed in Delaware licensed care will be held in federal family detention facilities either within our outside of Delaware.

### E.   The Rule Conflicts with the District of Columbia's Welfare Policy, Licensing, and Enforcement

194.   The District's Child and Family Services Agency is responsible for administering child and family services in the District, including by safeguarding the rights and protecting the welfare of children whose parents, guardians, or custodians are unable to do so and ensuring the protection of children who have been abused or neglected from further such experiences and conditions detrimental to their healthy growth and development.  D.C. Code § 4-1303.01a.

195.   The District's Child and Family Services Agency licenses all youth residential facilities in the District except for those facilities intended primarily for detained or delinquent youth or persons in need of supervision.  D.C. Mun. Regs.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1    tit. 29, § 6202.4.

2         196.   The District has a comprehensive licensing scheme for all placements

3    used to house children within its boundaries.  *See* D.C. Code § 4-1303.01a, et seq.;

4    D.C. Code § 7-2101, et seq.; D.C. Mun. Regs. tit. 29, § 6201, et seq.; D.C. Mun.

5    Regs. tit. 29, § 6301, et seq.

6         197.   The District follows a policy of placing children in the least restrictive

7    setting to meet their particular needs.  D.C. Mun. Regs. tit. 29, § 6201.3.  Under

8    District law, children may not be placed in locked facilities except under very

9    limited circumstances where a court has made specific findings regarding their

10   danger to self or others.  *See, e.g.*, D.C. Code § 2–1515.01, et seq.

11        198.   The District has a robust system for ensuring meaningful oversight,

12   accountability, and enforcement of standards for residential facilities that house

13   children.  D.C. Code §§ 7-2105 & 7-2108; D.C. Mun. Regs. tit. 29, § 6201, et seq.;

14   D.C. Mun. Regs. tit. 29, § 6301, et seq.

15        199.   To prevent harm to children in residential facilities, the District's Child

16   and Family Services Agency provides orientation prior to licensure, screens

17   applicants, reviews background checks submitted by providers, reviews staffing

18   requirements, conducts pre-licensing visits to inspect facilities, and provides

19   information regarding laws and regulations.  The District provides consultation,

20   education, and technical support, and monitors compliance with District child

21   welfare standards through unannounced facility inspections.  It also investigates

22   regulatory complaints and enforces standards by reporting the agency's findings,

23   which address any deficiencies, and which are reviewed with the operators, and

24   administrative legal actions that can lead to license restrictions or suspension.

25        200.   To ensure that children receiving care in a youth shelter, emergency

26   care facility, or youth group home have the adequate supervision and care necessary

27   for their well-being, on August 16, 2019, the District adopted emergency

28   regulations that prohibit the licensing of group housing facilities for children that

house more than fifteen children at the same time.  Vol. 66 No. 35 D.C. Reg. 011502 (Aug. 23, 2019).  The emergency regulations are in effect for 120 days, until December 14, 2019.  *Id.*  The regulations are subject to a thirty-day public comment period.  *Id.*

201.   The District prohibits persons and entities from operating child residential programs without a license.  *See, e.g.*, D.C. Code § 7-2102.  Operating a youth residential facility without a license or in violation of the terms of a license or impeding a District government employee in the performance of his or her duties under the Youth Residential Facilities Licensure Act or its implementing regulations can lead to criminal prosecution and/or civil proceedings.  *See, e.g.*, D.C. Code Ann. § 7-2108.

202.   Neither the Rule nor ICE's Family Residential Standards require the development of individualized plans to support each child's development, as required by the *Flores* Agreement and District law.

203.   Neither the Rule nor ICE's Family Residential Standards allow children independence appropriate to their age, maturity, and capability—including the right to not be confined in the facility twenty-four hours a day.

204.   The District does not have a statutory or regulatory licensing scheme for facilities that detain family units that detain children with adult parents.  Accordingly, there are no such facilities in the District.

205.   By creating an alternate licensing scheme to allow family detention in locked facilities in the District—to be overseen by a federal contractor rather than any District agency—the Rule undermines the District's ability to enforce its laws and procedures for ensuring child welfare.

206.   In addition, because of the Rule, children who otherwise may have been placed in the District's licensed care will be held in federal family detention facilities either within or outside of the District.

207.   The District is uniquely situated among the Plaintiff States, as it has no

sovereign interest to claim as against the Federal Government. *See* Const. art. I, § 8, cl. 17; *N. Pipeline Constr. Co. v. Marathon Pipe Line Co.*, 458 U.S. 50, 76 (1982); *District of Columbia ex rel. Am. Combustion, Inc. v. Transamerica Ins. Co.*, 797 F.2d 1041, 1046 (D.C. Cir. 1986) (Congress acts "as sovereign of the District of Columbia"). Rather, the District asserts its quasi-sovereign interests and its authority to enforce its laws and uphold the public interest under its Attorney General Act, which was intended to incorporate the common law authority of states' attorneys general. D.C. Code § 1-301.81. *See also Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*, 458 U.S. 592, 608 n.15 (1982) (recognizing that Puerto Rico "has a claim to represent its quasi-sovereign interests in federal court at least as strong as that of any State").

## F.     The Rule Conflicts with Illinois's Child Welfare Policy, Licensing, and Enforcement

208.   In Illinois, the Illinois Child Care Act (passed in 1969) defines various child care arrangements and sets minimum licensing, operation, and performance standards for child care institutions. The Illinois Department of Children and Family Services is charged with creating standards for, licensing, and overseeing all child care institutions in Illinois. 225 Ill. Comp. Stat. 10/1 *et seq.*

209.   The "primary and continuing responsibility" of the Illinois Department of Children and Family Services is "to provide social services to children and their families, to operate children's institutions, and to provide certain other rehabilitative and residential services." 20 Ill. Comp. Stat. 505/1. Illinois requires caregivers to consider "the best interest of the child," "the importance and fundamental value of encouraging the child's emotional and developmental growth gained through participation in activities in his or her community," and "the importance and fundamental value of providing the child with the most family-like living experience possible." 20 Ill. Comp. State. 505/7.3a(c)(2). Illinois regulations limit placement of children in secure child care facilities to those who

are between the ages of 13 and 17 and to situations in which there is a documented clinical finding that the child's or youth's behavior poses an established pattern of foreseeable serious risk of bodily harm to self or others.  Ill. Admin. Code tit. 89 §§ 411.10, 411.110(g).

210.   Illinois's Department of Children and Family Services has sole authority to license, monitor, and enforce standards for child care institutions.  In Illinois, although requirements vary based on the type of facility, all prospective child care institutions must apply for a license to operate; the licensing process includes background checks for all operators and employees of the institution, monitoring by the Department of Children and Family Services, and proof of training and testing for lead and radon among many other requirements.  In addition, the Department of Children and Family Services conducts annual monitoring visits to ensure child care institutions are in compliance with applicable state laws and regulations.  If the state receives a complaint about a child care institution, it conducts an inspection/investigation and determines whether the complaint is substantiated and whether the issuance of a corrective action is warranted.

211.   Illinois prohibits persons and entities from operating community care facilities, which includes child care institutions, without a license.  *See*, *e.g.*, 225 Ill. Comp. Stat. 10/3.

212.   Illinois laws and regulations require goods, services, and liberties that are not required by the Rule and are unavailable under ICE's Residential Standards be provided to children in child care institutions.  For example, Illinois regulations require that personal allowance money be available to children based upon the child's age and ability to manage money.  *Id*. § 404.33.  Illinois regulations provide that children be permitted and encouraged to participate in extra-curricular activities including sports, art, and music to the extent of their interests, abilities, and talents.  *Id*. § 404.34.

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF

213.    Illinois does not have a statutory or regulatory licensing scheme for facilities that detain family units with adult parents or guardians.  Accordingly, there are no such facilities in Illinois.

214.    By creating an alternate licensing scheme to allow family detention in locked facilities in Illinois—to be overseen by a federal contractor rather than the Illinois Department of Children and Family Services and with standards far short of those required for dependent children under Illinois law—the Rule undermines Illinois's ability to enforce its state laws and procedures for ensuring child welfare.

215.    In addition, because of the Rule, children who otherwise might have been placed in Illinois-licensed care will be held in federal family detention facilities either within or outside of Illinois.

### G.    The Rule Conflicts with Maine's Child Welfare Policy, Licensing, and Enforcement

216.    The Maine Department of Health and Human Services licenses residential placements for children, including, without limitation, emergency children's shelters, family foster homes, children's residential care facilities, and shelters for children.  Me. Rev. Stat. tit. 22, §§ 7801, 8101 *et seq.*

217.    Maine prohibits persons and entities from operating emergency children's shelters, family foster homes, children's residential care facilities, and shelters for homeless children, without a license.  Me. Rev. Stat. tit. 22, § 7801, 8101; *see* 10-144 Me. Code R. ch. 36; 10-148 Me. Code R. chs. 8, 9, 15, 16.

218.    Maine's Department of Health and Human Services has adopted rules for the various levels of children's residential care facilities in order to protect the health, safety, well-being and development of children, pursuant to title 22, section 22 of the Maine Revised Statues.

219.    Maine's Department of Health and Human Services out-of-home child abuse or neglect investigation team has been established to investigate reports of suspected abuse or neglect of children by persons or in facilities subject to

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF

department licensure.  Me. Rev. Stat. tit. 22, §§ 8352-8358.

220.   No license to operate an emergency children's shelter can be issued until Maine's Department of Health and Human Services determines compliance with all applicable requirements, which include, inspection by the State Fire Marshall's Office, required interviews, site visits, review of records, and technical assistance related to meeting and maintaining licensing requirements.  10-148 Me. Code R. ch. 9, § 4(A)-(F).  Once a license is issued, the Department of Health and Human Services has the right to enter and inspect the facility and its records for compliance with the law and with licensing rules.  *Id*. § 5(A)(4)(c).  Failure to comply with licensing rules may lead to sanctions including suspension or revocation of the license.  *Id*. § 5(C)(1)(f)-(g).

221.   No license to operate a children's residential care facility can be issued until an application is submitted and the Department of Health and Human Services conducts required interviews, site visits, review of records, and technical assistance related to meeting and maintaining licensing requirements.  10-144 Me. Code R. ch. 36, § 4(A)(1)(e).  Once a license is issued, the Department of Health and Human Services has the right to enter and inspect the facility and its records for compliance with the law and with licensing rules.  *Id*. § 4(A)(2).  In addition, the Department of Health and Human Services may investigate the facility's failure to comply with licensing rules.  *Id*. § 5(C).  Failure to comply with licensing rules may lead to sanctions including suspension or revocation of the license.  *Id*.

222.   Maine regulations of child residential care facilities require such facilities to establish policies that provide children the right to freedom from abuse or neglect, freedom from harmful actions or practices, freedom from unreasonable search, to a service plan, to a variety of activities, and the right to communicate, among other rights.  10-144 Me. Code R. ch. 36, § 5(E)(10).

223.   No license to operate a foster home can be issued until the Department determines compliance with applicable licensing requirements, which include the

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF

completion of a satisfactory safety inspection.  10-148 Me. Code R. ch. 16, §§ 2, 9(E).  Licenses are valid for two years.  *Id.* § 4(A).

224.   In the event the Maine Department of Health and Human Services, upon investigation, determines that conditions in the foster home immediately endanger the health or safety of persons living in the foster home, the Department may ask a Maine court for an emergency suspension of the foster home license. 10-148 Me. Code R. ch. 16, at § 5(C).

225.   State regulations require that foster home applicants undergo fingerprinting in order to allow Maine Department of Health and Human Services to submit required fingerprint-based checks of national crime information databases.  10-148 Me. Code R. ch. 16, at § 2(H).

226.   No license to operate a children's shelter can be issued until the Department of Health and Human Services determines compliance with all applicable requirements, which include, inspection by the State Fire Marshall's Office, required interviews, site visits, review of records, and technical assistance related to meeting and maintaining licensing requirements.  10-148 Me. Code R. ch. 8, § 4(A)-(F).  Once a license is issued, the Department of Health and Human Services has the right to enter and inspect the facility and its records for compliance with the law and with licensing rules.  *Id.* § 6(C).  Failure to comply with licensing rules may lead to sanctions including suspension or revocation of the license.  10-148 Me. Code R. ch. 8, app.

227.   These protections for children are unavailable under the Rule and ICE's Residential Standards.

228.   Maine does not have a statutory or regulatory licensing scheme for facilities that detain family units with adult parents or guardians.  Accordingly, there are no such facilities in Maine.

229.   By creating an alternate licensing scheme to allow family detention in locked facilities in Maine—to be overseen by a federal contractor rather than the

Maine Department of Health and Human Services and with standards far short of those required for dependent children under Maine law—the Rule undermines Maine's ability to enforce its state laws and procedures for ensuring child welfare.

230.   In addition, because of the Rule, children who otherwise may have been placed in Maine licensed care will be held in federal family detention facilities either within or outside of Maine.

## H.   The Rule Conflicts with Maryland's Child Welfare Policy, Licensing, and Enforcement

231.   It is Maryland state policy to "promote a stable, safe, and healthy environment for children and families that provides access to necessary services and supports in the least restrictive, most appropriate, and most effective environment possible."  Md. Code Ann., Hum. Servs. § 8-102.  Maryland's approach aims to be "family-driven, child-guided, home- and community-based, culturally and linguistically competent, individualized, and effective," providing a "continuum of care, opportunities, and supports that emphasize prevention, early intervention, and community-based services."  *Id*.  Beginning in 2007, Maryland began implementing the "Place Matters" initiative, which aims to prevent children from coming into care when possible, reduce the reliance on out-of-home care, and reduce the length of stay in out-of-home care.

232.   Maryland has a comprehensive licensing scheme for all residential child care facilities (group homes) and child placement agencies (foster care).  The Maryland Department of Human Services is responsible for licensing decisions for child placement agencies and residential child care facilities for the care of dependent children.

233.   Applications for a residential child care facility or a child placement agency license require detailed descriptions of the applicant's organizational structure, governance, fiscal condition, policies, history, and operations.  The Department of Human Services inspects all physical facilities to ensure they meet

regulatory requirements and conducts interviews with applicants.  All prospective employees whose positions include working with or in close proximity to children are required to submit to state and federal criminal background investigations.  Maryland monitors compliance through review of records and through unannounced and announced site visits during which records may be examined and staff and children interviewed.  Any complaints about a residential child care facility must be responded to within 24 hours of receipt.  Non-compliance with regulatory standards can result in the removal of children from the facility and the imposition of sanctions, including the suspension or revocation of the license.

234.  Maryland licenses all residential child care facilities and child placement agencies, including those that have contracts with ORR to provide housing to unaccompanied children in federal custody.  Maryland currently licenses and monitors one residential facility and one placement agency with federal contracts to house immigrant children.  It is a criminal violation to operate a residential child care facility or child placement agency in Maryland without a license.  *See* Md. Code Ann., Hum. Servs. § 8-710; Md. Code Ann., Fam. Law §§ 5-507, 5-509, 5-509.1, 5-521.

235.  Each child in residential child care in Maryland must be treated in compliance with Maryland's Residents' Bill of Rights.  The Bill of Rights provides, among other things, that all child residents have a right "to be treated with fairness, dignity, and respect," to "visitation, mail, and telephone communication with relatives, friends, attorneys, social workers, therapists, and guardians ad litem," and to "an appropriate education, including educational supports such as homework assistance, summer enrichment opportunities, and employment skills training."  Md. Code Ann., Hum. Servs. § 8-707.  These rights exceed those required by the Rule and contained in the ICE Residential Standards.

236.  Every residential child care program is required to develop an individual plan of care for each child resident.  Md. Code Regs. 14.31.06.17.  Each

plan is to include education, including special education; family relationship; health care; life skills development; personal, emotional, and social development; a recreation plan; and vocational training.  *Id.*  The plans are reviewed and updated every ninety days, modified as needed by the child's needs, interests, and circumstances.  Documentation of monthly progress toward achievement of goals is required.  *Id.*  Neither the Rule nor the ICE Residential Standards require the development of a similar individual plan of care.

237.   Maryland does not have a statutory or regulatory licensing scheme for facilities that detain family units with adult parents or guardians.  Accordingly, there are no such facilities in Maryland.

238.   By creating an alternate licensing scheme to allow family detention in locked facilities in Maryland to be overseen by a federal contractor rather than the state and with standards far short of those required for dependent children under Maryland law, the Rule undermines Maryland's ability to enforce its state laws and procedures for ensuring child welfare.

239.   In addition, because of the Rule, children who otherwise may have been placed in Maryland-licensed care will be held in federal family detention facilities either within or outside of Maryland.

### I.   The Rule Conflicts with Michigan's Child Welfare Policy, Licensing, and Enforcement

240.   Safety, permanency, and child well-being are the major concerns of Michigan's child welfare laws and public policy.  The focus of Michigan's child welfare policy is strengthening families to help them provide adequate care for their children.  Michigan provides services to children and families that safely reduce unnecessary out-of-home placements and the length of time that children live apart from their birth families before reunification.  If reunification is not possible, services must be provided to ensure a permanent placement for children in a timely manner.  Michigan law calls for children to be placed in the least restrictive setting

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF

1  appropriate to their needs.  Mich. Comp. Laws § 722.958b(3)(h).

2  241.   The Child Care Organizations Act, Mich. Comp. Laws § 722.111 *et*

3  *seq.*, provides the statutory authority and comprehensive scheme for the licensing of

4  institutions, foster parents, day care operators, and staff.  The Division of Child

5  Welfare Licensing is responsible for the licensing of institutions that care for

6  children outside a parent or guardian's custody and of foster parents who care for

7  the children placed in the legal custody of the Michigan Department of Health and

8  Human Services.  Michigan's statutes and administrative rules detail the

9  requirements involved with the prospective licensing, including comprehensive

10  background checks for staff and administrators of child caring institutions, and

11  compliance with training and staffing requirements for child care institutions over

12  which the state has legal care and supervision.  The Division of Child Welfare

13  Licensing provides direct oversight and monitoring of child caring institutions to

14  ensure compliance with licensing rules and with the Child Care Organizations

15  Act.  The Division of Child Welfare Licensing conducts on-site inspections

16  annually to monitor for compliance, and investigates allegations of noncompliance.

17  Michigan enforces compliance with its standards through actions for injunctive

18  relief and sanctions including fines, license revocation, and criminal liability.

19  Mich. Comp. Laws §§ 722.123, 722.125. Michigan law prohibits persons and

20  entities from operating community care facilities without a license.  *Id.*

21  § 722.115m(2).

22  242.   Michigan's child welfare responsibilities include licensing and

23  monitoring the residential conditions of children under state care who have pending

24  civil immigration proceedings.  The state licenses all child care organizations, child

25  placing agencies, foster family homes, and foster family group homes in Michigan,

26  including those that provide housing or placement to unaccompanied children in

27  federal custody.  Currently, unaccompanied children in ORR custody are being

28  placed in Michigan by two agencies licensed for child placement and care by the

Division of Child Welfare Licensing.

243.   Michigan law does not permit children to be placed in secure detention unless a delinquency complaint or petition has been filed or an adult criminal charge has been issued and the judge has issued an order for detention; secure detention is not permitted to be used as a placement for neglect/abuse wards.  Mich. Comp. Laws § 712A.15(4).

244.   Michigan law provides for what is called the "children's assurance of quality foster care," including minimum standards for the quality foster care a child can anticipate when in the state's care.   Mich. Comp. Laws §§ 722.958b, 722.958c, 722.958d.  Michigan requires that children in its care receive the following services, which are not required under the Rule or ICE's Residential Standards:

   a.  Transition planning, including housing, financial education, information regarding secondary education and post-secondary education, and independent living; and

   b.  Participation in extracurricular activities consistent with the child in foster care's age and developmental level.

245.   Michigan does not have a statutory or regulatory licensing scheme for facilities that detain family units with adult parents or guardians.  Accordingly, there are no such facilities in Michigan.

246.   By creating an alternate licensing scheme to allow family detention in locked facilities in Michigan—to be overseen by a federal contractor rather than the Michigan Department of Health and Human Services and with standards far short of those required for dependent children under Michigan law—the Rule undermines Michigan's ability to enforce its state laws and procedures for ensuring child welfare.

247.   In addition, because of the Rule, children who otherwise might have been placed in Michigan-licensed care will be held in federal family detention facilities either within or outside of Michigan.

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF

### J.   The Rule Conflicts with Minnesota's Child Welfare Policy, Licensing, and Enforcement

248.   The State of Minnesota's public policy affirms the importance of family integrity. For example, Minnesota Statutes, section 260C recognizes the importance of "preserv[ing] and strengthen[ing] the child's family ties whenever possible and in the child's best interests."  Minn. Stat. § 260C.001, subd. 2(b)(3). In Minnesota, children who cannot safely remain in their familial home may be placed in family foster care or a group residential facility.  Children taken into custody "shall be detained in the least restrictive setting consistent with the child's health and welfare and in closest proximity to the child's family as possible."  Minn. Stat. § 260C.181, subd. 2.

249.   The Minnesota Department of Human Services is exclusively responsible for licensing child residential care facilities and foster care placements. The Minnesota Department of Human Services has authority to monitor licensed entities as part of a licensing investigation or licensing inspection, and may issue an order of conditional license or order of revocation.  *See* Minn. Stat. §§ 245A.04, subd. 1(h); 245A.04, subd. 5; 245A.075(a).

250.   To prevent harm to children in out-of-home care, the Minnesota Department of Human Services requires that caregivers, including caregivers in group residential facilities, comply with training requirements and conducts background studies on applicants for licensure.  "An applicant and license holder must have a program grievance procedure that permits persons served by the program and their authorized representatives to bring a grievance to the highest level of authority in the program."  Minn. Stat. § 245A.04, subd. 1(d).  And, "[t]he applicant must be able to demonstrate competent knowledge of the applicable requirements of this chapter and chapter 245C, and the requirements of other licensing statutes and rules applicable to the program or services for which the applicant is seeking to be licensed."  Minn. Stat. § 245A.04, subd. 1(e); *see also*

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Minn. Stat. § 245C.03 (regarding background studies).

251.   Minnesota Statutes, section 245A.03, subdivision 1, prohibits persons and entities from operating residential or nonresidential programs without a license.

252.   Minnesota law requires that children in residential facilities be guaranteed particular services, rights, freedoms, or oversight unavailable under the Rule or ICE's Residential Standards, including:

a.   "The license holder must have discipline policies and procedure that require the resident's abuse history and developmental, cultural, disability, and gender needs be taken into consideration when deciding the disciplinary action to be taken with a resident."  Minn. R. 2960.0080, subp. 5.  Punishment shall not be imposed for "lapses in toilet habits, including bed wetting and soiling."  Minn. R. 2960.0080, subp. 5(A)(3).  The use of timeout as a punishment has specific requirements that must be satisfied. Minn. R. 2960.0080, subp. 5(D).

b.   Bedrooms with foster children must have two exits.  Minn. R. 2960.3040, subp. 2.

253.   Under Minnesota law, secure detention facilities are physically restraining facilities, including jails, hospitals, state institutions, residential treatment centers, and detention homes.  Minn. Stat. § 260C.007, subd. 29.  Other than temporary (24-hour) custody, placement in a secure detention facility is generally not authorized for children absent an allegation of criminal activity.

254.   Minnesota does not have a statutory or regulatory licensing scheme for facilities that detain family units with adult parents or guardians.  Accordingly, there are no such detention facilities in Minnesota.

255.   By creating an alternate licensing scheme to allow family detention in locked facilities in Minnesota—to be overseen by a federal contractor rather than the Minnesota Department of Human Services and with standards falling far short

of those required for dependent children under Minnesota law—the Rule undermines Minnesota's ability to enforce its state laws and procedures for ensuring child welfare.

256. In addition, because of the Rule, children who otherwise may have been placed in Minnesota-licensed care will be held in federal family detention facilities either within or outside of Minnesota.

### K. The Rule Conflicts with Nevada's Child Welfare Policy, Licensing, and Enforcement

257. Nevada has a significant interest in ensuring the health, safety, and well-being of all children, including those in child care facilities. To advance this interest, Nevada has a robust and comprehensive regulatory regime to license child care facilities, including child care institutions. Nevada prioritizes placing children in the least restrictive setting possible that is best for the child, prioritizing placement with relatives and foster homes before child care institutions. Nev. Rev. Stat. § 432B.390.

258. To prevent predictable harm to children in care, Nevada provides orientation prior to licensure, screens applicants, performs background checks, and inspects child care institutions. Nevada has the authority to investigate complaints and enforce standards. Specifically, upon receiving an application for licensure, Nevada investigates the premises of the facility, qualifications and background of all employees, method of operation of the facility, and "policies and purposes" of the applicant. Nev. Rev. Stat. § 432A. 170. Nevada requires child care employees to complete training on child abuse and neglect; care, education and safety of children; and child wellness related to nutrition and physical activity. *Id*. §§ 432A.1775; 432A.1776. Any Nevada-licensed emergency shelter must have policies related to the administration of medication and medical treatment for children. *Id*. § 432A.1757. Such emergency shelters must treat each child in accordance with the child's gender identity or expression. *Id*. § 432A.1759.

259.   Nevada's Chief Medical Officer must inspect all areas where food is prepared and served, bathrooms, areas used for sleeping; and common and outdoor areas used by children at least annually.  Nev. Rev. Stat. § 432A.186.  If the child care institution violates any regulations or standards, Nevada may impose administrative penalties, limit the occupancy, appoint temporary management, or suspend the license until the violation are corrected.  *Id.*

260.   Nevada prohibits persons and entities from operating child care institutions without a license from the Division of Public and Behavioral Health of the Nevada Department of the Health and Human Services.  *See* Nev. Rev. Stat. § 432A.131.  Operation without a license can lead to criminal prosecution and/or civil proceedings.  *See id.* §§ 432A.210; 432A.220.

261.   Nevada also requires child care institutions to obtain "or develop a complete social study of each child not later than 30 days after his or her admission."  *See* Nev. Admin. Code § 432A.450(1)(b).  Nevada ensures that this is done by ensuring a minimum ratio of two social workers for every 50 children in a child care institution.  *See id.* § 432A.445(1).  Nevada also requires each institution to make "the greatest use of small groups of persons to aid in developing the individuality of the child and helping him or her to attain a sense of personal identity."  *See id.* § 432A.450(2)(d).  Upon information and belief, these services are unavailable under ICE's Residential Standards and are not required by the Rule.

262.   Nevada does not have a statutory or regulatory licensing scheme for facilities that detain family units with adult parents or guardians.  Accordingly, there are no such facilities in Nevada.

263.   By creating an alternate licensing scheme to allow federal contractors to oversee family detention in locked facilities rather than the Nevada Division of Public and Behavioral Health and with standards far short of those required for dependent children under Nevada law, the Rule undermines Nevada's ability to enforce its state laws and procedures for ensuring child welfare.

264.   Additionally, because of the Rule, children who otherwise may have had Nevada-licensed care will be held in federal family detention facilities either within or outside of Nevada.

**L.   The Rule Conflicts with New Jersey's Child Welfare Policy, Licensing, and Enforcement**

265.   New Jersey's child welfare law declares that "the preservation and strengthening of family life is a matter of public concern as being in the interests of the general welfare."  N.J. Stat. Ann. § 30:4C-1(a).  When a child has been removed from her parent, the State must endeavor to place the child with a relative, in her own community, and with a sibling, if applicable.  *Id*. § 9:6B-4. To the extent that placement outside of the home is necessary, New Jersey law requires that the setting be "the least restrictive setting appropriate to the child's needs and conducive to the health and safety of the child," *Id*. § 9:6B-4(g), and the child must be free from physical or psychological abuse.

266.   New Jersey's Department of Children and Families licenses and oversees group homes, residential facilities, and shelters for children residing in the State.  The physical facilities must meet the rigorous standards issued by the State Office of Licensing, the New Jersey Uniform Construction Code, the New Jersey Fire Code, and the State Sanitary Code, which requires approval by municipal, county, or state health agencies.  If the facility poses a "serious or imminent hazard to the education, health, safety, well-being, or treatment needs of the children" a license will be denied.  N.J. Admin. Code §§ 3A:55-2.2; 3A:56-2.2.  Facilities must comply with background check, criminal history disclosures, and Child Abuse Registry Check and a license may be denied or terminated upon failure to comply.  The Department of Children and Families takes enforcement action on facilities that fail to meet its licensing standards or refuse to allow inspectors or investigators.

267.   The New Jersey Department of Children and Families is responsible for ensuring that state-licensed facilities meet the minimum requirements for

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

ensuring the education, health, safety, and well-being of children in their care. Group homes, residential facilities, and shelters in New Jersey are required to ensure that all school-age children receive educational programming in the local school district or through appropriate home instruction. All children in group homes and residential facilities must also have a comprehensive health plan, and the group home must ensure their medical, dental, metal health, and nutrition needs are met. Group homes are also required to maintain a visitation policy and must allow children to make free telephone calls. Many of these protections and services are not required by the Rule or ICE's Residential Standards.

268. Pursuant to its authority to license shelters, the New Jersey Department of Community Affairs approves licenses shelters for unaccompanied children, as well as shelter for mothers and babies, run by a private organization contracting with ORR. N.J. Stat. Ann. § 55:13C-5. Inspectors from the Department of Children and Families will accompany and provide technical assistance when inspecting centers providing care to unaccompanied children. New Jersey does not have a statutory or regulatory licensing scheme for facilities that detain family units. Accordingly, there are no such facilities in New Jersey.

269. These facilities must afford residents a "safe, healthful, and decent living environment that recognizes the dignity and individuality of the resident." N.J. Admin. Code § 5:15-3.1. Residents must be free from restraint or confinement and must be permitted to have visitors. Emergency shelters must also provide referral services for medical care, mental health care, and social services. All facilities with children are required to ensure that resident children attend school on a daily basis and are provided medical attention as necessary.

270. New Jersey law does not allow for the placement of children in locked facilities outside of the criminal justice and juvenile justice systems.

271. ICE's Residential Standards lack, and the Rule does not require, certain protections provided in New Jersey's parallel regulations for New Jersey

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF

programs operated under the auspices of and licensed by the Department of Children and Families and the Department of Community Affairs.

272.   By creating an alternate licensing scheme to allow family detention in locked facilities in New Jersey to be overseen by a federal contractor rather than the New Jersey Department of Children and Families and with standards well below those required for dependent children under New Jersey law, the Rule undermines New Jersey's ability to enforce its state laws and procedures for ensuring child welfare.

273.   In addition, because of the Rule, children who otherwise may have been placed in New Jersey licensed care and subject to New Jersey's more robust protections may be held in federal family detention facilities either within or outside of New Jersey and subject to lesser protections.

### M.   The Rule Conflicts with New Mexico's Child Welfare Policy, Licensing, and Enforcement

274.   New Mexico considers a child's health and safety of paramount concern and intends "that children in New Mexico be reared as members of a family unit."  N.M. Stat. Ann. § 32A-1-3.

275.   The New Mexico Children's Code was adopted in 1993 with the express purpose of providing "for the care, protection and wholesome mental and physical development of children" and established procedures to protect the statutory and constitutional rights of children in the State.  *ACLU of N.M. v. City of Albuquerque*, 992 P.2d. 866, 870 (N.M. 1999).

276.   New Mexico's "Children's Shelter Care Act," part of the State's Children's Code, governs standards of care for children in State custody when return to the child's family is not feasible or when intervention programs alone are inadequate for the child's care.  N.M. Stat. Ann. §§ 32A-9-1-7.  One purpose of the Children's Shelter Care Act is to address the problem that "many children are needlessly detained in secured facilities" when they "would benefit from either

1    immediate return to the family or placement in shelter-care homes or nonsecured

2    shelter-care facilities." *Id*. § 32A-9-2 (A).

3        277.   The New Mexico Children's Code provides for a continuum of

4    services for children and their families and is designed to provide culturally

5    sensitive services while reducing the overrepresentation of minority children in the

6    child care system.  N.M. Stat. Ann. § 32A-1-3.

7        278.   The Protective Services Division of New Mexico's Children, Youth

8    and Families Department is responsible for all child welfare services for children

9    and families in New Mexico.  Services are provided "in a setting most consistent

10   with the least restrictive alternatives." N.M. Code R. § 8.8.2.12.  Further, those

11   services are offered without regard to national origin, race, religion, color, ancestry,

12   sex, age, physical or mental handicap, serious medical condition, spousal affiliation,

13   sexual orientation or gender identity.  *Id.* § 8.8.2.9.

14       279.   The Children, Youth and Families Department licenses all children's

15   care facilities in New Mexico, including child shelter care facilities and other

16   residential facilities that house children.  The Children's Code's standards of

17   residential care for the placement of children are implemented by regulation with

18   the objective of establishing "minimum standards for licensing of residential

19   facilities that provide services in order to promote the health, safety and welfare of

20   children in need of such services" and to "assure that adequate supervision must be

21   provided at all times." N.M. Code R. § 7.8.3.6.

22       280.   Children's shelter-care regulations specify licensing, reporting, and

23   space and building requirements, as well as setting standards for medical care,

24   nutrition, housekeeping, waste disposal, and seclusion rooms, among other things.

25   N. M. Code R. § 7.8.3.2.  The regulations require shelter care for children to

26   "support, protect, and enhance the rights of children."  *Id*. § 7.8.3.28 (B)(7), (8).

27   The regulations also include rigorous requirements for staffing levels, staff

28   qualifications, staff training and evaluation, staff health certificates and criminal

background checks, and record-keeping. *Id.* §§ 7.8.3.30-.34. A facility that violates these regulations may have its license suspended or revoked, among other penalties. *Id.* § 7.8.3.7.

281. ORR facilities in New Mexico are also subject to the control of the Children, Youth and Families Department and New Mexico's shelter-care regulations. N. M. Code R. § 7.8.3.2.

282. ICE Residential Standards create alternate licenses that allow for housing migrant families, including their children, in locked facilities. New Mexico's regulatory scheme does not support detention of families with adult parents or guardians, and no family detention facility is located within the State.

283. Beyond what is required by ICE's Residential Standards or the Rule, New Mexico expressly requires that facilities provide each child "his/her own clearly identified toothbrush, comb, hair brush and other items for personal hygiene" and must provide a nutritious menu that does not repeat within a one-week cycle, in a setting that allows for children to "eat at a leisurely rate" encouraging socialization and a "pleasant mealtime experience." N. M. Code R. §§ 7.8.3.53, 7.8.3.55.

284. By creating an alternate licensing scheme to allow family detention in locked facilities in New Mexico—to be overseen by a federal contractor rather than CYFD and with standards far short of those required for dependent children under New Mexico law—the Rule undermines New Mexico's ability to enforce its state laws designed to ensure child welfare.

285. In addition, because of the Rule, children who otherwise might have been placed in New Mexico-licensed care will be held in federal family detention facilities either within or outside of New Mexico.

### N.  The Rule Conflicts with New York's Child Welfare Policy, Licensing, and Enforcement

286. Pursuant to Article XVII of its Constitution, New York State is

empowered to exercise its sovereign interest in protecting the health, safety, treatment, and training of dependent, neglected, or delinquent children placed within its borders. N.Y. Const. art. XVII, § 2.  The Division of Child Welfare and Community Services of the New York State Office of Children and Family Services oversees child welfare services within the state.

287.   The Office of Children and Family Services oversees programs that care for, place out, or board out children within the State.  N.Y. Soc. Serv. Law § 371(10).  The Office of Children and Family Services sets and enforces regulations to make sure that those children are cared for in safe and well-maintained facilities; are free from abuse or maltreatment; and are afforded appropriate education, health care, and other essential services.  *See* N.Y. Const. art. XVII; N.Y. Soc. Serv. Law §§ 34, 34-a.

288.   In New York, children must be placed in the "least restrictive and most homelike setting" possible where they can be maintained safely and receive the services specified in the foster child's service plan.  N.Y. Comp. Codes R. & Regs. tit. 18, § 430.11(d).

289.   Voluntary authorized agencies organized as not-for-profit corporations under New York State law may apply to operate congregate care facilities and foster family boarding homes.  With respect to all licensing applicants, the Office of Children and Family Services engages in a comprehensive review that includes: the background and appropriate experience of the executive director, board of directors, and other relevant personnel and the fitness and adequacy of any proposed facility or program.

290.   Once a voluntary authorized agency is licensed, it must receive additional approval in the form of an operating certificate to open a congregate care program or foster family home certification program.  The Office of Children and Family Services requires the same application process of voluntary authorized agencies and conducts the same review for issuance of an operating certificate to an

ORR-funded program as it does for any other congregate care program or foster family home certification program in New York.

291.   In keeping with the Office of Children and Family Services' broad authority over the inspection and supervision of residential programs, each potential program receives a robust review pursuant to a variety of subject areas, including: the adequacy of the physical facility; the education, recreation, health, and medical services to be provided to children in care; compliance with background check requirements for staff to promote safety; and residents' privacy rights.

292.   Following the issuance of an operating certificate, the Office of Children and Family Services conducts comprehensive reviews for voluntary authorized agencies running congregate care programs and certifying foster family boarding homes.  Monitoring includes quarterly site visits; additional announced or unannounced onsite visits; and investigation of complaints.  The Office of Children and Family Services enforces standards through notices of deficiency, heightened monitoring, fines, and civil penalties that can lead to license revocation and further legal action should a party elect to appeal the revocation of a license.

293.   Though the Office of Children and Family Services' licensing authority largely concerns facilities where children reside away from their parents, its authority and interests also include programs where parents reside with their children.  Such programs specifically include (1) minor parent and baby programs for minor parents who are in foster care, N.Y. Comp. Codes R. & Regs. tit. 18, § 442.17; (2) residential programs for victims of domestic violence and their minor children, *id*. § 452.2 *et seq.*; and (3) supervised independent living programs which are independent living situations with minimum supervision by staff to provide a transitional experience for up to four older youth including their children.  *Id.* § 449.1-8.  Therefore, the federal government's assertions  that ". . . States generally do not have licensing schemes for facilities to hold minors who are together with their parents or legal guardians, and therefore by definition are not

'dependent children'" is patently incorrect.  83 Fed. Reg. 45,486, 45488; *see also* 84 Fed. Reg. 44,392, 44,394.  Notwithstanding, New York does not have a statutory or regulatory licensing scheme for facilities that detain family units.  Accordingly, there are no family detention facilities within New York State.

294.   New York currently licenses and monitors eleven voluntary authorized agencies in New York State that provide care to children in ORR custody.

295.   New York prohibits persons and entities from operating foster care agencies without the required license and operating certificate, which includes congregate care programs and foster family boarding home licensing agencies. *See, e.g.*, N.Y. Soc. Serv. Law §§ 371, 460-a, 460-b.  The operation of such facilities without approval by the Office of Children and Family Services can lead to civil proceedings. *Id*. § 460-a.

296.   In New York, placement in a secure facility is limited to youth who have a juvenile criminal conviction and are serving a sentence arising out of that conviction.  N.Y. Comp. Codes R. & Regs. tit. 9, §§ 180-1.1–180.1.21, 180-3.1–180-3.32, and *id*. tit. 18 §§ 450.1–450.10.

297.   Neither the Rule nor ICE Residential Standards allow children the independence mandated by the reasonably prudent parent standard set forth by New York law. *See* N.Y. Comp. Codes R. & Regs. tit. 18, § 441.25.  Consequently, children that would otherwise be able to leave a congregate care facility under New York law in order to engage in self-directed activities such as competitive athletics, after-school volunteering, or employment would be prohibited from doing so in federal family detention under the Rule, impeding their growth and development into productive young adults.

298.   In light of the foregoing distinctions, this alternate federal licensing scheme would subject families detained in locked facilities within the State of New York to conditions and standards far short of those required for dependent children under New York State law, while preventing New York from monitoring and

enforcing its own child welfare standards.  This will undermine New York's ability to enforce its state laws and procedures for ensuring child welfare.

299.   Additionally, because of the Rule, children who otherwise would have been placed in New York-licensed care facilities may be held in federal family detention facilities either within or outside of New York.

## O.   The Rule Conflicts with Oregon's Child Welfare Policy, Licensing, and Enforcement

300.   The State of Oregon has statutorily codified a number of deeply-rooted public concerns regarding the care and protection of children within its boundaries. Oregon recognizes the intrinsic value of family relationships and has declared there is a "strong preference" that children live "with their own families."  Or. Rev. Stat. § 419B.090(5).  Custody determinations are based on the best interest of the child, including "[t]he emotional ties between the child and other family members" as well as "[t]he desirability of continuing an existing relationship."  *Id.*

301.   When substitute care is required, Oregon law requires that the child's placement be the "most home-like, least restrictive available to meet the needs of the child or young adult."  Or. Admin. R. 413-070-0625(1)(g).  Pursuant to the federal Social Security Act, Oregon has adopted a case review system to ensure "placement in a safe setting that is the least restrictive (most family-like) and most appropriate setting available and in close proximity to the parent's home."  42 U.S.C. § 675(5)(A).

302.   Oregon law limits the use of detention for children to instances where the child is alleged to have committed an act that is a violation of a law or ordinance, has been found to be under the jurisdiction of the juvenile court, or is an out-of-state runaway.  *See* 2019 Or. Laws, ch. 362.

303.   Oregon recognizes that children have a right to "freedom from. . . emotional abuse or exploitation."  Or. Rev. Stat. § 419B.090(1).  In addition, "[i]t is the policy of the State of Oregon to safeguard and promote each child's right to

safety, stability and well-being and to safeguard and promote each child's relationships with parents, siblings, grandparents, other relatives and adults with whom a child develops healthy emotional attachments." *Id*. § 419B.090(3).

304.    The Oregon Department of Human Services licenses child-caring agencies in Oregon, including a facility offering residential care and support services on contract with ORR.  Or. Rev. Stat. § 418.215.  Such a facility caring for immigrant children is defined as a child-caring agency.  *Id*. § 408.205(2)(a)(A). The Oregon Department of Human Services supervises and inspects all child-caring agencies in Oregon.  *Id*. § 418.225.

305.    In order to issue a license, the Oregon Department of Human Services must ensure that a child-caring agency is or will be in full compliance with the requirements to: ensure child and family rights, comply with all applicable abuse reporting and investigation requirements, apply appropriate behavior management techniques, provide adequate furnishing and personal items for children, provide appropriate food services, ensure the safety of children, use approved procedures and protocols for the use of medications for children, and provide access to a child receiving services to the Department of Human Services, the child's attorney, any governmental agency having a contract with the child-caring agency, or any other person authorized by the Department.  Or. Rev. Stat. § 418.240(2)(a); *see also* Or. Admin. R. 413-215-0001(4).  In addition, the Department may suspend, revoke, or place conditions on a license if the agency is not in compliance with any one of these requirements. Or. Rev. Stat. § 418.240(2)(b).

306.    Additionally, a child-caring agency must afford children in care the right to: (1) uncensored communication with caregivers, caseworkers, legal guardians, legal representatives, and others approved by the legal guardian or court order; (2) privacy; (3) participate in service or educational program planning; (4) fair and equitable treatment; (5) file a grievance; (6) adequate and personally exclusive clothing; (7) personal belongings; (8) an appropriate education;

(9) participate in recreation and leisure activities; and (10) timely access to physical and behavioral health care services.  Or. Admin. R. 413-215-0046(1).

307.   The Oregon Department of Human Services is required to investigate all reports of abuse, deficiencies, violations or failures to comply with the full compliance requirements in section 418.240(2)(a), and take appropriate action, with concern given to the health, safety, and welfare of the children for whom the child-caring agency is responsible.  Or. Rev. Stat. § 418.260.

308.   Operating a child-caring agency without a license is a Class A misdemeanor.  Or. Rev. St. § 418.990(3).  In addition, the Oregon Department of Human Services may impose a civil penalty on any child-caring agency that operates without a license.  *Id.* § 418.992(1)(d).

309.   A child-caring agency in Oregon must assure the child's right to participate in recreation and leisure activities.  Or. Admin. R. 413-215-0046(1)(i). An agency providing residential care must ensure a child has the ongoing opportunity to participate in at least one age-appropriate or developmentally appropriate activity.  *Id.* at 413-215-0554(2).

310.   Oregon does not have a statutory or regulatory licensing scheme for facilities that detain family units with adult parents or guardians.  Accordingly, there are no such facilities in Oregon.

311.   By creating an alternate licensing scheme to allow family detention in locked facilities in Oregon—to be overseen by a federal contractor rather than the Oregon Department of Human Services and with standards far short of those required for dependent children under Oregon law—the Rule undermines Oregon's ability to enforce its state laws and procedures for ensuring child welfare.

312.   In addition, because of the Rule, children who otherwise might have been placed in Oregon-licensed care will be held in federal family detention, either within or outside of Oregon.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

### P. The Rule Conflicts with Pennsylvania's Child Welfare Policy, Licensing, and Enforcement

313.   Pennsylvania has licensed and monitored residential placements for children as part of its child welfare system since 1967.

314.   The Pennsylvania Department of Human Services has supervision over all not-for-profit "children's institutions," for-profit "boarding homes for children," and for-profit "child care centers" within the Commonwealth.  62 Pa. Cons. Stat. §§ 902, 901, 1001, 1002.  The facilities include those that have contracts with ORR to provide housing to unaccompanied children in federal custody.

315.   These facilities cannot operate without a certificate of compliance issued by the Pennsylvania Department of Human Services.  55 Pa. Code §§ 20.21, 20.51, 3800.11.  As part of its enforcement and oversight authority, the Department conducts annual inspections, as well as unannounced and complaint-based inspections.  *Id.* §§ 20.33, 3800.4.  The Department may revoke or decline to renew a certificate of compliance for failure to comply with Pennsylvania regulations; failure to submit or adhere to a plan of correction; mistreatment or abuse of clients; and gross incompetence, negligence, or misconduct, among other grounds.  *Id.* § 20.71.  The Department may also issue provisional certificates of compliance if a facility is in substantial but not complete compliance with applicable statutes, ordinances, and regulations.  *Id.* § 20.54.  Provisional certificates cannot exceed six months.  *Id.*

316.   Pennsylvania regulations set out minimum standards "to protect the health, safety and well-being of children receiving care in a child residential facility."  55 Pa. Code § 3800.1; *see generally id.* § 3800.

317.   In addition to established civil rights under law, Pennsylvania regulations detail the specific rights guaranteed to each child, including the right to: be treated with dignity and respect; be free from discrimination and abuse; visitation and communications with family, legal counsel, and clergy; freedom from

unreasonable search and seizure; appropriate medical, behavioral health, and dental treatment; be free from "excessive medication"; be free from "unusual or extreme methods of discipline which may cause psychological or physical harm to the child"; and the right to clean, seasonal clothing that is age and gender appropriate. 55 Pa. Code § 3800.32. Children cannot be deprived of these rights, nor can rights and visitation be used as a reward or sanction. *Id.* § 3800.33.

318. Pennsylvania regulations also establish minimum standards in a wide range of areas to ensure child health and safety: consent to medical treatment of the child (55 Pa. Code. § 3800.19); production and confidentiality of each child's record (55 Pa. Code §§ 3800.21, 3800.241–3800.245); notification of the child's rights, including the right to lodge grievances without retaliation (55 Pa. Code § 3800.31); staffing (55 Pa. Code §§ 3800.51–3800.58); accommodation of children with disabilities (55 Pa. Code § 3800.81); healthy and safe physical sites (55 Pa. Code §§ 3800.81–3800.106); minimum bedroom size (55 Pa. Code § 3800.102); indoor activity space and separate recreation space (55 Pa. Code §§ 3800.98, 3800.99); fire safety (55 Pa. Code §§ 3800.121–3800.132); written health and safety assessment within 24 hours of admission, and written plan to protect the child if necessary (55 Pa. Code §§ 3800.141–3800.142); health examination within 15 days of admission (55 Pa. Code § 3800.143); dental, vision, hearing, health, behavioral, and emergency medical care (55 Pa. Code §§ 3800.144–3800.146, 3800.148, 3800.149); nutrition, including three meals a day (55 Pa. Code §§ 3800.161–3800.164); safe transportation (55 Pa. Code § 3800.171); administration of medications (55 Pa. Code §§ 3800.181–3800.189); use of restrictive procedures, including general prohibitions on seclusion and manual restraints, and a general prohibition on chemical restraints absent an emergency and an order from a licensed physician (55 Pa. Code §§ 3800.201–3800.213); development of an individual service plan for each child's care and treatment needs (55 Pa. Code §§ 3800.221–3800.230); additional requirements for facilities serving

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF

nine or more children (55 Pa. Code §§ 3800.251–3800.257); and secure care, including a general prohibition unless the child is alleged or adjudicated delinquent (55 Pa. Code §§ 3800.271–3800.274).

319.   Pennsylvania does not have a statutory or regulatory licensing process for facilities that detain children with their adult parents or legal guardians.

320.   By creating an alternate scheme that would allow family detention facilities in Pennsylvania to be overseen by a federal contractor with standards short of those required for dependent children under Pennsylvania's law, the Rule infringes on Pennsylvania's inherent police power to license and regulate facilities that care for dependent children and undermines Pennsylvania's ability to enforce its state laws and procedures for ensuring child welfare.

321.   In addition, DHS may eventually attempt to use the Rule to continue operating Berks County Residential Center as a family detention center without a state license.

### Q.   The Rule Conflicts with Rhode Island's Child Welfare Policy, Licensing, and Enforcement

322.   Rhode Island, as a matter of policy, finds that parents have the primary responsibility for meeting the needs of their children, and the state has an obligation to help them discharge this responsibility or to assume this responsibility when parents are unable to do so . . . ".  R.I. Gen. Laws § 42-72-2(1).  Rhode Island holds "a basic obligation to promote, safeguard and protect the social well-being and development of the children of the state through a comprehensive program providing for," *inter alia*, "facilities for children who require guidance, care, control, protection, treatment, or rehabilitation" and "[t]he setting of standards for social services and facilities for children." *Id*. § 42-72-2(2).

323.   Rhode Island state law provides for the Children's Bill of Rights, codified at title 42, chapter 72, section 15 of the Rode Island General Laws, which mandates that each child be treated in a humane and respectful manner with full

consideration for the child's personal dignity and right to privacy.  Moreover, the regulations promulgated pursuant to the Children's Bill of Rights set standards to ensure that all agencies create safe, clean, healthy, and emotionally supportive environments where every child receives the least intrusive, most clinically appropriate intervention.

324.   Pursuant to Rhode Island General Laws, title 42, chapter 72.9, *et seq.*, commonly known as the "Children's Right to Freedom From Restraint Act," it is the policy of the State of Rhode Island to ensure that children are placed in the least-restrictive setting.

325.   Rhode Island prohibits the provision of full-time care apart from the child's parents, including in residential child care facilities, without a license.  R.I. Gen. Laws § 42-72.1-4(a).

326.   Rhode Island's Department of Children, Youth, and Families is the agency responsible for the licensing of residential child care facilities and group homes (the characteristics of the group homes licensed by Rhode Island are diverse; each group home setting differs based on the characteristics of the group served and the needs of each group).

327.   For those who wish to receive a license to operate a child day care center or a group family day care home, an application must be submitted to the Department of Children, Youth, and Families.  *See* R.I. Gen. Laws § 42-72.1-5(2)(b)-(c).  As part of the application process, a facility must submit documentation including criminal history affidavits for all operators and employees, as well as criminal records checks; behavior management and crisis intervention policies; restraint and seclusion policies; documentation of completion of training in crisis intervention, restraint, and seclusion; and documentation of licensure of the clinical supervisor or director, confirming that they are a licensed practitioner of the healing arts.

328.   In order to enforce its licensing requirements, Rhode Island's

Department of Children, Youth, and Families may investigate any complaint alleging a violation of the Residential Child Care Regulations for Licensure, which is referred to the Licensing Division for investigation.

329.   If the facility does not correct a violation, the Licensing Administrator may initiate action to suspend, revoke or continue the license on Probationary Status.  214-40 R.I. Code R. § 00-4.2.4(A).  Rhode Island's Department of Children, Youth, and Families is also empowered to investigate complaints that allege a child has been abused and/or neglected in a facility, with such complaints referred to Child Protective Services.  *Id.* § 00-4.2.4(B).  In order to enforce its licensing provisions appropriately, the Department of Children, Youth, and Families is legally authorized to assess administrative penalties for violations.  R.I. Gen. Laws § 42-72.11-7.  In addition, the Licensing Administrator may also, after notice and a hearing on alleged violations, revoke a license, or suspend the license for a period not exceeding six months.  *Id*. § 42-72.1-6.

330.   The rights and privileges available to Rhode Island children, including immigrant children physically present in Rhode Island, as outlined above, are not required by the Rule and are currently unavailable to those same children under ICE's Residential Standards.

331.   Rhode Island does not have a statutory or regulatory licensing scheme for facilities that detain family units with adult parents or guardians.  Accordingly, there are no such facilities in Rhode Island.

332.   By creating an alternate licensing scheme to allow family detention in locked facilities in Rhode Island—to be overseeing by a federal contractor rather than the Rhode Island Department of Children, Youth, and Families and with standards far short of those required for dependent children under Rhode Island law—the Rule undermines Rhode Island's ability to enforce its state laws and procedures for ensuring child welfare.

333.   In addition, because of the Rule, children who otherwise may have

been placed in Rhode Island-licensed care under the supervision of the Department of Children, Youth, and Families will be held in federal family detention facilities either within or outside of Rhode Island.

### R. The Rule Conflicts with Vermont's Child Welfare Policy, Licensing, and Enforcement

334.   The State of Vermont has a fundamental, sovereign interest in the welfare of children and families.  Vermont has the authority and obligation to intervene where children are "without proper parental care or subsistence, education, medical, or other care necessary for [their] well-being."  Vt. Stat. Ann. tit. 33, § 5102(3)(B).  That duty includes bearing "such expenses for the proper care, maintenance, and education of a child, including the expenses of medical, surgical, or psychiatric examination or treatment" as deemed necessary in connection with juvenile care proceedings.  *Id*. § 5116(a).  Vermont strives to place children in community-based placements before placing children in group care or out-of-state facilities.

335.   Where children require foster care, Vermont strives to ensure their placement in a healthy, loving environment through strict licensing requirements. *See* Vt. Stat. Ann. tit. 33, § 4905; 12-3 Vt. Code R. § 508.  No license to operate a child residential care facility can be issued until an application is submitted to the Department of Children and Families and the Residential Licensing Unit conducts an inspection of the facility, assesses it for compliance with licensing regulations, and provides any needed consultation.  Facilities are required to conduct background checks, including checks of the Vermont Criminal Information Center, the Vermont Child Protection Registry, and the Adult Abuse Registry, and maintain documentation to be made available to licensing upon request.  *Id*. § 12-3-508:412, 413.  Once a license is issued, the Residential Licensing Unit of the Department of Children and Families has the right to enter and inspect the facility and to interview any employee of the program or child in its care.  *Id*. § 12-3-508:102-03.  In

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF

addition, the facility must cooperate fully in investigations of any complaint or allegation associated with the program.  *Id.* § 508:121.

336.   For youth charged with delinquencies or adjudicated delinquent, before a youth can be placed in a secure facility, Vermont requires a finding from either a court or an administrative hearing officer that no other suitable placement is available and that the child presents a risk of injury to himself or herself, to others, or to property.  Vt. Stat. Ann. tit. 33 § 5291.

337.   Vermont prohibits persons and entities from operating community care facilities, which includes child residential treatment programs and the foster family agencies that place children in resource family homes, without a license. *See*, *e.g.* Vt. Stat. Ann. tit. 33, § 2851; 12-3 Vt. Code R. §§ 500, 508:101.

338.   Neither the Rule nor ICE's Residential Standards require the development of individualized plans to support each child's development, as required by the Flores agreement and Vermont law.

339.   Neither the Rule nor ICE's Residential Standards allow children independence appropriate to their age, maturity, and capability—including the right to leave the facility in which they are housed—as required by Vermont law.

340.   Vermont does not have a statutory or regulatory licensing scheme for facilities that detain family units.  Accordingly, there are no such facilities in Vermont.

341.   By creating an alternate licensing scheme to allow family detention in locked facilities in Vermont—to be overseen by a federal contractor rather than the Vermont Department of Children and Families and with standards far short of those required for dependent children under Vermont law—the Rule undermines Vermont's ability to enforce its state laws and procedures for ensuring child welfare.

342.   In addition, because of the Rule, children who otherwise may have been placed in Vermont-licensed care will be held in federal family detention

facilities either within or outside of Vermont.

**S.    The Rule Conflicts with Virginia's Child Welfare Policy, Licensing, and Enforcement**

343.   As a matter of state policy, Virginia seeks to ensure that its child welfare system promotes the safety, permanency, and well-being of children and families in Virginia.  As part of its longstanding child welfare system, Virginia maintains a comprehensive licensing scheme for all placements used to house children within its boundaries, which is contained in Title 63.2 of the Code of Virginia and Title 22 Agency 40 of the Virginia Administrative Code.  While Virginia seeks to prevent or eliminate the need for out-of-home placements of children, any out-of-home placement of children must be in the "least restrictive, most family like setting consistent with the best interests and needs of the child." 22 Va. Admin. Code § 40-201-40(B)(2).  Placement in residential care must be consistent with the documented needs of the child and the most appropriate placement to meet those needs.  Family-centered and community-based services, practices, and supports should be provided for the child to maintain permanent connections with his or her family, with relationships important to the child, and with the community.

344.   The Virginia Department of Social Services is the state agency that administers the child welfare program in Virginia.  The Virginia Department of Social Services is responsible for ensuring the safety and well-being of children placed in out-of-home care facilities.  Its responsibilities include licensing, monitoring, and enforcing standards for children's residential facilities, child-placing agencies, and independent foster homes.  These functions include (1) conducting background checks for residential employees and volunteers and individuals residing in foster and adoptive homes, (2) issuing licenses or advising of denial, (3) conducting unannounced inspections to determine compliance, (4) investigating complaints and suppressing illegal operations, (5) enforcement

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF

action as warranted, (6) training for license applicants and licensed providers, (7) providing compliance support and assistance, and (8) processing variance requests. Local departments of social service investigate reports of child abuse and neglect in regulated care. Failure to maintain substantial compliance with standards or applicable requirements of the Code of Virginia constitutes grounds for revocation of a license.

345.    Virginia's oversight of facilities providing care to children includes at least two licensees that serve unaccompanied immigrant children pursuant to contracts with ORR. These licensees house unaccompanied immigrant youth in a temporary emergency shelter and provide placements in foster homes.

346.    Virginia prohibits persons and entities from operating community care facilities, which include children's residential facilities, child-placing agencies that place children in foster homes or independent living arrangements, and independent foster homes, without a license. Va. Code Ann. § 63.2-1701.

347.    Virginia law requires children's residential facilities to develop and maintain individualized service plans, provide case management services, structured program of care, and mother/baby programs not required by the Rule and unavailable under ICE's Residential Standards.

348.    Virginia does not license secure facilities for the detention of dependent children. However, Virginia maintains regulatory standards that protect the rights of children detained in secure facilities. Virginia law requires secure juvenile detention facilities to develop and maintain individualized service plans, provide case management services, and progress reports not required by the Rule and unavailable under ICE's Residential Standards. Accordingly, Virginia youth in juvenile justice detention facilities enjoy rights that would be unavailable to children detained in federal family detention facilities.

349.    Virginia does not have a statutory or regulatory licensing scheme for facilities that detain family units with adult parents or guardians. During a period

of detention authorized by the juvenile justice system, Virginia prohibits the confinement of any child in any detention facility that detains adults.  Va. Code Ann. § 16.1-247.  Accordingly, there are no such facilities in Virginia.

350.   By creating an alternate licensing scheme to allow family detention in locked facilities in Virginia—to be overseen by a federal contractor rather than the Virginia Department of Social Services and Virginia Department of Juvenile Justice and with standards far short of those required for dependent children under Virginia law—the Rule undermines Virginia's ability to enforce its state laws and procedures for ensuring child welfare.

351.   In addition, because of the Rule, children who otherwise may have been placed in Virginia-licensed or state-regulated care will be held in federal family detention facilities either within or outside of Virginia.

## T.   The Rule Conflicts with Washington's Child Welfare Policy, Licensing, and Enforcement

352.   In Washington State, legislative policies concerning children unambiguously promote the best interests of the child.  *See, e.g*, Wash. Rev. Code § 26.09.002 (child's best interests is standard for court evaluating parenting determinations); *id*. § 13.34.020 (child's best interests and rights to nurturing, health, and safety are paramount and trump parental legal rights); *id*. § 13.43.136 (out of home child placements and permanency plans are driven by the best interests of the child; child placements should promote continuity of schooling, neighborhood unless child's best interests require otherwise).  Washington's Department of Children, Youth, and Families was recently created to be a comprehensive agency exclusively dedicated to the social, emotional and physical well-being of children, youth, and families.  As Washington's newest agency, the Department of Children, Youth, and Families oversees several services previously offered through the state Department of Social and Health Services.

353.   Washington policy prohibits the use of restrictive out of home

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF

placements for children except under circumstances where the child's safety is at risk or where the child is involved with the juvenile justice system.  Even in the latter situation, the Department of Children, Youth, and Families promotes the least restrictive placement.  For example, the Department of Children, Youth, and Families' Office of Juvenile Justice works to eliminate the placement of non-offending youth (such as a dependent or neglected child) and status offenders (such as a runaway or truant) in secure facilities within the State.  Likewise, the Washington State Partnership Council on Juvenile Justice has adopted the Annie E. Casey Foundation's Juvenile Detention Alternatives Initiative (JDAI).  The JDAI, which recognizes the permanent damage to children that incarceration entails, promotes safely keeping youth in their homes, schools, and communities rather than in secure facilities.

354.   Where children are placed in non-secure residential facilities outside the care of their parents, Washington safeguards the health, safety, and well-being of children by ensuring that agencies meet the minimum standards for the care of children.  The Washington legislature has authorized the Department of Children, Youth, and Families to establish minimum licensing requirements for agencies and individuals, and to regulate the licensure of these child care facilities.  Wash. Rev. Code § 74.15.030.  The Department of Children, Youth, and Families' paramount concern and obligation is to "safeguard the health, safety, and well-being of children."  *Id.* § 74.15.010(1).  The Department of Children, Youth, and Families is charged with ensuring that licensed facilities meet the needs of children in their care, including children placed there by ORR.

355.   Washington law requires that any facility that "receive[s] children . . . for care" away from their parents must be licensed.  Wash. Rev. Code § 74.15.090. Washington's detailed licensing scheme governs: (a) the licensing process; (b) minimum staff qualifications; (c) staff training and professional development, (d) facility environment and space, including toilet and bathing facilities, indoor

and outdoor recreation areas, bedrooms, laundry facilities, and premises security; (e) elements of daily care including youth supervision, transportation, personal belongings, hygiene, food and meals, special diets, medical care, and discipline; (f) records management and reporting obligations; and (g) the license complaint and revocation processes.  Wash. Admin. Code §§ 110-145-1310 -1885.

356.   The Department of Children, Youth and Families conducts periodic licensing visits and youth interviews at youth group care facilities to ensure that the facility is providing a "healthy, age-appropriate home-like environment" that identifies and meets the "medical, psychological, physical and developmental needs" of children placed in their care.  Wash. Admin. Code §§ 110-145-1745, 110-145-1350.  Licensing visits verify that licensed group care facilities are aware of and provide for the cultural, social, and emotional needs of the children in their care.  Licensors also confirm that licensees consider the religious, educational, and recreational needs of youth.

357.   Youth group care facilities that are licensed in Washington are required to accord the Department of Children, Youth and Families "the right of entrance and the privilege of access to and inspection of records for the purpose of determining whether or not there is compliance with the provisions of [Washington's child welfare laws]." Wash. Rev. Code § 74.15.080.  Washington's licensing rules require that the Department of Children, Youth and Families must have access "to your facility, staff, and the children in your care at any time." Wash. Admin. Code § 110-145-1350.

358.   Washington does not have a similar statutory or regulatory licensing scheme for facilities that house family units.  Accordingly, there are no such facilities in Washington.  The Rule and ICE's Residential Standards do not address the needs of children in care with the same protections as those provided by Washington.

359.   By creating an alternate licensing scheme to allow family detention in

locked facilities in Washington—to be overseen by a federal contractor rather than the Department of Children, Youth and Families with standards far short of those required for dependent children under Washington law—the Rule undermines Washington's ability to enforce its state laws and procedures for ensuring child welfare.

360.   In addition, because of the Rule, children who otherwise may have been placed in Washington-licensed care will be held in federal family detention facilities either within or outside of the state

## VIII.   HARMS TO CHILDREN AND FAMILIES IN DETENTION RESULTING FROM THE RULE WILL BE BORNE BY THE STATES

361.   Every year thousands of children and adults are released from immigration detention and become residents of the States, who in turn provide services and support to the new aspiring Americans.  The harm children and their parents will suffer as a result of the Rule will be borne in part by the States and local communities that will welcome them as new residents.

362.   In the 2017 fiscal year, almost 15,000 immigrant children arriving with their families who spent time at one of ICE's family detention facilities received positive credible fear determinations and were released from federal custody.  *See* Apprehension, Processing, Care, and Custody of Alien Minors and Unaccompanied Alien Children, 83 Fed. Reg. 45486, 45519 (proposed Sept. 7, 2018).

### A.   California

363.   Every year thousands of children are released from immigration detention and reunified with family members or other adult sponsors in California. These children become residents of the State, attend California schools and, in some cases, grow into adults raising their own families.

364.   More unaccompanied immigrant children have been placed in California than in any other state in the country since Fiscal Year 2015, including 7,381 children in Fiscal Year 2016, 6,268 children in Fiscal Year 2017, 4,655

children in Fiscal Year 2018, and 6,347 children as of June 2019 in Fiscal Year 2019.

365.   California reasonably believes that immigrant families who are held in family detention facilities under the Rule and obtain protection from deportation will settle in California upon their release from federal custody.

366.   Aware of the trauma that that families fleeing persecution have faced, California has adopted policies and programs to support immigrant families and children.  As such, immigrant children arriving in California, including those that ICE holds in family detention facilities, have access to a number of state-funded resources.

367.   All children in California, including immigrant children, are entitled to a free public education.  Per pupil expenditures in 2017-18 exceeded $14,000 per child from all funding sources.  Of this total, over 91% came from state and local resources.  Schools throughout California also offer services that help their students, including immigrant children, cope with trauma.  For example, the Los Angeles Unified School District's School Mental Health department employs over 400 psychiatric social workers, psychiatrists, and support staff.  These individuals partner with educational professionals to address barriers that prevent students from learning to optimize their academic achievement, including the impact of trauma on a child's educational achievement.

368.   The California Department of Public Health administers health and mental health programs that are accessible to immigrants.  Its Office of Health Equity (OHE) is charged with aligning state resources and programs to achieve the highest level of health and mental health for all people with special attention to those in vulnerable communities, which by statute includes immigrants and refugees.  OHE also administers the Mental Health Services Act-funded California Reducing Disparities Project, which seeks to improve mental health outcomes in unserved, underserved, and inappropriately served communities that include

immigrants and refugees.

369.   California's Refugee Programs Bureau, which is part of the Immigration and Refugee Programs Branch of the California Department of Social Services, also provides assistance to newly arrived refugees to support long term social and economic integration.  In fiscal year 2017, at least 12,058 refugees arrived in California, and received assistance from the State in the form of nutrition aid, cash assistance, employment services, immigration legal services, medical services, and educational support.  The Bureau administers the Unaccompanied Refugee Minors (URM) Program, the Refugee School Impact Grant (RSIG), and the California Newcomer Education and Well-Being (CalNEW), three programs exclusively for children.  Through RSIG and CalNEW, the RPB funds programs in schools to provide supplementary educational and social adjustment support services including academic, English-language acquisition, and mental and well-being supports.  CalNEW is funded exclusively by the State.

370.   California will continue to welcome immigrant children to the State, and children who are subjected to prolonged and indefinite family detention under the Rule will continue to settle in California.  The psychological and developmental harms suffered by children in prolonged and indefinite family detention under the Rule will impact California's schools and communities.  As their needs grow due to harm suffered under the Rule, California's costs in serving this vulnerable population will also grow.

371.   California is home to many adult relatives and family friends who could provide loving and stable homes to children whose parents are being detained.  The use of federal family detention facilities to house children that are apprehended with a parent will prevent those children being released to sponsors in California, even if their parents would prefer to have them released to a trusted adult.  This denies parents in detention and potential caregivers in California from making choices regarding family integrity and harms California families and

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF

1  communities.

2  **B.    Massachusetts**

3      372.   Massachusetts is home to many robust immigrant communities, with

4  particularly large populations of residents from Honduras, Guatemala, and El

5  Salvador.  For example, Massachusetts has the eighth largest Salvadoran population

6  in the country.  Each year Massachusetts welcomes these and other immigrants,

7  who attend public schools, access health care, and plant roots and raise families.

8      373.   Massachusetts reasonably believes that immigrant families who are

9  held in family detention facilities under the Rule and obtain protection from

10  deportation will settle in Massachusetts upon their release from federal custody.

11      374.   In Massachusetts, all children are entitled to a free public education,

12  regardless of immigration status.  On average, annual per-pupil expenditures

13  amount to more than $16,000.  Of this total, over 95% comes from state and local

14  funding sources, with 39% from the state alone.  In Massachusetts's midsized

15  cities, where a higher proportion of immigrants live, state funding amounts to a

16  higher percentage of total per-pupil spending.  In addition to resourcing general

17  education teachers, administrators, and materials, the state provides funding to help

18  schools address the social-emotional needs of students, including students who

19  have experienced trauma.  For students whose needs make them eligible, the state

20  provides additional funding for special education services.

21      375.   All children in Massachusetts, including those who are undocumented,

22  are eligible for state-provided health insurance if they meet income eligibility

23  requirements or if they do not have access to other health care coverage.

24  Undocumented children, specifically, may be eligible through the Children's

25  Medical Security Plan or MassHealth Limited.  These children will sometimes seek

26  and receive mental health services through these state-funded insurance programs.

27      376.   Undocumented and other immigrant children who are not eligible for

28  mental health services through state-funded health insurance programs may qualify

for mental health services through the state's Department of Mental Health.  Under its statutory mandate, the Department of Mental Health provides or arranges for the provision of services to residents who meet certain clinical criteria.  Mass. Gen. Laws ch. 19, § 1.  For Massachusetts youth to meet Department of Mental Health clinical criteria, they must have a "serious emotional disturbance . . . that has lasted or is expected to last at least one year [and] has resulted in functional impairment that substantially interferes with or limits the child's [or] adolescent's role or functioning in family, school or community activities . . . .".  104 Code Mass. Regs. 20.04(2)(b).  Many children held in long-term detention under conditions of care that fall short of the *Flores* requirements may suffer from such disturbances.

377.   It is the policy of Massachusetts state government "to assure every child a fair and full opportunity to reach [their] full potential . . . ."  Mass. Gen. Laws Ch. 15D, § 1.  Under Massachusetts's licensure regulations, residential programs for children in state custody must pursue standards and practices that fulfill certain goals, including "to provide each resident with the least intrusive intervention sufficient to insure her or his safety, the safety of others, and promote healthy growth and development."  606 Code Mass. Regs. 3.01(e).

## C.   Connecticut

378.   Connecticut is home to more than 31,000 immigrant children under the age of 18.  Between October 1, 2018 and May 31, 2019, 590 unaccompanied immigrant children were placed with sponsors in Connecticut—a higher number, relative to the state's population, than in many more populous states.  These children become residents, attend Connecticut schools, and, in some cases, grow into adults raising their own families in Connecticut.

379.   Connecticut reasonably believes that immigrant families who are held in family detention centers under the Rule and obtain protection from deportation will settle in Connecticut upon their release from federal custody.

380.   Connecticut believes that all government services and supports

provided to children should be informed by an appreciation of childhood trauma and the impact that trauma can have on a child's safety, health, and education. The need for a trauma-informed approach is particularly acute with immigrant families and children, many of whom have come to Connecticut fleeing persecution and seeking shelter from fear.

381.   All children in Connecticut, including immigrant children, are entitled to a free public education. Connecticut has more than 32,000 immigrant children in its public schools, who account for more than 5% of the total public school population. Per pupil expenditures for Connecticut public school students in 2017-18 was more than $19,000, of which more than 95% came from state and local resources. In keeping with the state's commitment to a trauma-focused approach, schools throughout Connecticut offer services and supports that help their students, including immigrant children, cope with trauma. For example, public school systems in New Britain and New Haven, both of which have relatively large populations of immigrant children, have dedicated public resources to supporting district-wide projects that aim to provide intensive resources and trauma-informed supports to youth who have experienced trauma.

382.   Connecticut's Department of Social Services administers, Connecticut's state-subsidized health insurance programs for low-income people. Through these programs, Connecticut has chosen to expand health care supports, including mental health supports, for low-income immigrant asylum-seeking children by waiving the five-year waiting period for Medicaid eligibility. This means that many asylum-seeking children who have undergone trauma can receive state-funded mental health services even before achieving legal status.

**D.   Delaware**

383.   In Fiscal Year 2019 so far, 311 unaccompanied immigrant children have been placed with family members and other adult sponsors in the State of Delaware.

384.   Delaware reasonably believes that immigrant families who are held in family detention facilities under the Rule and obtain protection from deportation will settle in Delaware upon their release from federal custody.

385.   All children in Delaware, including immigrant children, are entitled to a free public education.  Del. Const. art. X; Del. Code Ann. tit. 14, § 202.  Per pupil expenditures in 2016-17 were $14,132 per child from all funding sources.  Of this total, over 91% came from state and local funding sources.  Schools throughout Delaware also provide educational programs for English Language Learners, defined as students with limited English proficiency who, by reason of foreign birth or ancestry, speak a language other than English and either comprehend, speak, read, or write little or no English, or who have been identified as English Language Learners by a valid English language proficiency assessment approved by the Department of Education for use statewide.  14 Del. Admin Code § 920.

386.   Immigrant families living in Delaware may benefit from all services offered by the state's Department of Services for Children, Youth, and Their Families to Delaware children and families, regardless of their citizenship status.  These services include: protective services, preventive and reunification services, home-based services, inpatient and outpatient mental health services, outpatient substance use treatment services, residential and institutional facilities, probation and aftercare, adoption and permanency planning, foster care, and independent living services.  Pursuant to its Non-Discrimination Policy, the Department of Services for Children, Youth, and Their Families does not exclude persons from participating in, or receiving benefits from, their programs or activities due to the "person's race, color, [or] national origin . . . ."  In furtherance of this policy, the state's Division of Family Services does not inquire about the citizenship of the children and families they serve.  Likewise, the Division of Prevention & Behavioral Health Services provides an array of voluntary in- and outpatient treatment and prevention services for children and youth throughout the State of

Delaware, including immigrant children, for their mental health, substance use, and behavioral health needs. Since 2014, Delaware has appropriated $565.76 million to fund programs for children and families residing in Delaware, to assist with their mental health, behavioral health, family stabilization, and youth rehabilitation needs. Delaware has appropriated more than $81 million for Fiscal Year 2019, alone.

### E.    District of Columbia

387.   ORR places hundreds of unaccompanied children with sponsors in the District of Columbia every year. For Fiscal Year 2019 so far, ORR has placed more than 230 children with District of Columbia resident sponsors. *See* U.S. Dep't of Health & Hum. Servs., Off. of Refugee Resettlement, *Unaccompanied Alien Children Released to Sponsors By State* (July 26, 2019), https://www.acf.hhs.gov/orr/resource/unaccompanied-alien-children-released-to-sponsors-by-state. These children become residents of the District, attend District schools and, in some cases, grow into adults raising their own families in the District.

388.   The District reasonably believes that immigrant families who are held in family detention centers under the Rule and obtain protection from deportation will settle in the District upon their release from federal custody.

389.   All children in the District, including immigrant children, are entitled to a free public education. In Fiscal Year 2019, the District allocated between $10,658 and $15,348 per student in DC Public Schools. *See* D.C. Off. of the Chief Fin. Officer, Public Schools FY 2019 Proposed Budget and Financial Plan, 14, https://cfo.dc.gov/sites/default/files/dc/sites/ocfo/publication/attachments/ga_dcps_chapter_2019j.pdf. In addition, the District allocated more than $5,000 for each English Language Learner in DC Public Schools, more than $2,000 per At-Risk student, between $10,338 and $37,196 per student in Special Education, and up to $5,233 per student receiving extended school year services. *Id*. Per-student

spending in DC Public Charter Schools was on par with these numbers. *See* D.C. Off. of the Chief Fin. Officer, Public Charter Schools FY 2019 Proposed Budget and Financial Plan, 5, https://cfo.dc.gov/sites/default/files/dc/sites/ocfo/publication/attachments/gc_dcpcs_chapter_2019j.pdf. The overwhelming share of the money spent on public education in the District comes from local taxes, fees, and resources. *Id*. at 1-3; D.C. Off. of the Chief Fin. Officer, Public Schools FY 2019 Proposed Budget and Financial Plan, 2, https://cfo.dc.gov/sites/default/files/dc/sites/ocfo/publication/attachments/ga_dcps_chapter_2019j.pdf.

390.   The District of Columbia offers comprehensive health insurance coverage to eligible immigrants. The Immigrant Children's Program and the DC Healthcare Alliance Program provide coverage equal to that offered by Medicaid, including doctor visits, immunizations, mental health services, dental, vision, and prescription drugs. *See* D.C. Dep't of Health Care Fin., Immigrant Children's Program, https://dhcf.dc.gov/service/immigrant-childrens-program (last visited Aug. 23, 2019); D.C. Dep't of Health Care Fin., Health Care Alliance, https://dhcf.dc.gov/service/health-care-alliance (last visited Aug. 23, 2019).

391.   The District also provides funding for legal services providers who serve the immigrant community in the District through the Immigrant Justice Legal Service Grant Program. In Fiscal Year 2018, $500,000 of funding was made available to fund programs that provide targeted services and resources to the District's immigrant population. The amount of funding for the grant program has increased every year since. In Fiscal Year 2019, the funding increased to $900,000, and for Fiscal Year 2020, the funding increased to $2.5 million. *See* Peter A. Tatian et al., *State of Immigrants in the District of Columbia*, Urb. Inst., 17 (Dec. 2018); Press Release, Office of the Mayor, *Mayor Bowser Announced $2.5 Million Available for FY 2020 Immigrant Justice Legal Services Grant Program* (July 12,

2019), https://mayor.dc.gov/release/mayor-bowser-announces-25-million-available-fy-2020-immigrant-justice-legal-services-grant.  Grants are provided to support a variety of services and projects, including legal representation, filing applications for S, T, U, Special Immigrant Juvenile visas and Violence Against Women Act (VAWA) petitions, and filing asylum applications and providing legal representation.

392.   The District also provides grants totaling close to $2 million to various organizations that provide needed services to the myriad immigrant populations in the District.  *See* Peter A. Tatian et al., *State of Immigrants in the District of Columbia*, Urb. Inst., 16 (Dec. 2018), https://www.urban.org/sites/default/files/publication/99031/state_of_immigrants_in_dc_brief.pdf.  This funding includes grants to the Asylum Seekers Assistance Project, as well as organizations that provide health and social services, education, language access, housing services, and employment assistance.  *Id.*

**F.    Illinois**

393.   ORR releases hundreds of children into Illinois each year.  In Fiscal Year 2019, ORR statistics indicate that ORR placed 659 unaccompanied immigrant children in Illinois, the state's highest number of the past five years.

394.   Illinois reasonably believes that immigrant families who are held in family detention facilities under the Rule and obtain protection from deportation will settle in Illinois upon their release from federal custody.

395.   In Illinois, all children are entitled to a free public education regardless of immigration status.  In the 2017-2018 school year, the operating expense per pupil in Illinois was $13,763.50.  Public education funding in Illinois comes from a combination of local, state, and federal sources.  Illinois offers other educational benefits to students regardless of immigration status; for example, a 2019 law allows undocumented immigrants to receive state-funded student financial aid to attend college. *See* Retention of Illinois Students and Equity Act, Pub. Act 101-021,

1  101st Gen. Assemb. (Ill. 2019).

2      396.   Illinois provides a wide range of other programs and services

3  specifically for immigrants.  These include the Immigrant Family Resource

4  Program, which helps limited-English-proficient low-income individuals apply for

5  public benefits and human services; Illinois Welcoming Centers, which serve as

6  one-stop service centers to link immigrants to human services, either provided by

7  grantees or external resources in the community; the Refugee Resettlement

8  Program, which since 1975 has provided short-term financial assistance, health

9  screening, and employment and social service programs such as mental health and

10  senior support to refugees, asylees, victims of human trafficking, and Cuban and

11  Haitian entrants to the U.S.; and the New Americans Initiative, an integrated

12  campaign that assists immigrants in preparing to become U.S. citizens.

13      **G.   Maine**

14      397.   Every year children are released from immigration detention and

15  placed with sponsors in Maine, including 11 unaccompanied immigrant children

16  released to sponsors in Maine in Fiscal Year 2017, and 21 unaccompanied

17  immigrant children released to sponsors in Maine in Fiscal Year 2018.  As of June

18  30, 2019, 14 unaccompanied immigrant children were released to sponsors in

19  Maine during Fiscal Year 2019.

20      398.   Maine reasonably believes that immigrant families who are held in

21  family detention facilities under the Rule and obtain protection from deportation

22  will settle in Maine upon their release from federal custody.

23      399.   When children are held in immigration detention, the trauma

24  associated with their flight from home is exacerbated.  The negative impacts of

25  secure detention away from family increase in proportion to the length of time

26  children spend in detention.  The quality of care children receive while in detention

27  directly affects their physical and mental health both long and short term.

28  Immigrant children living in Maine, including those released from immigration

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF

detention, have access to a number of state-funded services to help address the effect of trauma.

400.   All children in Maine, including immigrant children, are entitled to a free public education.   Per pupil expenditures in 2017-18 exceeded $15,552 from all funding sources.  Of this total, over 88.48% came from state and local resources.   Schools in Maine also offer services that help their students, including immigrant children, cope with trauma.  Local school districts in Maine employ or contract with professionals, including school nurses and school psychologists and support staff.  These individuals partner with educators to address barriers that prevent students from learning to optimize their academic achievement, including addressing the impact of trauma on a child's educational achievement.

401.   Students with post-traumatic stress disorder and other symptoms arising from traumatic experiences require specialized instruction, remedial academic support, and a host of other interventions in order to be successful at school.  Maine's school funding formula ascribes an additional state subsidy for such students in order to partially compensate local schools for the additional staffing and services that are necessary.

402.   Along with the extra state subsidy described above, there is an additional set of costs related to special education students.  The average additional state subsidy for special education students is approximately $3000 per year, based upon the numbers available from the 2017-18 school year funding.

403.   The Maine Department of Health and Human Services oversees behavioral health programs for counseling and therapy that are accessible to immigrants, including immigrant children.  Immigrants under the age of 18 years and pregnant women who have been paroled into the United States can qualify immediately for medically necessary services, including outpatient and residential behavioral health services and trauma counseling under Maine's Medicaid program, known as "MaineCare." Immigrants between the ages of 18 years and 21 years can

qualify for MaineCare after having been paroled into the United States for at least 12 months.  In addition, immigrants between the ages of 18 and 21 and pregnant women who are in "PRUCOL" status can qualify immediately for MaineCare.  Currently, Maine's share of reimbursement for MaineCare services is approximately 33.33%.

### H.   Maryland

404.   Every year thousands of children are released from immigration detention and reunified with family members or other adult sponsors in Maryland.  Thus far in Fiscal Year 2019, 3,502 children have been released to sponsors in Maryland.

405.   Maryland reasonably believes that immigrant families who are held in family detention facilities under the Rule and obtain protection from deportation will settle in the Maryland upon their release from federal custody.

406.   School systems in Maryland have a legal obligation to provide a free, public education to all children, including immigrants.  Md. Code Ann., Educ. §7-101.  Maryland spent an average of $14,484 per pupil in the 2017-2018 school year, approximately 94% of which is funded by state and local resources.  Maryland public schools spend significant funds on mental health services for students, including licensed school counselors, Adverse Childhood Experiences trauma training, and suicide prevention training.

### I.   Michigan

407.   Michigan reasonably believes that immigrant families who are held in family detention facilities under the Rule and obtain protection from deportation will settle in Michigan upon their release from federal custody.

408.   The Michigan Constitution states that "[t]he Legislature shall maintain and support a system of free public elementary and secondary schools as defined by law. Every school district shall provide for the education of its pupils without discrimination as to religion, creed, race, color or national origin."  Mich. Const.

1   art. VIII, § 2.

2       409.   The Michigan Department of Health and Human Services administers

3   cash and medical benefits to refugees, including immigrants that have been released

4   from detention upon gaining asylum protection.  Michigan also provides refugee

5   assistance through private agencies that deliver employment, integration, education,

6   language, and health-related services, as well as services to elderly refugees.

7       410.   Refugees and other eligible immigrants receive medical screening,

8   medical follow-up services, and referrals for mental health follow-up through state-

9   funded providers.  Mental Health services for immigrants are also provided through

10   state funds private providers.

11   **J.    Minnesota**

12       411.   During Fiscal Year 2018, ORR placed 292 children with Minnesota

13   resident sponsors.  As of June 30, 2019, ORR's available data show that Minnesota

14   has already received 465 unaccompanied children during Fiscal Year 2019.

15       412.   Minnesota reasonably believes that immigrant families who are held in

16   family detention facilities under the Rule and obtain protection from deportation

17   will settle in Minnesota upon their release from federal custody.

18       413.   In Minnesota, all children are eligible to receive a free public

19   education.  On average, per pupil expenditures for state Fiscal Year 2018 was

20   $12,596 per pupil.  The state Fiscal Year 2019 estimate is $12,953 per pupil.  Of

21   this total, approximately 96% comes from state and local resources.  If, as may be

22   expected, an immigrant child requires services through the English Learners

23   program, the state funds an additional $704 to $954 per child.  Children in

24   Minnesota, including immigrant children, may also require special education,

25   mental health services, and other programs delivered within the school district.

26   Immigrant children may also receive child care assistance in certain settings.

27       414.   In addition, immigrants residing in Minnesota are eligible to receive

28   health care through Minnesota's Emergency Medical Assistance program.

Minnesota Emergency Medical Assistance program covers the care and treatment of emergency medical conditions provided in an emergency department (ED), or in an inpatient hospital, when the admission is the result of an ED admission. Emergency medical conditions include labor and delivery.

### K.   Nevada

415.   Nevada reasonably believes that immigrant families who are held in family detention facilities under the Rule and obtain protection from deportation will settle in Nevada upon their release from federal custody.

416.   In Nevada, education is a constitutional right.  Nev. Const. art. 11. The Nevada Constitution prescribes a uniform system of common schools.  *Id.* § 2. All children in Nevada, including immigrant children, are entitled to a free public education.  Currently, Nevada's per pupil expenditures in 2018-19 will exceed $10,000 per child from state and local fund sources.

417.   Nevada funded a minimum of $9,224,730 during the 2018-2019 school year for mental health and other support services for students enrolled in schools in the state.  Among other support services, Nevada schools provide programs for approximately 73,520 students (approximately 15% of the total student population) who are English language learners.  Nevada will have to provide additional state-funded services to address the trauma suffered by immigrant children who are subjected to prolonged detention under the Rule prior to entering the Nevada educational system.

### L.   New Jersey

418.   Every year, thousands of children are released from immigration detention and ORR shelters and reunified with family members or other sponsors in New Jersey.  Thus far in Fiscal Year 2019, 3,163 unaccompanied children have been released to the care of sponsors in New Jersey, which places New Jersey among the top unaccompanied children-hosting states.  New Jersey has substantial policies and programs to support immigrant families and children, including

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF

providing access to state resources for education, mental and behavioral health care, legal support, and social services.

419.   New Jersey reasonably believes that immigrant families who are held in family detention facilities under the Rule and obtain protection from deportation will settle in New Jersey upon their release from federal custody.

420.   Children residing in New Jersey are eligible for services through the Division of Child Protection and Permanency and the Division of the Children's System of Care, regardless of citizenship or national origin.  These programs include mental and behavioral health programs in the community and in emergency and permanent group home settings.

421.   All children in New Jersey are entitled to a free public education, regardless of citizenship or national origin.  N.J. Stat. Ann. § 18A:7B-12; N.J. Admin. Code § 6A:22-3.3.  In Fiscal Year 2017-2018, New Jersey school districts spent an average of almost $22,000 per pupil on K-12 education costs, funded through a combination of state and local taxes and federal aid.  Additionally, the New Jersey Dream Act allows undocumented students to qualify for in-state tuition rates at all of New Jersey's public institutions of higher education, and to apply for state financial assistance.

422.   Over 2 million residents of New Jersey are immigrants, refugees, or other new Americans, who are integral to the State's economy and social and cultural fabric. To ensure that every resident in New Jersey is valued, supported, and welcomed, New Jersey is creating an Office of New Americans to empower immigrants throughout the State, including children, and to promote their well-being and access to services, resources, and employment.  N.J. Exec. Order No. 74 (July 4, 2019).  New Jersey prohibits discrimination on the basis of nationality in employment and all public accommodations.  N.J. Stat. Ann. §§10:5-9.1, 10:5-12.

423.   The New Jersey Department of Human Services will also be resuming its role as the Statewide Refugee Coordinator and the Statewide Refugee Health

Coordinator in October 2019.  In this capacity, the State will be responsible for the submission of a Refugee State Plan to ORR and will assume the responsibility for all mental and medical health needs for refugee populations in New Jersey, including unaccompanied children.  Qualified immigrants are eligible to receive New Jersey Temporary Assistance for Needy Families benefits, New Jersey Medicaid, and CHIP benefits.

## M.   New Mexico

424.   Every year since at least 2014, ORR has placed unaccompanied immigrant children with sponsors in New Mexico.

425.   New Mexico reasonably believes that immigrant families who are held in family detention facilities under the Rule and obtain protection from deportation will settle in New Mexico upon their release from custody.

426.   The New Mexico Department of Health has established the Refugee Health Program for newly-arrived refugees with integrated medical and mental health screenings.  This program serves as an entry point into the U.S. health system, striving to prevent the transmission of communicable diseases to the public and ensuring follow-up for conditions that could affect an immigrant's well-being or impede the newcomer's ability to effectively resettle in New Mexico.

427.   New Mexico's Refugee Health Program collaborates with a variety of health and other service providers and community-based organizations to facilitate access to culturally sensitive and trauma-informed healthcare.  Language interpretation services are available to refugees during all healthcare visits.

428.   New Mexico provides emergency health care, including labor and delivery care, for immigrants in New Mexico who do not qualify for Medicaid because of their immigration status, under its Emergency Medical Services for Aliens program.  *See* N.M. Code R. §§ 8.285.1 *et seq.*, 8.325.10.1 *et seq.*

429.   Although most immigrants who present at the southern border of the United States ultimately settle in the 20 largest metropolitan areas of the United

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF

States rather than in New Mexico, the State has dedicated generous resources to help immigrant children and their families released from ICE custody adjust to life in the United States.

430.   The State has invested humanitarian aid targeted toward asylum seekers via its various agencies.  The New Mexico Department of Homeland Security and Emergency Management has dedicated staff time and resources to respond to human trafficking reports from asylum seekers; the Department of Workforce Solutions has developed plans to support asylum-seekers; the Department of Public Safety has undertaken enhanced law enforcement activities; the Department of Health has deployed of the New Mexico Medical Reserve Corps to assist with public health issues related to asylum seekers; and the General Services Division and Department of Transportation have used vans and drivers to support asylum-seekers.  Complaint at ¶ 30, *New Mexico v. McAleenan*, No. 1:19-CV-00534-JB-LF (D.N.M. filed June 10, 2019).  Further, New Mexico has given at least $750,000 in emergency grants to local governments in Deming, Luna County, and Las Cruces near the Mexican border, where most migrant children and families have been held or released.  *Id*. at ¶ 31.

431.   In New Mexico, where 48.2% of the population identifies as Hispanic or Latino, cities, counties, and other local governments have contributed tax dollars in support of migrants released after being held in detention under the new federal policies.  Bernalillo County allocated $100,000 to fund psychological support services and crisis debriefing for migrant children and parents from a behavioral health tax.  The County's largest city, Albuquerque, also passed a $250,000 special appropriation to contribute to the humanitarian effort.  The city of Deming in Luna County declared a state of emergency to fund shelter care efforts for the influx of migrant families released there by U.S. Customs and Border Patrol.  The City of Las Cruces near the State's border with Mexico approved a half-million dollar transfer from the City's health services fund to cover expenses of helping people

dropped off by Border Patrol.

432.   New Mexico provides education and educational services to all students, including undocumented students, recognizing the fundamental right to education regardless of immigration status.

**N.   New York**

433.   Immigrants are at the heart of New York's rich social diversity and drive its economy. Approximately 4.5 million immigrants live in New York State. 2.8 million immigrant workers comprise roughly 27.8% of the State's labor force. In 2014, New York State immigrant-led households paid $26.5 billion in federal taxes and $15.9 billion in state and local taxes with $103.3 billion in after-tax income spending power.  Recognizing their significance, the State has undertaken initiatives to protect its immigrant population and foster their contributions to New York's growth.  The State's Office for New Americans assists newcomers through telephone hotline services directed at reporting immigration assistance services fraud and other schemes targeting immigrants.  The Office of New Americans also conducts entrepreneurship trainings and facilitates access to other New York State agency services, such as job-training provided by the New York State Department of Labor.

434.   In Fiscal Years 2017 and 2018, ORR placed 3,938 and 2,837 children with New York resident sponsors, respectively.  Between October 2018 and May 2019, ORR placed another 3,824 children with New York resident sponsors.

435.   New York reasonably believes that immigrant families who are held in family detention facilities under the Rule and obtain protection from deportation will settle in New York upon their release from federal custody.

436.   Children in New York State are entitled to a variety of state-funded services, including educational services, early intervention services, and access to healthcare, among others.  New York State makes these services available to such children in support of the State's interest in ensuring the health, safety, and well-

being of all residents.  Further, after a child enters the community, their home environment could be disrupted for a number of reasons.  If the child subsequently becomes at risk of entering foster care—for example, because of allegations of abuse or neglect by their parent or the sponsor now legally responsible for the child—the child welfare system will provide preventive services to attempt to keep the child safely in the home; such services are funded, in part, by New York State.  If those services are unsuccessful and the child must be removed from the home, New York State will also partly fund the child's placement and needed services while in the foster system.

437.   Whether living with their parents, sponsors, or subsequent foster care providers in the state, accompanied and unaccompanied immigrant children residing in New York have a right to attend public schools in the state.  Moreover, the Individuals with Disabilities Education Act requires New York to provide special education services to students with learning or emotional disabilities. New York State law also entitles qualified students to English Language Learner services.  N.Y. Comp. Codes R. & Regs. tit. 8, § 154.  There are 692 public school districts in New York that serve approximately 2.6 million students.  While costs will vary depending on the school district's location and the child's needs, the statewide average to educate a student in New York is approximately $23,000 per year.

438.   New York State also provides a robust early intervention program, which accompanied and unaccompanied children utilize when placed in New York State communities.  Each year, New York's early intervention program serves over 60,000 children ages zero to three who have moderate to severe developmental delays.  The early intervention program includes 1,312 providers that contract with New York State to bill for EIP services.  Total annual expenditures for New York's early intervention program total more than $650 million across all payers—45% is covered by Medicaid, 2% by commercial insurance, 26% by state funds, and 27%

by county funds.  While early intervention program costs and services vary based on the child's needs and the intensity of services offered, for the 2018 program year the average cost of services delivered ranged from $5,820 to $24,744 per child.

439.   New York State will also incur significant medical expenses for each child released from prolonged immigration custody, as all children under age 19, regardless of immigration status, are eligible for the Child Health Insurance Program in New York.  While the Child Health Insurance Program is jointly funded by federal and state governments, the federal government does not provide any funding for children it deems "unqualified immigrants."  As such, health care coverage provided to many accompanied and unaccompanied children is covered entirely with state funds.

440.   As accompanied and unaccompanied children arrive in New York, the State will need to provide these children with mental health services to address the trauma of family detention or their prolonged time in ORR custody, incurring significant expenses.  The New York State Office of Mental Health receives approximately $4.4 billion annually in funding to provide mental health programs and services annually to more than 772,000 individuals in the State.  The Office of Mental Health operates psychiatric centers across the State of New York, and regulates, certifies, and oversees more than 4,500 programs, which are operated by local governments and nonprofit agencies.  These programs include various inpatient and outpatient programs and emergency, community support, residential, and family care programs that are intended to prevent or reduce the disabling effects of mental illness.  Citizenship status, or lack thereof, does not affect the Office of Mental Health's obligation to provide mental health services to those residing in the State.  *See* N.Y. Comp. Codes R. & Regs. tit. 14 § 27.4.

441.   The New York State Office of Temporary and Disability Assistance provides services to refugees and their families to help them achieve economic and social self-sufficiency through its Refugee Resettlement Program.  The Refugee

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF

Resettlement Program includes a component that provides services to Unaccompanied Refugee Minors.  If children affected by the Rule acquire an immigration status qualifying them for refugee treatment and are reclassified as Unaccompanied Refugee Minors by ORR, then these children could receive services through this component of the Refugee Resettlement Program, such as foster placement, healthcare, and educational services geared toward facilitating independent living and economic self-sufficiency.  For State Fiscal Year 2019-2020, $26,000,000 has been appropriated in the New York State budget for the Refugee Resettlement Program.

**O.  Oregon**

442.   Every year children are released from immigration detention and placed with sponsors in Oregon, including 170 unaccompanied immigrant children in Fiscal Year 2017 and 201 unaccompanied immigrant children in Fiscal Year 2018.  As of June 2019, 265 unaccompanied immigrant children have been placed with sponsors in Oregon during Fiscal Year 2019.

443.   Oregon reasonably believes that immigrant families who are held in family detention facilities under the Rule and obtain protection from deportation will settle in Oregon upon their release from federal custody.

444.   The Oregon Department of Education provides funding to educate K-12 children regardless of immigration status.  In 2016-17, the cost of that education was $11,715 per student.  Of this total, 92% came from state and local resources. Since 2013, Oregon has also provided in-state college tuition benefits regardless of immigration status in many cases.  Children who have been held in long term detention facilities and are traumatized will require additional state educational resources.  Beginning in 2016 and 2017, the Oregon legislature has funded a pilot program form trauma-informed care in Oregon schools, administered as a partnership between the Oregon Department of Education, the Oregon Health Authority, and Oregon's Chief Education Officer.

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF

445.   The Oregon Health Authority, though its Cover All Kids program, provides medical, dental, and mental health benefits to children in certain low income families regardless of immigration status.  In 2018, the average per month cost was $184 per child.  Children who are wards of the court become eligible for the Oregon Health Plan regardless of immigration status.  The average per month cost of this coverage was $664 per child.  Children who have been held in long term detention facilities and are traumatized will require additional state health care resources.

446.   The Oregon Department of Human Services coordinates with Refugee Resettlement Agencies to provide assistance for refugee families in applying for social services, medical benefits, vocational training, employments supports, and language training. Families with children who have been held in long term detention facilities and are traumatized may require state assistance resources.

**P.     Pennsylvania**

447.   During Fiscal Year 2018, ORR placed 559 children with Pennsylvania resident sponsors.  ORR has already surpassed that number in Fiscal Year 2019, having placed 924 children with Pennsylvania resident sponsors as of June 2019.

448.   Pennsylvania reasonably believes that immigrant families who are held in family detention facilities under the Rule and obtain protection from deportation will settle in Pennsylvania upon their release from federal custody.

449.   Under the Pennsylvania Constitution, the Pennsylvania General Assembly "shall provide for the maintenance and support of a thorough and efficient system of public education to serve the needs of the Commonwealth." Pa. Const. art. III, § 14.  All children in Pennsylvania, including immigrant children, are entitled to a free public education.  22 Pa. Code § 11.11(a).  "A child's right to be admitted to school may not be conditioned on the child's immigration status."  *Id*. § 11.11(d).

450.   The Pennsylvania Department of Human Services administers cash

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF

1   and medical assistance programs for refugees and asylees residing in Pennsylvania,

2   including immigrants who have been released from detention upon gaining asylum

3   protection.  The Pennsylvania Department of Education provides a Refugee

4   Education Program that supports refugee students and their parents.  Pennsylvania

5   also provides refugee assistance through private organizations that deliver

6   employment, training, language, integration, education, and health-related services,

7   as well as services to unaccompanied children and elderly refugees.

8       451.   Pennsylvania reasonably believes that the psychological and

9   developmental harms suffered by children in prolonged and indefinite family

10  detention under the Rule will negatively impact Pennsylvania schools and

11  communities.

12      **Q.   Rhode Island**

13      452.   Every year hundreds of immigrant children are released from

14  immigration detention and placed with family members or other adult sponsors in

15  Rhode Island.  From October 2018 to June 2019, for example, 375 unaccompanied

16  children were released to adult sponsors in Rhode Island.  These children become

17  residents of the State, attend Rhode Island schools and grow into adults, sometimes

18  raising their own families.

19      453.   Rhode Island reasonably believes that immigrant families who are held

20  in family detention facilities under the Rule and obtain protection from deportation

21  will settle in Rhode Island upon their release from federal custody.

22      454.   The Rhode Island Constitution provides that "The diffusion of

23  knowledge, as well as of virtue among the people, being essential to the

24  preservation of their rights and liberties, it shall be the duty of the general assembly

25  to promote public schools and public libraries, and to adopt all means which it may

26  deem necessary and proper to secure to the people the advantages and opportunities

27  of education and public library services."  See R.I. Const. art. XII, § 1.  To

28  implement this goal, the Rhode Island Constitution also provides for the

establishment of a perpetual school fund, and that said funds are to be securely invested and remain a perpetual fund for that purpose, and the diversion of said funds for any other purpose whatsoever is prohibited. *Id.* §§ 3, 4.

455.   All children, including immigrant children, are entitled to the resources of a public education provided by the State of Rhode Island.  For Fiscal Year 2017-2018, the year for which the most recent data is available, the State of Rhode Island expended a net amount of $17,355 per student, a percentage of which comes from state and local funding sources.

456.   All public schools in Rhode Island expend public monies for English Learners, who are usually immigrant children that require assistance with language acquisition.  School districts with public schools that utilize programs for English Learners are entitled to reimbursement by the state for expenditures for direct services and instructional programs.  16 R.I. Gen. Laws § 54-4(a).

457.   The State of Rhode Island also administers The Office of Student, Community, and Academic Support, which helps to ensure that children with diverse learning needs and children receiving special education services are provided equal access to a public education.  The Office of Student, Community, and Academic Support also helps ensure that schools develop effective strategies for meeting the needs of these unique learners, including providing mental health services for children who have suffered trauma, if such trauma is reported.

458.   Last year, approximately 117 minor immigrant children, previously held in detention at the border of the United States and Mexico, were physically present in the State of Rhode Island.

459.   A majority of these children enrolled in Providence public schools, while several others enrolled in public schools in the cities of Central Falls, Pawtucket, Woonsocket, Bristol, and Cranston.

460.   Immigrant families living in Rhode Island may also receive food from the Rhode Island Community Food Bank, which receives approximately up to

4 percent of its funding from the State of Rhode Island.

461.   Immigrant children living in Rhode Island also have access to mental health services from the Providence Children and Youth Cabinet, an organization devoted to helping children who experience trauma to receive mental health-related services.  A portion of the Providence Children and Youth Cabinet's funding is public and comes directly from the State of Rhode Island.

462.   In addition to the programs outlined above, the State of Rhode Island also provides a Refugee Assistance Program, under which the State Refugee Coordinator within DHS administers federal grants that come to Rhode Island from the Federal Office of Refugee Resettlement and ensures coordination of public and private resources in refugee resettlement.  Refugees served by the Department are eligible for cash assistance, medical assistance, and employment planning services. This year alone, Rhode Island has already resettled approximately 90 refugees, at least 50 percent of whom were children.

463.   In addition, there are at least 85 unaccompanied immigrant children that were transferred from temporary detention at the border into the custody of the Office of Refugee Resettlement, and who were subsequently released to sponsor families in the State of Rhode Island, and received post-relief services.

464.   The State of Rhode Island experiences a direct, fiscal impact when immigrant families mental and physical health is harmed by prolonged detention in substandard conditions.  Rhode Island willingly provides the services described above to immigrant families, but the needs of those families will grow in proportion to the hardship they suffer due to the Rule, with fiscal consequences for Rhode Island.

**R.   Vermont**

465.   Vermont reasonably believes that immigrant families who are held in family detention facilities under the Rule and obtain protection from deportation will settle in Vermont upon their release from federal custody.

466.   The State of Vermont is responsible for protecting the welfare of all children living in the State.  This responsibility includes providing a variety of services, including, when necessary, substitute care, to ensure the right of any child living in Vermont to sound health and to normal physical, mental, spiritual, and moral development.  *See* Vt. Stat. Ann. tit. 33, § 101.  In appropriate circumstances, this responsibility includes commencing juvenile judicial proceedings and incurring significant costs to ensure that children are receiving safe and adequate care. *See generally* Vt. Stat. Ann. tit. 33, §§ 5102, 5103, 5116.  If federal policy changes result in more children residing in the State of Vermont, the State is committed to ensuring those children are receiving safe and adequate care.

467.   In Vermont, all children, regardless of immigration status, are entitled to a free public education.  On average, Vermont spends over $18,000 per pupil each year.  *See* Vt. Agency of Educ., *Per Pupil Spending: FY 2017 Report* (Feb. 21, 2017), http://education.vermont.gov/documents/data-per-pupil-spending-fy2017. State and local revenues account for approximately 94% of total pupil expenditures (90.3% state, 3.6% local); federal sources account for only 6%.  *See* U.S. Census Bureau, *2017 Annual Survey of School System Finances*, tbl. 5 (2017), https://www2.census.gov/programs-surveys/school-finances/tables/2017/secondary-education-finance/elsec17_sumtables.xls.

468.   Vermont also provides a comprehensive, integrated system of mental health services from three departments (Education, Mental Health, and Children and Families).  These departments develop a coordinated services plan to assist children coping with emotional disturbance.  *See* Vt. Stat. Ann. tit. 33, §§ 4301-05.

469.   Many immigrant children are also eligible to receive free or low-cost health care through Vermont's children's health insurance program, known as Dr. Dynasaur.  *See generally* Vt. Agency of Hum. Servs., Health Benefits Eligibility & Enrollment Rules, §§ 2.03(b), 7.02(b), 7.03(a)(3), 17.02, 17.03, https://humanservices.vermont.gov/on-line-rules/hbee/1hbee-combined-doc-with-

master-toc-6.28.19.pdf.  The program includes mental health services, which may face increased demand in cases of prolonged detention.  These services include screening, prevention services, social supports, treatment, counseling, and crisis response.  *See* Vt. Dep't. of Health Access, *Health Care Programs Handbook* 26 (2016), https://www.greenmountaincare.org/sites/gmc/files/ctools/2016%20VT_HlthcareProgramsHandbook_FINAL.pdf.

### S.   Virginia

470.   Immigrants arriving in Virginia, including those ICE holds in family detention facilities, become residents of Virginia, attend Virginia schools, and have access to a number of state-funded resources.  Welcoming immigrant children and families to Virginia after they have been held in long-term detention facilities will result in the additional expenditure of limited state resources in the areas of public education, mental health, and other social and health services, due to the increased trauma that will be suffered under the Rule.

471.   Thousands of unaccompanied immigrant children have been placed with family members and other adult sponsors in Virginia since Fiscal Year 2014, including 3,127 children thus far in Fiscal Year 2019.

472.   Virginia reasonably believes that immigrant families who are held in family detention facilities under the Rule and obtain protection from deportation will settle in Virginia upon their release from federal custody.

473.   All children in Virginia, including immigrant children, are entitled to a free public education.  The Virginia Department of Education provides the state share of the cost for educating students enrolled in public schools, and the enrolling local school division is responsible for paying the local share of the cost for educating students enrolled in public schools at a total per pupil statewide average expenditure in excess of $10,000.  Virginia state and local support services available to immigrant children include trauma-informed care strategies in school

and school mental health/psychological services.

474.   The Virginia Department of Health and the Virginia Department of Behavioral Health and Developmental Services administer health and mental health programs that are accessible to immigrants.  The Virginia Department of Health's Newcomer Health Program is charged with identifying and eliminating health related barriers to the successful resettlement of Virginia's refugee population. This program coordinates and facilitates initial health assessments for all newly arriving immigrants with a refugee or asylum status.  The Virginia Department of Health's Office of Multicultural and Community Engagement develops programs and partnerships to empower racial and ethnic minority communities, including immigrants, to promote awareness of health inequities.  The Virginia Department of Behavioral Health and Developmental Services administers Virginia's Refugee Healing Partnership, a program focused on refugee mental health.  The Virginia Department of Behavioral Health and Developmental Services mental health program provides services for immigrant populations, including refugees and unaccompanied children.

475.   The Office of Newcomer Services in the Virginia Department of Social Services administers Virginia's Refugee Resettlement Program, which provides assistance to newly arrived refugees to support long term social and economic integration.  In Fiscal Year 2017, at least 4,268 refugees arrived in Virginia and were eligible to receive assistance from the Commonwealth in the form of nutrition assistance, cash assistance, energy assistance, medical services, medical screening, employment services, child care assistance, and refugee health education and outreach program and services for older refugees.  The Office of Newcomer Services also administers the Unaccompanied Refugee Minors Program and the Virginia Refugee Student Achievement Program, two programs exclusively for immigrant children.

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF

### T.    Washington

476.   Every year hundreds of children are released from ORR custody and reunified with family members or other adult sponsors in Washington. Many of these children become residents, attend Washington schools and, in some cases, grow into adults raising their own families in Washington communities.  For Fiscal Year 2019, the last year for which complete data are available, ORR released more than 500 children with Washington resident sponsors, and dozens of other children were placed in the various state-licensed care facilities in Washington.

477.   Washington reasonably believes that immigrant families who are held in family detention facilities under the Rule and obtain protection from deportation will also settle in Washington upon their release from federal custody.

478.   Washington funds a State Refugee Coordinator to ensure that state agencies collaborate with local partners including clinicians, community based organizations, health coalitions, and voluntary agencies to address refugee health issues.  In addition, the Washington State Refugee Health Promotion Project is a collaboration between state agencies, health providers, and resettlement agencies such as Seattle Children's Hospital and Lutheran Community Services Northwest to improve health outcomes and enable successful resettlement for refugee populations.  The City of Seattle's New Americans Program is one of sixteen different community-based programs in Washington providing employment services, vocational English language programs, food assistance, and application and preparation assistance for the naturalization exam.  The needs these programs address will only be increased by the additional trauma that migrants will endure while languishing in unlicensed federal facilities, without any state minimum regulatory standards governing the conditions of their confinement.

479.   Washington's Office of Refugee and Immigrant Assistance provides comprehensive economic stability and immigration services to more than 10,000 refugees and immigrants each year, including asylees and unaccompanied children,

using an annual budget of nearly $28 million.  One of Washington's state social service programs partners with local governments, community and technical colleges, ethnic community-based organizations, and other service provider agencies to deliver educational services, job training skills, assistance establishing housing and transportation, language classes, and other comprehensive support services.  These programs are almost certain to require more state financial assistance to address the needs of families and children held indefinitely in unlicensed federal facilities.

480.   Educational services, which are largely state-funded, will be complicated by the trauma of family detention.  All children in Washington are entitled to a free public education regardless of immigration status or natural origin. The Washington State Constitution declares that it is "the paramount duty of the state to make ample provision for the education of all children residing within its borders, without distinction or preference on account of race, color, caste, or sex." Washington's Legislature has also expressly prohibited discrimination in Washington public schools on the basis of, among other things, race, creed, religion, color, or national origin.  Wash. Rev. Code § 28A.642.010.

481.   The public schools of the State of Washington make available a free, public education to all children residing within Washington, regardless of that child's citizenship status or country of origin.  The state's public school educators welcome all children within Washington State and are deeply committed to ensuring that all children, regardless of their race, immigration status, or national origin, have an opportunity to receive basic education.

482.   Washington has almost 300 public school districts that serve over a million children.  The State apportions state and federal funding to districts using numerous formulas and grants that recognize variable costs of districts and the special needs of disadvantaged students.  Depending on the child's needs and location, per pupil spending from the state general fund ranges anywhere from

$6,000 to $15,000 per child.  Students with disabilities, for example, those who come from linguistically and culturally diverse backgrounds, and those who are struggling to meet state learning standards, will have greater needs and thus require more state funding to have those needs met.

483.   The average state general fund expenditure per pupil for 2016-17 was over $11,800 per child.  More than 90% of Washington's school funding comes from state and local, rather than federal, sources.  For the 2017-19 biennium, state spending for basic education will total over $22 billion, with over $16 billion allocated to basic general education services.

484.   Defendants' Rule will adversely affect Washington's financial interests, as it must expend additional resources to address the harms inflicted on increasing numbers of immigrant parents and children.  State programs, including those for housing assistance, foster care, child welfare services, social and health services, and educational services are all likely to experience significant fiscal impacts.

## ALLEGATIONS FOR INJUNCTIVE AND DECLARATORY RELIEF

485.   An actual controversy exists between the parties within the meaning of 29 U.S.C. § 2201(a), in that Plaintiffs contend that the Rule is invalid and Defendants contend the opposite.

486.   The Rule, if implemented, will cause harm to the States and their residents for which there is no remedy at law.

## **FIRST CLAIM FOR RELIEF**

### (*Ultra Vires* **Agency Action**)

487.   Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

488.   States have long been responsible for ensuring proper care and supervision of children in government custody, including the licensing of facilities that provide for the residential care of children in the custody of the government.

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF

489.   The federal government has never licensed facilities for the care of children and lacks the authority—much less the expertise—to intrude into this area of law, traditionally reserved to the states.

490.   Congress has not authorized DHS to establish an alternative licensing scheme for facilities that provide residential care and supervision of children or families.

491.   The Rule replaces state standards for the care and supervision of children with ICE's Residential Standards.

492.   The Rule replaces state oversight over the care and supervision of children in residential facilities with inspections by federal contractors.

493.   The Rule's usurpation of traditional state authority over the care and supervision of children and its creation of an alternative federal licensing scheme for family detention facilities is *ultra vires* in excess of statutory authority granted to DHS by Congress.

## SECOND CLAIM FOR RELIEF

### (Violation of Administrative Procedure Act, 5 U.S.C. §§ 701-706)

494.   Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

495.   Although the stated purpose of the Rule is to implement the *Flores* Agreement, the Rule sets forth standards that violate critical, material requirements of that Agreement and fail to further its goals and core principles.

496.   The Defendant agencies' explanation of the Rule runs counter to the evidence before them, the reasons proffered for the Rule are pretextual, and, in promulgating the Rule, Defendant agencies have failed to consider important aspects of the problem at issue.

497.   The Rule is unsupported by a reasoned basis for departure from the terms of the *Flores* Agreement, previous regulations, and past practice.

498.   The Rule is arbitrary, capricious, an abuse of discretion, and contrary

to law.

499.   The Rule is in excess of statutory jurisdiction, authority, and limitations and short of statutory right.

500.   The Rule is contrary to constitutional right.

501.   For these reasons, the Rule violates the Administrative Procedure Act, 5 U.S.C. §§ 701-706.

## THIRD CLAIM FOR RELIEF

### (Due Process Clause of the Fifth Amendment of the U.S. Constitution)

502.   Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

503.   Adults and children have a fundamental liberty interest in being free from imprisonment.

504.   The current presidential administration has repeatedly sought to terminate the release and licensed care requirements for children in federal immigration custody in order to subject children and families to detention throughout their immigration proceedings, without regard to their individual risk of flight or danger to the community.

505.   The Rule subjects children and their families—including individuals who have been found to have credible fear of persecution and referred to an immigration court for proceedings under Section 240 of the Immigration and Nationality Act—to prolonged and indefinite detention at Defendants' discretion.

506.   The Rule provides for this detention without affording each individual an opportunity to be heard by a neutral magistrate and to seek release on the basis that he or she poses no risk of flight or danger to the community.

507.   The Rule fails to guard against the imposition of secure detention conditions on children that do not present a risk of flight or danger.

508.   The Rule interferes with parents' ability to make choices regarding their children's education and well-being. By preventing parents from allowing

1  their children to reside at liberty with a trusted relative or friend, the Rule violates

2  their rights as parents and their children's rights to family integrity.

3      509.   Defendants' stated interest in imposing mandatory detention upon

4  children and families who pose no risk of flight or danger to the community to deter

5  other noncitizens from entering the United States, including those seeking asylum

6  and other protection under U.S. law and international treaty obligations, is an

7  invalid and illegitimate basis for civil detention.

8      510.   The detention-related harms suffered by children and families who

9  ultimately obtain protection from deportation and settle in the States as a result will

10  also impact the communities in which they live and require additional support and

11  services from the States.

12      511.   For the foregoing reasons, the Rule violates the procedural and

13  substantive components of the Due Process Clause of the Fifth Amendment to the

14  U.S. Constitution.

15                          **PRAYER FOR RELIEF**

16      WHEREFORE, Plaintiffs State of California, Commonwealth of

17  Massachusetts, State of Connecticut, State of Delaware, District of Columbia, State

18  of Illinois, State of Maine, State of Maryland, State of Michigan, State of

19  Minnesota, State of Nevada, State of New Jersey, State of New Mexico, State of

20  New York, State of Oregon, Commonwealth of Pennsylvania, State of Rhode

21  Island, State of Vermont, Commonwealth of Virginia, and State of Washington

22  request that this Court:

23      1.     Enter a preliminary and permanent injunction that enjoins Defendants

24  from implementing the Rule;

25      2.     Postpone the effective date of the Rule, pending judicial review,

26  pursuant to 5 U.S.C. § 705;

27      3.     Enter an order setting aside and vacating the Rule as unlawful,

28  pursuant to 5 U.S.C. § 706(2);

COMPLAINT FOR DECLARATORY AND
                                                    INJUNCTIVE RELIEF

4.      Issue a declaration that the Rule is

a. *ultra vires*,

b. violates the Administrative Procedure Act, and

c. violates the Due Process Clause of the Fifth Amendment of the U.S. Constitution;

5.      Award the States their costs and expenses, including reasonable attorneys' fees and expert witness fees; and

6.      Award such further and additional relief as is just and proper.


Dated:  August 26, 2019                    Respectfully submitted,


MAURA HEALEY                              XAVIER BECERRA
Attorney General for the Commonwealth     Attorney General of California
of Massachusetts                          MICHAEL L. NEWMAN
ANGELA BROOKS                             Senior Assistant Attorney General
ABIGAIL TAYLOR                            SARAH E. BELTON
Assistant Attorneys General               Supervising Deputy Attorney General
One Ashburton Place
Boston, MA 02108                          */S/  Julia Harumi Mass*
Telephone: (617) 963-2590                 JULIA HARUMI MASS
Email: Angela.Brooks@mass.gov             Deputy Attorney General
*Attorneys for Plaintiff the Commonwealth*  *Attorneys for Plaintiff State of*
*of Massachusetts*                        *California*

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF

WILLIAM TONG
Attorney General of Connecticut
JOSHUA PERRY
Special Counsel for Civil Rights
55 Elm Street
Hartford, CT 06106
Telephone: (860) 808-5372
Email: Joshua.Perry@ct.gov
*Attorneys for Plaintiff State of Connecticut*

KATHLEEN JENNINGS
Attorney General of Delaware
ILONA KIRSHON
Deputy State Solicitor
DONNA THOMPSON
Deputy Attorney General
820 North French Street
Wilmington, DE 19801
Telephone: (302) 577-8367
Email: Donna.Thompson@delaware.gov
*Attorneys for Plaintiff State of Delaware*

KARL A. RACINE
Attorney General for the District of Columbia
JIMMY ROCK
Acting Deputy Attorney General
VALERIE M. NANNERY (SBN 227394)
Assistant Attorney General
441 4th Street, N.W., Suite 630 South
Washington, DC 20001
Telephone: (202) 442-9596
Email: valerie.nannery@dc.gov
*Attorneys for Plaintiff District of Columbia*

KWAME RAOUL
Attorney General of Illinois
JEFF VANDAM
Public Interest Counsel
100 W. Randolph Street, 12th Fl.
Chicago, IL 60601
Telephone: (312) 814-1188
Email: jvandam@atg.state.il.us
*Attorneys for Plaintiff State of Illinois*

AARON FREY
Attorney General of Maine
SUSAN P. HERMAN (*pro hac vice pending*)
Deputy Attorney General
6 State House Station
Augusta, Maine 04333-0006
Telephone: (207) 626-8814
Email: susan.herman@maine.gov
*Attorneys for Plaintiff State of Maine*

BRIAN E. FROSH
Attorney General of Maryland
STEVEN M. SULLIVAN
Solicitor General
JEFFREY P. DUNLAP
Assistant Attorney General
200 Saint Paul Place
Baltimore, MD 21202
Telephone: (410) 576-7906
Email: jdunlap@oag.state.md.us
*Attorneys for Plaintiff State of Maryland*

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

DANA NESSEL
Attorney General of Michigan
B. ERIC RESTUCCIA
JOSEPH T. FROEHLICH
Assistant Attorneys General
P.O. Box 30212
Lansing, MI 48909
Telephone: (517) 335-7628
Email: restucciae@michigan.gov
*Attorneys for Plaintiff State of Michigan*

KEITH ELLISON
Attorney General of Minnesota
Janine Kimble
Assistant Attorney General
102 State Capitol
75 Rev. Dr. Martin Luther King Jr. Blvd.
St. Paul, MN 55155
Telephone: (651) 757-1415
Email: janine.kimble@ag.state.mn.us
*Attorneys for Plaintiff State of Minnesota*

AARON D. FORD
Attorney General of Nevada
HEIDI PARRY STERN
Solicitor General
Office of the Nevada Attorney General
555 E. Washington Ave., Ste. 3900
Las Vegas, NV 89101
Telephone: (702) 486-3420
Email: HStern@ag.nv.gov
*Attorneys for Plaintiff State of Nevada*

GURBIR S. GREWAL
Attorney General of New Jersey
GLENN J. MORAMARCO
Assistant Attorney General
MARIE SOUEID
Deputy Attorney General
25 Market Street
Trenton, NJ 08625
Telephone: (609) 376-3232
Email: Glenn.Moramarco@law.njoag.gov
*Attorneys for Plaintiff State of New Jersey*

HECTOR BALDERAS
Attorney General of New Mexico
TANIA MAESTAS
Chief Deputy Attorney General
408 Galisteo Street
Santa Fe, NM 87501
Telephone: (505) 490-4060
Email: TMaestas@nmag.gov
*Attorneys for Plaintiff State of New Mexico*

LETITIA JAMES
Attorney General of New York
ELENA GOLDSTEIN
Senior Trial Counsel
NANCY TRASANDE
Assistant Attorney General
28 Liberty Street
New York, NY 1005
Telephone: (212) 416-8905
Email: nancy.trasande@ag.ny.gov
*Attorneys for Plaintiff State of New York*

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF

ELLEN F. ROSENBLUM
Attorney General of Oregon
J. NICOLE DEFEVER (SBN #191525)
Senior Assistant Attorney General
Oregon Department of Justice
1162 Court Street N.E.
Salem, OR 97301
Telephone: (971) 673-1880
Fax: (971) 673-5000
Email: Nicole.DeFever@doj.state.or.us
*Attorneys for Plaintiff State of Oregon*

JOSH SHAPIRO
Attorney General for the Commonwealth
of Pennsylvania
Aimee D. Thomson
Deputy Attorney General
1600 Arch St., Suite 300
Philadelphia, PA 19103
Telephone: (267) 940-6696
Email: athomson@attorneygeneral.gov
*Attorneys for Plaintiff Commonwealth
of Pennsylvania*

PETER F. NERONHA
Attorney General of Rhode Island
ADAM D. ROACH
Special Assistant Attorney General
150 South Main Street
Providence, RI 02903
Telephone: (401) 274-4400 x 2490
Email: aroach@riag.ri.gov
*Attorneys for Plaintiff State of
Rhode Island*

THOMAS J. DONOVAN, JR.
Attorney General of Vermont
BENJAMIN D. BATTLES
Solicitor General
JULIO A. THOMPSON
Director, Civil Rights Unit
109 State Street
Montpelier, VT 05609
Telephone: (802) 828-5500
Email: Julio.Thompson@vermont.gov
*Attorneys for Plaintiff State of Vermont*

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF

MARK R. HERRING
Attorney General for the
Commonwealth of Virginia
MICHELLE S. KALLEN
Deputy Solicitor General
202 North 9th Street
Richmond, VA 23219
Telephone: (804) 786-2436
Email: SolicitorGeneral@oag.state.va.us
*Attorneys for Plaintiff Commonwealth of Virginia*

ROBERT W. FERGUSON
Attorney General of Washington
COLLEEN M. MELODY (WSBA #42275)
Division Chief, Civil Rights Unit
LAURA K. CLINTON (WSBA #29846)
Assistant Attorneys General
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
Telephone: (206) 464-5342
Email: Colleen.Melody@atg.wa.gov
Email: Laura.Clinton@atg.wa.gov
*Attorneys for Plaintiff State of Washington*

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF