XAVIER BECERRA
Attorney General of California
MICHAEL L. NEWMAN
Senior Assistant Attorney General
SARAH E. BELTON
Supervising Deputy Attorney General
VIRGINIA CORRIGAN (SBN 292035)
REBEKAH A. FRETZ (SBN 300478)
MARISOL LEÓN (SBN 298707)
VILMA PALMA-SOLANA (SBN 267992)
JULIA HARUMI MASS (SBN 189649)
Deputy Attorneys General
  1515 Clay Street, 20th Floor
  P.O. Box 70550
  Oakland, CA  94612-0550
  Telephone:  (510) 879-3300
  Fax:  (510) 622-2270
  E-mail:  Julia.Mass@doj.ca.gov
*Attorneys for Plaintiff State of California*

(*Additional counsel listed on signature page*)

# IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF CALIFORNIA
### WESTERN DIVISION

| | |
|---|---|
| STATE OF CALIFORNIA, COMMONWEALTH OF MASSACHUSETTS, STATE OF CONNECTICUT, STATE OF DELAWARE, DISTRICT OF COLUMBIA, STATE OF ILLINOIS, STATE OF MAINE, STATE OF MARYLAND, STATE OF MICHIGAN, STATE OF MINNESOTA, STATE OF NEVADA, STATE OF NEW JERSEY, STATE OF NEW MEXICO, STATE OF NEW YORK, STATE OF OREGON, COMMONWEALTH OF PENNSYLVANIA, STATE OF RHODE ISLAND, STATE OF VERMONT, COMMONWEALTH OF VIRGINIA, and STATE OF WASHINGTON, | Case No. 2:19-cv-07390-JFW (PLAx) **NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT** Date:         September 30, 2019 Time:         1:30 p.m. Dept:          Courtroom 7A Judge:        Hon. John F. Walter Trial Date:   Not set Action Filed:  August 26, 2019 |
| Plaintiffs, | |
| v. | |

**KEVIN K. MCALEENAN,** in his official capacity as Acting Secretary of Homeland Security; **U.S. DEPARTMENT OF HOMELAND SECURITY; ALEX M. AZAR, II,** in his official capacity as Secretary of Health and Human Services; **U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES; MARK A. MORGAN,** in his official capacity as Acting Commissioner for U.S. Customs and Border Protection; **U.S. CUSTOMS AND BORDER PROTECTION; MATTHEW T. ALBENCE,** in his official capacity as Acting Director for U.S. Immigration and Customs Enforcement; **U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT; JONATHAN HAYES,** in his official capacity as Director of the Office of Refugee Resettlement; **OFFICE OF REFUGEE RESETTLEMENT,**

                                    Defendants.

**TO THE DEFENDANTS AND THEIR COUNSELS OF RECORD:**

   **PLEASE TAKE NOTICE** that on September 30, 2019, at 1:30 p.m., in Courtroom 7A of the above-entitled court, at 350 West 1st Street, Los Angeles, California, Plaintiffs the State of California, the Commonwealth of Massachusetts, the State of Connecticut, the State of Delaware, the District of Columbia, the State of Illinois, the State of Maine, the State of Maryland, the State of Michigan, the State of Minnesota, the State of Nevada, the State of New Jersey, the State of New Mexico, the State of New York, the State of Oregon, the Commonwealth of Pennsylvania, the State of Rhode Island, the State of Vermont, the Commonwealth of Virginia, and the State of Washington (collectively, Plaintiff States) will move under Local Rule 7-2 for preliminary relief enjoining implementation of the final agency action, "Apprehension, Processing, Care, and Custody of Alien Minors and Unaccompanied Alien Children," 84 Fed. Reg. 44,392 (Aug. 23, 2019) (to be

codified at 8 C.F.R. Parts 212, 236 and 45 C.F.R. Part 410) (the Rule), postponing its effective date, and maintaining the status quo pending judicial review, pursuant to 5 U.S.C. § 705.

Because the Rule violates the Administrative Procedure Act (APA) and will cause irreparable harm, and because the equities and public interest weigh in Plaintiff States' favor, Plaintiff States seek a preliminary injunction enjoining enforcement and implementation of the Rule by Defendants the U.S. Department of Homeland Security (DHS), U.S. Department of Health and Human Services (HHS), U.S. Customs and Border Protection (CBP), U.S. Immigration and Customs Enforcement (ICE), the Office of Refugee Resettlement (ORR), Acting Secretary of DHS Kevin McAleenan, Secretary of HHS Alex M. Azar, II, Acting Commissioner for CBP Mark A. Morgan, Acting Director for ICE Matthew T. Albence, and Director of ORR Jonathan Hayes (collectively, Defendants), or an order postponing the effective date of the Rule pending judicial review, pursuant to 5 U.S.C. § 705.

This motion is based on this notice, the Memorandum of Points and Authorities, the Declarations of Patrick Allen, Ross E. Armstrong, Mary M. Bourque, Sharon C. Boyle, Donna M. Bradbury, Christina A. Brown, Brian S. Cechnicki, JooYeun Chang, Michael A. Chavez, Jean Chen, Joseph A. Curtatone, Ted Dallas, Veronica Davis, Benard P. Dreyer, Pia V. Escudero, Lisa Ghartey-Ogundimu, Bethany L. Hamm, Michael P. Hein, Brad James, Nicole Knight, Daron Korte, James Lane, Ngoan Le, Catrina Lucero, A. Pender Makin, Josette D. Manning, Peggy McDonald, Dierk Meierbachtol, Jonathan P. Moore, Bitta Mostofi, Sarah Neville-Morgan, Trisha A. Olson, Marjean A. Perhot, Sarah K. Peterson, Alma Poletti, Tara Ragland, Lillian Rainer, Ruben Reeves, Michael Rodriguez, Brian C. Ross, M. Marcela Ruiz, Kenneth Schatz, Lisa Schilling, Mira E. Signer, Mary E. Skipper, Felicia Sullivan, Priya Tahiliani, Tom van der Veen, George Vennikandam, Janet S. Whitten, Michael C. Williams, Luis H. Zayas, Robert W. Zavoski, Marie Zimmerman, Howard A. Zucker, Plaintiff States' Request for

1   Judicial Notice and the documents attached as exhibits thereto, this Court's file, and

2   any matters properly before the Court.

3

4   Dated:  August 30, 2019                    Respectfully submitted,

5

6                                              XAVIER BECERRA
                                               Attorney General of California
7                                              MICHAEL L. NEWMAN
                                               Senior Assistant Attorney General
8                                              SARAH E. BELTON
                                               Supervising Deputy Attorney General
9                                              VIRGINIA CORRIGAN
10                                             REBEKAH A. FRETZ
                                               MARISOL LEÓN
11                                             VILMA PALMA-SOLANA
12                                             JASLEEN K. SINGH
                                               Deputy Attorneys General
13

14                                             /s/ *Julia Harumi Mass*
                                               JULIA HARUMI MASS
15                                             Deputy Attorney General
16                                             *Attorneys for Plaintiff State of*
                                               *California*
17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

**Page**

INTRODUCTION .................................................................................................. 1

BACKGROUND .................................................................................................. 1

    I.     The Flores Settlement Agreement ......................................................... 1

    II.    Federal Legislation Impacting Implementation of the *Flores* Agreement and the Rights of Unaccompanied Immigrant Children ........................................................................................................ 3

    III.   The Use of Family Detention and Family Separation as Immigration Enforcement Practices ....................................................... 3

    IV.   The Impact of Detention on Children and Families ............................ 5

    V.    The Rule ................................................................................................. 7

LEGAL STANDARD ........................................................................................ 7

ARGUMENT ....................................................................................................... 8

    I.     The States Are Likely to Succeed on the Merits of their Administrative Procedure Act Claim ................................................. 8

         A.    The Rule's Stated Purpose Directly Conflicts with its Actual Effect of Eliminating Key Protections of the Agreement ................................................................................... 9

         B.    DHS's Action to Promote Family Detention Relies on Unsupported and Unlawful Justifications and Fails to Consider Its Impacts ............................................................. 10

         C.    The Agencies Failed to Consider the Value of State Licensing or the Rule's Impact on State Sovereign Interests ........................................................................................ 17

         D.    The Rule's Specific Regulatory Changes Conflict with the Flores Agreements and Violate the APA ................................ 20

    II.    The States Satisfy the Remaining Requirements for Injunctive Relief ....................................................................................................... 30

         A.    The States Face Irreparable Harm ............................................ 30

          B.    The Balance of Equities and the Public Interest Weigh Heavily in Favor of Provisional Relief ...................................... 34

CONCLUSION .................................................................................................. 35

# TABLE OF AUTHORITIES

**Page**

CASES

*Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*
   458 U.S. 592 (1982) ................................................................................... 31

*Ariz. Dream Act Coal. v. Brewer*
   855 F.3d 957 (9th Cir. 2017) ................................................................... 35

*Bond v. United States*
   572 U.S. 844 (2014) ................................................................................... 20

*Chalk v. U.S. Dist. Ct. Cent. Dist. of Cal.*
   840 F.2d 701 (9th Cir. 1988) ................................................................... 33

*FCC v. Fox Television Stations, Inc.*
   556 U.S. 502 (2009) ................................................................................... 28

*Flores v. Barr*
   __ F.3d __, 2019 WL 3820265 (9th Cir. Aug. 15, 2019) ....................... 21, 22, 28

*Flores v. Johnson*
   212 F. Supp. 3d 864 (C.D. Cal. 2015), *aff'd in part, rev'd in part*
   *sub nom. Flores v. Lynch*, 828 F.3d 898 (9th Cir. 2016) ...................... 18

*Flores v. Lynch*
   828 F.3d 898 (9th Cir. 2016) ................................................................... 3, 19

*Flores v. Reno*
   Case No. CV 85-4544 RJK (Px) (C.D. Cal. Jan. 17, 1997) .................... 2

*Flores v. Sessions*
   862 F.3d 863 (9th Cir. 2017) ................................................................... 3, 22, 23, 24

*Gen. Chem. Corp. v. United States*
   817 F.2d 844 (D.C. Cir.1987) ................................................................. 15, 30

*Ginsberg v. New York*
   390 U.S. 629 (1968) ................................................................................... 32

*Globe Newspaper Co. v. Super. Ct. for Norfolk Cty.*
   457 U.S. 596 (1982) ................................................................................... 32

# TABLE OF AUTHORITIES

**Page**

*H.C. ex rel. Gordon v. Koppel*
    203 F.3d 610 (9th Cir. 2000) ................................................................ 32

*Hook v. State of Ariz., Dep't of Corr.*
    972 F.2d 1012 (9th Cir. 1992) ............................................... 10, 18, 20

*Int'l Ladies' Garment Workers' Union v. Donovan*
    722 F.2d 795 (D.C. Cir. 1983) .............................................................. 27

*J.D.B. v. North Carolina*
    564 U.S. 261 (2011) .............................................................................. 15

*Jennings v. Rodriguez*
    __U.S. __ 138 S.Ct. 830 (2018) (Breyer, J., dissenting) .................... 16

*League of Wilderness Defs./Blue Mountains Biodiversity Project v.*
    *Connaughton*
    752 F.3d 755 (9th Cir. 2014) ............................................................... 34

*Maryland v. King*
    567 U.S. 1301 (2012) ........................................................................... 31

*Mass. v. EPA*
    549 U.S. 497 (2007) ............................................................................... 8

*Michigan v. EPA*
    __U.S. __, 135 S. Ct. 2699 (2015) ................................................. 8, 13

*Moore v. Sims*
    442 U.S. 415 (1992) ....................................................................... 19, 31

*Motor Vehicle Mfrs. Ass'n of United States, Inc. v. State Farm Mut.*
    *Automobile Ins. Co.*
    463 U.S. 29 (1983) ......................................................................*passim*

*Ms. L. v. ICE*
    310 F. Supp. 3d 1133 (S.D. Cal. 2018) ................................................. 4

*Nat'l Parks Conservation Ass'n v. EPA*
    788 F.3d 1134 (9th Cir. 2015) ....................................................... 8, 9, 30

# TABLE OF AUTHORITIES

**Page**

*New Motor Vehicle Bd. of Cal. v. Orrin W. Fox Co.*
  434 U.S. 1345 (1977) (Rehnquist, J., in chambers) ............................................... 31

*Nken v. Holder*
  556 U.S. 418 (2009) ........................................................................................ 7, 34

*Norsworthy v. Beard*
  87 F. Supp. 3d 1164 (N.D. Cal. 2015)................................................................. 33

*Phillips Petroleum Co. v. FERC*
  792 F.2d 1165 (D.C. Cir. 1986) ........................................................................... 9

*Prince v. Massachusetts*
  321 U.S. 158 (1944) ........................................................................................... 19

*R.I.L.-R v. Johnson*
  80 F. Supp. 3d. 164 (D.D.C. 2015) ..................................................................... 12

*Regents of the Univ. of Cal. v. U.S. Dep't of Homeland Sec.*
  908 F.3d 476 (9th Cir. 2018).......................................................................... 8, 20

*Reno v. Flores*
  507 U.S. 292 (1993) ..................................................................................*passim*

*Rodriguez v. Robbins*
  715 F.3d 1127 (9th Cir. 2013)............................................................... 15, 34, 35

*Roper v. Simmons*
  543 U.S. 551 (2005) .......................................................................................... 15

*Sacks v Office of Foreign Control*
  466 F.3d 764 (9th Cir. 2006).............................................................................. 26

*Safe Air for Everyone v. EPA*
  488 F.3d 1088 (9th Cir. 2007)............................................................................. 9

*Saravia v. Sessions*
  905 F.3d 1137 (9th Cir. 2018)..................................................................... 16, 23

# TABLE OF AUTHORITIES

**Page**

*Schall v. Martin*
    467 U.S. 253 (1984) ........................................................................... 32

*SEC v. Chenery Corp.* (*Chenery I*)
    318 U.S. 80 (1943) ............................................................................... 9

*SEC v. Chenery Corp.* (*Chenery II*)
    332 U.S. 194 (1947) ........................................................................... 24

*Thompson v. Oklahoma*
    487 U.S. 815 (1988) ........................................................................... 15

*Troxel v. Granville*
    530 U.S. 57 (2000) (Kennedy, J., dissenting) .................................... 19

*Winter v. Nat. Res. Def. Council, Inc.*
    555 U.S. 7 (2008) ................................................................................. 7

*Wisconsin v. Yoder*
    406 U.S. 205 (1972) ........................................................................... 19

*Wyoming ex rel. Crank v. United States*
    539 F.3d 1236 (10th Cir. 2008) ......................................................... 31


**FEDERAL STATUTES**

5 United States Code
    § 705 .................................................................................................... 7
    § 706(2) ................................................................................................ 8
    § 706(2)(C) ................................................................................... 18, 20

6 United States Code
    § 111 .................................................................................................... 3
    § 231 .................................................................................................... 3
    § 279 .................................................................................................... 3
    § 291 .................................................................................................... 3
    § 552(a)(1) .......................................................................................... 3

# TABLE OF AUTHORITIES

**Page**

8 United States Code
    § 1158(a)(2)(E) ................................................................ 27
    § 1182(d)(5)(A) ................................................................ 22
    § 1229a(b)(5)(C) .............................................................. 12

Pub. L. No. 11-457, 122 Stat. 5044 .......................................... 3

Pub. L. No. 107-26, 116 Stat. 2135 .......................................... 3

Pub. L. No. 115-123, 132 Stat. 246 ......................................... 17

STATE STATUTES

55 Pennsylvania Code
    § 3800 ............................................................................ 19

1866 Mass. Acts Chapter 283 ................................................... 32

California Health & Safety Code
    § 1508 ............................................................................ 31

District of Columbia Code
    § 4-1303.01a .................................................................. 19
    § 7-2105 ......................................................................... 19
    § 7-2108 ......................................................................... 19

Mass. Gen. Laws Chapter 15D
    § 6 ................................................................................. 31
    § 15A ............................................................................. 31

Mass. Gen. Laws Chapter 119, § 1 ........................................... 32

Minn. R. 2960.0080 .............................................................. 19

FEDERAL REGULATIONS

8 Code of Federal Regulations
    § 212.5(b) ....................................................................... 21

# TABLE OF AUTHORITIES

**Page**

§ 235.3(b)(2)(iii) ........................................................................................ 21


**STATE REGULATIONS**

California Code of Regulations, Title 22
§ 80006(c) ................................................................................................... 31

D.C. Mun. Regs. Title 29, § 6201 .................................................................. 19

D.C. Mun. Regs. Title 29, § 6301 .................................................................. 19



**OTHER AUTHORITIES**

58 Fed. Reg. 51,735 ...................................................................................... 13

83 Fed. Reg. 29,435 ...................................................................................... 14

83 Fed. Reg. 45,496 ...................................................................................... 30

84 Fed. Reg. 44,392 .............................................................................. *passim*

**INTRODUCTION**

Defendants U.S. Department of Homeland Security (DHS) and U.S. Department of Health and Human Services (HHS) (collectively, the Agencies) have promulgated regulations purporting to codify the *Flores* Agreement for the purpose of terminating it. *Apprehension, Processing, Care, and Custody of Alien Minors and Unaccompanied Alien Children*, 84 Fed. Reg. 44,392 (Aug. 23, 2019) (Rule). Because the Rule violates core provisions of the very settlement agreement it claims to codify, it must be set aside under the Administrative Procedure Act (APA) as arbitrary, capricious, an abuse of discretion, and contrary to law. The Rule is also "short of statutory right," within the meaning of the APA, because it sets up a federal licensing scheme for the oversight of child welfare standards—a police power squarely within the traditional purview of the states and which no act of Congress authorizes. Finally, with respect to the policy decision to subject families with children to civil detention, the Agencies failed to analyze—much less justify—the human and financial costs of the Rule as compared to less restrictive alternatives for ensuring that families appear for their immigration hearings and comply with any resulting orders. The Rule will cause irreparable harm not only to countless migrant children and their families, but also to the Plaintiff States. Moreover, the balance of the equities and the public interest tip decidedly in favor of enjoining the Rule.

**BACKGROUND**

**I.    THE *FLORES* SETTLEMENT AGREEMENT**

In 1984, the Western Region of the U.S. Immigration and Naturalization Service (INS) adopted a policy prohibiting the release of detained children to anyone other than "a parent or lawful guardian, except in unusual and extraordinary cases." *Reno v. Flores*, 507 U.S. 292, 296 (1993) (internal quotations omitted). The next year, four immigrant children filed a class action lawsuit in this Court, challenging the policy and the detention conditions to which they were subjected

under the policy. After significant litigation, the parties reached an agreement, which was approved by the Court in 1997.

The *Flores* Agreement (also, FSA) "sets out nationwide policy for the detention, release, and treatment of minors in [immigration] custody."[1] It sets forth detailed procedures to ensure that children in immigration custody are placed in the "least restrictive setting appropriate to the minor's age and special needs" consistent with the government's enforcement interests. RJN Ex. 50 ¶ 11. The Agreement requires that Defendants place children in state-licensed facilities no later than five days after they are taken into custody except under very narrow circumstances. *Id*. ¶ 12(A). Such facilities must not only be "licensed by an appropriate State agency to provide residential, group, or foster care services for dependent children," but they must also be "non-secure as required under state law" and meet additional standards laid out in Exhibit 1 of the Agreement. *Id*. ¶ 6.

The *Flores* Agreement states a "general policy favoring release." *Id.* p. 14. When detention is not required to secure a child's timely appearance in immigration proceedings or to ensure the child's safety or the safety of others, DHS or HHS— successors to INS for purposes of the *Flores* Agreement—must release the child from custody "without unnecessary delay" to: a parent, a legal guardian, an adult relative, an adult individual or entity designated by the parent or legal guardian; a licensed program willing to accept legal custody; or an adult individual or entity seeking custody, in the discretion of the agencies, when it appears that there is no likely alternative to long term detention and family reunification does not appear to be a reasonable possibility. *Id.*

In 2001, the parties to the *Flores* Agreement signed an addendum stipulating that the agreement would remain in place until 45 days after Defendants' publication of final regulations implementing the agreement. The addendum

---

[1] Stipulated Agreement, *Flores v. Reno*, Case No. CV 85-4544 RJK (Px) (C.D. Cal. Jan. 17, 1997); *see* Request for Judicial Notice (RJN) Ex 50.

1  provides that, notwithstanding the termination date, "the INS shall continue to

2  house the general population of minors in INS custody in facilities that are state-

3  licensed for the care of dependent minors." *Id.* p. 49.

4  **II.    FEDERAL LEGISLATION IMPACTING IMPLEMENTATION OF THE *FLORES***

5  **AGREEMENT AND THE RIGHTS OF UNACCOMPANIED IMMIGRANT
   CHILDREN**

6          In 2002, Congress dissolved the INS and transferred its authority to DHS.

7  Homeland Security Act of 2002 (HSA), Pub. L. No. 107-26, 116 Stat. 2135; *see*

8  6 U.S.C. §§ 111, 231, 291. Congress also delegated the care and custody of

9  unaccompanied immigrant children to the Office of Refugee Resettlement (ORR).

10  6 U.S.C. § 279. INS's obligations under the *Flores* Agreement were preserved and

11  transferred to DHS and ORR through the savings provisions of the HSA. 6 U.S.C.

12  § 552(a)(1) (incorporated by reference into 6 U.S.C. § 279(f)(2)); *see Flores v.*

13  *Sessions*, 862 F.3d 863, 871 (9th Cir. 2017)).

14          In 2008, Congress enacted the William Wilberforce Trafficking Victims

15  Protection Reauthorization Act of 2008 (TVPRA), Pub. L. No. 110-457, 122 Stat.

16  5044 (principally codified in relevant part at 8 U.S.C. § 1232). It also incorporated

17  by reference and partially codified the *Flores* Agreement by creating statutory

18  standards for the treatment of unaccompanied children. The TVPRA did not

19  diminish the federal government's obligations under the *Flores* Agreement with

20  respect to unaccompanied *or* accompanied children. *Flores v. Sessions*, 862 F.3d at

21  871, 881; *see also Flores v. Lynch*, 828 F.3d 898, 910 (9th Cir. 2016).

22  **III.   THE USE OF FAMILY DETENTION AND FAMILY SEPARATION AS**

23  **IMMIGRATION ENFORCEMENT PRACTICES**

          Prior to 2001, families apprehended for entering the United States without

24  authorization were most often released, rather than detained. *Flores v. Lynch*, 828

25  F.3d at 903. However, beginning in 2001, ICE began detaining a limited number of

26  families in detention facilities (referred to as "Family Residential Centers" by ICE)

27  in Pennsylvania, Texas, and New Mexico. *Id.* at 903-04. DHS's use of these

28

facilities has come under intense criticism for harm caused to children and their families resulting from detention in "prison-like" conditions. RJN Exs. 25, 28, 31 at 1698-1704. In 2007, ICE Enforcement and Removal Operations approved standards for family detention facilities (ICE Residential Standards). RJN Exs. 2, 50. To date, these standards do not include the requirements governing conditions for children enumerated in Exhibit 1 to the *Flores* Agreement. *Id*. at Ex. 50.

In response to controversy over family detention, DHS established the DHS Advisory Committee on Family Residential Centers in 2015. This committee's initial report recommended that "DHS should discontinue the general use of family detention, reserving it for the rare cases when necessary following an individualized assessment of the need to detain because of danger or flight risk that cannot be mitigated by conditions of release." RJN Ex. 25 at 791.

On April 6, 2018, former U.S. Attorney General Jefferson Sessions announced a new "zero tolerance" policy under which all adult undocumented immigrants entering the United States without authorization would be subject to criminal prosecution, with no exceptions for asylum seekers or those accompanied by minor children. RJN Ex. 53. This zero tolerance policy resulted in thousands of children being separated from their parents—a consequence that has since been enjoined. *See Ms. L. v. ICE*, 310 F. Supp. 3d 1133, 1149 (S.D. Cal. 2018), *appeal docketed*, No. 18-56151 (9th Cir. Aug. 27, 2018).[2]

Following public outcry over the separation of thousands of families, on June 20, 2018, President Trump signed an Executive Order purporting to suspend the policy, and ordering DHS to detain immigrant families together during the pendency of any criminal trial or immigration proceeding to the extent permitted by law. RJN Ex. 9. As contemplated by the Executive Order, the federal government

---

[2] In a subsequent report, the U.S. Department of Human Services Office of the Inspector General estimated that thousands more children had been separated prior to the announcement of the policy, but that efforts to identify them had been hampered by the lack of a system to track separated families. RJN Ex. 3.

filed a request to modify the *Flores* Agreement to allow it to detain all families with children during their immigration proceedings, without any individual determination of the need for such detention. RJN Ex. 51. The Court denied the federal government's application, holding that the relief ordered by the court in *Ms. L* did not support modification of the *Flores* Agreement, and noting that "[a]bsolutely nothing prevents Defendants from reconsidering their current blanket policy of family detention and reinstating prosecutorial discretion." RJN Ex. 52.

ICE currently operates three family residential centers, with a combined capacity of 3,326: the Karnes Residential Center in Karnes City, Texas; the South Texas Family Residential Center in Dilley, Texas; and the Berks Family Residential Center in Berks County, Pennsylvania. 84 Fed. Reg. 44,508. Due to release requirements under the *Flores* Agreement, families are currently detained for up to approximately 20 days, which is generally the time required for U.S. Citizenship and Immigration Services (USCIS) to conduct credible fear proceedings. *Id.*

## IV.    THE IMPACT OF DETENTION ON CHILDREN AND FAMILIES

Being subject to detention for even brief periods causes lasting harm to children, especially for children with previous trauma. Such harms are compounded in ICE's family detention facilities where, as numerous studies have documented, prison-like and unsafe conditions are paired with inadequate access to health services, limited mental health services, and a lack of appropriate developmental and educational opportunities. *See* RJN Exs. 25 at 707; 30; 31 at 1689-1761.

Individuals who have worked with children in family detention have documented the adverse effects. Dr. Luis Zayas, Dean of the School of Social Work at the University of Texas at Austin, interviewed families in family detention facilities and found "regressions in children's behavior; suicidal ideation in teenagers; nightmares and night terrors; and pathological levels of depression, anxiety, hopelessness, and despair." RJN Ex. 39 at 2308. Detained parents have also reported behavioral changes in their children while in detention, including lack

of appetite, weight loss, sleep disturbances, clinginess, bed wetting, withdrawal, self-harming behavior, suicidal ideation, developmental regressions, and aggression. RJN Ex. 47. Clinical studies have shown that that the harmful impact of detention on a child's physical and mental health is not mitigated by the presence of a parent. RJN Exs. 20, 30.

The Administrative Record for the instant Rule is replete with comments from subject matter experts warning about the negative physical and mental health impacts of prolonged detention on children and families. *E.g.,* RJN Exs. 19-21, 23, 25, 29-33. The American Association of Pediatrics warned that "even short periods of detention can cause psychological trauma and long-term mental health risks for children" and that "[s]tudies of detained immigrants have shown that children and parents may suffer negative physical and emotional symptoms from detention, including anxiety, depression, and posttraumatic stress disorder." RJN Ex. 25 at 710. Similarly, the American Psychological Association commented that "[s]tudies of health difficulties of detained children found that most of them reported symptoms of depression, sleep problems, loss of appetite and somatic complaints, such as headaches and abdominal pains. Other concerns include inadequate nutritional provision, restricted meal times, and child weight loss." RJN Ex. 29 at 1063.

DHS's own Advisory Committee on Family Residential Centers concluded that "detention [is] never in the best interest of children." RJN Ex. 25 at 791. The medical and psychiatric subject matter experts for DHS's Office of Civil Rights and Civil Liberties reported "significant compliance issues resulting in harm to children" to the U.S. Senate Whistleblowing Caucus, based on ten investigations of family detention facilities in over four years. Their findings included significant weight loss in children that went largely unnoticed by facility medical staff, dangerously inadequate medical care, and physically dangerous conditions, among other concerns. These experts stated that "the fundamental flaw in family detention

1   is not just the risk posed by the conditions of confinement," but in fact "no amount

2   of programming that can ameliorate the harms created by the very act of confining

3   children to detention centers." RJN Ex. 25 at 986.

4   **V.    THE RULE**

5        The Rule, which was published August 23, 2019, purports to implement, and

6   thereby terminate, the *Flores* Agreement. But contrary to the *Flores* Agreement's

7   guiding principles to protect children, every provision of the Rule reduces the

8   protections for children and increases the Agencies' authority to detain.

9   Specifically, the Rule amends regulations concerning eligibility for release on bond

10  or parole, eliminates the requirement to release children to qualified non-parent

11  sponsors, and eliminates—for accompanied children—the requirement that they be

12  placed in state-licensed facilities. The Rule replaces state-licensing for

13  accompanied children with a shadow licensing scheme created and implemented by

14  ICE for family detention facilities. The Rule is scheduled to become effective 60

15  days after its publication, on October 22, 2019.

16                  **LEGAL STANDARD**

17       A preliminary injunction may issue when the plaintiffs establish that they are

18  likely to succeed on the merits, they are likely to suffer irreparable harm in the

19  absence of preliminary relief, the balance of equities tips in plaintiffs' favor, and an

20  injunction is in the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S.

21  7, 20 (2008). Under the APA, "the reviewing court […] may issue all necessary and

22  appropriate process to postpone the effective date of an agency action." 5 U.S.C. §

23  705. This remedy is available "to the extent necessary to prevent irreparable injury"

24  and to preserve the status quo pending judicial review proceedings. *Id.; see Nken v.*

25  *Holder*, 556 U.S. 418, 425 (2009) (applying preliminary injunction factors to

26  request for stay pending review).

27

28

# ARGUMENT

## I.   THE STATES ARE LIKELY TO SUCCEED ON THE MERITS OF THEIR ADMINISTRATIVE PROCEDURE ACT CLAIM

"Federal administrative agencies are required to engage in 'reasoned decisionmaking.'" *Michigan v. EPA*, __U.S. __, 135 S.Ct. 2699, 2706 (2015) (internal citations omitted). Under the APA, courts must "hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;" "contrary to constitutional right;" or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2). In this case, the Agencies' actions meet *each* of these bases for judicial reversal.

First, the Rule's overall goal of replacing the *Flores* Agreement's protections with a federal family detention system that limits children's rights to release from custody is directly at odds with its stated intention of implementing the *Flores* Agreement through regulations. This fundamental inconsistency, along with DHS's shifting justifications and failure to address "important aspect[s] of the problem," render the Rule arbitrary and capricious under the APA. *Motor Vehicle Mfrs. Ass'n of United States, Inc. v. State Farm Mut. Automobile Ins. Co.*, 463 U.S. 29, 43 (1983); *see also Nat'l Parks Conservation Ass'n v. EPA*, 788 F.3d 1134, 1141 (9th Cir. 2015) ("EPA's actions must also be consistent; an internally inconsistent analysis is arbitrary and capricious.") (internal citations omitted).

Second, the Agencies seek to justify the Rule's specific regulatory changes with erroneous legal positions or with no reasons at all. "[I]t is black letter law that where an agency purports to act solely on the basis that a certain result is legally required, and that legal premise turns out to be incorrect, the action must be set aside, regardless of whether the action *could* have been justified as an exercise of discretion." *Regents of the Univ. of Cal. v. U.S. Dep't of Homeland Sec.*, 908 F.3d 476, 505 (9th Cir. 2018) (emphasis in original); *see also Mass. v. EPA*, 549 U.S.

497, 532 (2007); *SEC v. Chenery Corp.* (*Chenery I*), 318 U.S. 80, 94 (1943) ("[A]n order may not stand if the agency has misconceived the law."); *Safe Air for Everyone v. EPA*, 488 F.3d 1088, 1101 (9th Cir. 2007); *Phillips Petroleum Co. v. FERC*, 792 F.2d 1165, 1170–71 (D.C. Cir. 1986) (rejecting agency interpretation of statute where agency's position "was based solely on its erroneous reading" of precedent and agency "believed itself bound by" that case). For these reasons, the States are likely to prevail on the merits of their APA claim.

### A.   The Rule's Stated Purpose Directly Conflicts with its Actual Effect of Eliminating Key Protections of the Agreement

The Rule at issue here may be unique in the history of agency action for the degree to which the justifications put forth by the Agencies conflict with the reality of the agency action taken. This fundamental inconsistency renders it arbitrary and capricious under the APA. *See Nat'l Parks Conservation Ass'n*, 788 F.3d at 1141.

The Rule characterizes its "primary purpose" as "codifying the purposes of the FSA in regulations" and "accordingly implements the FSA." 84 Fed. Reg. 44,393. It also characterizes its action as adopting "regulatory measures that are materially parallel to the FSA standards and protections" while responding to "changed factual and operational circumstances." 84 Fed. Reg. 44,397. Indeed, implementation of the *Flores* Agreement is the only permissible purpose for a regulation intended to meet the termination clause of the *Flores* Agreement. RJN Ex. 50 at 2600. Yet, it is clear that the true goal of the Agencies was to *override* fundamental protections of the *Flores* Agreement and Agency obligations that stem from it. RJN Exs. 8, 15-18, 49 at 2545 (listing "OVERRIDE FLORES AGREEMENT" as one of the White House's three "solutions").

The Rule seeks to achieve this goal by eliminating key protections of the Agreement. Specifically, as described below, the Rule contravenes the Agreement by allowing longer detentions of children in immigration custody and routine use of facilities that are not state-licensed in accordance with the *Flores* Agreement. The

Agencies justify these changes by admitting that they are broadening the authority to detain children beyond what is allowed under the Agreement:

> [B]y modifying the literal text of the FSA (to the extent it has been interpreted to apply to accompanied minors) in limited cases to reflect and respond to intervening statutory and operational changes, DHS ensures that it *retains discretion to detain families* . . . to meet its enforcement needs, while still providing protections to minors that the FSA intended.

84 Fed. Reg. 44,398 (emphasis added). Having inherited obligations from the federal agency that entered into the *Flores* Agreement, the Agencies cannot simply "modify the literal text" of the Agreement "to reflect and respond to intervening statutory and operational changes." *Cf.* 84 Fed. Reg. 44,398; *see Hook v. State of Ariz., Dep't of Corr.*, 972 F.2d 1012, 1016-17 (9th Cir. 1992) (finding that even if underlying law fails to support a consent decree, an agency must seek to vacate the decree rather than "promulgate new regulations which directly violate the consent decree"). Yet, this is exactly what the Agencies have done here. Because the stated purpose is directly contrary to the obvious impact—and true purpose—of the Rule, it should be set aside as arbitrary and capricious agency action.

### B. DHS's Action to Promote Family Detention Relies on Unsupported and Unlawful Justifications and Fails to Consider Its Impacts

The Agencies' adoption of a Rule that promotes family detention without the protections of the *Flores* Agreement is also arbitrary, capricious, and contrary to law because the offered explanations "run[] counter to the evidence before the agenc[ies]," are not supported by the required substantial evidence, and "entirely fail[] to consider an important aspect of the problem." *State Farm*, 463 U.S. at 43, 44. Specifically, the Agencies relied on internally inconsistent positions to respond to serious public concerns, dismissed readily available alternatives that would achieve the government's interests, and failed to address significant human and financial costs. *See State Farm*, 463 U.S. at 52 (agencies are required to "look at the costs as well as the benefits" of their actions, or to properly consider readily

available alternatives).

### 1. DHS's Justifications Are Unsupported by the Record before the Agency and Contrary to Law

DHS attempted to justify its adoption of a family detention system in three ways, none of which withstand scrutiny under the APA. First, DHS reasoned that family detention will "maintain[] family unity during immigration proceedings," with advantages such as "the child being under the care of the parent, immigration proceedings occurring together and any removal or release occurring at the same time." 84 Fed. Reg. 44,403. As these advantages are equally present when families are released pending immigration proceedings, it is clear that DHS's purported interest in family unity is not a rational justification for expanding family detention.

Second, DHS implied that family detention will have an important deterrent effect on migration. Specifically, the Agency cited an increase in the volume of children and families seeking entry to the United States to support its speculation that release pending immigration proceedings "may incentivize [the] risky practices [of traveling to and seeking to cross the border with children]." 84 Fed. Reg. 44,403-404. Many commenters challenged this inference by presenting statistical analyses of migration trends, how migrants' misapprehend U.S. immigration enforcement policies and practices, and the home country conditions many migrants seek to escape, but DHS's response did not address the points presented. *See*, *e.g.*, RJN Exs. 24 at 684-88; 31 at 1131-1167. Instead, it stated, ". . . the primary objective of the rule is to implement the FSA; it is not to utilize detention as a deterrent to migration."  84 Fed. Reg. 44,484.

Notably, this response conflicts with Defendants' 2018 application for relief from the *Flores* Agreement, which argued that a deterrence theory justified modifying the Agreement. *See* RJN Ex. 51 at 2622 ("detaining these individuals dispels such expectations, and deters others from unlawfully coming to the United States"); *see also* RJN Ex. 17 and 18. The Agencies' position on deterrence is

unclear at best. What is clear is that a deterrence theory cannot serve as justification for the Rule, both because it is not supported by substantial evidence, and because it is an improper basis for civil detention. *See State Farm*, 463 U.S. at 36, 43-44 (agency findings should be supported by "substantial evidence"); *R.I.L.-R v. Johnson*, 80 F. Supp. 3d. 164, 188-89 (D.D.C. 2015) ("civil detention may not 'become a mechanism for retribution or *general deterrence*'—functions properly those of criminal law, not civil commitment") (quoting *Kansas v. Crane*, 534 U.S. 407, 412 (2002) (internal citation omitted)).

Third, DHS justified its decision to detain rather than release families based on the Agency's interest in ensuring that children and their parents appear for their immigration proceedings and do not evade removal. In support of family detention, DHS cited data regarding *in absentia* removal orders, *i.e.* the closure of immigration cases due to respondents failing to appear. 84 Fed. Reg. 44,405-07. DHS did not explain or address the fact that *in absentia* removal orders are issued upon a single instance of a respondent failing to appear in court. *See* 8 U.S.C. § 1229a(b)(5)(C) (*in absentia* removal order automatic for failure to appear if government presents evidence that notice was given). DHS also failed to consider the many reasons respondents do not appear, such as ICE's failure to provide hearing notices in languages that respondents understand. *See* RJN Ex. 11 at 605, 610 (87.9% of released respondents in study who spoke neither English nor Spanish received Notices to Appear in Spanish). DHS failed to analyze reasons for *in absentia* orders, simply assuming that all such orders represent intentional efforts to avoid immigration proceedings.

Moreover, DHS was presented with comments regarding alternatives to detention (ATD) that have proven effective at securing families' participation in their immigration cases at a lower cost than detention. 84 Fed. Reg. 44,487 (ATD costs $4 per person, per day; $36 per family per day compared to approximately $319 per person per day in detention); *see* RJN Exs. 25 at 996, 999; 31 at 1168-

1221, 1481-1493, 1584-1602, 1603-1606. DHS responded to the comments about ATD by stating:

> DHS agrees with the commentators that ATD has an important role to play as an effective compliance tool for some aliens. . . . But ATD is only a partial solution, not a complete answer. Congress has authorized, and in some cases required, immigration detention as a tool for fulfilling ICE's mission.

84 Fed. Reg. 44,487. DHS noted that alternatives to detention "do not provide a means to effectively remove those who are illegally present and have a final order of removal," and that "family units on ATD tend to abscond at a higher rate than non-family units." 84 Fed. Reg. 44,487-488. It reasoned, without providing relative rates, that the cost savings per day using ATD is offset by non-detained cases taking more time in immigration court. *Id*.

DHS's position that alternatives to detention do not work in every case falls short of justifying its dramatic departure from the *Flores* Agreement's requirements that children be held in the least restrictive setting appropriate to their ages and special needs; that care and oversight be provided through state-licensed facilities; and that DHS release children "without unnecessary delay" to adult relatives or other qualified sponsors. DHS's stated concern about *in absentia* removal orders is too thin a reed to bear the human and financial costs of the Rule. *See State Farm*, 463 U.S. at 52 (agencies are required to "look at the costs as well as the benefits" of their actions and to properly consider readily available alternatives).

### 2. The Agencies Failed to Meet Their Burden to Analyze the Impacts of this Financially Significant Rule

As DHS concedes, the Rule involves potential costs over $100 million. 84 Fed. Reg. 44,496. They were, therefore, specifically required to provide analysis and assessments of its costs and benefits, as well as the "costs and benefits of potentially effective and reasonably feasible alternatives[.]" Exec. Order No. 12866, 58 Fed. Reg. 51,735; *see also Michigan v. EPA*, 135 S. Ct. at 2715 (noting that for "all rules with an annual economic effect of at least $100 million," the agency

proposing the rule "must systematically assess the regulation's costs and benefits"). The Agencies failed to consider significant costs of the Rule, including its financial impact, the significant constitutional concerns it poses, and costs to individual and public health.

### a.   The Agencies Improperly Refuse to Estimate the Financial Impact of the Rule

The Agencies' conclusion that they are "unable to determine if this rule would result in additional bed space" to detain family units is not only patently unconvincing; it also illustrates the Agencies' refusal to estimate the financial impact of the Rule. Two days after the President's June 20, 2018 Executive Order mandating, *inter alia*, that DHS "maintain custody of alien families during the pendency of any…immigration proceedings," ICE issued a Request for Information soliciting interest from potential facilities to accommodate up to 15,000 family detention beds. 83 Fed. Reg. 29,435; RJN Exs. 9, 10. Also in June 2018, the Pentagon issued a statement stating that DHS asked it to provide 12,000 beds to detain families. RJN, Ex. 13. Then, on November 18, 2018, the President tweeted "Catch and Release is an obsolete term. It is now Catch and Detain…." RJN Ex.16.

Faced with comments regarding the financial significance of the Rule, Defendants attempted to avoid their obligation to analyze its impact by minimizing the anticipated need for family detention space. For example, the record includes analyses estimating that the Rule will cost between ***$201 million and $1.3 billion per year*** for increased detention capacity based on historic length of stay data. RJN Ex. 24 at 688-698. DHS responded it could not look at historic average length of stays to estimate costs and that not all those apprehended will be detained for prolonged times. 84 Fed. Reg. 44,497. Yet, on the day the Rule was issued Acting ICE Director Albence stated that the "agency was preparing for the average stay for families to increase from 10 days to up to 50 days." RJN Ex. 14 at 623-624.

The Agencies simultaneously embrace contradictory lines of reasoning to

avoid facts inconvenient to their preferred policy outcome. Having justified all departures from the *Flores* Agreement's protections based on the need to increase detention for enforcement purposes, they minimize the likelihood of using their increased detention authority under the Rule.  Such internal inconsistencies are a hallmark of arbitrary and capricious rulemaking. *See Gen. Chem. Corp. v. United States,* 817 F.2d 844, 854 (D.C. Cir.1987) (agency cannot "have it both ways").[3] Of course, the Agency's refusal to estimate costs based on plans to expand detention also fails to meet the standard of reasoned decisionmaking. *See State Farm*, 463 U.S. at 43, 44 (agency action is arbitrary and capricious if it "runs counter to the evidence before the agency" or "is so implausible that it could not be ascribed to a difference in view or the product of agency expertise").

### b.    The Agencies Failed to Analyze Due Process Concerns

"[F]reedom from physical restraint has always been at the core of the liberty protected by the Due Process Clause from arbitrary governmental action." *Rodriguez v. Robbins*, 715 F.3d 1127, 1146 (9th Cir. 2013) (internal quotations omitted). Prolonged detention of children by immigration authorities thus raises serious due process concerns. These concerns are heightened because of the particular care that must be exercised in safeguarding their welfare and constitutional rights. *See*, *e.g.*, *J.D.B. v. North Carolina*, 564 U.S. 261, 272 (2011) (*Miranda* custody analysis is different for children); *Roper v. Simmons*, 543 U.S. 551, 578 (2005) (the Eighth and Fourteenth Amendments prohibit the death penalty for juvenile offenders); *Thompson v. Oklahoma*, 487 U.S. 815, 823 (1988) (recognizing "there are differences which must be accommodated in determining the rights" of children compared to those of adults) (internal quotations omitted).

The Agencies failed to consider these concerns in permitting—and in some

---

[3]  *See also* 84 Fed. Reg. 44,486 ("current limitations on bed space . . . will likely mean that, as a practical matter, unless the amount of bed space is significantly expanded . . . families that have established credible fear and who are not a flight risk or danger will often be released from detention").

cases requiring—the detention of accompanied children with their parents during the pendency of immigration proceedings, despite the likelihood such detention may last for months, and even years, due to prolonged immigration proceedings. *See, e.g.*, 84 Fed. Reg. at 44,517; RJN Ex. 31 at 1125-1130, 1222-1270. This is particularly true for families seeking asylum, who comprise a large portion of families subject to detention under the Rule. *See Jennings v. Rodriguez*, __U.S. __, 138 S.Ct. 830, 860 (2018) (Breyer, J., dissenting) ("The record shows that the Government detained some asylum seekers for 831 days (nearly 2 & half years), 512 days, 456 days, 421 days, 354 days, 319 days, 318 days, and 274 days—before they won their cases and received asylum.").

Importantly, recent court decisions recognize due process limits on detention of children in removal proceedings. In June 2017, for example, the administration was enjoined from carrying out its policy and practice of arresting and detaining previously released unaccompanied children based on allegations of gang membership without notice of the evidence against them or an opportunity to rebut that evidence before a neutral magistrate. *Saravia v. Sessions*, 905 F.3d 1137, 1141 (9th Cir. 2018). Despite the serious constitutional concerns at issue, here, DHS failed to consider whether the Rule might result in a deprivation of liberty interests in violation of the due process rights of children detained pursuant to the Rule.

### c. The Agencies Failed to Analyze the Rule's Impact on Individual and Public Health

Disclaiming any certainty that family detention will be expanded, Defendants declined to consider the physical and mental health effects of detention on children and families, or the costs to communities who will welcome them upon their release. As discussed in Section IV, above, family detention is deeply harmful, and the record before the Agencies was full of medical, mental health, and child development expertise condemning the use of family detention and providing examples of terrible neglect and egregious outcomes. *See*, *e.g.*, RJN Exs. 19-21, 23,

24, 25, 29-33, 34 at 2074. "In one case, an 18-month old toddler died of respiratory failure after she and her mother were released from the Dilley detention center where she was provided inadequate treatment despite a consistently high fever and progressively worsening symptoms." RJN Ex. 35 at 2084. Notably, both state child welfare policy and federal policy promote family-based care over institutionalized care for children. *See* Family First Prevention Services Act, Pub. L. No. 115-123, 132 Stat. 246 (enacted February 9, 2018) (limiting federal payments for out-of-home placements that are not foster homes).

The impact of agency action on family well-being is clearly a relevant factor for a rule creating a family detention system. *State Farm*, 463 U.S. at 43. Yet the Agencies failed to engage meaningfully with the many public comments about the adverse impacts of family detention. And while commenters drew comparisons and warned of dangers similar to those inflicted on the Japanese Americans civilly incarcerated during World War II, the Agencies did not offer any response or analysis of the similarity. RJN Exs. 31 at 1762-1976, 36; 84 Fed. Reg. 44,486 and 44,462.

The potential due process, human, and economic harms resulting from the Rule are too many to justify the Agencies' adoption of the Rule, particularly when considered in light of the effectiveness of alternatives to detention, discussed above.

**C.   The Agencies Failed to Consider the Value of State Licensing or the Rule's Impact on State Sovereign Interests**

**1.   Federal "Licensing" of Family Detention Facilities Violates the *Flores* Agreement and Is Unsupported by Reasoned Explanation**

To ensure adequate care and independent oversight, the *Flores* Agreement requires that children be placed in state-licensed facilities. RJN Ex. 50 ¶ 14. The Rule departs from the Agreement by substituting a federal licensing scheme for facilities that would violate state law. 84 Fed. Reg. 44,526 (to be codified at 8 C.F.R. § 236.3(b)(9)).  The Rule's attempt to authorize federal licensing is arbitrary

1    and capricious, contrary to law, and short of statutory right. 5 U.S.C. § 706(2)(C).

2        First, DHS's avoidance of the *Flores* Agreement's state licensing requirement

3    is contrary to law. The *Flores* court has found, and the Ninth Circuit has affirmed,

4    that the state-licensing requirement is a material term in the *Flores* Agreement to

5    which Defendants are bound. *Flores v. Johnson*, 212 F. Supp. 3d 864, 879-80 (C.D.

6    Cal. 2015), *aff'd in part, rev'd in part sub nom. Flores v. Lynch*, 828 F.3d at 906,

7    910. The Agencies cannot issue regulations to avoid obligations under the consent

8    decree that they find inconvenient. *See Hook,* 972 F.2d at 1016-17.

9        Second, DHS failed to consider the importance and purpose of state licensing,

10   or to analyze the many ways in which federal "licensing" under the Rule falls short

11   of what was intended and effectuated through the state-licensing requirement of the

12   *Flores* Agreement. *State Farm*, 463 U.S. at 43 (failure to consider important aspect

13   of the problem). In the Plaintiff States, as elsewhere, family detention facilities for

14   migrant children are fundamentally incompatible with state licensing schemes and

15   child welfare policy because the long-term detention of children is generally not in

16   the best interests of children and is understood to be harmful to their safety and

17   well-being.

18       Third, the Family Residential Standards contemplated by the Rule lack

19   numerous important protections frequently afforded by state licensing schemes in

20   order to provide for the best interests of children including: the provision of

21   individualized plans to support each child's development; the allowance of

22   independence and access to the community, as appropriate; specifications as to size,

23   maintenance, and inspections of living quarters and residential areas; requirements

24   regarding cleanliness and personal care items; protections for transgender youth to

25   be housed according to their gender identities; and allowances for participation in

26   extra-curricular, recreational, and cultural activities outside the facility.[4]

27   _____
     [4] Appendix ("App"). Ex. A ¶¶ 16-19; Ex. K ¶¶ 10, 15; Ex. M ¶¶ 9, 16-17; Ex.

28   Q ¶ 6; Ex. T ¶¶ 7, 10; Ex. U ¶ 14; Ex. V ¶ 7; Ex. Y ¶ 6; Ex. BB ¶¶ 10-11; Ex. EE ¶¶

Furthermore, the value of state-licensing includes robust independent oversight and enforcement. *See, e.g.*, *Flores v. Lynch*, 828 F.3d at 906 ("obvious purpose" of requiring placement of unaccompanied immigrant children in state licensed facilities is to "use the existing apparatus of state licensure to independently review detention conditions"). By contrast, "ICE's difficulties with monitoring and enforcing compliance with detention standards stretch back many years and continue today." RJN Ex. 5 at 446; 6 at 492; 7 at 559-560. Neither ICE's internal oversight nor inspections performed by its contractor "ensure[] consistent compliance with detention standards or comprehensive correction of identified deficiencies." *Id*.[5] To suggest that the federal scheme could take the place of state child welfare standards, licensing, and enforcement protections is "so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *State Farm*, 463 U.S. at 43. The Rule's creation of a federal licensing process for family detention facilities should be set aside.

### 2.    The Rule Confers Federal Licensing Powers Beyond What Congress Has Authorized

It is well established that promoting and protecting health, safety, and welfare—particularly of children—is a traditional police power vested in the states. *See Prince v. Massachusetts*, 321 U.S. 158, 167 (1944); *Wisconsin v. Yoder*, 406 U.S. 205, 220 (1972); *Troxel v. Granville*, 530 U.S. 57, 97 (2000) (Kennedy, J., dissenting) ("States have the authority to intervene to prevent harm to children.") (citations omitted); *Moore v. Sims*, 442 U.S. 415, 429-30 (1992). Although DHS has authority over the enforcement of immigration laws, it has no authority to develop and enforce child welfare standards generally, or residential licensing

---

5, 12; Ex. II ¶¶ 25, 35, 42, 56-57, 62; Ex. MM ¶ 11; Ex. OO ¶¶ 3-6; Ex. RR ¶¶ 8-9; Ex. XX ¶ 16; Ex. YY ¶¶ 7, 9-10, 12, 16; Ex. ZZ ¶¶ 7-11; D.C. Code §§ 4-1303.01a, 7-2105, 7-2108; D.C. Mun. Regs. tit. 29, §§ 6201, et seq. & 6301, et seq; Minn. R. 2960.0080, subp. 2, 5; 55 Pa. Code § 3800, et seq.

[5] This lack of oversight no doubt contributes to the extensive record of dangers and abuses encountered by immigrants in ICE custody. *See supra* Background Part IV (describing harms to immigrants in family detention).

schemes specifically, both of which are squarely within the States' police power. Congress must be "explicit" if it wants to "readjust the balance of state and national authority." *Bond v. United States*, 572 U.S. 844, 858 (2014) (quoting *BFP v. Resolution Trust Corp.*, 511 U.S. 531, 544 (1994)). Through the Rule, DHS arrogates to itself a licensing power not in any statute. Particularly in light of the states' traditional role over this area, the Rule's delegation of child care licensing to DHS must be set aside as "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(C).

### D.   The Rule's Specific Regulatory Changes Conflict with the *Flores* Agreements and Violate the APA

As discussed above, Defendants cannot escape their obligations under the *Flores* Agreement by promulgating conflicting regulations, even if they believe the consent decree's requirements to be unlawful. *See Hook*, 972 F.2d at 1016-17. Attempting nevertheless to achieve this impermissible purpose, Defendants rely on false legal premises, fail to explain the bases of their decisions, and fail to consider important aspects of the problem at issue. *See State Farm*, 463 U.S. at 43.

### 1.   The Rule Relies on False Legal Premises

Defendants attempt to justify two material departures from the *Flores* Agreement—limiting release on parole for children in expedited removal proceedings and eliminating the right of unaccompanied children and certain accompanied children to bond redetermination hearings—by arguing that the departures are required by statute and existing regulation. However, the legal premises upon which Defendants rely have been rejected repeatedly by the *Flores* Court and by the Ninth Circuit. The Agencies' reliance on erroneous interpretations of federal law cannot justify any agency action. *See, e.g., Regents of the Univ. of Cal.*, 908 F.3d at 505 (agency action must be set aside if based on incorrect premise that action is required).

### a. The Rule Would Significantly Curtail the Release of Children in Expedited Removal Proceedings

The general policy favoring release is a cornerstone of the *Flores* Agreement. RJN Ex. 50 p. 9. Currently, children who are detained while subject to expedited removal proceedings may be paroled on the basis of urgent humanitarian need. 8 C.F.R. § 212.5(b). The Rule eliminates this basis for parole for children in expedited removal proceedings, limiting parole for such children to situations involving "medical emergency" or "a legitimate law enforcement objective." 8 C.F.R. § 235.3(b)(2)(iii). DHS acknowledges that this change "may result in additional or longer detention" of children. 84 Fed. Reg. 44,397.

DHS claims this change is required to "codify its longstanding understanding of how certain provisions in § 235.3(b)'s provisions relating to parole of aliens in expedited removal proceedings . . . apply to both adults and minors" and to "eliminate an existing tension with the text of the relevant statutory provision." 84 Fed. Reg. 44,409.[6]

However, the Ninth Circuit has already ruled that DHS's "longstanding understanding" is incorrect. *Flores v. Barr*, __ F.3d __, 2019 WL 3820265, at *6 (9th Cir. Aug. 15, 2019).  In response to the same argument, the court held that the *Flores* Agreement's presumption in favor of releasing minors "is fully consistent with the [Immigration and Nationality Act's] expedited removal provisions," as "the government's own regulations contemplate that minors in expedited removal proceedings may be considered for release, just as the Agreement requires." *Id*.

Similarly, Defendants' concern that current section 212.5(b)(3) "is in tension with the text of the relevant statutory provisions [sic] at 8 U.S.C. 1225(b)(1)(B)(iii)(IV)," does not justify precluding parole based on humanitarian

---

[6] Defendants note that the *Flores* Agreement "does not specifically mention parole, much less require parole for urgent humanitarian reasons or significant public benefit." 84 Fed. Reg. 44,411.  This is for the simple reason that the *Flores* Agreement sets out a general policy favoring release of children, rather than an exhaustive list of the forms release might take.

need for children in expedited removal. 84 Fed. Reg. 44,411. This is because another section of the INA permits the Attorney General to "in his discretion parole into the United States temporarily…for urgent humanitarian reasons or significant public benefit . . . any alien applying for admission to the United States," including noncitizens in expedited removal proceedings. 8 U.S.C. § 1182(d)(5)(A); *see also Flores v. Barr*, __ F.3d __, 2019 WL 3820265, at *6.

And there is yet another avenue for resolving the tension between the expedited removal statute and the *Flores* Agreement that this purportedly creates: Defendants can decline to place children in expedited removal proceedings. *See Flores v. Barr*, __ F.3d __, 2019 WL 3820265, at *6. However, Defendants failed to address this possibility in their rulemaking.

Because 8 C.F.R. § 212.5(b) explicitly permits the prompt release of immigrant children that Defendants seek to prevent, and which the *Flores* Agreement requires, Defendants seek to amend the regulation. But Defendants' erroneous statutory interpretation cannot justify this material departure from the *Flores* Agreement, and Defendants offer no other reasoned basis for it.

### b. The Rule Eliminates Bond Redetermination Hearings for Two Categories of Children

The *Flores* Agreement guarantees that every "minor in deportation proceedings shall be afforded a bond redetermination hearing before an immigration judge in every case." RJN Ex. 50 ¶ 24A. This bond hearing is "a fundamental protection guaranteed to . . . minors under the *Flores* Settlement" that "provide[s] minors with meaningful rights and practical benefits." *Flores v. Sessions*, 862 F.3d at 867. Relying on repeatedly discredited legal arguments, the Rule rescinds access to bond redetermination hearings from two sets of children in immigration custody.

First, for unaccompanied children in the ORR custody, the Rule replaces the bond redetermination hearing before an immigration judge with a so-called "810

hearing" conducted by an HHS hearing officer, who has no authority to alter the child's placement or order her release. 84 Fed. Reg. 44,535 (to be codified at 45 C.F.R. § 410.810(a)). Defendants assert that the 810 hearings provide "substantially the same substantive protections" as bond redetermination hearings. Not so. As the Ninth Circuit has repeatedly recognized, bond redetermination hearings "were designed to consider ORR's . . . determination under the TVPRA that a minor should be detained in a secure facility." *Saravia*, 905 F.3d at 1144; *see also Flores v. Sessions*, 862 F.3d at 876-77 (noting that ORR does not have sole authority to "assess whether a child should remain detained or in a particular placement"). A finding that a child does not pose a danger precludes the child's continued placement in a secure facility, and for children who have a parent or other qualified sponsor, a favorable bond hearing outcome means freedom from government custody. *Flores v. Sessions*, 862 F.3d at 878. By contrast, an 810 hearing, "may not be invoked to determine the UAC's placement while in HHS custody" or "to determine level of custody for the UAC." 84 Fed. Reg. 44,535 (to be codified at 45 C.F.R. § 410.810(h)). Through this change, Defendants have discarded a mechanism required by the *Flores* Agreement for children to challenge their detention in a secure or staff secure facility.[7]

HHS attempts to justify the Rule's elimination of children's right to bond redetermination hearings noting that the TVPRA does not require one. 84 Fed. Reg. 44,476. The Ninth Circuit has already rejected this argument, finding that "the authority granted to ORR does not prevent the government from continuing to fully implement Paragraph 24A" and refusing to find that "Congress's failure to explicitly provide for bond hearings under the HSA or TVPRA demonstrates that it

_____

[7] The 810 hearing also provides less due process than called for by the *Flores* Agreement, as it replaces the immigration judge—a neutral decisionmaker with expertise in the standards for bond and release—with an HHS hearing officer and replaces appeal to the Board of Immigration Appeals with appeal to the Assistant Secretary of the Administration for Children and Families. 84 Fed. Reg.  44,535 (to be codified at 45 C.F.R. § 410.810(a), (e)).

did not intend for unaccompanied minors to receive them." *Flores v. Sessions*, 862 F.3d at 879, 874-75. This decision—affirming the right of children in ORR custody to bond redetermination hearings—remains binding upon the Agencies.

Second, the Rule adds a regulatory provision that deems children in DHS custody "who are not in section 240 proceedings . . . ineligible to seek review by an immigration judge of their DHS custody determinations." 84 Fed. Reg. 44,529 (to be codified at § 236.3(m)). As recently as 2017, Defendants did not contest that accompanied children remained entitled to bond hearings. *Flores v. Sessions*, 862 F.3d at n. 20. Now, without any change in the underlying statute or regulations, Defendants assert that certain accompanied minors are not, in fact, entitled to bond redetermination hearings. But, just like the right a bond hearing that does not exist in the TVPRA, children in expedited removal proceedings have a right to a bond hearing that is not explicitly set forth in the applicable statute. This right derives the *Flores* Agreement. It has been enforced for children in expedited removal proceeding until now, and the Agencies provide no reasoned explanation for their change in position as to its ongoing binding effect.

## 2.   Defendants Fail to Explain the Bases of Their Decisions

It is a "simple but fundamental rule of administrative law" that "a reviewing court . . . must judge the propriety of [agency] action solely by the grounds invoked by the agency," and not post hoc grounds articulated during litigation. *SEC v. Chenery Corp. (Chenery II)*, 332 U.S. 194, 196 (1947). Accordingly, an agency action must be set aside unless its basis is "set forth with such clarity as to be understandable." *Id*. In several instances, Defendant make fundamental changes to the provisions of the *Flores* Agreement without even noting that they have done so—let alone explaining the grounds for their decision.

### a.   The Rule Restricts Release Options

The Rule newly restricts, without explanation, the options for release from detention for accompanied children. Whereas the *Flores* Agreement required

immigration authorities to release children to a parent, legal guardian, adult relative, or other adult seeking custody—and to "make prompt and continuous efforts" to do so, RJN Ex. 50 ¶ 18—the Rule only requires DHS to make efforts towards release only to a parent or legal guardian. 84 Fed. Reg. 44,529 (to be codified at 8 C.F.R. § 236.3(j)(5)(i)). If a parent or legal guardian is not available, the Rule permits, but does not require DHS to facilitate release to a sibling, uncle, aunt, or grandparent. The Rule eliminates, for accompanied children, the option provided in the *Flores* Agreement to be released to an adult other than a sibling, uncle, aunt, or grandparent. *Compare* RJN Ex. 50 ¶ 14 *with* 84 Fed. Reg. 44,529 (to be codified at 8 C.F.R. § 236.3(j)(5)(i)). *Id.* Despite the significant impact for children without parents or legal guardians able to act as sponsors, the Agencies failed to acknowledge that the Rule departs from the *Flores* Agreement in this respect or provide any reasoned basis for the departure. *See id.*

### b.   The Rule Increases Use of Unlicensed Facilities

Although the *Flores* Agreement permits children to be placed in unlicensed facilities temporarily upon initial detention if there is no licensed facility immediately available, it requires children to be moved to a licensed placement within five days in the absence of an emergency or influx. RJN Ex. 50 ¶ 12A. After temporary initial placement, children are required to be placed in a licensed program absent an emergency. *Id.* ¶ 19. The Rule departs from that requirement by allowing ORR to hold unaccompanied children indefinitely in unlicensed and/or secure facilities if "no appropriate licensed program [is] immediately available," and requiring only that ORR make "all reasonable efforts to place each UAC in a licensed program as expeditiously as possible." 84 Fed. Reg. 44,531 (to be codified at 45 C.F.R. § 410.201(e)).[8]  In addition, the Rule permits ORR to hold children in

---

[8] Defendants state that a clause referring to "a State or county juvenile facility" was stricken from proposed section 410.202(e). 84 Fed. Reg. 44,457. However, the clause remains in the Rule, suggesting that the Rule permits the detention of unaccompanied children in secure facilities based solely on a lack of availability of a licensed placement.  84 Fed. Reg. 44,531 (to be codified at 45 C.F.R. § 410.201(e)).

unlicensed facilities, beyond temporary initial custody, due to an influx, which is not contemplated by the *Flores* Agreement. 84 Fed. Reg. 44,531 (to be codified at 45 C.F.R. § 410.202(c)). Defendants neither acknowledge nor provide any basis for this departure from the requirements of the *Flores* Agreement. *See* 84 Fed. Reg. 44,457.

### c.  The Rule Uses Descriptive Rather than Mandatory Language

Throughout the Rule, language that is mandatory in the *Flores* Agreement has been replaced with descriptive or permissive language. For example, the *Flores* Agreement states Defendants "shall place each detained minor in the least restrictive setting," RJN Ex. 50 ¶ 11, while the corresponding language in the Rule merely states "ORR places each UAC in the least restrictive setting." 84 Fed. Reg. 44,531 (to be codified at 45 C.F.R. § 410.201).[9] *See Sacks v. Office of Foreign Control,* 466 F.3d 764, 778 (9th Cir. 2006) (terms such as "may" and "shall" determine whether function is discretionary). Defendants fail entirely to address or explain the near-wholesale conversion of the *Flores* Agreement's mandatory language to the Rule's descriptive language with respect to ORR's obligations. *See* 84 Fed. Reg. 44,485-486, 44,493.

### d.  The Rule Adds Terms to Release Agreements

The Rule creates obstacles to release of unaccompanied children by adding onerous terms to the custodial release agreement that a sponsor must sign before obtaining custody of a child. 84 Fed. Reg. 44,533 (to be codified at 45 C.F.R. § 410.302(e)(3), (8)).

---

[9] Additional examples include: 84 Fed. Reg. 44,531 (to be codified at 45 C.F.R. § 410.202) ("ORR places…"); 84 Fed. Reg. 44,532 (to be codified at § 410.204) ("ORR considers…"); 84 Fed. Reg. 44,532 (to be codified at § 410.206) ("ORR provides…"); 84 Fed. Reg. 44,532 (to be codified at § 410.208) ("ORR assesses…"); 84 Fed. Reg. 44,532 (to be codified at § 410.301) ("ORR releases…"); 84 Fed. Reg. 44,534 (to be codified at § 410.403) ("ORR monitors…").

However, Defendants do not even mention these changes, let alone provide any reasoned basis for them. Defendants fail to acknowledge or respond to comments made in the rulemaking process addressing these departures from the *Flores* Agreement, their potential effects on the timely release of children from ORR custody, and their impermissible intrusion on parental rights. *See* RJN Ex. 37 at 2127-28, Ex. 45 at 2458-59.

### 3. Defendants Fail to Consider Important Aspects of the Problem at Issue

In several instances, Defendants failed to adequately respond to comments that the Proposed Rule contravened the *Flores* Agreement or otherwise failed to protect the well-being of children. While an agency need not respond to every individual comment, it must "respond in a reasoned manner to explain how the agency resolved any significant problems raised by the comments, and to show how that resolution led the agency to the ultimate rule." *Int'l Ladies' Garment Workers' Union v. Donovan*, 722 F.2d 795, 818 (D.C. Cir. 1983) (internal quotations and citations omitted).

### a. The Rule Newly Requires Redetermination of UAC Status

The Rule codifies and expands USCIS's recent change in policy and practice regarding the re-evaluation of a child's status as accompanied or unaccompanied. *See* RJN Ex. 4. Once a child has been determined to be unaccompanied, he or she is entitled to certain protections under the TVPRA, including, for example, an exemption from the one-year filing deadline for an asylum claim. 8 U.S.C. § 1158(a)(2)(E). Removing those protections disadvantages children in their removal or asylum hearing processes. Under the Rule, a child who arrived unaccompanied will lose that status based on the availability of a parent or guardian to provide care and physical custody or reaching the age of 18. 84 Fed. Reg. 44,531 (to be codified at 45 C.F.R. § 410.101).

Defendants attempt to justify this change by asserting that it is required by the plain language of 6 U.S.C. § 279(g)(2). 84 Fed. Reg. 44,427. However, that statute merely provides a definition of "unaccompanied alien child"—it does not specify when, how, how often, or whether Defendant Agencies may reassess that status. Moreover, Defendants failed to consider the significant reliance interests such children have—reliance interests that were raised in public comments regarding this provision of the Rule.[10]  As the Supreme Court has recognized, "when [a] prior policy has engendered serious reliance interests that must be taken into account . . . [i]t would be arbitrary and capricious to ignore such matters." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). In such situations, "a reasoned explanation is needed for disregarding facts and circumstances that…were engendered by the prior policy." *Id*. at 516. Defendants' complete failure to provide such an explanation here renders the Rule arbitrary and capricious.

### b.    The Rule Removes Critical Oversight Provisions

The *Flores* Agreement provides for robust oversight of conditions by counsel for *Flores* plaintiffs, including through access to facilities and monthly data reports. RJN Ex. 50 ¶¶ 28A, 29, 33. Despite the fact that this oversight has been crucial to holding Defendants to the requirements of the *Flores* Agreement, the Rule provides no similar mechanism for oversight by an outside body. In particular, the Rule makes no provision for continuing external oversight of CBP's compliance with the requirement to hold children in facilities that are safe, sanitary, and consistent with their particular vulnerability, despite CBP's well-documented failures in this area. *See* 84 Fed. Reg. 44,450 (describing external oversight for ICE, but not CBP, facilities); *Flores v. Barr*, __ F.3d __, 2019 WL 3820265, at *2 (describing findings that minors were detained in unsafe and unsanitary conditions in CBP facilities). Given the significant concerns expressed by commenters regarding conditions in

---

[10] For example, Defendants do not address the impact on a child who relied on the exemption from the one-year bar to filing an asylum claim before being reunited with a parent. *See* RJN Ex. 38 at 2148; *see also* RJN Ex. 39 at 2264-2269.

1  CBP facilities, the failure to explain why the Rule eschews external oversight is
2  arbitrary and capricious. *See* RJN Ex. 48 at 2535, Ex. 45 at 2432; *see also* RJN
3  Ex. 37 at 2114-15.

4  ### c.   The Rule Expands the Definition of Emergency

5  The Rule redefines "emergency" to include "an act or event [. . . that] impacts
6  other conditions provided by this section."  84 Fed. Reg. 44,526 (to be codified at 8
7  C.F.R. § 236.3(b)(5)). The Rule indicates that this change was made to permit the
8  Agencies to "delay compliance" or "excuse noncompliance" with provisions of the
9  Rule—including basic health and safety requirements, such as the requirements to
10 provide children with food, drinking water, and adequate temperature control. 84
11 Fed. Reg. 44,412; 44,451. It could also permit DHS to house unaccompanied
12 children with unrelated adults for more than 24 hours, which is explicitly prohibited
13 by the *Flores* Agreement. Defendants assert that the change "does not depart from
14 how the [*Flores* Agreement] defines an emergency act or event" but merely
15 "recognizes that…an emergency may arise…that impacts more than just the
16 transfer" of children from one facility to another. *Id*. But the *Flores* Agreement
17 defines emergency explicitly—and exclusively—in terms of impacts on the ability
18 to transfer children. RJN Ex. 50 ¶ 12B. Defendants failed meaningfully to engage
19 this significant issue, which was raised by multiple comments. *See* RJN Exs. 41 at
20 2365-66, Ex. 43 at 2396, Ex. 44 at 2400.

21 ### d.   The Rule Declines to Update the Influx Definition

22 The Flores Agreement defines "influx" as "those circumstances where the INS
23 has, at any given time, more than 130 minors eligible for placement in a licensed
24 program…including those who have been so placed or are awaiting such
25 placement" and provides that in the event of an influx the requirement to place
26 minors in a licensed facility within five days is relaxed. RJN Ex. 50 ¶ 12A, 12B. In
27 the Notice of Proposed Rulemaking, DHS "welcome[d] public comment on
28 whether it would be appropriate to revise the definition of influx to better reflect

current operational realities" and suggested an alternative definition. 83 Fed. Reg. 45,496.

In the Rule, the Agencies acknowledged that "the definition of influx in the Flores Agreement . . . . …renders the agency in an ongoing state of influx which has been the status quo for several years," but nevertheless chose to maintain the *Flores* Agreement's definition of influx with respect to both DHS and HHS. 84 Fed. Reg. 44,422-23; 84 Fed. Reg. 44,526 (to be codified as 8 C.F.R. § 236.3(b)(10)); 84 Fed. Reg. 44,530 (to be codified as 45 C.F.R. § 410.101). This is one of many examples of the Agencies trying to "have it both ways." *Gen. Chem. Corp. v. United States,* 817 F.2d at 854. While invoking "operational reality" to justify significant departures from the *Flores* Agreement, such realities are deemed unimportant for triggering additional care. *Compare, e.g.*, 84 Fed. Reg. 44,403-407 (relying on increased numbers of children and family crossing the border to justify family detention impermissible under the *Flores* Agreement) *with* 84 Fed Reg. 44,423 (20 year old measure of "'influx' as it was written in the FSA remains relevant to current operational realities"). The Agencies cannot—consistent with reasoned decisionmaking—both rely on a changed "operational environment" to justify new restrictions on the rights of children while disclaiming its relevance as to the Agencies' own obligations. *Nat'l Parks Conservation Ass'n*, 788 F.3d at 1141 (inconsistency is arbitrary and capricious).

## II.   THE STATES SATISFY THE REMAINING REQUIREMENTS FOR INJUNCTIVE RELIEF

### A.   The States Face Irreparable Harm

#### 1.   The Rule Will Cause Irreparable Harm to the States' Sovereign Interests in Regulating Child Welfare, an Area Within the States' Historic Purview

The States have comprehensive and long-standing legal codes for the welfare of children who require care outside the home. These codes include licensing and related oversight to ensure that residential facilities for children protect and nurture

their residents. App. Ex. A ¶¶ 8, 13; Ex. M ¶ 14; Ex. Q ¶ 3; Ex. T ¶¶ 5, 10; Ex. H ¶ 10; Ex. K ¶¶ 9-10, 16; Ex. U ¶ 8; Ex. V ¶ 3; Ex. Y ¶ 4; Ex. BB ¶ 9; Ex. EE ¶¶ 4, 13-14; Ex. II ¶¶ 4-5, 26, 31; Ex. MM ¶ 4; Ex. RR ¶ 4; Ex. OO ¶ 3; Ex. XX ¶ 8; Ex. YY ¶ 7; Ex. ZZ ¶ 8. In addition to mandating detailed requirements for and oversight of state-licensed facilities, many States' laws specifically prohibit the operation of unlicensed residential facilities within their jurisdictions and violation of these prohibitions can lead to fines and imprisonment. *See, e.g.*, Mass. Gen. Laws ch. 15D, §§ 6, 15A; Cal. Health & Safety Code § 1508; Cal. Code Regs. tit. 22, § 80006(c); App. Ex. Q ¶ 5; Ex. T ¶¶ 4-5; Ex. K ¶ 13; Ex. V ¶ 4; Ex. Y ¶ 7; Ex. OO ¶ 8; Ex. YY ¶ 8. The *Flores* Agreement expressly incorporates these state licensing regimes, properly recognizing the States' power, authority, and long history of operating child welfare systems as part of their *parens patriae* responsibility for children who reside in their jurisdictions. By exempting family detention centers from state licensing, the Rule effectively guts this aspect of the *Flores* agreement and partially preempts the States' authority to enforce their laws.

The Rule thus irreparably harms the States' sovereign interest in their "power to create and enforce a legal code." *Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*, 458 U.S. 592, 601 (1982); *see Wyoming ex rel. Crank v. United States*, 539 F.3d 1236, 1242 (10th Cir. 2008) (Federal regulatory action that preempts state law creates an injury in fact). Any time a state is so prevented "from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." *New Motor Vehicle Bd. of Cal. v. Orrin W. Fox Co.*, 434 U.S. 1345, 1351 (1977) (Rehnquist, J., in chambers); *see also Maryland v. King*, 567 U.S. 1301 (2012) (Roberts, C.J., in chambers) (state's inability to "employ a duly enacted statute … constitutes irreparable harm").

The harm to the States here is particularly acute because child welfare laws are among the traditional powers reserved for the states. *See, e.g.*, *Moore v. Sims*, 442 U.S. 415, 435 (1979) ("Family relations are a traditional area of state concern.");

*H.C. ex rel. Gordon v. Koppel*, 203 F.3d 610, 613 (9th Cir. 2000). Indeed, states have not only the power but also the responsibility to "play [their] part as parens patriae" where "parental control falters…." *Schall v. Martin*, 467 U.S. 253, 265 (1984).[11] In taking away their power to enforce their own licensing regimes, the Rule directly and irreparably harms the States, not only in their general sovereign interest of enforcing their duly-enacted laws and regulations, but also in their compelling interest of protecting the welfare of children.[12]

### 2. The States' Economic Interests Are Impacted by Harms Suffered by Children and Families in Federal Family Detention Centers

As Defendants acknowledge, "children who are detained are at a significantly higher rate of psychological distress." 84 Fed. Reg. 44,504. Children who are detained in immigration facilities experience increased rates of self-harm and suicidal behavior, severe depression, anxiety, and Post-Traumatic Stress Disorder (PTSD), as well as significant developmental regression, including bed wetting, language regression, and social withdrawal. App. Ex. B ¶ 14; Ex. F ¶¶ 20, 23-24, 28, 35, 42; Ex. CC ¶ 25; Ex. FF ¶¶ 9-10. Where children have experienced trauma in their countries of origin or on the journey to the United States, detention adds to and exacerbates the effects of that trauma. App. Ex. B ¶ 11; Ex. F ¶¶ 20, 37, 40, 51; Ex. G ¶ 8; Ex. I ¶ 10; Ex. J ¶¶ 11, 15; Ex. S ¶ 3; Ex. FF ¶ 13; Ex. KK ¶ 17,

---

[11] States accordingly have a long history of enacting child welfare laws which allow for the care and protection of minor children who cannot remain safely at home. Massachusetts passed such a law in 1866. *See* An Act Concerning the Care and Education of Neglected Children, 1866 Mass. Acts ch. 283; *see also* Mass. Gen. Laws ch. 119, § 1.

[12] The States' interest in protecting children is unquestionably of the highest order. *See, e.g., Globe Newspaper Co. v. Super. Ct. for Norfolk Cty.*, 457 U.S. 596, 607 (1982) (holding that a State's "interest" in "safeguarding the physical and psychological well-being of a minor … is a compelling one"); *Ginsberg v. New York*, 390 U.S. 629, 640 (1968) (noting that a State "has an independent interest in the well-being of its youth," and recognizing "'society's transcendent interest in protecting the welfare of children'" (citation omitted)).

19; Ex. AAA ¶¶ 9, 12.  In fact, studies of asylum seekers—who in most cases have experience significant trauma prior to detention—suggest that detained children's PTSD symptoms and self-harming behavior is often directly tied to their experiences in detention. App. Ex. F ¶ 35. The ongoing stress, uncertainty, and despair caused by detention can have life-long impacts on children's psychological and physical health that will require significant services to alleviate. App. Ex. B ¶¶ 8, 11-12; Ex. D ¶ 15; Ex. F ¶¶ 37, 52; Ex. N ¶ 8-9; Ex. G ¶ 5, 9; Ex. H ¶ 16; Ex. I ¶ 6; Ex. HH ¶¶ 7, 15; Ex. LL ¶¶ 54-56; Ex. AAA ¶¶ 10, 12.

As DHS's own experts declared, "there is no amount of programming that can ameliorate the harms created by the very act of confining children to detention centers."  RJN Ex. 25 at 986. "Visits to family detention centers by pediatricians reveal discrepancies between the standards outlined by ICE and the actual services provided, including inadequate or inappropriate immunizations, delayed medical care, inadequate education services, and limited mental health services."  RJN Ex. 25 at 705. The harms of detaining children and families, at ICE's family detention centers are well-documented. *See*, *supra*, at IV. These emotional and psychological injuries constitute irreparable harm. *See, e.g., Chalk v. U.S. Dist. Ct. Cent. Dist. of Cal.*, 840 F.2d 701, 710 (9th Cir. 1988); *Norsworthy v. Beard*, 87 F. Supp. 3d 1164, 1193 (N.D. Cal. 2015).

Many families detained at family detention facilities and children released from ORR are and will eventually be released into the States. RJN Exs. 12; 31 at 1108-10; App. Ex. CC ¶ 46. The harm to children and parents from their detention experiences will impact their ability to thrive in their new communities, leading them to require mental health and healthcare at greater rates. App. Ex. B ¶ 15; Ex. C ¶¶ 22-23; Ex. G ¶¶ 5, 9; Ex. I ¶ 17; Ex. J ¶ 13; Ex. CC ¶¶ 47, 50-51; Ex. FF ¶¶ 15-17; Ex. HH ¶¶ 7, 13-14, 16; Ex. KK ¶¶ 5, 7, 9, 19; Ex. LL ¶ 79; Ex. OO ¶ 13; Ex. QQ ¶ 9; Ex. SS ¶ 9; RJN Exs. 56, 57. Children—who are entitled to free

education in all the States—will require special educational and school-based mental health resources to cope with trauma caused by federal immigration detention under the Rule. App. Ex. B ¶ 4; Ex. C ¶¶ 8, 10-15, 22; Ex. D ¶ 5, 15; Ex. G ¶¶ 5, 10, 12-13, 17; Ex. I ¶¶ 11, 13-14, 17; Ex. J ¶ 21; Ex. L ¶ 7-8, 10-11; Ex. N ¶¶ 3, 8; Ex. P ¶ 2; Ex. S ¶ 4-5; Ex. W ¶ 4; Ex. Z ¶ 5; Ex. AA ¶¶ 3, 12; Ex. BB ¶ 15; Ex. GG ¶ 4; Ex. QQ ¶ 9; Ex. NN ¶¶ 3, 7; Ex. UU ¶¶ 4-5; RJN Ex. 55. Any additional and unnecessary injury to the States' future residents harms the States, as state funded resources will ultimately be called upon to respond to the consequences of those injuries. App. App. Ex. C ¶¶ 16, 19; Ex. G ¶¶ 8-9, 11, 13, 17; Ex. H ¶¶ 17-21; Ex. I ¶¶ 10-12, 14, 17; Ex. J ¶¶ 6-9, 11-17; Ex. L ¶¶ 9-10; Ex. E ¶¶ 5-11; Ex. M ¶ 8; Ex. O ¶¶ 4-7; Ex. R ¶ 9; Ex. S ¶¶ 5-6; Ex. W ¶ 6; Ex. X ¶¶ 4, 8; Ex. Z ¶¶ 6-7; Ex. AA ¶¶ 5, 11; Ex. CC ¶ 49; Ex. DD ¶¶ 5-6, 11;  Ex. FF ¶¶ 4, 16, 20-21; Ex. GG ¶ 4; Ex. II ¶ 68; Ex. JJ ¶¶ 6, 17, 24-25; Ex. LL ¶¶ 23, 34; Ex. NN ¶¶ 6-7; Ex. PP ¶ 6; Ex. QQ ¶¶ 6-7; Ex. SS ¶ 9; Ex. TT ¶¶ 4-7; Ex. UU ¶ 8; Ex. VV ¶¶ 3, 15, 17-20; Ex. AAA ¶¶ 7, 14; RJN Ex. 54, 58.

The Rule cannot take effect. Every day that prolongs a child's and her family's detention is a day too long. The harms from prolonged detention in ICE constitute irreparable harm. *See Rodriguez*, 715 F.3d at 1144 (affirming preliminary injunction in favor of detainees in ICE custody facing prolonged detention).

### B.    The Balance of Equities and the Public Interest Weigh Heavily in Favor of Provisional Relief

The final two factors for a preliminary injunction, the balance of the equities and the public interest, merge when the government is a party. *Nken*, 556 U.S. at 435; *League of Wilderness Defs./Blue Mountains Biodiversity Project v. Connaughton*, 752 F.3d 755, 766 (9th Cir. 2014). In assessing these factors, courts consider the impacts of the injunction on nonparties as well. *Id*. at 766. The greatest impact the Rule will have is on children and their families. As future members of our communities, the States have a *parens patriae* responsibility to protect them.

1  The public has also expressed overwhelming opposition to prolonged family

2  detention—among the more than 100,000 comments submitted in response to the

3  NPRM, "most commenters on this topic expressed general opposition to the

4  detention of family units." 84 Fed. Reg. 44,433. The Rule will also impair the

5  States' sovereign interest in licensing facilities that house children.

6      By contrast, there is no harm to Defendants by maintaining the status quo. If

7  Plaintiffs prevail on the merits, the Defendants have no interest in enforcing

8  unlawful or unconstitutional decisions. *Rodriguez*, 715 F.3d at 1145 ("in light of the

9  major hardship posed by needless prolonged detention, we conclude that the

10  balance of the equities favors" the detained immigrants); *Ariz. Dream Act Coal. v.*

11  *Brewer*, 855 F.3d 957, 978 (9th Cir. 2017) ("[I]t is clear that it would not be

12  equitable or in the public's interest to allow the state to violate the requirements of

13  federal law, especially when there are no adequate remedies available." (quoting

14  *Valle del Sol v. Whiting*, 732 F.3d 1006, 1029 (9th Cir. 2013)). "While ICE is

15  entitled to carry out its duty to enforce the mandates of Congress, it must do so in a

16  manner consistent with our constitutional values." *Rodriguez*, 715 F.3d at 1146.

17                                    **CONCLUSION**

18      For the foregoing reasons, this Court should enjoin the Rule from taking

19  effect, postpone the effective date of the Rule, and preserve the effective status of

20  the *Flores* Agreement pending adjudication on the merits of this case.

21

22  / / /

23

24  / / /

25

26  / / /

27

28

Dated:  August 30, 2019                    Respectfully submitted,

MAURA HEALEY                               XAVIER BECERRA
Attorney General for the Commonwealth      Attorney General of California
of Massachusetts                           MICHAEL L. NEWMAN
ANGELA BROOKS*                             Senior Assistant Attorney General
ABIGAIL TAYLOR*                            SARAH E. BELTON
Assistant Attorneys General                Supervising Deputy Attorney General
One Ashburton Place                        VIRGINIA CORRIGAN
Boston, MA 02108                           REBEKAH A. FRETZ
Telephone: (617) 963-2590                  MARISOL LEÓN
Email: Angela.Brooks@mass.gov              VILMA PALMA-SOLANA
*Attorneys for Plaintiff the Commonwealth*   JASLEEN K. SINGH
*of Massachusetts*                          Deputy Attorneys General

                                           /s/ *Julia Harumi Mass*
                                           JULIA HARUMI MASS
                                           Deputy Attorney General
                                           *Attorneys for Plaintiff State of*
                                           *California*

WILLIAM TONG                               KATHLEEN JENNINGS
Attorney General of Connecticut            Attorney General of Delaware
JOSHUA PERRY*                              ILONA KIRSHON*
Special Counsel for Civil Rights           Deputy State Solicitor
55 Elm Street                              DONNA THOMPSON*
Hartford, CT 06106                         Deputy Attorney General
Telephone: (860) 808-5372                  820 North French Street
Email: Joshua.Perry@ct.gov                 Wilmington, DE 19801
*Attorneys for Plaintiff State of*           Telephone: (302) 577-8367
*Connecticut*                               Email: Donna.Thompson@delaware.gov
                                           *Attorneys for Plaintiff State of Delaware*

KARL A. RACINE
Attorney General for the District of
Columbia
JIMMY ROCK*
Acting Deputy Attorney General
VALERIE M. NANNERY (SBN 227394)
Assistant Attorney General
441 4th Street, N.W., Suite 630 South
Washington, DC 20001
Telephone: (202) 442-9596
Email: valerie.nannery@dc.gov
*Attorneys for Plaintiff District of
Columbia*

KWAME RAOUL
Attorney General of Illinois
JEFF VANDAM*
Public Interest Counsel
100 W. Randolph Street, 12th Fl.
Chicago, IL 60601
Telephone: (312) 814-1188
Email: jvandam@atg.state.il.us
*Attorneys for Plaintiff State of Illinois*

AARON FREY
Attorney General of Maine
SUSAN P. HERMAN (*pro hac vice pending*)
Deputy Attorney General
6 State House Station
Augusta, Maine 04333-0006
Telephone: (207) 626-8814
Email: susan.herman@maine.gov
*Attorneys for Plaintiff State of Maine*

BRIAN E. FROSH
Attorney General of Maryland
STEVEN M. SULLIVAN*
Solicitor General
JEFFREY P. DUNLAP*
Assistant Attorney General
200 Saint Paul Place
Baltimore, MD 21202
Telephone: (410) 576-7906
Email: jdunlap@oag.state.md.us
*Attorneys for Plaintiff State of
Maryland*

DANA NESSEL
Attorney General of Michigan
B. ERIC RESTUCCIA*
JOSEPH T. FROEHLICH*
Assistant Attorneys General
P.O. Box 30212
Lansing, MI 48909
Telephone: (517) 335-7628
Email: restucciae@michigan.gov
*Attorneys for Plaintiff State of Michigan*

KEITH ELLISON
Attorney General of Minnesota
JANINE KIMBLE*
Assistant Attorney General
102 State Capitol
75 Rev. Dr. Martin Luther King Jr. Blvd.
St. Paul, MN 55155
Telephone: (651) 757-1415
Email: janine.kimble@ag.state.mn.us
*Attorneys for Plaintiff State of
Minnesota*

AARON D. FORD
Attorney General of Nevada
HEIDI PARRY STERN*
Solicitor General
Office of the Nevada Attorney General
555 E. Washington Ave., Ste. 3900
Las Vegas, NV 89101
Telephone: (702) 486-3420
Email: HStern@ag.nv.gov
*Attorneys for Plaintiff State of Nevada*

GURBIR S. GREWAL
Attorney General of New Jersey
GLENN J. MORAMARCO*
Assistant Attorney General
MARIE SOUEID*
Deputy Attorney General
25 Market Street
Trenton, NJ 08625
Telephone: (609) 376-3232
Email: Glenn.Moramarco@law.njoag.gov
*Attorneys for Plaintiff State of New Jersey*

HECTOR BALDERAS
Attorney General of New Mexico
TANIA MAESTAS*
Chief Deputy Attorney General
408 Galisteo Street
Santa Fe, NM 87501
Telephone: (505) 490-4060
Email: TMaestas@nmag.gov
*Attorneys for Plaintiff State of
New Mexico*

LETITIA JAMES
Attorney General of New York
ELENA GOLDSTEIN*
Senior Trial Counsel
NANCY TRASANDE*
Assistant Attorney General
28 Liberty Street
New York, NY 1005
Telephone: (212) 416-8905
Email: nancy.trasande@ag.ny.gov
*Attorneys for Plaintiff State of New York*

ELLEN F. ROSENBLUM
Attorney General of Oregon
J. NICOLE DEFEVER (SBN #191525)
Senior Assistant Attorney General
Oregon Department of Justice
1162 Court Street N.E.
Salem, OR 97301
Telephone: (971) 673-1880
Fax: (971) 673-5000
Email: Nicole.DeFever@doj.state.or.us
*Attorneys for Plaintiff State of Oregon*

JOSH SHAPIRO
Attorney General for the Commonwealth
of Pennsylvania
AIMEE D. THOMSON*
Deputy Attorney General
1600 Arch St., Suite 300
Philadelphia, PA 19103
Telephone: (267) 940-6696
Email: athomson@attorneygeneral.gov
*Attorneys for Plaintiff Commonwealth
of Pennsylvania*

PETER F. NERONHA
Attorney General of Rhode Island
ADAM D. ROACH*
Special Assistant Attorney General
150 South Main Street
Providence, RI 02903
Telephone: (401) 274-4400 x 2490
Email: aroach@riag.ri.gov
*Attorneys for Plaintiff State of Rhode Island*

MARK R. HERRING
Attorney General for the
Commonwealth of Virginia
MICHELLE S. KALLEN*
Deputy Solicitor General
202 North 9th Street
Richmond, VA 23219
Telephone: (804) 786-2436
Email: SolicitorGeneral@oag.state.va.us
*Attorneys for Plaintiff Commonwealth of Virginia*

THOMAS J. DONOVAN, JR.
Attorney General of Vermont
BENJAMIN D. BATTLES*
Solicitor General
JULIO A. THOMPSON*
Director, Civil Rights Unit
109 State Street
Montpelier, VT 05609
Telephone: (802) 828-5500
Email: Julio.Thompson@vermont.gov
*Attorneys for Plaintiff State of Vermont*

ROBERT W. FERGUSON
Attorney General of Washington
COLLEEN M. MELODY (WSBA #42275)*
Division Chief, Civil Rights Unit
LAURA K. CLINTON (WSBA #29846)*
Assistant Attorneys General
800 Fifth Avenue, Suite 2000
Seattle, WA  98104
Telephone: (206) 464-5342
Email: Colleen.Melody@atg.wa.gov
Email: Laura.Clinton@atg.wa.gov
*Attorneys for Plaintiff State of Washington*

*\*Pro Hac Vice applications forthcoming*