JOSEPH H. HUNT
Assistant Attorney General
Civil Division
AUGUST E. FLENTJE
Special Counsel to the Assistant Attorney General
WILLIAM C. PEACHEY
Director, District Court Section
Office of Immigration Litigation
JEFFREY S. ROBINS
Deputy Director
P.O. Box 868, Ben Franklin Station
Washington, D.C. 20044
Tel: (202) 616-1246
Fax: (202) 305-7000
Email: jeffrey.robins@usdoj.gov
YAMILETH G. DAVILA
Assistant Director
STEVEN A. PLATT
Trial Attorney
*Counsel for Defendants*

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

# WESTERN DIVISION

| | |
|---|---|
| STATE OF CALIFORNIA, et al., | ) Case No. 2:19-cv-7390 DMG(AGRx) |
| Plaintiffs, | ) |
| | ) **DEFENDANTS' RESPONSE IN** |
| v. | ) **OPPOSITION TO PLAINTIFFS'** |
| | ) **MOTION FOR A PRELIMINARY** |
| KEVIN K. McALEENAN, in his | ) **INJUNCTION** |
| official capacity as Acting | ) |
| Secretary of Homeland Security, | ) Date: October 4, 2019 |
| et al., | ) Time: 2:00 p.m. |
| Defendants. | ) Dept: Courtroom 8C |
| | ) Judge: Hon. Dolly M. Gee |

# TABLE OF CONTENTS

TABLE OF CONTENTS...............................................................................i

TABLE OF AUTHORITIES ..................................**Error! Bookmark not defined.**

I. INTRODUCTION ..............................................**Error! Bookmark not defined.**

II. BACKGROUND................................................**Error! Bookmark not defined.**

    A.    The Original Flores Litigation and Settlement Agreement ........ **Error! Bookmark not defined.**

    B.    Procedural History of the Rule............................................................2

    C.    This Litigation .......................................................................4

III. THE APPLICABLE LEGAL STANDARD ............................................4

IV. ARGUMENT........................................................................................5

    A.    The Court Lacks Jurisdiction Over This Case .....................................5

    1.    The States Lack Standing................................................................5

      a.    The States Cannot Claim Injuries That Belong to Third Parties ..........5

      b.    The States Cannot Claim Injuries to Their Purported Sovereign or Quasi-Sovereign Interests .................................................................8

      c.    The States' Alleged Economic Injuries Do Not Establish Standing.........................................................................................11

    2.    The States and Their Claims Are Not Within the Zone of Interests Protected by The Relevant Statutes, And So Lack Prudential or Statutory Standing Under the APA....................................................12

    3.    The States Lack Standing To Pursue Claims Regarding the Agreement ......................................................................................14

    B.    The States Are Not Likely to Succeed on The Merits of Their Claims..........................................................................................15

    1.    The Rule was Promulgated Consistent with APA Rulemaking Procedures ......................................................................................15

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

2.   The States' Attempt to Second Guess the Agencies' Reasoned Decision-making Does not Establish a Likelihood of Success on the Merits .......................................................................... 18

a.   Family Custody ............................................................... 18

b.   Other Provisions ............................................................. 26

C.   The States are Not likely to Suffer Irreparable Harm Absent Preliminary Relief, and an Injunction Is Not in the Public Interest ....... 30

D.   Any Interim Relief Must Be Sharply Limited .................................... 15

V. CONCLUSION ........................................................................... 34

## <u>TABLE OF AUTHORITIES</u>

**CASES**

*Adams v. Vance,*
570 F.2d 950 (D.C. Cir. 1978) ................................................................. 32

*Aiken v. City of Memphis,*
37 F.3d 1155 (6th Cir. 1994) ............................................................ 14-15

*Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez,*
458 U.S. 592 (1982) .............................................................................. 6

*Allen v. Wright,*
468 U.S. 737 (1984).. .................................................................... 10, 11

*Am. Immigration Lawyers Ass'n v. Reno,*
199 F.3d 1352 (D.C. Cir. 2000) .......................................................... 7

*Am. Trucking Ass'n, Inc. v. City of L.A.,*
559 F.3d 1046 (9th Cir. 2009) ............................................................. 4

*Arizona v. United States,*
567 U.S. 387 (2012) .............................................................. 6, 11, 12, 31

*Arpaio v. Obama,*
797 F.3d 11 (D.C. Cir. 2015) ............................................................ 11

*Ass'n of Nat. Advertisers, Inc. v. F.T.C.,*
627 F.2d 1151 (D.C. Cir. 1979) ......................................................... 17

*Bair v. Cal. Dept. of Transp.,*
No. C10–04360WHA, 2011 WL 2650896 (N.D.Cal. July 6, 2011) ...................... 23

*Baltimore Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.,*
462 U.S. 87 (1983) ............................................................................. 18

*Block v. Cmty. Nutrition Inst.,*
467 U.S. 340 (1984) ......................................................................... 13

*Blue Chip Stamps v. Manor Drug Stores,*
421 U.S. 723 (1975) ......................................................................... 14

*Cal. Hosp. Ass'n v. Maxwell-Jolly,*
No. CIV. S-10-3465FCD/EFB, 2011 WL 464008 (E.D. Cal. Feb. 4, 2011) .......... 33

*California v. Azar,*
911 F.3d 558 (9th Cir. 2018) .............................................................. 33

*Caribbean Marine Servs. Co. v. Baldrige*,
  844 F.2d 668 (9th Cir. 1988)............................................................................31

*City & Cty. of S.F. v. Trump*,
  897 F.3d 1225 (9th Cir. 2018)..................................................................... 33-34

*City of Los Angeles v. Barr*,
  929 F.3d 1163 (9th Cir. 2019)........................................................................30

*Clapper v. Amnesty Int'l USA*,
  568 U.S. 398 (2013) ........................................................................................5

*Clarke v. Secs. Indus. Ass'n*,
  479 U.S. 388 (1987) .................................................................................12, 13

*DaimlerChrysler Corp. v. Cuno*,
  547 U.S. 332 (2006) ........................................................................................5

*Dep't of Commerce v New York*,
  139 S. Ct. 2551 (2019) ...........................................................................*passim*

*E. Bay Sanctuary Covenant v. Barr*,
  —F.3d—, 2019 WL 3850928 (9th Cir. Aug. 16, 2019) ........................................33

*E. Bay Sanctuary Covenant v. Trump*,
  909 F.3d 1219 (9th Cir. 2018)........................................................................32

*E. Bay Sanctuary Covenant v. Trump*,
  932 F.3d 742 (9th Cir. 2018)..........................................................................13

*FCC v. Fox Television*,
  556 U.S. 502 (2009) ......................................................................................16

*Federation for Am. Immigration Reform, Inc. (FAIR) v. Reno*,
  93 F.3d 897 (D.C. Cir. 1996) .........................................................................14

*FERC v. Elec. Power Supply Assn.*,
  577 U. S. ——, 136 S.Ct. 760 (2016) ..............................................................21

*Flores v. Lynch*,
  828 F.3d 898 (9th Cir. 2016)......................................................................3, 19

*Florida v. Mellon*,
  273 U.S. 12 (1927) ........................................................................................11

*Gen. Chem. Corp. v. United States*,
  817 F.2d 844 (D.C. Cir. 1987) .......................................................................28

*Gill v. Whitford*,
  138 S. Ct. 1916 (2018) ..................................................................................33

iv

*Haitian Refugee Ctr. v. Gracey*,
   809 F.2d 794 (D.C. Cir. 1987) ................................................................. 10

*Hook v. State of Ariz., Dep't of Corr.*,
   972 F.2d 1012 (9th Cir. 1992) .............................................. 14, 15, 16

*In re Tarble*,
   80 U.S. 397 (1871) ................................................................................. 9

*Innovation Law Lab v. McAleenan*,
   924 F.3d 503 (9th Cir. 2019) ............................................................... 32

*Jennings v. Rodriguez*,
   138 S. Ct. 830 (2018) ........................................................................... 22

*Kowlaski v. Tesmer*,
   543 U.S. 125 (2004) ............................................................................... 7

*L.A. Haven Hospice, Inc. v. Sebelius*,
   638 F.3d 644 (9th Cir. 2011) ............................................................... 33

*Landon v. Plasencia*,
   459 U.S. 21 (1982) .............................................................................. 31

*Linda R.S. v. Richard D.*,
   410 U.S. 614 (1973) ............................................................................. 10

*Lujan v. Defenders of Wildlife*,
   504 U.S. 555 (1992) .......................................................................... 5, 10

*Lujan v. Nat'l Wildlife Fed'n*,
   497 U.S. 871 (1990) ............................................................................. 12

*Madsen v. Women's Health Ctr., Inc.*,
   512 U.S. 753 (1994) ............................................................................. 33

*Massachusetts v. Mellon*,
   262 U.S. 447 (1923) ........................................................................... 6, 9

*Monsanto Co. v. Geertson Seed Farms*,
   561 U.S. 139 (2010) ............................................................................... 4

*Motor Vehicle Mfrs. Assn. of United States, Inc. v. State Farm Mut. Automobile Ins.
Co.*,
   463 U.S. 29 (1983) .............................................................................. 18

*Nat'l Soft Drink Ass'n v. Block*,
   721 F.2d 1348 (D.C. Cir. 1983) ........................................................... 17

*New York v. United States,*
   505 U.S. 144 (1992) ............................................................... 9

*Ober v. U.S. E.P.A.,*
   84 F.3d 304 (9th Cir. 1996) ................................................... 23

*Perez v. Mortg. Bankers Ass'n,*
   135 S. Ct. 1199 (2015) .......................................................... 15

*Plyler v. Doe*, 457 U.S. 202 (1982) ......................................... 12

*Pub. Utilities Comm'n of Cal. v. United States,*
   356 F.2d 236 (9th Cir. 1966) ................................................... 6

*Reno v. Flores,*
   507 U.S. 292 (1993) ............................................. 2, 14, 25, 26

*Rybachek v. Environmental Protection Agency,*
   904 F.2d 1276 (9th. Cir.1990) ............................................... 23

*Sacora v. Thomas,*
   628 F.3d 1059 (9th Cir. 2010) ............................................... 30

*Santosky v. Kramer,*
   455 U.S. 745 (1982) ............................................................... 9

*Sierra Club v. Costle,*
   657 F.2d 298 (D.C. Cir. 1981) ............................................... 30

*Simon v. E. Ky. Welfare Rights Org.,*
   426 U.S. 26 (1976) ............................................................... 11

*Souza v. California Dep't of Transportation,*
   No. 13-CV-04407-JD, 2014 WL 1760346 (N.D. Cal. May 2, 2014) ................... 23

*Texas v. United States,*
   106 F.3d 661 (5th Cir. 1997) ................................................. 12

*United States v. California,*
   921 F.3d 865 (9th Cir. 2019) ................................................... 7

*United States v. ITT Continental Baking Co.,*
   420 U.S. 223 (1975) ............................................................. 14

*Univ. of Tex. v. Camenisch,*
   451 U.S. 390 (1981) ............................................................. 33

*Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc.,*
   435 U.S. 519 (1978) ............................................................. 17

*Virginia ex rel. Cuccinelli v. Sebelius*,
    656 F.3d 253 (4th Cir. 2011) ........................................................... 6, 8-9

*Voigt v. Savell*,
    70 F.3d 1552 (9th Cir. 1995) ...............................................................7

*Winter v. Nat'l Res. Def. Council*,
    555 U.S. 7 (2008) ........................................................................4, 34

*Wyoming v. DOI*,
    674 F.3d 1220 (10th Cir. 2012) .........................................................11

**STATUTES**

5 U.S.C. § 553 ...........................................................................15, 17

5 U.S.C. § 702 ................................................................................12

5 U.S.C. §§ 701-06 .........................................................................15

5 U.S.C. § 706 ...........................................................................15, 25

5 U. S. C. § 706(2)(A) .....................................................................18

6 U.S.C. § 279(g)(2) ........................................................................28

8 U.S.C. § 1101 ..............................................................................13

8 U.S.C. § 1101(a)(27)(J) ...................................................................8

8 U.S.C. § 1225(b)(1) ......................................................................22

8 U.S.C. § 1232 ..............................................................................13

8 U.S.C. § 1232(b)(1) ........................................................................6

8 U.S.C. § 1621 ..............................................................................12

**REGULATIONS**

8 C.F.R. § 212.5(b) ..........................................................................19

8 C.F.R. § 212.5(b)(3)(i) .................................................................3, 19

8 C.F.R. § 236.3(a)(1) ........................................................................3

8 C.F.R. § 236.3(b)(9) ..................................................................1, 10, 19

8 C.F.R. § 236.3(g)(2) ........................................................................3

8 C.F.R. § 236.3(i)(3) .....................................................................1, 19

8 C.F.R. § 236.3(i)(4) ..............................................................................1, 4, 19

8 C.F.R. § 236.3(i)(4)(ii)..............................................................................1, 19

8 C.F.R. § 236.3(i)(4)(iv)..............................................................................1, 19

8 C.F.R. § 236.3(i)(4)(vii)....................................................................................1

8 C.F.R. § 236.3(j) ...............................................................................................3

8 C.F.R. § 236.3(j)(2) ........................................................................................19

8 C.F.R. § 236.3(j)(4) .................................................................................19, 24

8 C.F.R. § 236.3(j)(5)(i)....................................................................................19

8 C.F.R. § 212.5(m) ..........................................................................................19

45 C.F.R. § 410.102 .............................................................................................3

45 C.F.R. § 410.301 .............................................................................................3

45 C.F.R. § 810 ..................................................................................................29

**OTHER AUTHORITIES**

Proposed Rule, Apprehension, Processing, Care, and Custody of Alien Minors and
    Unaccompanied Alien Children, 83 Fed. Reg. 45,486-01 (Sept. 7, 2018) ........2, 30

Final Rule, Apprehension, Processing, Care, and Custody of Alien Minors and
    Unaccompanied Alien Children, 84 Fed. Reg. 44,392-01 (Aug. 23, 2019). ...passim

# I.     INTRODUCTION

The Plaintiff States have moved to temporarily enjoin the government from implementing the Departments of Homeland Security's and Health and Human Services' rule, *Apprehension, Processing, Care, and Custody of Alien Minors and Unaccompanied Alien Children*, 84 Fed. Reg. 44,392 (Aug. 23, 2019) (to be codified at 8 C.F.R. pts. 212 and 236, and 45 C.F.R. pt. 410) ("the Rule"). That request should be denied. As a threshold matter, the States lack standing to bring a challenge to the Rule, and are not within the zone of interests for purposes of bringing such a challenge. On the merits, the States have not established that injunctive relief is warranted. The Rule was promulgated consistent with established procedures under the Administrative Procedure Act ("APA") and is not arbitrary, capricious, or contrary to law.

Specifically, the Rule adopts key protections parallel to the Agreement with respect to family residential centers ("FRC") in that such facilities must provide services for the care of children (8 C.F.R. § 236.3(i)(4)) including medical, education, and counseling services (8 C.F.R. § 236.3(i)(4)(ii), (iv), (vii)); they must be licensed by the State if licensing is available, they are subject to independent review if a state declines to regulate FRCs (8 C.F.R. § 236.3(b)(9)); and they are non-secure (8 C.F.R. § 236.3(i)(3)). The Rule facilitates families remaining together during immigration proceedings, but also provides standards for release that reasonably balance the interests of children, parents, and immigration enforcement, in order to avoid creating significant loopholes for parents who arrive at the border with children. In developing the Rule, the agencies meaningfully addressed voluminous public comments and selected between permissible alternatives.

Further, the States cannot establish a likelihood of irreparable harm absent an injunction where the States' vaguely defined interest in regulating child welfare and unsubstantiated economic impact is preempted by the Rule and federal law. In contrast, the public interest in settled legislative rules governing minors in immigration

custody and the protection of the country's borders is well-established.

Consequently, the States' motion should be denied because the Rule is the product of sound decision-making balancing the unique needs of children with legitimate law enforcement prerogatives and is a "reasonable response to the difficult problems presented" when families migrate. *Reno v. Flores*, 507 U.S. 292, 315 (1993).

## II.    BACKGROUND

### A. The Original *Flores* Litigation and Settlement Agreement

The Rule at issue in this case is an outgrowth of the *Flores* litigation, which began on July 11, 1985. *Flores v. Barr*, 85-cv-4544 (C.D. Cal.). After the Supreme Court upheld prior rules governing the custody and release of unaccompanied alien children ("UAC"), *Flores*, 507 U.S. at 296, the parties entered into a settlement agreement in 1997. The stated purpose of the Agreement was to temporarily establish a "nationwide policy for the detention, release, and treatment of minors in the custody of the INS" until federal rules could be promulgated. Agreement ¶ 9. The Agreement was originally set to expire in 2002, but was extended to terminate "45 days following defendants' publication of final regulations implementing this Agreement." Stipulation, Dec. 7, 2001, ECF No. 101.

### B. Procedural History of the Rule

On September 7, 2018, DHS and HHS issued a notice of proposed rulemaking, *Apprehension, Processing, Care, and Custody of Alien Minors and Unaccompanied Alien Children*, to implement the Agreement. *See* 83 Fed. Reg. 45,486 (Sept. 7, 2018). The proposed rule resulted in the submission of over 100,000 comments to the relevant agencies, including comments from 15 of the Plaintiff States. Compl. ¶ 82 (ECF No. 1); *see* https://www.regulations.gov/document?D=ICEB-2018-0002-0001.

On August 23, 2019, DHS and HHS published the Rule implementing the Agreement. *See* 84 Fed. Reg. 44,392 (Aug. 23, 2019); Compl. ¶ 84. The key provisions of the Rule address the comprehensive and multi-faceted obligations and responsibilities that arise with respect to immigration custody, care, and release of

children at multiple federal agencies, consistent with governing law.

The Rule parallels the substantive provisions of the Agreement, informed by experience and changes that have occurred in circumstances since 1997. As a threshold matter, the Rule adopts the Agreement's commitment to treat all children in government custody with dignity, respect, and special concern for their particular vulnerability as minors. Agreement ¶ 11; *see* 84 Fed. Reg. 44,392, 44,525, 44,531 (Aug. 23, 2019). 45 C.F.R. § 410.102; 8 C.F.R. § 236.3(a)(1). To that end, the Rule requires each detained minor be placed in the least restrictive setting appropriate for their age and special needs. Agreement ¶ 11; 45 C.F.R. § 410.102; 8 C.F.R. § 236.3(g)(2), (i); *see* 84 Fed. Reg. at 44,527. It tracks the Agreement's requirement that facilities are safe and sanitary. *Compare* 8 C.F.R. § 236.3(g)(2) *with* Agreement ¶ 12.A.

The Rule addresses the release of minors in immigration custody. For UACs, release is governed by the relevant provisions of the Trafficking Victims Protection Reauthorization Act ("TVPRA"), which is incorporated into the Rule. *See* 45 C.F.R. § 410.301. For accompanied minors who are apprehended with their parents, the Rule develops new provisions relating to release since the issues that arise in this circumstance were not contemplated or addressed by the parties in drafting the Flores Agreement, as the Ninth Circuit recognized. *Flores v. Lynch*, 828 F.3d 898, 906–07 (9th Cir. 2016). These standards are consistent with the general release provision in paragraph 14 by, among other things, adopting a parole release standard based on danger and flight risk mirroring the standard in Paragraph 14 of the Agreement. *Compare* 8 C.F.R. § 236.3(j), *with* Agreement ¶ 14. The Rule also permits release of accompanied minors, in DHS' discretion, to referenced adult relatives other than parents or legal guardians: siblings, aunts, uncles, or grandparents. *See* 8 C.F.R. §§ 212.5(b)(3)(i), 236.3(j).

The Rule similarly parallels salient portions of the Agreement specifying what to do when an accompanied minor remains in DHS custody – including by requiring

state licensing when the state provides a licensing scheme for FRCs. *See* Agreement ¶¶ 19, 21–24.A; 8 C.F.R. § 236.3(i)(4)(i–xv). The rule directly parallels the standards from Exhibit 1 to the Agreement, with which licensed facilities must comply. *Compare* 8 U.S.C. § 236.3(i)(4)(i–xv) *with* Agreement Ex. 1.

## C. This Litigation

On August 26, 2019, a group of states and the District of Columbia (collectively, "the States") filed the instant suit challenging the lawfulness of the Rule. Although Defendants operate FRCs only in Texas and Pennsylvania, Texas is not a Plaintiff, and Pennsylvania has chosen to join this suit filed in California rather than in Pennsylvania. The core of the States' Complaint is a challenge to the family detention provisions of the Rule. The only claim for which injunctive relief is sought is Count Two, which claims that the Rule violates the APA because it is arbitrary or capricious, and because it violates statutes or the Constitution or the Flores Agreement. *Id.* ¶¶ 495–500.

## III.   THE APPLICABLE LEGAL STANDARD

A preliminary injunction is "an extraordinary remedy never awarded as of right." *Winter v. Nat'l Res. Def. Council*, 555 U.S. 7, 24 (2008). A plaintiff seeking a preliminary injunction "must establish" that: (1) it is likely to succeed on the merits of its claims; (2) it is likely to suffer irreparable harm absent preliminary relief; (3) the balance of equities tips in its favor; and (4) an injunction is in the public interest. *Id.* at 20; *see also Am. Trucking Ass'n, Inc. v. City of L.A.*, 559 F.3d 1046, 1052 (9th Cir. 2009). Because it is such an extraordinary remedy, a preliminary injunction "may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter*, 555 U.S. at 376.

//

//

//

4

# IV.   ARGUMENT

Defendants respectfully request that this Court deny the States' motion. The Court lacks jurisdiction over this case, and the States fail to carry their heavy burden of showing entitlement to a preliminary injunction. *See Munaf v. Geren*, 553 U.S. 674, 690 (2008) ("difficult question as to jurisdiction" weighs against granting injunction).

## A.   The Court Lacks Jurisdiction Over This Case.

## 1. The States Lack Standing.

The States lack standing because the Rule does not regulate them – it regulates children in immigration custody. The State cannot assert injuries of those third parties (and as this Court knows, those third parties are seeking relief on their own behalf in *Flores*). The States also cannot evade that limit by claiming a sovereign interest in protecting children within their borders – that is just another improper way of trying to assert the interests of third parties.

Article III standing "is an essential and unchanging part of the case-or-controversy requirement." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 576 (1992). To establish standing, the States bear the burden of demonstrating, by competent proof, that they suffer an injury that is (1) "concrete, particularized, and actual or imminent"; (2) "fairly traceable to the challenged action"; and (3) "redressable by a favorable ruling." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (citations omitted). Where standing is premised on a projected future injury, the States must show that the threatened future injury is "*certainly* impending." *Id.* Additionally, standing must be established for *each* claim. *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006).

### a.  The States Cannot Claim Injuries That Belong to Third Parties.

The alleged injuries the States principally purport to identify are not injuries to the States, but injuries to alien children or parents they claim will be present within their borders. *See* ECF No. 32 at 32; Compl. ¶ 486. Each State alleges that "because of the Rule, children who otherwise may have been placed in [the State's] licensed

care will be held in federal family detention facilities either within or outside of [the State]." *E.g.*, *id.* ¶¶ 149, 184, 193, 215, 230. The States allege that the Rule "disadvantages children in their removal or asylum hearing processes." *Id.* ¶ 114; *see also id.* ¶¶ 128-35 ("Detention Is Extremely Harmful to Children"). Finally, the States allege that parents are harmed by the Rule because the Rule supposedly impinges on their parental decision-making. *Id.* ¶¶ 141-42.

These are not allegations of injuries to the Plaintiff States, but to third parties, alien children and parents who might be located within their borders. But it is quite well established that "[a] State does not have standing as *parens patriae* to bring an action against the Federal Government." *Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez,* 458 U.S. 592, 610 n.16 (1982) (citing *Massachusetts v. Mellon*, 262 U.S. 447, 485-86 (1923)). "[I]t is no part of [a state's] duty or power to enforce [its citizens'] rights in respect of their relations with the federal government." *Mellon*, 262 U.S. at 485-86. In this regard, "it is the United States, and not the state, which represents [its citizens] as *parens patriae*." *Id.* Thus, while a State may sue private entities on behalf of its citizens, it may not sue "to protect citizens of the United States from the operation" of federal law. *Id*. This limitation, which controls here, is rooted in the proper allocation between federal and state authority: "[w]hen a state brings a suit seeking to protect individuals from [federal law], it usurps [the] sovereign prerogative of the federal government and threatens the general supremacy of federal law." *Virginia ex rel. Cuccinelli v. Sebelius*, 656 F.3d 253, 269 (4th Cir. 2011); *Pub. Utilities Comm'n of Cal. v. United States*, 356 F.2d 236 (9th Cir. 1966).

These cases normally apply to citizens, but even assuming they could be applied to non-citizen aliens residing within a state, the principle prohibiting such a suit against the United States has special force in cases involving immigration, since the authority to apprehend and remove aliens from the United States is a uniquely federal function where the State role is severely limited. *Arizona v. United States*, 567 U.S. 387, 409 (2012) (recognizing the "principle that the removal process is entrusted to the

discretion of the Federal Government" and rejecting State's effort to exercise authority over the detention of aliens). Individuals in federal immigration custody are subject to federal law and federal standards. *See* 8 U.S.C. § 1232(b)(1) (HHS responsible for "care and custody of all unaccompanied alien children, including responsibility for their detention"); *cf. United States v. California*, 921 F.3d 865, 882 & n.7 (9th Cir. 2019) (state law that applies to "facilities in which noncitizens are being housed or detained for purposes of civil immigration proceedings" "relates exclusively to federal conduct" for purposes of intergovernmental immunity).

Finally, the States' assertion of *parens patriae* standing fails because they are doing no more than suing on behalf of individual residents. *Alfred L. Snapp,* 458 U.S. at 607 ("[M]ore must be alleged than injury to an identifiable group of individual residents."). A state cannot sue *parens patriae* when it is "merely litigating as a volunteer the personal claims of its citizens," *Pennsylvania v. New Jersey*, 426 U.S. 660, 665 (1976), and here the States are merely suing to vindicate interests of alien children (or parents) within their borders.

The States fail to satisfy the rigorous requirements when suing on behalf of a third party. "[A] party 'generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties.'" *Kowlaski v. Tesmer*, 543 U.S. 125, 129 (2004); *see also Am. Immigration Lawyers Ass'n v. Reno*, 199 F.3d 1352, 1364 (D.C. Cir. 2000) (entities "do not have standing to raise claims, whether statutory or constitutional, on behalf of aliens"). The Supreme Court generally permits third party standing only where a party demonstrates a "close relationship with the person" whose rights it invokes and a "hindrance" to that person's "ability to protect his own interests." *Kowlaski*, 543 U.S. at 130.

The States fall short on both fronts. For one, they cannot plausibly allege that any individuals whose rights they seek to claim face a "hindrance" in asserting their own rights, *id.*, given that a class of children in immigration custody is in fact seeking to vindicate their own rights with respect to the Rule before this Court. *See Flores*, No.

85-4544. Furthermore, the States cannot and do not allege any close relationship with individuals allegedly affected by Defendants' enforcement actions. The mere fact that an individual *might* be housed in a facility or with a guardian within a State's territory or end up in the State after release does not create a legally sufficient close relationship where those individuals are subject to *federal* custody and control. *See, e.g.*, *Voigt v. Savell*, 70 F.3d 1552, 1565 (9th Cir. 1995) (no close relationship where plaintiff may "occasionally be in a position to hire a non-resident").

Even farther afield are the States' attempts to demonstrate a close relationship with *possible* future residents they speculate will be housed "outside of [the State]" or unspecified parents and children placed in state-licensed detention centers in their States. *E.g.*, Compl. ¶¶ 159, 175, 273, 285, 299, 312. The States plainly lack *any* relationship with possible future (or past) residents.[1]

### b. The States Cannot Claim Injuries to Their Purported Sovereign Or Quasi-Sovereign Interests.

Because they cannot sue on behalf of children in immigration custody, the States try to recast their injury as a sovereign interest in regulating or protecting children within their borders. But this recasting fails to advance their claim and reveals a fundamental mismatch between the asserted injury and the claims actually asserted in this case. Aliens in the United States – including children – are subject to regulation under the federal immigration laws, and state law is relevant only when Congress incorporates it. *See*, *e.g.*, 8 U.S.C. § 1101(a)(27)(J). The States do not – and cannot -- contend, as a substantive matter, that the Rule violates any asserted sovereign interests. Indeed, if it were otherwise, the TVPRA would itself violate the States' claimed sovereign interests, as would the Flores Agreement itself, since both govern the treatment of children subject to the immigration laws under federal law, not state law. As to the claims the States do advance, those claims are all claims in which the States

---

[1] Further, the only Plaintiff State with a family residential center is Pennsylvania, making venue in this district improper even if this Court credited the theory that a State could sue on behalf of current residents of residential centers.

1    are trying to assert the interests of third parties within their borders. For the reasons
2    explained above, the States lack standing to assert those claims.

3        The States allege that the "Rule irreparably harms the States' sovereign interest
4    in their 'power to create and enforce a legal code.'" ECF No. 32 at 31; *see also, e.g.*,
5    Compl. ¶¶ 229, 238, 246, 263. Specifically, the States allege that the Rule inhibits
6    them from "enfor[ing] . . . state laws and procedures for ensuring child welfare."
7    Compl. ¶ 263; *see also* ¶¶ 161, 186, 209, 300, 343, 352.

8        But States lack any cognizable interest in "usurp[ing the] sovereign prerogative
9    of the federal government" by "bring[ing] a suit seeking to protect individuals from a
10   federal" action. *Cuccinelli*, 656 F.3d at 269. The Framers established a National
11   Government with the power to act directly upon *individuals*, not solely upon the States
12   as under the Articles of Confederation. *See New York v. United States*, 505 U.S. 144,
13   162-66 (1992). Actions of the federal government affecting individuals within the
14   sovereign territory of a State may in turn generate incidental effects on that State with
15   respect to its own actions affecting those same individuals. But the necessary
16   autonomy inherent in the Constitution's framework of separate sovereigns, each acting
17   directly upon individuals, is inconsistent with the notion that a State has a legally or
18   judicially cognizable interest in avoiding incidental effects derivative of the federal
19   government's actions affecting or regulation of individuals who happen to be in that
20   State (or, in this case, who might otherwise travel to that State or are in federal custody
21   within the State). *Cf. Mellon*, 262 U.S. at 485-86 (1923) ("[I]t is no part of [a State's]
22   duty or power to enforce [its citizens'] rights in respect of their relations with the
23   federal government. In that field it is the United States, and not the State, which
24   represents them . . . ."). Thus, the States lack a legally sufficient interest in the care of
25   minors in immigration detention, even when such detention occurs within their
26   territorial boundaries. *See In re Tarble*, 80 U.S. 397, 406-07 (1871) ("There are within
27   the territorial limits of each State two governments, restricted in their spheres of action,
28   but independent of each other . . . . Neither government can intrude within the

jurisdiction . . . of the other.").

The specific subject matter at issue here—child welfare—does not change that conclusion. In claiming that the Rule injures their ability to regulate child welfare, the States suggest that the Rule harms their various family-law regimes to promote the "best interests of the child." *E.g.*, Compl. ¶¶ 161, 186, 209, 300, 343, 352. To the extent that states have an interest in promoting a child *resident's* welfare, however, it is a *parens patriae* interest, *Santosky v. Kramer*, 455 U.S. 745, 766 (1982), which provides no cause of action against the federal government.

Further, the Rule does not command the States to take, or refrain from taking, any action with respect to aliens in their borders. This is a case where the States complain of injury "from the government's allegedly unlawful regulation (or lack of regulation) of someone else," where it is "substantially more difficult to establish," and standing cannot be based on the State volunteering to take on obligations in response to the government's regulation. *Lujan*, 504 U.S. at 562. Further, allowing the States to challenge Defendants' rules would conflict with the fundamental principle that a plaintiff "lacks standing to contest the policies of the prosecuting authority when he himself is neither prosecuted nor threatened with prosecution." *Linda R.S. v. Richard D.*, 410 U.S. 614, 619 (1973); *Haitian Refugee Ctr. v. Gracey*, 809 F.2d 794, 804-07 (D.C. Cir. 1987) (immigration context). Just as a state could not halt a federal prosecution based on concerns over the welfare of family members, the States here cannot inject themselves into the quintessential federal immigration function here.

As the D.C. Circuit has explained, "[g]iven the complexity and interdependence of our society and governmental policies, it will often be possible to allege with some plausibility that a change in a governmental policy is likely to cause other persons or institutions to modify their behavior." *Haitian Refugee Ctr.*, 809 F.2d at 805. Such a theory of standing has been rejected because it would "thrust [courts] into a far larger role of judging governmental policies" and lead to "the virtually limitless spread of judicial authority." *Id.*; *see Allen v. Wright*, 468 U.S. 737, 759-60 (1984).

It is particularly inappropriate to credit a State's self-inflicted injury in this case, given that the asserted institutional injury – a claim that the Rule circumvents state regulation over facilities housing children – only occurs if the State *declines to regulate such facilities in the State. See* 84 Fed. Reg. 44,394 ("where state licensing is unavailable" federal scheme will apply); 8 C.F.R. § 236.3(b)(9) (licensed FRC must be "licensed by the state . . . if such a licensing process exists"). It is remarkable that the State would challenge a federal rule *deferring* to State regulation on the ground that it *usurps* the State's regulatory authority. And it is revealing: the true goal of the States is to use their lack of a licensing scheme to "require DHS to release" family units in its custody. 84 Fed. Reg. 44,394; *see* ECF No. 32 at 18 ("family detention facilities [are] . . . fundamentally incompatible with state licensing schemes"). Just as a state law requiring the release of an alien family would be preempted, an interest in mandating unilateral release of aliens is not a protected State interest under Article III. *Cf. Arizona*, 567 U.S. at 408 (state law invalid when it "attempts to provide state officers . . . greater authority to arrest . . . than Congress has given . . . federal . . . officers").

### c. The States' Alleged Economic Injuries Do Not Establish Standing

The States speculate the Rule may increase the presence of children in their States, that such children are injured by federal policies, and that "state funded resources will *ultimately* be called upon to respond to the consequences of those injuries." ECF No. 32 at 34 (emphasis added). Such claims are speculative, attenuated, and, even crediting this allegation, only an incidental effect of the challenged Rule. *Arpaio v. Obama*, 797 F.3d 11, 21 (D.C. Cir. 2015) (rejecting "as overly speculative those links [in a chain of allegations] which are predictions of future events (especially future actions to be taken by third parties)"). The Supreme Court has rejected similar attempts to base standing on a theory that a federal policy somehow "encourages" complained-of third-party conduct. *See Florida v. Mellon*, 273 U.S. 12, 18 (1927); *Allen*, 468 U.S. at 758-59; *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 41-42 (1976). And such a theory is entirely speculative here, where the Rule reduces incentives to put children in danger

through migration travel patterns and will enable federal custody – at federal expense – and similar immigration treatment for family units. *See* 84 Fed. Reg. 44,395, 44,403.

Even crediting the speculation that the Rule results in an increase of affected children present in the States, they fail to plausibly allege an economic injury directly attributable to Defendants' actions, rather than the result of the actions of the migrants entering their territory. *See Wyoming v. DOI*, 674 F.3d 1220, 1234 (10th Cir. 2012) (no standing where state would incur cost regardless of federal policy). Moreover, federal law establishes a presumption that certain categories of aliens are "not eligible for any State or local public benefits," unless a state affirmatively elects to provide those benefits. 8 U.S.C. § 1621. Thus, any alleged predicted costs associated with providing state services or benefits to children previously detained or in custody are "self-inflicted injuries" that are not cognizable under Article III. *See Clapper*, 133 S. Ct. at 115-13; *Texas v. United States*, 106 F.3d 661, 666 (5th Cir. 1997) (rejecting state's standing based on medical and educational expenditures for undocumented aliens where state's own laws or the Constitution required expenditures and no "federal statute or regulation or executive branch directive specifically compel[ed] states to provide services to undocumented aliens"). Indeed, many of the Plaintiff States previously argued – correctly – that the economic injuries they now assert are insufficient to support standing. *See United States v. Texas*, No. 15-674 (S. Ct.) (Amicus Brief of the States of Washington, California, *et al.*) ("nothing in the Guidance requires States to do anything at all, including providing . . . benefits to anyone"), *available at* https://www.scotusblog.com/wp-content/uploads/2016/03 /March-8-AG-Amicus.pdf.

Finally, any perceived injury to the States based on this claim is not traceable to the Rule. Rather, it would stem from the Constitution and the exclusive assignment of authority over immigration to the political Branches of the National Government. See *Arizona*, 567 U.S. at 394-95; *Plyler v. Doe*, 457 U.S. 202, 219 n.19 (1982). It would be fundamentally backwards to rely on the structural limitations on state authority as

a basis for permitting States, through the federal judiciary, to interfere with the federal government's administration of the immigration laws as to third-party aliens: Those limitations exist to prevent individual States from interfering in these sensitive and inherently national affairs. *Id.*

## 2. The States and Their Claims Are Not Within the Zone of Interests Protected by the Relevant Statutes, and So Lack Prudential or Statutory Standing Under the APA.

The States' claims must be dismissed because they fall outside the zone of interests of the INA provisions governing the detention and release of aliens and UAC. The APA does not "allow suit by every person suffering an injury in fact." *Clarke v. Secs. Indus. Ass'n*, 479 U.S. 388, 395 (1987). Rather, it provides a cause of action only to "[a] person . . . adversely affected or aggrieved by agency action within the meaning of a relevant statute." 5 U.S.C. § 702. To be "aggrieved" in this sense, "the interest sought to be protected by the complainant [must] be arguably within the zone of interests to be protected or regulated by the statute . . . in question." *Clarke*, 479 U.S. at 396 (brackets and citation omitted). Put somewhat differently, such a plaintiff must establish that the injury it complains of "falls within the 'zone of interests' sought to be protected by the statutory provision whose violation forms the legal basis for his complaint." *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 883 (1990). The "essential inquiry is whether Congress 'intended for [a particular] class [of plaintiffs] to be relied upon to challenge agency disregard [of the statute they seek to enforce].'" *Clarke*, 479 U.S. at 399 (quoting *Block v. Cmty. Nutrition Inst.*, 467 U.S. 340, 347 (1984)).

Here, the statutes in question are the federal immigration statutes, including the INA, 8 U.S.C. § 1101, et seq., and the TVPRA, 8 U.S.C. § 1232. And the contested regulatory action is DHS's and HHS's exercise of the discretion to detain and care for alien unaccompanied and accompanied children. The States thus are not the subjects of the contested regulatory action—alien children are the subject of that action.

Further, neither the INA nor the TVPRA serve to protect States from bearing the incidental costs associated with the federal government's immigration policies or

13

otherwise. As the Ninth Circuit recently explained, "[b]ecause the APA provides a cause of action only to those suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute . . . the relevant zone of interests is not that of the APA itself, but rather the zone of interests to be protected or regulated by the statute that [the plaintiff] says was violated." *E. Bay Sanctuary Covenant v. Trump*, 932 F.3d 742, 767-68 (9th Cir. 2018) (internal quotation marks and citations omitted).

In particular, just as these statutes do not protect the States from the medical costs incurred by discretionary decisions relating to the enforcement of the immigration laws generally, they also do not protect states from the incidental costs that might stem from the difficult judgments that must be made in administering the immigration laws with respect to children and family units who are in the country in violation of federal immigration law. *See Federation for Am. Immigration Reform, Inc. (FAIR) v. Reno*, 93 F.3d 897, 899, 904 (D.C. Cir. 1996). In *FAIR*, the D.C. Circuit found that an organization seeking less immigration was not in the zone of interests of laws governing the parole of alien workers into the country, explaining that "Congress, in the various immigration statutes that the [plaintiff] says have been violated, did not seek to protect the interests of the [plaintiff's] members by intending them as beneficiaries or as suitable challengers of violations." Here, the same is true: Congress enacted the INA provisions governing the detention, custody, and release of alien children to balance the interests of those children with the federal interest in enforcing the immigration laws. *See Flores*, 507 U.S. at 304-05 ("government responsibility . . . over a child who has come within the federal government's control" is a policy judgment for the federal government). The States are not within that zone of interest, and Congress did not seek to protect the States' interests in its "response to the difficult problems presented when the Service arrests unaccompanied alien juveniles" or family units. *Flores*, 507 U.S. at 314.

**3. The States Lack Standing Or Any Cognizable Interest To Pursue Claims Regarding the Agreement.**

Much of the States' arguments concern their claim that various regulatory provisions do not properly implement the Flores Agreement. But the States are not parties to that Agreement and are not intended third-party beneficiaries. As such, they lack standing or any judicially cognizable interest to enforce their understanding of its terms. Whether viewed as a settlement agreement or a consent decree, the Flores Agreement is analyzed pursuant to contract principles. *Hook v. State of Ariz., Dep't of Corr.*, 972 F.2d 1012, 1014–15 (9th Cir. 1992). Key to the present case, the Agreement works as a contract for purposes of enforcement. *United States v. ITT Continental Baking Co.,* 420 U.S. 223, 238 (1975). And a "well-settled line of authority from [the Supreme] Court establishes that a consent decree is not enforceable directly or in collateral proceedings by those who are not parties to it even though they were intended to be benefited by it." *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 750 (1975); *see also Aiken v. City of Memphis*, 37 F.3d 1155, 1167–68 (6th Cir. 1994). Therefore, enforcement of consent decrees is governed by the established contract principle that only parties may enforce an agreement. *Id.* Here, the States do not even allege they are intended third party beneficiaries of the Agreement, but only that the Agreement incorporates certain state regulations. They, accordingly, have no standing to enforce or enjoin compliance with the Agreement or its termination provision. *See Hook v. State of Ariz., Dep't of Corr.*, 972 F.2d at 1015.

**B.     The States are not likely to succeed on the merits of their claims.**

Should the Court conclude that it has jurisdiction over this case, then the States must still satisfy the four requirements for a preliminary injunction. The first requirement, again, is a likelihood of success on the merits. The States fail to make this showing for the APA count on which they seek preliminary relief.

## 1. The Rule was Promulgated Consistent with APA Rulemaking Procedures

The agencies promulgated the Rule consistent with the requirements of the APA. Section 4 of the APA, 5 U.S.C. § 553, prescribes a three-step procedure for "notice-and-comment rulemaking." First, the agency must issue a "[g]eneral notice of proposed rule making," ordinarily by publication in the Federal Register. *Id*. at § 553(b). Second, the agency will "give interested persons an opportunity to participate . . . through submission of written data, views, or arguments." *Id*. at § 553(c). An agency must consider and respond to significant comments received during the period for public comment. *See Perez v. Mortg. Bankers Ass'n*, 135 S. Ct. 1199, 1203 (2015). Third, when the agency promulgates the final rule, it must include in the rule's text "a concise general statement of [its] basis and purpose." *Id*. at § 553(c).

The Rule at issue is subject to judicial review under the limited terms set out by Congress in the APA. *See* 5 U.S.C. §§ 701-06. Under those provisions, the Court would determine if they are "arbitrary [or] capricious," "contrary to constitutional right," "in excess of statutory . . . authority," or "unsupported by substantial evidence." 5 U.S.C. § 706.

Here, the Rule is the product of the established, extensive, and appropriate notice-and-comment procedures. Specifically, the notice-and-comment process included consideration of 100,073 comments from the public. The government, in turn, provided nearly 150 Federal Register pages of consolidated responses and made modifications to the proposed regulation based on public input. Where the regulation is different from the existing regulatory regime governed by the Flores Agreement, the agencies provided a "reasoned explanation" for the differences and, in any event, retained the overarching goals of the Agreement. *See FCC v. Fox Television*, 556 U.S. 502, 515 (2009). Accordingly, as required by the APA, the agencies properly considered and incorporated comments from the public and explained judgments addressing current operational circumstances.

As an initial matter, in addition to lacking standing to enforce the Flores Agreement, the States seek to circumvent the well-established APA standards by basing much of their challenge on the contention that the Rule seeks to "override" the Agreement. Br. at 8-10. The States, however, ignore that, pursuant to the APA, the Rule is not reviewed for its consistency with a former agreement with private parties. Instead, the States must identify some provision of law with which the Rule conflicts. The Court should reject the States' attempt to bind the agencies to issue rules containing set provisions, evade the framework governing judicial review of those provisions, or impose a review standard different from that provided by the APA. *See Fox Television Stations, Inc*., 556 U.S. at 513 (the APA "sets forth the full extent of judicial authority to review executive agency action for procedural correctness" and "permits . . . the setting aside of agency action that is 'arbitrary' or 'capricious'").

Further, the States find no support for their avoidance of the APA's review standards in *Hook*, 972 F.2d at 1013. ECF No. 32 at 10. In *Hook*, the parties agreed to state regulations that themselves served as a consent decree between the parties and were entered as a judgment by the court. *Hook*, 972 F.2d at 1013. The Ninth Circuit held that in order to modify the regulations, the state was required to first seek and obtain modification of the consent decree under Rule 60(b). *Id*. The case provides little guidance here. First, the Flores Agreement did not establish "regulations"; rather, it settled claims between the parties and provided for termination upon the promulgation of regulations under the APA in the future. That terminating event has now occurred and no modification of the Agreement is required. Second, the decree in *Hook* likely could not be entered into by a federal agency consistent with the APA notice and comment provisions. The case therefore provides little assistance in evaluating the APA challenge here.

Acceptance of the States' argument that the Rule violates the APA because it purportedly undermines the Agreement would render the APA rulemaking process a nullity. Preordained results are inconsistent with basic APA formal rulemaking

requirements. 5 U.S.C. § 553. Congress intended these APA procedures to improve the quality of information available for rulemaking, to compel reexamination of the proposed rule in light of the arguments adduced during the comment period, and to facilitate judicial review by incorporation of this information into a rulemaking record. *See Nat'l Soft Drink Ass'n v. Block*, 721 F.2d 1348, 1353 (D.C. Cir. 1983); *Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc.*, 435 U.S. 519, 549 (1978). Thus, a rulemaking necessarily entails debate over factual issues and the policy questions to which they go. *Ass'n of Nat. Advertisers, Inc. v. F.T.C.*, 627 F.2d 1151, 1168 (D.C. Cir. 1979). All of this is provided for under the APA process to advance the evolution of considered policy. This is particularly true when the prior authority is over 20 years old and the agencies have to account for experience over that lengthy period and changed circumstances at the border since that time. Consequently, the States have not established a likelihood of success based on perceived differences between the Flores Agreement and the Rule.

## 2. The States' Attempt to Second Guess the Agencies' Reasoned Decision-making Does not Establish a Likelihood of Success on the Merits

At base, the States allege the agencies failed to consider certain topics and the Rule is not supported by the evidence before the agencies at the time of promulgation. ECF No. 32 at 11-30. The Court reviews the Rule under the deferential "arbitrary and capricious" standard. *See* 5 U. S. C. § 706(2)(A). The scope of review is "narrow" and limited to determine only whether the agencies "examined 'the relevant data' and articulated 'a satisfactory explanation' for [the] decision, 'including a rational connection between the facts found and the choice made.'" *Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2569 (2019) (quoting *Motor Vehicle Mfrs. Assn. of United States, Inc. v. State Farm Mut. Automobile Ins. Co.*, 463 U.S. 29, 43 (1983)). The Court may not substitute its judgment for that of the agencies, but instead must confine itself to ensuring that the agencies "remained 'within the bounds of reasoned

decisionmaking.'" *Id.* (quoting *Baltimore Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.*, 462 U.S. 87, 105 (1983)).

Far from failing to consider the comments and views of the public, the agencies provided nearly 150 Federal Register pages of responses to a variety of topics, including those identified by the States in their motion. Plaintiffs, however, incorrectly equate a decision not to adopt a certain course to a failure to "consider" the States' preferred option. But the choice between reasonable policy alternatives in the face of uncertainty is for the federal agencies to make. *Dep't of Commerce*, 139 S. Ct. at 2570. Having considered the relevant factors, weighed risks and benefits, and articulated a satisfactory explanation for the Rule in a thorough and detailed discussion, overriding that reasonable exercise of policymaking judgment would improperly substitute the States' judgment for that of the agencies.

**a. Family Custody**. Most of the States' arguments address concerns about the provisions of the Rule governing family custody. The Ninth Circuit has recognized the "potentially complex issues involving the housing of family units" who have come into immigration custody. *Flores*, 828 F.3d at 906–07. The Rule addresses those issues in a reasonable way. First, the Rule adopts key protections paralleling the Flores Agreement with respect to FRCs: they must provide all of the conditions of custody that the Flores Agreement included for the care of children (8 C.F.R. § 236.3(i)(4)), including medical, education, and counseling services (8 C.F.R. § 236.3(i)(4)(ii), (iv), (vii)); they must be licensed by the State if licensing is available, and subject to independent review if a state declines to regulate FRCs (8 C.F.R. § 236.3(b)(9)); and such facilities are non-secure (8 C.F.R. § 236.3(i)(3)).

Second, the Rule provides release standards that reasonably balance the interests of children, parents, and immigration enforcement, in order to avoid creating significant loopholes for parents who arrive at the border with children. The Rule creates a regulatory regime for residential centers where families can remain together pending immigration proceedings or removal. Moreover, the Rule incorporates bond

and parole standards that assess the flight risk and danger presented by release – standards that parallel those in the Flores Agreement ⁋ 14 and that are familiar to immigration law. *See* 8 C.F.R. § 236.3(j)(4) (parole standard); § 236.3(m) (bond). To close a significant enforcement loophole, the Rule clarifies the parole rule that applies when minors accompanied by their parents or legal guardians have not established a credible fear of persecution. 8 C.F.R. §§ 212.5(b), 236.3(j)(2). The Rule also provides authority for DHS to release accompanied minors to another adult relative—including relatives identified by the parent in custody—who can provide appropriate care and treatment for the minor. 8 C.F.R. §§ 212.5(b)(3)(i), 236.3(j)(5)(i).

The States raise a variety of challenges to the manner in which DHS considered these multi-faceted issues, but none of these challenges would justify overriding DHS's reasoned judgment nor show that DHS acted arbitrarily or capriciously in promulgating these comprehensive rules governing family custody.

<u>State Licensing</u>. The States argue that the Rule is "arbitrary and capricious" and "contrary to law" because it "authorize[s] federal licensing" of FRCs. Br. at 17-18. This is a remarkable attack coming from the Plaintiff States: As we have explained, the rule *gives priority* to state licensing, and only provides for independent review and oversight when the state itself declines to regulate. The States cannot pontificate about the "importance and purpose of state licensing" (Br. at 18), refuse to regulate or issue licenses, and then attack the regulatory scheme for developing an alternative. This is, as we have explained, an effort by the States to control immigration policy in a manner that is not consistent with the Supremacy Clause and cannot therefore form the basis for invalidating the rules.

The States' specific concerns with respect to the licensing scheme also do not show it to be irrational or invalid. *See* Br. at 18-19. The scheme, as we have explained, provides for protections that mirror the Flores Agreement. And because the Rule defers to state regulation, the Plaintiff States are free to provide "important protections

frequently afforded by state licensing schemes in order to provide for the best interests of children." Br. at 18-19.

DHS also explained in the Rule that the FRCs in Texas and Pennsylvania continue to abide by state requirements, thus taking into account the States' standards for the best interest of the child in the only two jurisdictions where FRCs are currently located. 84 Fed. Reg. 44,416-17. Indeed, in the only Plaintiff State where a FRC is located – Pennsylvania – the facility is currently operating under a state license, as Plaintiffs concede. Complaint ¶ 70. Moreover, DHS allows inspections by State officials: "[D]espite the ongoing litigation surrounding the state licensure of the FRCs, the State of Texas and the Commonwealth of Pennsylvania regularly conduct both announced and unannounced inspections of FRCs, and the reports of those inspections are publicly available on the States' websites." *Id.* at 44,417. This is a reasonable way to address comments regarding state licensing.

<u>Release</u>. The States next argue that DHS did not sufficiently consider the benefits of releasing family units. Br. at 11. But in making this argument, the States fail to acknowledge that the Rule allows for release – either under parole or bond – under well-established standards that provide for a government evaluation of flight risk or danger. Unsurprisingly, the States do not explain how that aspect of the Rule lacks a reasoned explanation: they do not argue that releasing family units even though they present a flight risk or danger would be appropriate.

Instead, the States argue that it was irrational to rely on family unity justifications for maintaining custody because the identified "advantages are equally present when families are released pending immigration proceeding." ECF No. 32 at 11 (referencing 84 Fed. Reg. 44,403). But the States disregard DHS's need to balance multiple interests – including the need to ensure aliens can be removed and appear for immigration proceedings, and the reality that "the most effective means to achieve this is using detention." 84 Fed. Reg. 44,494; *see* 84 Fed. Reg. 44,498 ("the government may need to detain minors to secure their timely appearance in immigration

proceedings or to ensure their safety, as has been underscored by the significant numbers of final orders of removal that have recently been entered in absentia for family units") (referencing the Flores Agreement). Creating a regime that allows for lawful family custody is a reasonable means to address both interests. The determination of how to serve family unity while furthering other legitimate governmental interests "called for value-laden decisionmaking and the weighing of incommensurables under conditions of uncertainty." *Dep't of Commerce*, 139 S. Ct. at 2571. The agencies considered—and responded—to divergent views and gave reasons for the chosen course of action. It is not for the States or the Court to ask whether the decision was "the best one possible" or even whether it was "better than the alternatives." *FERC v. Elec. Power Supply Assn.*, 577 U. S. ——, ——, 136 S.Ct. 760, 782 (2016). Rather, APA review prohibits second-guessing the weighing of risks and benefits and penalizing agencies for making reasonable policy calls.

<u>Deterrence</u>. The same reasoning applies to the States' flawed assertion that the agencies provided inconsistent or improper justifications regarding the deterrent impact of immigration detention. ECF No. 32 at 11-12. To be sure, there is nothing improper about deterring irregular migration into the United States, and much of the statutory regime at the border – such as the expedited removal statute – was enacted to provide tools to efficiently address irregular migration in ways that no doubt have a deterrent effect. The expedited removal statute, for one, requires detention until removal and release in only very narrow circumstances. 8 U.S.C. § 1225(b)(1). The Supreme Court has "recognized detention during deportation proceedings as a constitutionally valid aspect of the deportation process," and accepted that Congress, justifiably concerned that aliens who are not detained may pose a danger or may fail to appear for their removal hearings, could require that aliens be detained during removal proceedings. *See Jennings v. Rodriguez*, 138 S. Ct. 830, 857 (2018).

For its part, the Rule recognizes the harm such irregular migration can cause to children. 84 Fed. Reg. at 44,403 (addressing "significant and ongoing surge of adults

who have made the choice to enter the United States illegally with juveniles or make the dangerous overland journey to the border with juveniles, a practice that puts juveniles at significant risk of harm"). The Rule thus makes clear that while the purpose of creating regulations governing family custody "is not to utilize detention as a deterrent," proper enforcement of immigration laws can be a deterrent to migration, and proper enforcement of immigration laws will include detention in cases where "detention is mandatory" and in other cases where DHS is "appropriately exercising the enforcement discretion Congress has vested in DHS." 84 Fed. Reg. at 44,484-85. Specifically, "[t]o the extent that the effect of enforcing the laws passed by Congress is to deter some migrants from making the journey to the United States, that effect is merely a result of enforcing the laws currently in place." *Id.* Accordingly, the Rule appropriately addressed the issue of deterrence.

Flight Risk and in Absentia Rates. The States' next argue that the Rule irrationally addresses concerns about flight risk, but the record supports the agencies' conclusions regarding flight risks. In justifying a family custody regime, the Rule explains that "when looking at all family unit aliens encountered at the Southwest Border from FY 2014 through FY 2018, the in absentia rate for completed cases as of the end of FY 2018 was 66 percent." 84 Fed. Reg. 44,494. Importantly, the agencies considered comments arguing that in absentia rates were less than shown by government statistics. 84 Fed. Reg. 44,486, 44,494 (Sept. 7, 2018). Commenters, including 15 of the Plaintiff States, cited a study which concluded that 86% of families released from detention attended their immigration court hearings. *See* 84 Fed. Reg. 44,494.[2] However, as DHS explained in the Rule, "[s]tatistics that purport to show

---

[2] The study by the U.S. Immigration Policy Center submitted by the States (RJN Ex. 11) was not provided through the formal comment submission process, and no commenter referenced the claim that many aliens fail to appear because of language barriers. The comments by Plaintiff States also did not cite this study. The States cannot challenge the Rule using material not presented for consideration during rulemaking. The APA does not require agencies to consider an "endless cycle" of comments. *Ober v. U.S. E.P.A.*, 84 F.3d 304, 314–15 [9th Cir. 1996) (citing *Rybachek v. Environmental Protection Agency*, 904 F.2d 1276, 1286 (9th. Cir.1990)). Instead, interested members of the public should have the opportunity to comment and not be

lower *in absentia* rates often count all court appearances, rather than only completed cases, thus counting multiple times aliens who appear for multiple court appearances and often not counting the time when being absent is most likely—at hearings where proceedings are completed and likely to result in a removal order." 84 Fed. Reg. at 44,407. DHS thoroughly discusses its use of *in absentia* data on pp. 44,405-44,407 and its disagreements with commenters' use of alternative data at p. 44,494. And DHS ultimately adopted a rule that looks at flight risk in making determinations about parole and bond. 8 C.F.R. § 236.3(j)(4), (m). There is nothing irrational about the manner in which the government evaluated and addressed the issue of flight risk and *in absentia* rates.

Alternatives to Detention ("ATD"). The agencies also considered alternatives to detention, contrary to the States' assertion. The Rule explains that "ATD has an important role to play as an effective compliance tool for some aliens." 84 Fed. Reg. 44,487. But, as the Rule recognizes, it "is only a partial solution." *Id.* It then identified numerous flaws with ATD, including costs and the fact that "historically family units on ATD tend to abscond at a higher rate than non-family unit participants." *Id.* at 44,888. The Rule properly assesses the issues relating to ATD in detail and concludes that while it is a tool to be used, it cannot replace the need for family custody in appropriate circumstances. *Id.*; *see id.* at 44,494 ("ATD is effective" for certain "small segment[s]," and "DHS's approach to immigration detention of family units reflected in this rule,. . . will allow ICE to appropriately use the statutorily authorized tools to carry out its mission"). This is a rational response to comments regarding ATD.

---

prejudiced by a lack of opportunity to review and comment on the comments of others during the comment period. *Id.* Additionally, because the study that the States now cite was not before the agency for consideration, the Court should reject the State's use of this extra-record evidence to support their merits arguments. *See, e.g., Souza v. California Dep't of Transportation*, No. 13-CV-04407-JD, 2014 WL 1760346, at *7 (N.D. Cal. May 2, 2014) (citing *Bair v. Cal. Dept. of Transp.*, No. C10–04360WHA, 2011 WL 2650896, at *3 (N.D. Cal. July 6, 2011)).

Cost Estimates. The Rule properly assesses potential costs in detail, concluding that the cost of FRCs or increased detention cannot easily be forecast and will depend on many factors such as whether Congress appropriates funds for additional facilities. 83 Fed. Reg. 44,500; *see* 84 Fed. Reg. 44,496-501; 44,504-20. The States are mistaken in asserting that the agencies' inability to quantify the costs of the Rule is arbitrary and capricious. ECF No. 32 at 13-15. In the proposed rule at 83 Fed. Reg. at 44,514, DHS explained that the cost of the Rule was dependent on a number of factors, some of which are outside the scope of the Rule, and requested comment from the public. The comments DHS received, however, did not provide viable estimates, as they used "unsupported assumptions . . . and then applied such assumptions to the per-person, per-day costs" of detention. 84 Fed. Reg. 44,500. In reality, "DHS is unable to forecast the future total number of such minors that may experience additional or longer detention as a result of this rule or for how much longer individuals may be detained because there are many other variables that may affect such estimates" such as the availability of detention space and the number of aliens crossing the border. 84 Fed. Reg. 44,497. DHS adds that "[t]he large spike in the number of family units apprehended or found inadmissible at the Southwest Border since the publication of the proposed rule underscores the difficulties in reliably making quantitative estimates in this space." *Id.* Far from a lack of consideration, the agencies specifically acknowledge the inability to forecast costs given factors that are unpredictable and entirely outside the agencies' control—most notably the fluctuating number of families apprehended, the pace of immigration proceedings, the eligibility and grant of parole or bond, and congressional appropriations. *Id.* at 44,517. In any event, any perceived error in lack of quantified estimates of total cost is not the type of substantive error that should result in invalidation of the Rule, where the agencies fully lay out the various factors impacting cost and solicited views from the public that were considered but were, ultimately, not well-supported. *See Dep't of Commerce*, 139 S. Ct. at 2573

(citing U.S.C. § 706) ("in reviewing agency action, 'due account shall be taken of the rule of prejudicial error'").

Impact on Children. Contrary to the States' assertions, the agencies considered and address in detail public comments regarding the impact on children of custody in a FRC. ECF No. 32 at 16-17. As a threshold matter, as we have explained, the Rule provides for standards of release that are based on flight risk or danger, standards that are familiar in immigration law.

Moreover, and as explained above, the Rule explains how FRCs are designed to address and minimize negative impacts on children. *See* 84 Fed. Reg. 44,434. The most important benefit is that the child is with his or her parent, and FRCs "serve to encourage and strengthen family interaction and growth" where "parents are expected to be responsible for their children and are encouraged to take an active role in their development." *Id*. at 44,433-34; *see Flores*, 507 U.S. at 302 ("juveniles, unlike adults, are always in some form of custody," and problems arise "where the custody of the parent or legal guardian fails"). Education and medical services are provided at residential centers, under standards that parallel the protections in the Flores Agreement. *Id*. at 44,440 (discussing educational and recreational opportunities); *see id*. at 44,433-34 (discussing conditions at FRCs). And ultimately, "FRCs are non-secure, meaning that families are not physically prevented from leaving the facility if they wish." 84 Fed. Reg. 44,433. The Rule further explains that studies show that "relocating several times during the asylum process and the length of the pendency of the asylum case contributed to the mental health issues experienced by asylum-seeking children"; to address this concern, FRCs provide a stable location with the child's parent during the pendency of proceedings. 84 Fed. Reg. 44,503. In sum, the Rule is the product of sound decision-making balancing the unique needs of children with the government's legitimate law enforcement prerogatives and is a "reasonable response to the difficult problems presented." *Flores*, 507 U.S. at 315.

1    <u>Release to Family Members</u>. The Rule allows for minors who are being held
2    with their parent to be released to another family members – a sibling, aunt, uncle, or
3    grandparent – in the discretion of DHS. Indeed, the Rule broadened release provisions
4    as a response to public comments. 84 Fed. Reg. at 44,444. DHS explained that its
5    position had changed upon consideration of comments seeking to permit DHS to
6    release children directly to an alternate caregiver, a situation that may arise when the
7    parent is a substantial flight risk, but where other relatives are available to allow the
8    release of the child. The States argue that the Rule should have allowed release of
9    children to non-relatives (Br. at 25), but they do not explain why that would be
10   preferable to remaining with a parent. Based on comments, DHS determined "that
11   allowing for such releases here is necessary and appropriate." *Id.* This is precisely the
12   sort of considered rulemaking the APA intends to promote.

13       **b. Other Provisions**. The States argue that various other provisions of the Final
14   Rule are arbitrary or inconsistent with law. These claims lack merit.

15       <u>Emergency Definition</u>. Contrary to the States' assertion (Br. at 29), the Rule
16   reasonably defines "emergency," and that definition mirrors the definition in the Flores
17   Agreement. Paragraph 12(B) of the Agreement defined an emergency as "any act or
18   event that prevents the placement of minors pursuant to paragraph 19 within the time
19   frame provided." It also contained a *non-exhaustive* list of acts or events that constitute
20   an emergency, such as "natural disasters," fires, "civil disturbances, and medical
21   emergencies." Accordingly, the Rule adopts this definition while recognizing that an
22   emergency may arise, generally unanticipated, that affects more than just the transfer
23   of a minor from one facility to another (*e.g.*, a natural disaster or facility fire may
24   render CBP temporarily unable to provide contact between a minor and family
25   members apprehended with him or her). 84 Fed. Reg. at 44,413. Thus, is reasonable
26   for the agency to conclude that "the impact, severity, and timing of a given emergency
27   situation dictate the operational feasibility of providing certain items to minors, and
28   thus the regulations cannot contain every possible reality DHS will face." *Id.*

<u>Maintenance of Influx Definition</u>. The Flores Agreement set three or five day timelines for transferring children into licensed programs, but specified that during an "influx" – defined as there being 130 minors in custody awaiting transfer – those transfers must occur "as expeditiously as possible." The States argue that it is irrational to maintain this definition of "influx" given the large number children apprehended at the border. If anything, this only shows how outdated the Flores Agreement is in many respects. Putting that to the side, the States do not explain how it is irrational for the agency to provide for transfers "as expeditiously as possible." The agencies explain in detail that some flexibility is needed with respect to transfer times. 84 Fed. Reg. at 44,423. They explain that this flexibility is compelled by current operational realities and is "still relevant to today's operations." *Id*. At the same time, Customs and Border Protection ("CBP") takes efforts to transfer all minors out of its custody within 72 hours, and the TVPRA now requires UACs to be transferred to HHS custody within 72 hours, absent exceptional circumstances. *Id*. HHS also minimizes the use of unlicensed temporary care facilities, but they must be available to ensure that UACs can promptly leave CBP custody. *See* 84 Fed. Reg. 44,462 ("The FSA contemplates scenarios when the U.S. government's ability to place every UAC in a licensed facility is not possible during an emergency or influx. The HSA and the TVPRA do not prohibit the use of unlicensed facilities in some circumstances."). These are reasonable responses to the crushing burden at the border and the need for prompt transfer to HHS and into licensed facilities. In sum, maintenance of the definition of influx does not change any aspect of current actual, current operations, is consistent with other enactments, and is not arbitrary or capricious.[3]

---

[3] The States' reliance on *Gen. Chem. Corp. v. United States*, 817 F.2d 844, 854 (D.C. Cir. 1987), for the proposition that the agencies are impermissibly having it "both ways" is unfounded. ECF No. 32 at 30. In *Gen. Chem*, the court found the agency could not treat evidence as probative for some purposes, but irrelevant for others. 817 F.2d at 854. That situation has no relevance here, where the government explained the rationale for either departing from or retaining current policy.

1      <u>Definition of UAC</u>. The States challenge the regulatory provision that specifies
2  that an alien is no longer a UAC if his or her parent becomes available, or he or she
3  turns 18. Br. at 27-28. This is, however, a straightforward application of the statutory
4  definition in 6 U.S.C. § 279(g)(2). As the agencies explain, "[t]he plain language of 6
5  U.S.C. 279(g)(2) provides criteria for determining whether an individual is a UAC,
6  and this regulation applies those criteria." 84 Fed. Reg. 44,426-27. Thus, HHS cannot
7  retain custody over an alien after he or she turns 18. Likewise, as the Rule explains,
8  an individual who does not meet the definition of a UAC is not entitled to any of the
9  additional protections that Congress authorized for UACs. 84 Fed. Reg. 44,426-27.
10 With regard to the filing of asylum applications, nevertheless, DHS notes that an
11 individual who is a UAC at the time of filing his or her application, regardless of the
12 time it takes to adjudicate the application, will still be subject to USCIS' initial
13 jurisdiction and the benefit of UAC classification. *Id.* Since the Rule is entirely
14 consistent with statute, it is not the product of unsound decision-making.

15     <u>HHS Custody</u>. Plaintiffs argue that the rule increases the use of unlicensed
16 facilities (ECF No. 32 at 25-26), converts a mandatory requirement to place minors in
17 the least restrictive setting into an optional provision (p. 26), and adds terms to release
18 agreements (p. 26). These arguments miss the mark. First, HHS addresses the use of
19 unlicensed facilities in a reasonable way given current burdens on the system. The
20 Rule provides that ORR will make all reasonable efforts to place each UAC in a
21 licensed program as expeditiously as possible. Doing so helps ensure UACs can leave
22 CBP custody as quickly as possible and is an appropriate standard that parallels the
23 Flores Agreement. *See* 84 Fed. Reg. 44,462. Second, the various provisions describing
24 HHS obligations and cited by Plaintiffs in the present tense (Br. at 26) are not optional
25 – they are requirements of the Rule that will be applied by HHS. Third, the release
26 agreement provisions cited by Plaintiffs are not a change from current practice – they
27 reflect "the historical agreement and accompanying form that ORR has used so that
28 the sponsor acknowledges his or her responsibilities." 83 Fed. Reg. 45,507; *see also*

84 Fed. Reg. 44,464. They have been used since at least 2005, are reasonable, and reflect the Flores Agreement and TVPRA requirements. The States' challenge to these provisions lack merit.[4]

Bond Hearings. The States also challenge custody hearing provisions in 45 C.F.R. § 810, without explaining how placing administrative appeals within the agency that has responsibility for custody of unaccompanied alien children could possibly be considered arbitrary and capricious or violate any law. And while they attempt to argue that "due process" would require HHS to site its administrative appeals within a different Department, they offer no case law supporting the proposition that due process requires administrative agencies to locate their administrative appeals within other Departments. Nor do they acknowledge that all these functions were performed by the same Department at the time of the Flores Agreement. HHS regulations require an "independent hearing officer" and provide a substantive explanation for moving the hearings to within the HHS Department, fully satisfying APA requirements. 84 Fed. Reg. at 44,476-84.

-----------------------

The Rule is supported by reasonable justifications rooted in the government's "experience," *Sacora v. Thomas*, 628 F.3d 1059, 1069 (9th Cir. 2010), and passes muster under the deferential review applicable to such rules, *City of Los Angeles v. Barr*, 929 F.3d 1163, 1176-77 (9th Cir. 2019). At base, the States' arguments generally assert that the agencies' reasoning should be rejected because they would have chosen different alternatives. A court, however, may not set aside an agency's policymaking judgment because others would have preferred alternative choices. *Dep't of Commerce*, 139 S. Ct. at 2573. Such decisions are routinely informed by policy choices, the legislative process, public views, interest group relations, foreign relations, and national security concerns (among others). *Id*. The validity of policy

---

[4] The clause that Plaintiff States cite (ECF No. 31 at 25 n.8) referring to "a State or county juvenile facility" was a drafting error, and HHS will issue a correction notice. *See* 84 Fed. Reg. 44,457 (making clear this provision being stricken from final rule).

preferences and ideas is no less applicable in the immigration context than in any other area of administrative law. *Id.* The States failed to show a likelihood of success on the merits.

## C. The States Are Not Likely to Suffer Irreparable Harm Absent Preliminary Relief, and an Injunction Is Not in the Public Interest.

The States fail to carry their burden with respect to the remaining preliminary injunction factors. This Court should deny the States' Motion because they fail to show that judicial intervention is necessary to prevent immediate, irreparable harm. Moreover, a preliminary injunction would irreparably harm the United States and the public.

It is in the public interest to have settled legislative rules governing the treatment of minors in immigration custody. It is also in the public interest to protect the country's borders and enforce its immigration laws. *See Landon v. Plasencia*, 459 U.S. 21, 34 (1982). The Rule balances these interests and enjoining it would harm the public interest. Further, DHS and HHS should not be required to discard a thorough, well-reasoned rule—issued based on a generation of experience under the *Flores* Agreement and after consideration of tens of thousands of public comments—that ensures that alien minors are treated with dignity, respect, and special concern for their particular vulnerability. To enjoin such a product of good government would be detrimental to the public interest—not to mention the interest of the *Flores* counsel that negotiated the Agreement, which specifically contemplated the promulgation of the Rule. Indeed, because these rules replace the Agreement, enjoining the Rule would result in a regulatory void.

Against this, the States fail to show any "immediate threatened injury." *Caribbean Marine Servs. Co. v. Baldrige*, 844 F.2d 668, 674 (9th Cir. 1988). As an initial matter, the only injury identified in the States' motion pertains to family residential centers operated by DHS. *See* ECF No. 32 at 30-33. Accordingly, that is the only aspect of the Rule that could properly be enjoined even if this Court were to credit their claims. Moreover, the States cannot properly invoke the alleged harm to

third parties from the Rule – they must identify immediate injury they will suffer. *See E. Bay Sanctuary Covenant v. Trump*, 909 F.3d at 1219, 1240 (9th Cir. 2018).

The States cannot show that they will suffer immediate injury from the provisions of the Rule governing family residential centers. The States allege that they would suffer "irreparable harm to" their "sovereign interests in regulating child welfare." ECF No. 32 at 30-33. But immigration custody and removal procedures are federal functions. Any conflicting state regulatory regime therefore is preempted by the Rule and federal law and is not a cognizable harm for purposes of balancing the equities. *See Arizona*, 567 U.S. at 409. And the States do not explain why immediate injunctive relief is needed when this sovereign injury could be remedied by a final decision on the merits. Indeed, FRCs currently exist in only two States, and only one of those States – Pennsylvania – is a Plaintiff. Yet the Complaint concedes that the FRC in Pennsylvania is currently operating under a valid Pennsylvania State license. Complaint ⁋ 70; *see also* Ex. 1, Declaration of Christopher George ¶ 2; Ex. 2, Declaration of Michael Sheridan Decl. ¶ 1. Thus, there is no immediate injury to this asserted "sovereign" interests.

The States also claim that the costs of care and education services for minors will increase. ECF No. 32 at 32-33. But providing special services to alien minors is optional, and in any event this claim is entirely speculative and does not justify immediate injunctive relief. First, the States do not identify a single resident of their states who is impacted by the rules governing FRCs or who has suffered the kinds of harms they assert will be borne by the States. The only Plaintiff State with an FRC – Pennsylvania – has made no concrete allegation of increased costs, has licensed the FRC to operate in its borders, and has continued its oversight of the FRC in the State. *See* Complaint ⁋⁋ 70, 451; Ex. 1, George Decl. ¶¶ 2-7. The contention that there will be increased costs is also speculative given that the Rule contains provisions that permit release in appropriate circumstances in line with the Agreement's provisions. The States also do not come to terms with the reality that the Rule – which closes

significant loopholes at the border – may very well reduce costs for the States and reduce childhood trauma by *reducing* the number of children who are brought by adults on the dangerous journey to the United States for the purpose of taking advantage of that loophole. *See* 84 Fed. Reg. 44,395, 44,403. And the provisions that permit families to be held in custody pending removal proceedings – where the costs are borne solely by the federal government – would reduce costs for the State. The States' alleged incidental costs are accordingly far too speculative to justify immediate injunctive relief. Even if credited, these asserted harms do not outweigh the harm that would be imposed by "injunctive relief [that] deeply intrudes into the core concerns of the executive branch," *Adams v. Vance*, 570 F.2d 950, 954 (D.C. Cir. 1978), and undermines the "efficient administration of the immigration laws at the border." *Innovation Law Lab v. McAleenan*, 924 F.3d 503, 510 (9th Cir. 2019). Under these circumstances, an injunction would not serve the public interest. Thus, for the reasons established, Defendants respectfully urge the Court to deny the States' motion.[5]

## E.   Any Interim Relief Must Be Sharply Limited.

Even if the States were entitled to any relief, it would need to be strictly limited. Article III and equitable principles require that relief be no broader than necessary to redress the States' injuries. Under Article III, "[a] plaintiff's remedy must be tailored to redress the plaintiff's particular injury." *Gill v. Whitford*, 138 S. Ct. 1916, 1934 (2018). And the rule in equity is that injunctions "be no more burdensome to the

---

[5] The States do not make any claim of harm stemming from HHS activity, but discuss only the custody of accompanied minors and family residential centers, which are operated by DHS. Br. at 31-33. The HHS regulations are substantively identical to the Agreement, so the States have failed to show *any* harm, much less irreparable harm, with respect to the portions of the Rule that apply to HHS. But to the extent the States' harm argument – which relates to its States' sovereign interest in licensing and preserving a *parens patriae* role to protect children – is applied to HHS influx facilities, the arguments lack merit. Instead, the Rule as applied to HHS is no different than the current status quo: HHS currently uses unlicensed facilities when sufficient licensed beds simply do not exist to absorb the number of UAC arriving at the border and to get them out of CBP custody as quickly as possible. Congress recently ratified the usage of these unlicensed facilities as influx shelters. *See* Emergency Supplemental Appropriations for Humanitarian Assistance and Security at the Southern Border Act. 2019 Pub. L. 116-26.

defendant than necessary to provide complete relief to the plaintiffs." *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994). Those restrictions are especially important at the preliminary injunction stage, where relief must be "as narrow as possible to prevent the irreparable injury" of the States—and only the States. *Cal. Hosp. Ass'n v. Maxwell-Jolly*, No. CIV. S-10-3465FCD/EFB, 2011 WL 464008, *1 (E.D. Cal. Feb. 4, 2011).

As we explained, the only harms asserted by the States relate to the provisions involving family residential centers, and relief could extend no further than those claimed harms. The relief must further be tailored to remedying the Plaintiff States' particular alleged licensing harms relating to family residential centers, *see L.A. Haven Hospice, Inc. v. Sebelius*, 638 F.3d 644, 664 (9th Cir. 2011), especially at this stage, where the purpose of any injunction is to "preserve the relative positions of the parties until a trial." *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981). There is only a family residential center in one Plaintiff State, and accordingly, at most relief would give that State a continued role in licensing. *See* Ex. 1, George Decl. ¶ 2. The Court certainly cannot in this action impose State licensing requirements on family residential centers in non-Plaintiff States like Texas. Nor can this Court issue a nationwide injunction. "National injunctions interfere with good decisionmaking by the federal judiciary." *E. Bay Sanctuary Covenant v. Barr*, —F.3d—, 2019 WL 3850928, at *2 (9th Cir. Aug. 16, 2019) (quoting Samuel L. Bray, *Multiple Chancellors: Reforming the National Injunction*, 131 Harv. L. Rev. 417, 461 (2017)). Indeed, the Ninth Circuit has recently narrowed nationwide injunctions in similar APA challenges. *See E. Bay Sanctuary Covenant v. Barr*, —F.3d—, 2019 WL 3850928, at *1-2; *California v. Azar*, 911 F.3d 558, 584 (9th Cir. 2018); *City & Cty. of S.F. v. Trump*, 897 F.3d 1225, 1244 (9th Cir. 2018). And it is the States who bear the burden of showing their requested injunction is not impermissibly broad, given that it is their burden to demonstrate their entitlement to an injunction. *See Winter*, 555 U.S. at 20. They have not done that here.

# V.    CONCLUSION

For the foregoing reasons, Defendants respectfully request that this Court deny Plaintiffs' Motion for a Preliminary Injunction (ECF No. 32).


Dated: September 16, 2019                    Respectfully submitted,


JOSEPH H. HUNT
Assistant Attorney General
Civil Division

AUGUST E. FLENTJE
Special Counsel to the
Assistant Attorney General

WILLIAM C. PEACHEY
Director
District Court Section
Office of Immigration Litigation

*/s/ Jeffrey S. Robins*
JEFFREY S. ROBINS
Deputy Director
P.O. Box 868, Ben Franklin Station
Washington, DC 20044
Tel: (202) 616-1246
Fax: (202) 305-7000
Email: jeffrey.robins@usdoj.gov

YAMILETH G. DAVILA
Assistant Director

STEVEN A. PLATT
Trial Attorneys

*Counsel for Defendants*