XAVIER BECERRA
Attorney General of California
MICHAEL L. NEWMAN
Senior Assistant Attorney General
SARAH E. BELTON
Supervising Deputy Attorney General
VIRGINIA CORRIGAN (SBN 292035)
REBEKAH A. FRETZ (SBN 300478)
VILMA PALMA-SOLANA (SBN 267992)
JULIA HARUMI MASS (SBN 189649)
Deputy Attorneys General
  1515 Clay Street, 20th Floor
  P.O. Box 70550
  Oakland, CA  94612-0550
  Telephone:  (510) 879-3300
  Fax:  (510) 622-2270
  E-mail:  Julia.Mass@doj.ca.gov

*Attorneys for Plaintiff State of California*
(*Additional counsel listed on signature page*)

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE CENTRAL DISTRICT OF CALIFORNIA**
**WESTERN DIVISION**

| | |
|---|---|
| STATE OF CALIFORNIA, COMMONWEALTH OF MASSACHUSETTS, STATE OF CONNECTICUT, STATE OF DELAWARE, DISTRICT OF COLUMBIA, STATE OF ILLINOIS, STATE OF MAINE, STATE OF MARYLAND, STATE OF MICHIGAN, STATE OF MINNESOTA, STATE OF NEVADA, STATE OF NEW JERSEY, STATE OF NEW MEXICO, STATE OF NEW YORK, STATE OF OREGON, COMMONWEALTH OF PENNSYLVANIA, STATE OF RHODE ISLAND, STATE OF VERMONT, COMMONWEALTH OF VIRGINIA, and STATE OF WASHINGTON,<br><br>                    Plaintiffs,<br><br><br>        v.<br><br>ALEJANDRO MAYORKAS, in his official | Case No. 2:19-cv-07390-DMG (AGRx)<br><br>**PLAINTIFFS' SUPPLEMENTAL BRIEF IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION**<br><br>Date:           March 19, 2021<br>Time:           9:30 a.m.<br>Courtroom:   8C<br>Judge: Hon.   Dolly M. Gee<br>Trial Date:   N/A<br>Action Filed: August 26, 2019 |

1   capacity as Secretary of Homeland
    Security; **U.S. DEPARTMENT OF**
2   **HOMELAND SECURITY; NORRIS**
    **COCHRAN,** in his official capacity as
3   Acting Secretary of Health and Human
    Services; **U.S. DEPARTMENT OF**
4   **HEALTH AND HUMAN SERVICES;**
    **TROY MILLER,** in his official capacity
5   as Acting Commissioner for U.S.
    Customs and Border Protection; **U.S.**
6   **CUSTOMS AND BORDER PROTECTION;**
    **TAE D. JOHNSON,** in his official
7   capacity as Acting Director for U.S.
    Immigration and Customs
8   Enforcement; **U.S. IMMIGRATION AND**
    **CUSTOMS ENFORCEMENT; KEN TOTA,**
9   in his official capacity as Acting
    Director of the Office of Refugee
10  Resettlement; **OFFICE OF REFUGEE**
    **RESETTLEMENT,**
11
                              Defendants.
12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

**Page**

Introduction.................................................................................................... 1

Background ..................................................................................................... 2

    I.      Procedural Background................................................................. 2

           A.     The Rule ........................................................................... 2

           B.     Plaintiffs' Complaint and Motion for a Preliminary
                 Injunction........................................................................ 2

           C.     Proceedings in *Flores* Litigation ................................... 3

           D.     The Impact of *Flores v. Rosen* on the Instant Action................. 4

    II.     Questions Presented by Plaintiffs' Narrowed Motion for
           Provisional Relief........................................................................ 6

Legal Standard ............................................................................................... 6

Argument ........................................................................................................ 7

    I.      The States are Likely to Succeed on the Merits of their
        Administrative Procedure Act Claim............................................ 7

           A.     HHS's Use of Descriptive Rather than Mandatory
                 Language Is Not Supported by Reasoned Decision-
                 making ............................................................................. 7

           B.     The Rule Permits Placement of Unaccompanied Children
                 in Secure and Unlicensed Facilities, Contrary to the
                 TVPRA ........................................................................... 11

           C.     HHS Failed to Address Important Reliance Interests in
                 Stripping Unaccompanied Youth of Ongoing Benefits
                 Provided by the TVPRA .................................................. 16

    II.     The States Satisfy the Remaining Requirements for Injunctive
        Relief ........................................................................................... 18

           A.     The States Face Irreparable Harm ................................... 18

                 1.     The Rule Will Cause Irreparable Harm to the
                        States' Sovereign Interests in Regulating Child
                        Welfare, an Area Within the States' Historic
                        Purview ................................................................. 19

                 2.     The States' Economic Interests Are Impacted by
                        Harms Suffered by Children Held in Secure and/or
                        Unlicensed Facilities ............................................ 21

                 3.     The Rule Undermines States' Investments in
                        Services to Support Unaccompanied Immigrant
                        Children ................................................................ 23

            B.     The Balance of Equities and the Public Interest Weigh
                   Heavily in Favor of Provisional Relief............................ 24

Conclusion ..................................................................................................... 25

i

# TABLE OF AUTHORITIES

**Page**

CASES

*Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel., Barez*
    458 U.S. 592 (1982) ............................................................... 20

*Am. Farm Lines v. Black Ball Freight Serv.*
    397 U.S. 532 (1970) ................................................................. 8

*Ariz. Dream Act Coal. v. Brewer*
    855 F.3d 957 (9th Cir. 2017) .................................................. 25

*Chalk v. U.S. Dist. Ct. Cent. Dist. of Cal.*
    840 F.2d 701 (9th Cir. 1988) .................................................. 22

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*
    140 S. Ct. 1891 (2020) ............................................................. 7

*FCC v. Fox Television Stations, Inc.*
    556 U.S. 502 (2009) ................................................... 7, 10, 17

*Flores v. Barr*
    407 F. Supp. 3d 909 (C.D. Cal. 2019) ............................... *passim*

*Flores v. Rosen*
    984 F.3d 720 (9th Cir. 2020) ............................................ *passim*

*Gen. Chem. Corp. v. U.S.*
    817 F.2d 844 (D.C. Cir. 1987) ............................................... 13

*Ginsberg v. State of N.Y.*
    390 U.S. 629 (1968) ............................................................... 21

*Globe Newspaper Co. v. Super. Ct. for Norfolk Cty.*
    457 U.S. 596 (1982) ............................................................... 21

*H.C. ex rel. Gordon v. Koppel*
    203 F.3d 610 (9th Cir. 2000) ................................................. 20

*J.O.P. v. U.S. Dep't of Homeland Sec.*
    409 F. Supp. 3d 367 (D. Md. 2019) ...................................... 16

ii

**TABLE OF AUTHORITIES**
(continued)

Page

*League of Wilderness Defs./Blue Mountains Biodiversity Project v.
     Connaughton*
     752 F.3d 755 (9th Cir. 2014) ........................................................ 24, 25

*Maryland v. King*
     567 U.S. 1301 (2012) ......................................................................... 20

*Mass. v. EPA*
     549 U.S. 497 (2007) ............................................................................. 7

*Michigan v. EPA*
     576 U.S. 743 (2015) ............................................................................. 7

*Moore v. Sims*
     442 U.S. 415 (1979) ........................................................................... 20

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins.
     Co.*
     463 U.S. 29 (1983) ....................................................................... *passim*

*Nat'l Parks Conservation Ass'n v. EPA*
     788 F.3d 1134 (9th Cir. 2015) ............................................ 3, 7, 11, 13

*New Motor Vehicle Bd. of Cal. v. Orrin W. Fox Co.*
     434 U.S. 1345 (1977) ......................................................................... 20

*Nken v. Holder*
     556 U.S. 418 (2009) ....................................................................... 6, 24

*Norsworthy v. Beard*
     87 F. Supp. 3d 1164 (N.D. Cal. 2015) ............................................... 22

*Regents of the Univ. of Cal. v. U.S. Dep't of Homeland Sec.*
     908 F.3d 476 (9th Cir. 2018) ......................................................... 7, 17

*Rodriguez v. Robbins*
     715 F.3d 1127 (9th Cir. 2013) ........................................................... 25

*Sacks v. Off. of Foreign Control*
     466 F.3d 764 (9th Cir. 2006) ............................................................... 9

iii

**TABLE OF AUTHORITIES**
(continued)

Page

*Safe Air for Everyone v. U.S. EPA*
      488 F.3d 1088 (9th Cir. 2007)............................................................... 7

*Schall v. Martin*
      467 U.S. 253 (1984) ......................................................................... 20

*Sec. & Exch. Comm'n v. Chenery Corp.*
      318 U.S. 80 (1943) ................................................................... 7, 8, 11

*U.S. v. Fifty-Three (53) Eclectus Parrots*
      685 F.2d 1131 (9th Cir. 1982).............................................................. 8, 10

*Winter v. Nat. Res. Def. Council, Inc.*
      555 U.S. 7 (2008) ............................................................................. 6

*Wyoming ex rel. Crank v. U.S.*
      539 F.3d 1236 (10th Cir. 2008)........................................................... 20

**FEDERAL STATUTES**

5 United States Code
      § 705 ........................................................................................... 6
      § 706 ...................................................................................... 7, 12

6 United States Code
      § 279 .......................................................................................... 17

8 United States Code
      § 1158 ......................................................................................... 16
      § 1232 ................................................................................. 6, 11, 16

William Wilberforce Trafficking Victims Protection Reauthorization
      Act of 2008, Pub. L. No. 110-457, 122 Stat. 5044.......................................*passim*

**STATE STATUTES**

1866 Massachusetts Acts Chapter 283 ..................................................... 20

2020 New Jersey Laws S2021 ............................................................... 24

iv

# TABLE OF AUTHORITIES
### (continued)

Page

California Health & Safety Code
  § 1508 ...................................................................................................... 19

Massachusetts General Laws Chapter 15D
  § 6 .......................................................................................................... 19
  § 15A ...................................................................................................... 19

Massachusetts General Laws Chapter 119
  § 1 .......................................................................................................... 20

New York Social Services Law
  § 389 ...................................................................................................... 19
  § 460 ...................................................................................................... 19
  § 469 ...................................................................................................... 19

**COURT RULES**

Federal Rules of Appellate Procedure
  Rule 40 ....................................................................................................... 4
  Rule 41 ....................................................................................................... 4

**OTHER AUTHORITIES**

8 Code of Federal Regulations
  § 236.3 ....................................................................................................... 4

45 Code of Federal Regulations
  § 410.102 ................................................................................................. 10
  § 410.201 ............................................................................... 6, 10, 12, 14
  § 410.202 ........................................................................................... 6, 14
  § 410.204 ................................................................................................. 10
  § 410.205 ................................................................................................. 10
  § 410.208 ................................................................................................. 10
  § 410.301 ................................................................................................. 10
  § 410.403 ................................................................................................. 10

83 Federal Register
  45,496 ..................................................................................................... 13

v

1
2

**TABLE OF AUTHORITIES**
**(continued)**

Page

3   84 Federal Register
4   44,392 ............................................................................................*passim*

5   California Code of Regulations Title 22
6   § 80006 ....................................................................................... 19

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**INTRODUCTION**

In their preliminary injunction motion previously set for hearing, Plaintiffs sought to enjoin the entirety of the regulations promulgated by Defendants U.S. Department of Homeland Security (DHS) and U.S. Department of Health and Human Services (HHS) (collectively, the Agencies) in Apprehension, Processing, Care, and Custody of Alien Minors and Unaccompanied Alien Children, 84 Fed. Reg. 44,392 (Aug. 23, 2019), ECF 32-5 at 1-145 (Rule) under the Administrative Procedure Act (APA). The Court stayed the instant action based on its permanent injunction of the Rule as inconsistent with the *Flores* Agreement, which the Rule purported to implement.[1] In its review of that permanent injunction, the Ninth Circuit Court of Appeals held that most of the HHS regulations contained in the Rule are consistent with the *Flores* Agreement and vacated the injunction as to those provisions. *Flores v. Rosen*, 984 F.3d 720, 730 (9th Cir. 2020). However, the Ninth Circuit did not consider whether those provisions are unlawful and must be set aside under the APA.

Indeed, several aspects of the HHS regulations included in the Rule violate the APA without regard to their adherence to the terms of the *Flores* Agreement. Specifically, HHS's justifications for its failure to use mandatory language for purportedly binding obligations are internally inconsistent and fail to consider important factors, rendering the HHS regulations arbitrary and capricious. The HHS regulations also include exceptions that threaten to swallow the rules they

---

[1] *Flores v. Barr*, 407 F. Supp. 3d 909, 931 (C.D. Cal. 2019); Stipulated Agreement, *Flores v. Reno*, Case No. CV 85-4544 RJK (Px) (C.D. Cal. Jan. 17, 1997); *see* Request for Judicial Notice, ECF 32-9, Ex 50.

For the Court's convenience, Plaintiffs reference record evidence submitted through their Request for Judicial Notice (ECF 32-9), Supplemental Request for Judicial Notice (ECF 84-3), Appendix of declarations (ECF 32-1), and Supplemental Appendix (ECF 84-1) by citing the ECF filing number and the page number or numbers of the entire pdf file, corresponding to the page number in the document's ECF-generated header. Additional evidence is submitted with this brief through Plaintiffs' Second Supplemental Request for Judicial Notice (Second Supp. RJN) and additional declarations with references to document page numbers. The entire Rule is available at ECF 32-5 at 2-145 and citations to the Rule in this brief are to its Federal Register pagination.

purport to put in place requiring the use of licensed facilities and limiting secure placement, a result that is both arbitrary and capricious and contrary to law. Defendants' erroneous legal positions and failure to consider important reliance interests also render the Rule's provision stripping benefits under federal law from unaccompanied children arbitrary and capricious. These aspects of the Rule will cause irreparable harm not only to countless migrant children, but also to the Plaintiff States where those children will eventually come to reside. Moreover, the balance of the equities and the public interest tip decidedly in favor of enjoining the HHS regulations contained in the Rule.

## BACKGROUND

### I. PROCEDURAL BACKGROUND

#### A. The Rule

The Rule, which was published August 23, 2019, purported to implement, and thereby terminate, the *Flores* Agreement. But contrary to the *Flores* Agreement's guiding principles to protect children, every provision of the Rule reduced the protections for children and increased the Agencies' authority to detain them. Specifically, the Rule amended regulations concerning eligibility for release on bond or parole, eliminated the requirement to release children to qualified non-parent sponsors, and eliminated—for accompanied children—the requirement that they be placed in state-licensed facilities. The Rule was scheduled to become effective 60 days after its publication, on October 22, 2019.

#### B. Plaintiffs' Complaint and Motion for a Preliminary Injunction

On August 26, 2019, Plaintiffs filed the instant action, challenging the Rule in its entirety under the APA, the Due Process Clause of the Fifth Amendment, and as *ultra vires* agency action. ECF 1. On August 30, 2019, Plaintiffs moved for a preliminary injunction on their APA claims. Plaintiffs argued that the Rule's shifting justifications and failure to address "important aspect[s] of the problem," render the Rule arbitrary and capricious under the APA. *Motor Vehicle Mfrs. Ass'n*

1    *of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983); *see also*

2    *Nat'l Parks Conservation Ass'n v. EPA*, 788 F.3d 1134, 1141 (9th Cir. 2015)

3    ("EPA's actions must also be consistent; an internally inconsistent analysis is

4    arbitrary and capricious.") (internal citations omitted).  In addition, Plaintiffs

5    highlighted the Rule's attempts to justify specific regulatory changes with

6    erroneous legal positions.  ECF 32 at 8.  The preliminary injunction motion

7    described significant harms to immigrant children and their families stemming from

8    increased use of family detention and secure placement of unaccompanied

9    children—the consequences of which would be borne by Plaintiff States—as well

10   as harms to the Plaintiff States' sovereign interests in enforcing child welfare laws

11   and licensing standards.  ECF 32 at 30-34.  However, the instant litigation was

12   stayed after this Court permanently enjoined the Rule as materially and inexcusably

13   inconsistent with the *Flores* Agreement.  ECF 95.

14       **C.    Proceedings in *Flores* Litigation**

15       On September 27, 2019, one week before Plaintiffs' preliminary injunction

16   motion was scheduled for hearing, this Court permanently enjoined the Rule as

17   materially inconsistent with the *Flores* Agreement.  *Flores v. Barr*, 407 F. Supp. 3d

18   at 931. The federal government appealed, and on December 29, 2020, the Ninth

19   Circuit issued an opinion affirming in part and reversing in part the Court's

20   injunction.  *Flores v. Rosen*, 984 F.3d at 744.

21       The Ninth Circuit affirmed this Court's injunction as to nearly all of the Rule's

22   DHS regulations, holding that the Rule's provisions expanding DHS discretion to

23   hold accompanied children in family detention "undermine the Agreement's core

24   'presumption in favor of releasing minors,' and its requirement that those not

25   released be placed in 'licensed, non-secure facilities that meet certain standards.'"

26   *Id.* at 737; quoting *Flores v. Lynch*, 828 F.3d 898, 901 (9th Cir. 2016) ("*Flores*

27

28

*1"*).[2]  The Ninth Circuit also affirmed this Court's injunction of two aspects of the HHS regulations: language permitting the Office of Refugee Resettlement (ORR) to hold unaccompanied children in secure custody "upon an agency determination that the minor is 'otherwise a danger to self or others,'" and a provision making bond hearings optional rather than automatic, as applied to children in secure placements. *Flores v. Rosen*, 984 F.3d at 732, 736.  The Ninth Circuit reversed this Court with respect to all but these two aspects of the Rule's HHS regulations, holding that they were consistent with the *Flores* Agreement and could be implemented. *Id.* at 736.[3]

### D.    The Impact of *Flores v. Rosen* on the Instant Action

Plaintiffs maintain that the entire Rule violates the APA for the reasons set forth in their original preliminary injunction briefing.  However, the partial continuing effect of this Court's injunction limits the threat the Rule poses to the welfare of immigrant children and the Plaintiff States.[4]  Therefore, Plaintiffs seek provisional relief only as to APA violations (1) stemming from aspects of the Rule that the Ninth Circuit decision would allow to be implemented, and (2) that are independent of the Rule's lack of consistency with the *Flores* Agreement.[5]

In deciding whether to issue an injunction against these remaining provisions,

---

[2] The Ninth Circuit held that two subsections of the DHS regulations—8 C.F.R. § 236.3(f) and (g)(2) were consistent with the *Flores* Agreement and could be implemented. *Flores v. Rosen*, 984 F.3d at 744.

[3] Plaintiffs note for the record that the Ninth Circuit, *Flores v. Rosen*, 984 F.3d at 739, mistakenly stated that Pennsylvania offers a licensing program for family unit detention.  In fact, Pennsylvania does not have a statutory or regulatory licensing process for facilities that detain children with their adult parents or legal guardians. Complaint, ECF 1, ¶ 33.

[4] Absent an order shortening time, this Court's injunction of the entire Rule will remain in place until at least February 19, 2021.  *See* Fed. R. App. P. 41(b) (mandate of Court of Appeal to issue seven days after the period for seeking rehearing or seven days after any order denying a timely petition for panel rehearing, petition for rehearing *en banc* or motion for stay of mandate, whichever is later); Fed. R. App. P. 40(a)(1) (party may file motion for rehearing within 45 days after entry of judgment in civil matter involving a United States agency).

[5] Although Plaintiffs do not at this time seek preliminary relief as to the aspects of the Rule that govern DHS, Plaintiffs reserve the right to challenge the Rule in its entirety at summary judgment and to seek leave to amend the complaint to assert additional claims.

the Court may consider them within the context of Defendants' broader agency action, which both this Court and the Ninth Circuit recognized as fundamentally inconsistent with core provisions of the *Flores* Agreement.  *Flores v. Barr*, 407 F. Supp. 3d at 929; *Flores v. Rosen*, 984 F.3d at 737.  The Rule characterized its "primary purpose" as "codifying the purposes of the FSA [Flores Settlement Agreement] in regulations" and claimed that it "accordingly implements the FSA." 84 Fed. Reg. 44,393.  Indeed, implementation of the *Flores* Agreement was the only permissible purpose for a regulation intended to meet the termination clause of the *Flores* Agreement.  ECF 32-9 at 2600.  Yet, it was clear that the true goal of the Agencies was to *override* fundamental protections of the *Flores* Agreement and Agency obligations that stem from it.[6]

Indeed, the gravamen of the Rule—permitting DHS to hold accompanied minors in non-state-licensed facilities for the duration of their immigration proceedings—violated two central protections of the *Flores* Agreement: its "presumption in favor of releasing minors" and "its requirement that those not released be placed in licensed non-secure facilities that meet certain standards." 984 F.3d at 737 (internal quotation marks and citations omitted).  This context is critical for considering whether the HHS provisions of the Rule are supported by reasoned decision-making under the APA, or—like the regulations enjoined by this Court with the Ninth Circuit's approval—are intended to expand agency discretion despite meaningful harm to the well-being and rights of children in federal immigration custody.

---

[6] *See* ECF 32-5 at 561-63, ECF 32-6 at 17-23, ECF 32-8 at 450 (listing "OVERRIDE FLORES AGREEMENT" as one of the White House's three "solutions").

## II.   QUESTIONS PRESENTED BY PLAINTIFFS' NARROWED MOTION FOR PROVISIONAL RELIEF

1.   Whether Plaintiffs are likely to succeed on the merits of their claims that:

    a.   Defendants' use of descriptive rather than mandatory language to describe binding obligations with regard to HHS's care and custody of unaccompanied minors was unsupported by reasoned decision-making.

    b.   Proposed 45 C.F.R. § 410.201(e) is contrary to law because it allows placement of unaccompanied immigrant children in secure facilities in contravention of 8 U.S.C. § 1232(c)(2)(A).

    c.   Proposed 45 C.F.R. §§ 410.201(e) and 410.202(c) are arbitrary and capricious and/or contrary to law.

    d.   HHS's definition of influx is arbitrary and capricious.

    e.   The Agencies' termination of benefits for unaccompanied immigrant children based on the availability of a parent or legal guardian or the child's reaching the age of 18 is arbitrary and capricious or contrary to law.

2.   Whether Plaintiffs have established they are likely to suffer irreparable harm in the absence of preliminary relief.

3.   Whether the balance of equities tips in Plaintiffs' favor.

4.   Whether an injunction is in the public interest.

## LEGAL STANDARD

A preliminary injunction may issue when plaintiffs establish that they are likely to succeed on the merits, they are likely to suffer irreparable harm in the absence of preliminary relief, the balance of equities tips in plaintiffs' favor, and an injunction is in the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). Under the APA, "the reviewing court […] may issue all necessary and appropriate process to postpone the effective date of an agency action." 5 U.S.C. § 705. This remedy is available "to the extent necessary to prevent irreparable injury" and to preserve the status quo pending judicial review proceedings. *Id.*; *see Nken v. Holder*, 556 U.S. 418, 426 (2009) (applying preliminary injunction factors to request for stay pending review).

1

**ARGUMENT**

2

**I.   THE STATES ARE LIKELY TO SUCCEED ON THE MERITS OF THEIR ADMINISTRATIVE PROCEDURE ACT CLAIM**

3

4   "Federal administrative agencies are required to engage in 'reasoned

5   decisionmaking.'"  *Michigan v. EPA*, 576 U.S. 743, 750 (2015) (internal citations

6   omitted).  Under the APA, courts must "hold unlawful and set aside agency action"

7   that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance

8   with law;" "contrary to constitutional right;" or "in excess of statutory jurisdiction,

9   authority, or limitations, or short of statutory right."  5 U.S.C. § 706(2).  In this

10  case, HHS's actions meet *each* of these bases for judicial reversal.

11  HHS's inconsistent justifications and failure to address "important aspect[s] of

12  the problem" render the Rule arbitrary and capricious under the APA.  *State Farm*,

13  463 U.S. at 43; *see also Nat'l Parks Conservation Ass'n*, 788 F.3d at 1141.  In

14  addition, HHS's reasoning reveals a failure to consider important reliance interests

15  that are affected by the Rule.  *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502,

16  515 (2009); *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S. Ct.

17  1891, 1915 (2020).  Furthermore, HHS attempted to justify certain changes with

18  erroneous legal positions or with no reasons at all.  It is well established that an

19  agency action "may not stand if the agency has misconceived the law." *Sec. &*

20  *Exch. Comm'n v. Chenery Corp.*, 318 U.S. 80, 94 (1943); *see also Regents of the*

21  *Univ. of Cal. v. U.S. Dep't of Homeland Sec.*, 908 F.3d 476, 505 (9th Cir. 2018),

22  *aff'd Dep't of Homeland Sec.*, 140 S.Ct. 1891; *Mass. v. EPA*, 549 U.S. 497, 532

23  (2007); *Safe Air for Everyone v. U.S. EPA*, 488 F.3d 1088, 1101 (9th Cir. 2007).

24  For these reasons, the States are likely to prevail on the merits of their APA claim.

25  **A.   HHS's Use of Descriptive Rather than Mandatory Language Is Not Supported by Reasoned Decision-making**

26  In resolving the question whether the non-mandatory language in the Rule's

27  HHS regulations should be set aside as inconsistent with the *Flores* Agreement, the

28  Ninth Circuit did not consider whether Defendants' language choices pass muster

Plaintiffs' Supplemental Brief in Support of Motion for Preliminary Injunction
Case No. 2:19-cv-07390-DMG-AGR

1 under the APA.  Instead, the Ninth Circuit chose to bind the federal government to

2 its litigation position that "'the use of the present tense . . . does not render these

3 provisions optional; they are mandatory.'" *Flores v. Rosen,* 984 F.3d at 731.

4 Declaring that HHS and ORR therefore "are bound by and must comply with the

5 descriptive language in the HHS regulations," the Ninth Circuit held that "[s]o

6 interpreted, the descriptive language in the regulations is consistent with the

7 Agreement." *Id.*  However, it is well established that, when evaluating agency

8 action under the APA, "courts may not accept . . . counsel's *post hoc*

9 rationalizations" and that "an agency's action must be upheld, if at all, on the basis

10 articulated by the agency itself."  *State Farm*, 463 U.S. at 29, 50; *Chenery*, 318 U.S.

11 at 87 ("The grounds upon which an administrative order must be judged are those

12 upon which the record discloses that its action was based.").  The Ninth Circuit's

13 interpretation of the Rule's language for purposes of considering consistency with

14 the *Flores* Agreement thus does not retroactively immunize from APA scrutiny the

15 agency decision to use non-binding language for standards that the agency now

16 asserts are meant to be binding.

17     As a general matter, regulations must include clear requirements in order to

18 create enforceable rights.  "To have the force and effect of law, enforceable against

19 an agency in federal court, [an] agency pronouncement must (1) prescribe

20 substantive rules—not interpretive rules, general statements of policy or rules of

21 agency organization, procedure and practice—and, (2) conform to certain

22 procedural requirements."  *U.S. v. Fifty-Three (53) Eclectus Parrots*, 685 F.2d

23 1131, 1136 (9th Cir. 1982) (internal quotation marks and citations omitted); *see*

24 *also Am. Farm Lines v. Black Ball Freight Serv.*, 397 U.S. 532, 538-39 (1970)

25 (regulation that set forth a "procedural rule[] adopted for the orderly transaction of

26 business" not enforceable against the agency absent showing of substantial

27 prejudice).

28     Given this context, Defendants must have been aware that merely describing

particular procedures could result in the regulations being construed as a "general statement of policy," rather than mandatory terms stemming from the *Flores* Agreement, rendering them unenforceable by children and their advocates. Nevertheless, Defendants rewrote *requirements*, e.g. that immigration authorities "shall provide minors not placed in licensed programs with a notice of the reasons for housing the minor in a detention or medium security facility," as *practices*, e.g. "[w]ithin a reasonable period of time, ORR provides each UAC [unaccompanied alien child] placed or transferred to a secure or staff secure facility with a notice of the reasons for the placement."  ECF 32-9 at 16, ¶ 24.C; 84 Fed. Reg. 44,532 (to be codified at 45 C.F.R. § 410.206).  The critical questions under the APA are whether Defendants considered the important problem of enforceability presented by non-mandatory language and whether they "cogently explain" their decision to use it. *State Farm*, 463 U.S. at 43, 48.  They did not.

In the Rule's preamble, Defendants acknowledged public submissions that called for the use of mandatory language for terms required by the *Flores* Agreement.  *See* 84 Fed. Reg. 44,485-486, 44,493.  Defendants' response is instructive.  First, the Rule states that:

> . . . in those provisions that require the government to provide services or benefits to minors or UACs, the regulatory text does indeed use the words 'will,' 'shall,' and 'must.' . . .  On the other hand, when it could benefit the minor or UAC that the government not act in a strict manner, the regulatory text uses 'may.'"

*Id.* at 44,493.  This explanation of the Agencies' language choices is consistent with the common rules of statutory and regulatory construction that treat "shall" as creating a mandatory duty and that recognize that when different words are used to describe government actions, such as "may," these differences are understood to connote different meanings.  *See Sacks v. Off. of Foreign Control,* 466 F.3d 764, 778 (9th Cir. 2006) (terms such as "may" and "shall" determine whether function is discretionary).

This explanation falls short, however, because the regulations use "shall" for

only *some* of HHS's and ORR's duties under the *Flores* Agreement and federal statute. *See, e.g.,* 84 Fed. Reg. 44,531, to be codified at § 410.102(c) ("ORR shall hold UACs in facilities that are safe and sanitary . . ."). Other mandatory duties originating from the *Flores* Agreement and TVPRA are described in the Rule as practices, rather than mandates. *See*, *e.g.*, 84 Fed. Reg. 44,531, to be codified at § 410.201(a) ("ORR places each UAC in the least restrictive setting that is in the best interest of the child and is appropriate to the UAC's age and special needs . . .").[7] The Rule does not account for these language differences, despite its acknowledgement that such duties should be described using mandatory language. Instead, it simply asserts, "[a]s for HHS' portion of the rule, the regulations are binding on the shelters that ORR regulates, whether or not the rule uses the words, 'will,' 'shall,' and 'must'" 84 Fed. Reg. 44,493. This statement is not sufficient to give mandatory effect to the plainly descriptive language of the regulations. *See Fifty-Three (53) Eclectus Parrots*, 685 F.2d at 1136.

The Rule provides no explanation for why HHS did not use mandatory language to describe duties it considered mandatory. *See FCC,* 556 U.S. at 515 (agency must provide reasoned explanation for its action). Moreover, the Rule's assertion that "shelters that ORR regulates" are bound by the Rule's descriptive language entirely fails to address the provisions that use descriptive rather than mandatory language to detail the obligations of ORR—rather than contractors or shelters regulated by ORR—under the *Flores* Agreement. *See*, *e.g.*, 84 Fed. Reg. 44,532, to be codified at § 410.205 ("ORR does not place a UAC in a secure facility . . . if less restrictive alternatives are available and appropriate under the circumstances."). Defendants' lack of cogent explanation and internally

---

[7] Additional examples include: 84 Fed. Reg. 44,531 (to be codified at 45 C.F.R. § 410.202) ("ORR places…"); 84 Fed. Reg. 44,532 (to be codified at § 410.204) ("ORR considers…"); 84 Fed. Reg. 44,532 (to be codified at § 410.206) ("ORR provides…"); 84 Fed. Reg. 44,532 (to be codified at § 410.208) ("ORR assesses . . ."); 84 Fed. Reg. 44,532 (to be codified at § 410.301) ("ORR releases . . ."); 84 Fed. Reg. 44,534 (to be codified at § 410.403) ("ORR monitors . . .").

inconsistent discussion of the language used to describe purportedly mandatory standards in the HHS regulations fall short of the standards for agency rulemaking under the APA. *State Farm*, 463 U.S. at 43-49, *Nat'l Parks Conservation Ass'n*, 788 F.3d at 1141 (internally inconsistent analysis is arbitrary and capricious).

Thus, notwithstanding the Ninth Circuit's corrective interpretation of the permissive language contained in the HHS regulations to make them consistent with the mandatory obligations contained in the *Flores* Agreement, the Court must look to the Agencies' explanation at the time the Rule was promulgated. *Chenery*, 318 U.S. at 87-88. Because HHS failed to explain or offer coherent and consistent explanations for its failure to use mandatory language to describe what it means to be enforceable obligations, the HHS regulations should be set aside. *State Farm*, 463 U.S. at 43, 48.

### B. The Rule Permits Placement of Unaccompanied Children in Secure and Unlicensed Facilities, Contrary to the TVPRA

The William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008 prohibits placement of an unaccompanied child in a secure facility "absent a determination that the child poses a danger to self or others or has been charged with having committed a criminal offense." Pub. L. No. 110-457, 122 Stat. 5044 (TVPRA); 8 U.S.C. § 1232(c)(2)(A). The TVPRA further requires that "an unaccompanied alien child in the custody of the Secretary of Health and Human Services . . . be promptly placed in the least restrictive setting that is in the best interest of the child." *Id.* The Rule effectuates the "best interest of the child" requirement by stating that "ORR places UACs in a licensed program promptly after a UAC is transferred into ORR legal custody." *See* 84 Fed. Reg. 44,531 (to be codified at § 410.202). However, the Rule includes exceptions to both the limitation on placement in secure facilities and the licensed placement requirement that threaten to swallow the rules. The result—for which the Agencies fail to provide a cogent explanation—is both arbitrary and capricious and contrary to the

1   requirements of the TVPRA, requiring that the provisions be set aside under the

2   APA.  5 U.S.C. § 706(2).

3        First, the Rule permits ORR to hold UACs in "a State or county juvenile

4   detention facility"—i.e., a secure facility—where there is "no appropriate licensed

5   program immediately available."  84 Fed. Reg. 44,531 (to be codified at 45 C.F.R.

6   § 410.201(e)).  The Rule does not require any determination that the UAC poses a

7   danger or has been charged with a criminal offense prior to such a placement, in

8   direct contravention of the TVPRA's requirements.  Despite a statement in the

9   discussion of the Rule that the clause referring to "a State or county juvenile

10  facility" was stricken from proposed section 410.201(e), 84 Fed. Reg. 44,457, the

11  clause remains in the Rule.  If permitted to go into effect, the Rule would permit the

12  detention of unaccompanied children in secure facilities based solely on a lack of

13  availability of a licensed placement.  84 Fed. Reg. 44,531 (to be codified at

14  45 C.F.R. § 410.201(e)).  This could allow HHS to circumvent the express legal bar

15  to placing UACs in secure facilities without the determination required by the

16  TVPRA by simply failing to contract with sufficient licensed facilities.

17       Second, the Rule permits ORR to hold unaccompanied children indefinitely

18  in unlicensed facilities in two circumstances not contemplated by the TVPRA: as an

19  alternative to secure placement (discussed above) where "no appropriate licensed

20  program [is] immediately available," 84 Fed. Reg. 44,531 (to be codified at 45

21  C.F.R. § 410.201(e)), and "due to an emergency or influx."  84 Fed. Reg. 44,531 (to

22  be codified at 45 C.F.R. § 410.202(c)).  Whereas the TVPRA requires that a child

23  be promptly placed in the least restrictive setting that is in his or her best interest,

24  the Rule would permit UACs to be housed in unlicensed facilities *indefinitely* based

25  on ORR's operational capacity considerations, rather than a consideration of the

26  child's best interest or whether a setting is the least restrictive setting.  Again, this

27  would authorize HHS to avoid the requirement to use licensed facilities by failing

28  to contract with sufficient licensed facilities, effectively allowing HHS to determine

1  through its own conduct whether UACs will be held in the least restrictive setting

2  that is in their best interest.

3      Moreover, the Agencies adopted a definition of "influx" that would allow

4  HHS to place children in unlicensed facilities on an ongoing basis.  As the

5  Agencies acknowledged, "the definition of influx in the [Flores Agreement] . . .

6  renders the agency in an ongoing state of influx which has been the status quo for

7  several years." 84 Fed. Reg. 44,422.[8]  In the Notice of Proposed Rulemaking, DHS

8  "welcome[d] public comment on whether it would be appropriate to revise the

9  definition of influx to better reflect current operational realities" and suggested an

10  alternative definition.  83 Fed. Reg. 45,496.  The Agencies nevertheless maintained

11  the *Flores* Agreement's definition of influx, asserting that this "operational reality"

12  did not permit it "to circumvent compliance with requirements that stem from the

13  FSA." 84 Fed. Reg. 44,422-23.[9]  Of course, altering the definition of "influx" to

14  make it *more* protective of children's rights would not have violated the *Flores*

15  Agreement.  Instead, this was an example of the Agencies trying to "have it both

16  ways." *Gen. Chem. Corp. v. U.S.*, 817 F.2d 844, 854 (D.C. Cir. 1987).  Having

17  cited a changed "operational environment" to justify family detention and its

18  departures from core provisions of the *Flores* Agreement, the Agencies cannot also

19  disclaim the relevance of operational realities to their own obligations.  *Nat'l Parks*

20  *Conservation Ass'n*, 788 F.3d at 1141 (inconsistency is arbitrary and capricious).

21      Given recent examples of ORR-contracted facilities that were not state-

22  licensed, such as the Tornillo and Homestead facilities, the adoption of an influx

23  definition that would permit regular use of such facilities raises serious concerns.

24  

---

25  [8] The *Flores* Agreement defined "influx" as "those circumstances where the INS has, at any given time, more than 130 minors eligible for placement in a

26  licensed program…including those who have been so placed or are awaiting such placement." ECF 32-9 at 9-10, ¶ 12B.

27  [9] The Agencies received numerous comments reflecting concerns that the proposed definition of influx was outdated and would permit the Agencies to

28  circumvent the requirements of the *Flores* Agreement and the TVPRA.  84 Fed. Reg. 44,422.

*See infra* Section II.A.  However, Defendants neither acknowledge nor justify these

broad exceptions from the TVPRA's requirement to place children in least-

restrictive facilities consistent with their best interest.  *See* 84 Fed. Reg. 44,457.

Instead, in response to concerns about the impact of the "influx" definition with

respect to the care of unaccompanied children, HHS stated it would adopt DHS's

definition in the interest of "continuity of joint operations," and referred to DHS's

explanation.  84 Fed. Reg. 44,453.  DHS's explanation, however, was that a change

to the definition of influx would not affect its operations because DHS is required

under the TVPRA to transfer UACs to HHS custody within 72 hours and currently

attempts to transfer all individuals out of Customs and Border Protection (CBP)

custody within 72 hours.  84 Fed. Reg. 44,423.  For HHS to adopt DHS's definition

of influx, when DHS's justification for the definition is that it largely does not

matter to DHS operations, cannot be considered "reasoned decisionmaking."  *State

Farm*, 463 U.S. at 52.[10]  This is particularly true because a change to the definition

of influx does materially affect HHS operations—in the absence of a permanent

state of influx, HHS's ability to place children in unlicensed facilities is

significantly limited.  HHS's reliance on DHS's explanation, and its failure to

independently consider whether to update the definition of influx, constitute an

"entire[] fail[ure] to consider an important aspect of the problem" and render this

aspect of the Rule arbitrary and capricious.  *Id.* at 43, 44.

The broad exceptions to licensed placement contained in proposed sections

410.201(e) and 410.202(c) permit HHS to detain children in conditions that are far

less protective than those provided by licensed programs when "no appropriate

licensed program [is] immediately available" or in the event of an influx, without

---

[10] ORR's own existing policy guidance contains a different definition of
influx that does not rely on the *Flores* Agreement's outdated definition.  ECF 84-4
at 365 (defining influx as "[a]n increase in the number of unaccompanied alien
children that exceeds the standard capabilities of responsible Federal departments
and agencies to process and transport them timely and/or to shelter them with
existing resources").  Defendants neither mention nor explain this departure from
ORR's own prior policy guidance on the definition of influx.

1   any limitation on the duration of placement.  This undermines not only the robust

2   protections offered by the States' own licensing regimes, but the Rule's panoply of

3   minimum standards for licensed facilities and services such facilities are required to

4   provide, including medical care, appropriate educational services, and regular

5   counseling.  84 Fed. Reg. 44,533-44,534 (to be codified at 45 C.F.R. § 410.402).

6   These limitless operational exceptions will allow ORR to detain unaccompanied

7   children indefinitely in unlicensed facilities that are required to meet only a bare-

8   bones minimum of habitability.[11]

9       Although HHS avers that "UACs at temporary influx programs still have

10  access to services to the greatest extent possible," 84 Fed. Reg. 44,456, such a

11  requirement is nowhere to be found in the text of the Rule itself.  Despite the

12  absence of state licensing and its attendant monitoring and enforcement regimes for

13  influx facilities and although the Agencies included monitoring provisions to ensure

14  CBP and ICE compliance with custody standards, the Rule does not provide any

15  oversight to ensure the safety and well-being of children subject to these broad

16  exceptions.  *See* 84 Fed. Reg. 44,530 (to be codified at 8 C.F.R. § 236.3(o)).

17  Indeed, ORR's existing definition of influx care facilities specifies that such

18  facilities provide only "temporary emergency shelter and services" and specifically

19  notes that such facilities "may be opened on Federally owned or leased properties,

20  in which case, the facility would not be subject to State or local licensing standards;

21  or, at facilities otherwise exempted by the State licensing authority."  ECF 84-4 at

22  365.  As is discussed in further detail below, see *infra* Section II.A, concerns

23  regarding conditions at such unlicensed facilities are well founded.

24

25  ─────────────────

26  [11] Such facilities are required only to provide "access to toilets and sinks, drinking water and food as appropriate, medical assistance if a UAC is in need of

27  emergency services, adequate temperature control and ventilation, adequate supervision to protect UAC from others, and contact with family members who

28  were arrested with the minor."  84 Fed. Reg. 44,531 (to be codified at 45 C.F.R. § 410.201(d)).

**C.   HHS Failed to Address Important Reliance Interests in Stripping Unaccompanied Youth of Ongoing Benefits Provided by the TVPRA**

In the TVPRA, Congress set forth special protections for children who come to the United States unaccompanied by a parent or guardian.  These include access to legal orientation programs and appointed counsel, 8 U.S.C. § 1232(c)(4) and (5), (d)(8); an extended time period to apply for asylum, 8 U.S.C. § 1158(a)(2)(E); and a less adversarial asylum process than is available to adults in removal proceedings, TVPRA, Pub. L. No. 110-457, 122 Stat. 5044, § 235(d)(7)(B) (U.S. Citizenship and Immigration Services (USCIS) has initial jurisdiction of asylum applications made by UAC).  Under the Rule, a child who arrived unaccompanied will immediately lose any legal benefits related to unaccompanied status based on the availability of a parent or guardian to provide care and physical custody or reaching the age of 18.  84 Fed. Reg. 44,531 (to be codified at 45 C.F.R. § 410.101).[12]  This policy change—explained only by statutory language that does not demand it and made without consideration of significant reliance interests—violates the APA.

Since 2013 and until recently, agency practice at USCIS—the agency that adjudicates asylum applications in a non-adversarial setting for unaccompanied children—had specified that reaching the age of 18 or becoming reunited with a parent would not divest a child who entered unaccompanied of the benefits associated with that status.  *See* Second Supp. RJN Ex. 78.  In recent litigation, the U.S. District Court for the District of Maryland enjoined USCIS's change to that policy, which would deny unaccompanied children access to benefits under the TVPRA based on the availability of a parent or reaching age 18.  *J.O.P. v. U.S. Dep't of Homeland Sec.*, 409 F. Supp. 3d 367, 378 (D. Md. 2019) (plaintiffs likely

---

[12] The language of the regulation is particularly concerning because children will be stripped of benefits "when a parent or legal guardian in the United States is *available* to provide care and physical custody," rather than when a child is actually released to a parent or legal guardian.  84 Fed. Reg. 44,531 (to be codified at 45 C.F.R. § 410.101) (emphasis added).

1    to succeed on merits of claim that it was arbitrary and capricious to change policy
2    without considering serious reliance interests).

3        The Agencies here attempt to justify removing unaccompanied status from
4    children based on their reaching their eighteenth birthday or the "availability" of a
5    parent or guardian in the United States by asserting that it is required by the plain
6    language of 6 U.S.C. § 279(g)(2).  84 Fed. Reg. 44,427, 44,455.  However, that
7    statute merely provides a definition of "unaccompanied alien child"—it does not
8    specify when, how, how often, or whether Defendant Agencies may reassess that
9    status or whether benefits associated with having entered the United States
10   unaccompanied may or must be terminated.  Reliance on a legal interpretation that
11   does not justify the policy change adopted is inconsistent with reasoned decision-
12   making.  *Regents of the Univ. of Cal.*, 908 F.3d at 505, *rev'd in part and vacated in*
13   *part on other grounds by U.S. Dep't of Homeland Sec.*, 140 S. Ct. 1891 ("[I]t is
14   black letter law that where an agency purports to act solely on the basis that a
15   certain result is legally required, and that legal premise turns out to be incorrect, the
16   action must be set aside, regardless of whether the action *could* have been justified
17   as an exercise of discretion") (emphasis in original).

18       Moreover, Defendants failed to consider the significant reliance interests such
19   children have—reliance interests that were raised in public comments regarding this
20   provision of the Rule.[13]  As the Supreme Court has recognized, "when [a] prior
21   policy has engendered serious reliance interests that must be taken into account . . .
22   [i]t would be arbitrary and capricious to ignore such matters."  *FCC*, 556 U.S. at
23   515.  In such situations, "a reasoned explanation is needed for disregarding facts
24   and circumstances that…were engendered by the prior policy."  *Id*. at 516.

25

26       _____
         [13] *See* ECF 32-8 at 89-92; *see also* ECF 32-8 at 169-175.  Defendants do not
27   address, for example, the impact on a child who relied on the exemption from the
     one-year bar to filing an asylum claim and becomes statutorily barred from seeking
     asylum protection when a previously unavailable parent or guardian is deemed
28   available.

Defendants' complete failure to provide such an explanation here renders the Rule
arbitrary and capricious.

## II.   THE STATES SATISFY THE REMAINING REQUIREMENTS FOR INJUNCTIVE RELIEF

### A.   The States Face Irreparable Harm

The HHS regulations' failure to employ mandatory language, combined with
provisions that allow HHS greater discretion to place children in secure or
unlicensed facilities either within or outside the Plaintiff States, adversely impact
the States by undermining the States' sovereign interests in enforcing child welfare
standards. These provisions also put children at risk of increased harm related to
detention conditions, and—because many children released from ORR's influx
facilities and secure placements are and will be released into the States—harms to
those children will in turn be borne by Plaintiffs' education and social services
programs. In addition, removing benefits associated with unaccompanied status
will undermine state-funded programs intended to assist immigrant children with
obtaining legal status to which they are entitled under federal law.

In 2018 and 2019, HHS housed thousands of children in facilities, including
in Tornillo, Texas, and Homestead, Florida, that were not licensed for the
residential care of children. ECF 32-7 at 957; ECF 32-8 at 194; Second Supp. RJN
Ex. 79 at 3092. Advocates reported that these facilities lacked schooling and
offered limited mental health and legal services. In Tornillo, "[c]hildren spen[t]
weeks crammed 20 to a tent, languishing in the desert, far away from sponsors and
attorneys, and without adequate access to basic needs such as schools or a firm roof
over their head." ECF 32-8 at 305. "At Tornillo some children believed they would
be shot if they tried to leave," and "Homestead [was] surrounded by a high fence
with guards posted at locked gates" reflecting a secure detention facility. Second
Supp. RJN Ex. 79 at 3094. Children only received two five- to seven-minute calls
with family a week. *Id.*

Plaintiffs' Supplemental Brief in Support of Motion for Preliminary Injunction
Case No. 2:19-cv-07390-DMG-AGR

Increasingly concerning was the fact that "thousands of children [were] abruptly transferred from licensed programs to these remote facilities, purportedly to make room for other children as they await[ed] release to sponsors."  ECF 32-7 at 957.  Such actions by Defendants, as permitted by the Rule, undermine the States' interests in regulating child welfare.

1. **The Rule Will Cause Irreparable Harm to the States' Sovereign Interests in Regulating Child Welfare, an Area Within the States' Historic Purview**

The States have comprehensive and long-standing legal codes for the welfare of children who require care outside the home. These codes include licensing and related oversight to ensure that residential facilities for children protect and nurture their residents.  *See, e.g.*, ECF 32-2, pp. 5-6, ¶ 8; p. 7 ¶ 13; p. 122, ¶ 10; pp. 148-149, ¶¶ 9-10; p. 151 ¶ 16; p. 167, ¶ 14; pp. 192-193, ¶ 3; p. 208, ¶ 5, p. 209, ¶10; pp. 216-17, ¶ 8; p. 221, ¶ 3; p. 238, ¶ 4; ECF 32-3, p. 14, ¶ 9; pp. 46-47, ¶ 4, pp. 52-53, ¶¶13-14; pp. 87-88, ¶¶ 4-5; p. 96, ¶ 26; p. 98, ¶ 31; p. 169, ¶ 4; pp. 200-201, ¶ 4; p. 180, ¶ 3; p. 264, ¶ 8; p. 280, ¶ 7; p. 290, ¶ 8.[14]  In addition to mandating detailed requirements for and oversight of state-licensed facilities, many States' laws specifically prohibit the operation of unlicensed residential facilities within their jurisdictions and violation of these prohibitions can lead to fines and imprisonment. *See, e.g.*, Mass. Gen. Laws ch. 15D, §§ 6, 15A; Cal. Health & Safety Code § 1508; Cal. Code Regs. tit. 22, § 80006(c); N.Y. Soc. Serv. Law §§ 389, 460(d), 469(f) (McKinney); ECF 32-2, p. 150, ¶ 13; p. 193, ¶ 5; p. 208, ¶¶ 4-5; p. 215, ¶ 9; pp. 221-22, ¶ 4; p. 239, ¶ 7; ECF 32-3, pp. 181-82, ¶ 8; pp. 280-81, ¶ 8. By maintaining broad operational exemptions from the requirement to place children in licensed care facilities and using non-mandatory language for HHS's obligations to place children in licensed facilities, the Rule opens the door for increased use of "influx

_____

[14] While the declarations submitted in support of Plaintiffs' original preliminary injunction motion focused particularly on harms from extended detention in family detention centers, these concerns are equally applicable to the detention of unaccompanied children in unlicensed facilities, such as Tornillo and Homestead. *See* Second Supp. RJN Ex. 79 at 3094.

care facilities" like Tornillo and Homestead, undermining the States' interests in
enforcing their own licensing standards. *See* ECF 32-8 at 305 (Tornillo was "built
on federal land, is exempt from state oversight and licensing requirements").

The Rule thus irreparably harms the States' sovereign interest in their "power
to create and enforce a legal code." *Alfred L. Snapp & Son, Inc. v. Puerto Rico ex
rel., Barez*, 458 U.S. 592, 601 (1982); *see Wyoming ex rel. Crank v. U.S.*, 539 F.3d
1236, 1242 (10th Cir. 2008) (federal regulatory action that preempts state law
creates an injury in fact). Any time a state is so prevented "from effectuating
statutes enacted by representatives of its people, it suffers a form of irreparable
injury." *New Motor Vehicle Bd. of Cal. v. Orrin W. Fox Co.*, 434 U.S. 1345, 1351
(1977) (Rehnquist, J., in chambers); *see also Maryland v. King*, 567 U.S. 1301
(2012) (Roberts, C.J., in chambers) (state's inability to "employ a duly enacted
statute . . . constitutes irreparable harm").

The harm to the States here is particularly acute because child welfare laws are
among the traditional powers reserved for the states. *See, e.g., Moore v. Sims*, 442
U.S. 415, 435 (1979) ("Family relations are a traditional area of state concern.");
*H.C. ex rel. Gordon v. Koppel*, 203 F.3d 610, 613 (9th Cir. 2000). Indeed, states
have not only the power but also the responsibility to "play [their] part as parens
patriae" where "parental control falters…." *Schall v. Martin*, 467 U.S. 253, 265
(1984).[15] By expanding ORR's ability to hold children in non-licensed influx
facilities—either within or outside of the Plaintiffs States—the Rule reduces the
States' power to enforce their own licensing regimes. This irreparably harms the
States' sovereign interests in enforcing their duly enacted laws and regulations, as
well as their compelling interest of protecting the welfare of children.[16]

---

[15] States have a long history of enacting child welfare laws that allow for the
protection of children who cannot remain safely at home. Massachusetts passed
such a law in 1866. *See* An Act Concerning the Care and Education of Neglected
Children, 1866 Mass. Acts ch. 283; *see also* Mass. Gen. Laws ch. 119, § 1.

[16] The States' interest in protecting children is unquestionably of the highest

2. **The States' Economic Interests Are Impacted by Harms Suffered by Children Held in Secure and/or Unlicensed Facilities**

As Defendants acknowledge, "children who are detained are at a significantly higher rate of psychological distress." 84 Fed. Reg. 44,504.  Children who are detained in immigration facilities experience increased rates of self-harm and suicidal behavior, severe depression, anxiety, and Post-Traumatic Stress Disorder (PTSD), as well as significant developmental regression, including bed wetting, language regression, and social withdrawal.  ECF 32-2, p. 20, ¶ 14; p. 58-60, ¶¶ 20, 23-24; pp. 60-61, ¶ 28; pp. 63-64, ¶ 35; pp. 69-70, ¶ 42; ECF 32-3, p. 26, ¶ 25; pp. 61-62, ¶¶ 9-10.  Where children have experienced trauma in their countries of origin or on the journey to the United States, detention adds to and exacerbates the effects of that trauma.  ECF 32-2, pp. 18-19, ¶ 11; p. 58, ¶ 20; p. 65, ¶ 37; p. 68, ¶ 40; pp. 74-75, ¶ 51; p. 114, ¶ 8; pp. 130-31, ¶ 10; p. 139, ¶ 11; p. 140, ¶ 15; p. 203, ¶ 3; ECF 32-2, pp. 62-63, ¶ 13; p. 139-40, ¶ 17; p. 141, ¶ 19; p. 297, ¶ 9; p. 298, ¶ 12.  In fact, studies of asylum seekers—who in most cases have experienced significant trauma prior to detention—suggest that detained children's PTSD symptoms and self-harming behavior is often directly tied to their experiences in detention.  ECF 32-2, pp. 63-64, ¶ 35.  The ongoing stress, uncertainty, and despair caused by detention can have life-long impacts on children's psychological and physical health that will require significant services to alleviate.  ECF 32-2, pp. 17-19, ¶¶ 8, 11-12; p. 41, ¶ 15; p. 65, ¶ 37; p. 75, ¶ 52; p. 113-14, ¶¶ 5, 9; p. 123, ¶ 16; p. 130, ¶ 6; pp. 176-77, ¶¶ 8-9; ECF 32-3, pp. 77-78, ¶ 7; pp. 81-82, ¶ 15;  pp. 157-58, ¶¶ 54-56; p. 297-98, ¶¶ 10, ¶ 12.

---

order.  *See, e.g., Globe Newspaper Co. v. Super. Ct. for Norfolk Cty.*, 457 U.S. 596, 607-08 (1982) (holding that a State's "interest" in "safeguarding the physical and psychological well-being of a minor … is a compelling one"); *Ginsberg v. State of N.Y.,* 390 U.S. 629, 640 (1968) (noting that a State "has an independent interest in the well-being of its youth," and recognizing "'society's transcendent interest in protecting the welfare of children'" (citation omitted)).

The HHS regulations expand ORR's ability to use unlicensed facilities and to place children in secure facilities even if they do not pose a threat of danger to themselves or others, contrary to the best interests of children.  As DHS's own experts declared, "there is no amount of programming that can ameliorate the harms created by the very act of confining children to detention centers."  ECF 32-6 at 375.  These emotional and psychological injuries constitute irreparable harm.  *See, e.g., Chalk v. U.S. Dist. Ct. Cent. Dist. of Cal.*, 840 F.2d 701, 710 (9th Cir. 1988); *Norsworthy v. Beard*, 87 F. Supp. 3d 1164, 1193 (N.D. Cal. 2015).

Many children released from ORR's influx facilities and secure placements are and will eventually be released into the States.  ECF 32-6 at 2-3; ECF 32-7 at 36-37; ECF 32-3at 32, ¶ 46.  In fact, many of the children held at Homestead and Tornillo were held in those unlicensed facilities for 61-120 days and then released to a number of plaintiff States.  Second Supp. RJN Ex. 80 at 3113.  For children with a history of trauma, these types of facilities "compound the emotional and psychological trauma facing unaccompanied alien children and increase the risk their needs will be inadequately addressed."  ECF 32-7 at 957.  The harm to children from their detention experiences will impact their ability to thrive in their new communities, leading them to require mental health and healthcare at greater rates.  ECF 32-2, pp. 20-21, ¶ 15; pp. 32-33, ¶¶ 22-23; p. 113-14, ¶¶ 5, 9; p. 133, ¶ 17; p. 140, ¶ 13; ECF 32-3, p. 32-33, ¶¶ 47, 50-51; pp. 63-64, ¶¶ 15-17; pp. 77-78, ¶ 7; pp. 80-81, ¶¶ 13-14; p. 82, ¶ 16; p. 134-35, ¶¶ 5, 7, 9; p. 141, ¶ 19; p. 162, ¶ 79; p. 182, ¶ 13; pp. 194-95, ¶ 9; p. 208, ¶ 9; ECF 32-9 at 119-126.  Children—who are entitled to free education in all the States—will require special educational and school-based mental health resources to cope with trauma caused by federal immigration detention under the Rule.  ECF 32-2, p. 16, ¶ 4; p. 27, ¶ 8; pp. 28-30, ¶¶ 10-15, 22; p. 38, ¶ 5; p. 41, ¶ 15; p. 113-15, ¶¶ 5, 10, 12-13; p. 116, ¶ 17; p. 131-33, ¶¶ 11, 13-14, 17;  p. 141, ¶ 21; pp. 157-58, ¶¶ 7-8, 10-11; p. 173, ¶ 3; pp. 176-177, ¶ 8; p. 187, ¶ 4; p. 203, ¶¶ 4-5; p. 228, ¶ 4; p. 245, ¶ 5; ECF 32-3, p. 5, ¶ 3; pp.

7-8, ¶ 12; p. 16, ¶ 15; pp. 69-70, ¶ 4; p. 175-76, ¶¶ 3,  7; pp. 194-95, ¶ 9; pp. 217-18, ¶¶ 4-5; ECF. No. 32-9 at 100-18.  Any additional and unnecessary injury to the States' future residents harms the States, as state-funded resources will ultimately be called upon to respond to the consequences of those injuries.  ECF 32-2, p. 30-31, ¶¶ 16, 19; pp. 46-48, ¶¶ 5-11; p. 114-16, ¶¶ 8-9, 11, 13, 17; pp. 123-23, ¶¶ 17-21; pp. 130-33, ¶¶ 10-12, 14, 17;  pp. 137-141, ¶¶ 6-9, 11-17; pp. 157-58, ¶¶ 9-10; pp. 164-65, ¶ 8; pp. 182-83, ¶¶ 4-7; p. 198, ¶ 9; pp. 203-04, ¶¶ 5-6; p. 228, ¶ 6; p. 233, ¶¶ 4, 8; pp. 245-46, ¶¶ 6-7; ECF 32-3, p. 5, ¶ 5; p. 7, ¶ 11; p. 33, ¶ 49; pp. 38-39, ¶¶ 5-6; p. 41, ¶ 11; pp. 59-60, ¶ 4; p. 63-64, ¶¶ 16, 20-21; pp. 69-70, ¶ 4; p. 113, ¶ 68; pp. 119-20, ¶ 6; pp. 123-25, ¶ 17; pp. 127-28, ¶¶ 24-25; p. 150, ¶ 23; p. 152, ¶ 34; p. 176, ¶¶ 6-7; pp. 186-87, ¶ 6; pp. 192-94, ¶¶ 6-7; p. 208, ¶ 9; pp. 212-13, ¶¶ 4-7; p. 218, ¶ 8; pp. 222-23, ¶ 3; p. 228, ¶ 15; pp. 228-30, ¶¶ 17-20; pp. 296-97 ¶¶ 7; p. 298, ¶ 14; ECF 32-9 at 96-99, 128-153.

### 3.   The Rule Undermines States' Investments in Services to Support Unaccompanied Immigrant Children

In addition to education and social services available to all residents, several of the States offer services specific to immigrants, including unaccompanied immigrant children.  California, for example, funds legal services, education, and outreach to increase access to legal immigration remedies, such as asylum. Declaration of Eliana Kaimowitz (Kaimowitz Dec.) ¶¶ 4, 8.[17]  Since fiscal year 2014-15, California has awarded $20.3 million to fund legal services to 3,625 immigrant children who arrived to the United States unaccompanied by a parent or guardian.  *Id.* ¶ 12.  A significant portion of the unaccompanied children whose representation is funded by California are reunited with a parent or guardian or reach the age of 18 before they are able to file for asylum.  Declaration of Gabriel Arellano (Arellano Dec.) ¶ 12.  New Jersey also works to ensure that all children in

---

[17] The Declaration of Eliana Kaimowitz is supplemental to the Declaration of Marcela Ruiz in support of Plaintiffs' original Motion for a Preliminary Injunction, which also provided information regarding the California Department of Social Services programs for immigrants. *See* ECF 32-2 at 44.

1    its custody who require immigration legal assistance are provided that assistance.

2    *See* Second Supp. RJN Exh. 81.  In Fiscal Year 2020-21, New Jersey appropriated a

3    two-year grant of over $500,000 to fund immigration legal services for children,

4    including unaccompanied children.  2020 N.J. Laws S2021.  Oregon likewise

5    provides funding for legal services for immigrants seeking immigration relief,

6    including unaccompanied children applying for asylum.  Declaration of Jordan

7    Cunnings (Cunnings Dec.) ¶¶ 3-5.

8          The Rule imposes a more burdensome asylum process based on the

9    availability of a parent or guardian to care for an unaccompanied child: a one-year

10   application deadline and an adversarial proceeding in immigration court lieu of an

11   interview by an asylum officer.  *See* 84 Fed. Reg. 44,531 (to be codified at

12   § 410.101 (definition of *unaccompanied alien child*).  But unaccompanied children

13   who are later reunited with a parent continue to face particular challenges by virtue

14   of having travelled alone—such as not having a parent that can present testimony

15   about their experience or serve as the lead respondent in the case—that children that

16   arrive as part of a family unit do not.  Arellano Dec. ¶¶ 9-11.  The burdens the Rule

17   places on these children will require additional time and effort by their

18   representatives, likely precluding some children who are eligible for asylum from

19   being able to seek it.  Arellano Dec. ¶¶ 14-16.  By stripping children that arrived

20   unaccompanied of protections conferred by the TVPRA, the Rule will undermine

21   the States' investment in asylum services for those children.  *Id.*; Kaimowtiz Dec.

22   ¶¶ 13-15; Declaration of Jesse Thompson ¶¶ 8-13; Cunnings Dec. ¶¶ 6-8.

23          **B.    The Balance of Equities and the Public Interest Weigh Heavily**
24                 **in Favor of Provisional Relief**

25           The final two factors for a preliminary injunction, the balance of the equities

26   and the public interest, merge when the government is a party.  *Nken*, 556 U.S.

     at 435; *League of Wilderness Defs./Blue Mountains Biodiversity Project v.*

27   *Connaughton*, 752 F.3d 755, 766 (9th Cir. 2014).  In assessing these factors, courts

28

consider the impacts of the injunction on nonparties as well.  752 F.3d at 766.  The greatest impact the Rule will have is on children and their families.  As future members of our communities, the States have a *parens patriae* responsibility to protect them.  An injunction preserving the status quo would also protect the public's interest in ensuring that children continue to be held in non-secure, state-licensed facilities and that unaccompanied children maintain access to benefits conferred upon them by Congress pending the Court's determination of the merits.

By contrast, there is no harm to Defendants by maintaining the status quo. Indeed, Defendants in the *Flores* litigation have indicated that the HHS regulations are intended to be mandatory and to give effect to *Flores* Agreement.  If Plaintiffs prevail on the merits, the Defendants have no interest in enforcing unlawful or unconstitutional decisions.  *Rodriguez v. Robbins,* 715 F.3d 1127, 1145 (9th Cir. 2013) ("in light of the major hardship posed by needless prolonged detention, we conclude that the balance of the equities favors" the detained immigrants); *Ariz. Dream Act Coal. v. Brewer*, 855 F.3d 957, 978 (9th Cir. 2017) ("[I]t is clear that it would not be equitable or in the public's interest to allow the state to violate the requirements of federal law, especially when there are no adequate remedies available."), *quoting Valle del Sol Inc. v. Whiting*, 732 F.3d 1006, 1029 (9th Cir. 2013).  "While [immigration authorities are] entitled to carry out [their] duty to enforce the mandates of Congress, [they] must do so in a manner consistent with our constitutional values."  *Rodriguez*, 715 F.3d at 1146.

## CONCLUSION

For the foregoing reasons, this Court should enjoin the HHS regulations in the Rule from taking effect, postpone the effective date of the Rule, and preserve the effective status of the *Flores* Agreement pending adjudication on the merits of this case.

Dated:  February 5, 2021

Respectfully submitted,

MAURA HEALEY
Attorney General for the Commonwealth
of Massachusetts
ANGELA BROOKS*
ABIGAIL TAYLOR*
Assistant Attorneys General
One Ashburton Place
Boston, MA 02108
Telephone: (617) 963-2590
Email: Angela.Brooks@mass.gov
*Attorneys for Plaintiff the Commonwealth
of Massachusetts*

XAVIER BECERRA
Attorney General of California
MICHAEL L. NEWMAN
Senior Assistant Attorney General
SARAH E. BELTON
Supervising Deputy Attorney General
VIRGINIA CORRIGAN
REBEKAH A. FRETZ
VILMA PALMA-SOLANA
Deputy Attorneys General

/s/  *Julia Harumi Mass*
JULIA HARUMI MASS
Deputy Attorney General
*Attorneys for Plaintiff State of
California*

WILLIAM TONG
Attorney General of Connecticut
JOSHUA PERRY*
Special Counsel for Civil Rights
165 Capitol Avenue
Hartford, CT 06106
Telephone: (860) 808-5372
Email: Joshua.Perry@ct.gov
*Attorneys for Plaintiff State of
Connecticut*

KATHLEEN JENNINGS
Attorney General of Delaware
CHRISTIAN DOUGLAS WRIGHT*
Director of Impact Litigation
820 North French Street
Wilmington, DE 19801
Telephone: (302) 577-8944
Email: christian.wright@delaware.gov
*Attorneys for Plaintiff State of Delaware*

Plaintiffs' Supplemental Brief in Support of Motion for Preliminary Injunction
Case No. 2:19-cv-07390-DMG-AGR

1  KARL A. RACINE                              KWAME RAOUL
2  Attorney General for the District of        Attorney General of Illinois
   Columbia                                    JEFF VANDAM*
3  KATHLEEN KONOPKA                            Public Interest Counsel
4  Deputy Attorney General                     100 W. Randolph Street, 12th Fl.
   Public Advocacy Division                    Chicago, IL 60601
5  ALACOQUE HINGA NEVITT (SBN 268768)          Telephone: (312) 814-1188
6  Assistant Attorney General                  Email: jvandam@atg.state.il.us
   400 6th Street N.W.                         *Attorneys for Plaintiff State of Illinois*
7  Washington, DC 20001
8  Telephone: (202) 717-1368
   Email:  alacoque.nevitt @dc.gov
9  *Attorneys for Plaintiff District of*
10 *Columbia*

11

12 AARON FREY                                  BRIAN E. FROSH
   Attorney General of Maine                   Attorney General of Maryland
13 KIMBERLY L. PATWARDHAN*                     STEVEN M. SULLIVAN
14 Assistant Attorney General                  Solicitor General
   6 State House Station                       JEFFREY P. DUNLAP**
15 Augusta, Maine 04333-0006                   Assistant Attorney General
16 Telephone: (207) 626-8570                   200 Saint Paul Place
   Email: Kimberly.Patwardhan@maine.gov        Baltimore, MD 21202
17 *Attorneys for Plaintiff State of Maine*    Telephone: (410) 576-7906
18                                             Email: jdunlap@oag.state.md.us
                                               *Attorneys for Plaintiff State of*
19                                             *Maryland*

20

21

22

23

24

25

26

27

28

DANA NESSEL
Attorney General of Michigan
B. ERIC RESTUCCIA*
JOSEPH T. FROEHLICH*
Assistant Attorneys General
P.O. Box 30212
Lansing, MI 48909
Telephone: (517) 335-7628
Email: restucciae@michigan.gov
*Attorneys for Plaintiff State of Michigan*

KEITH ELLISON
Attorney General of Minnesota
JANINE KIMBLE*
Assistant Attorney General
102 State Capitol
75 Rev. Dr. Martin Luther King Jr. Blvd.
St. Paul, MN 55155
Telephone: (651) 757-1415
Email: janine.kimble@ag.state.mn.us
*Attorneys for Plaintiff State of Minnesota*

AARON D. FORD
Attorney General of Nevada
HEIDI PARRY STERN*
Solicitor General
Office of the Nevada Attorney General
555 E. Washington Ave., Ste. 3900
Las Vegas, NV 89101
Telephone: (702) 486-3420
Email: HStern@ag.nv.gov
*Attorneys for Plaintiff State of Nevada*

GURBIR S. GREWAL
Attorney General of New Jersey
MARIE SOUEID**
Deputy Attorney General
25 Market Street
Trenton, NJ 08625
Telephone: (609) 376-2564
Email: marie.soueid@law.njoag.gov
*Attorneys for Plaintiff State of New Jersey*

HECTOR BALDERAS
Attorney General of New Mexico
TANIA MAESTAS*
Chief Deputy Attorney General
408 Galisteo Street
Santa Fe, NM 87501
Telephone: (505) 490-4060
Email: TMaestas@nmag.gov
*Attorneys for Plaintiff State of New Mexico*

LETITIA JAMES
Attorney General of New York
NANCY TRASANDE*
Assistant Attorney General
28 Liberty Street
New York, NY 10005
Telephone: (212) 416-8905
Email: nancy.trasande@ag.ny.gov
*Attorneys for Plaintiff State of New York*

ELLEN F. ROSENBLUM
Attorney General of Oregon
J. NICOLE DEFEVER (SBN 191525)
Senior Assistant Attorney General
Oregon Department of Justice
1162 Court Street N.E.
Salem, OR 97301
Telephone: (971) 673-1880
Fax: (971) 673-5000
Email: Nicole.DeFever@doj.state.or.us
*Attorneys for Plaintiff State of Oregon*

JOSH SHAPIRO
Attorney General for the Commonwealth
of Pennsylvania
AIMEE D. THOMSON*
Deputy Attorney General
1600 Arch St., Suite 300
Philadelphia, PA 19103
Telephone: (267) 940-6696
Email: athomson@attorneygeneral.gov
*Attorneys for Plaintiff Commonwealth
of Pennsylvania*

PETER F. NERONHA
Attorney General of Rhode Island
MICHAEL W. FIELD*
Assistant Attorney General
150 South Main Street
Providence, RI 02903
Telephone: (401) 274-4400
Email: mfield@riag.ri.gov
*Attorneys for Plaintiff State of
Rhode Island*

THOMAS J. DONOVAN, JR.
Attorney General of Vermont
BENJAMIN D. BATTLES
Solicitor General
JULIO A. THOMPSON*
Director, Civil Rights Unit
109 State Street
Montpelier, VT 05609
Telephone: (802) 828-5500
Email: Julio.Thompson@vermont.gov
*Attorneys for Plaintiff State of Vermont*

MARK R. HERRING
Attorney General for the
Commonwealth of Virginia
MICHELLE S. KALLEN*
Deputy Solicitor General
202 North 9th Street
Richmond, VA 23219
Telephone: (804) 786-2436
Email: SolicitorGeneral@oag.state.va.us
*Attorneys for Plaintiff Commonwealth of
Virginia*

ROBERT W. FERGUSON
Attorney General of Washington
COLLEEN M. MELODY (WSBA #42275)*
Division Chief, Civil Rights Unit
LAURA K. CLINTON (WSBA #29846)*
Assistant Attorneys General
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
Telephone: (206) 464-5342
Email: Colleen.Melody@atg.wa.gov
Email: Laura.Clinton@atg.wa.gov
*Attorneys for Plaintiff State of
Washington*

*Appearing Pro Hac Vice
** Application to Appear Pro Hac Vice forthcoming

OK2018602905