Rob Bonta
Attorney General of California
Michael L. Newman
Senior Assistant Attorney General
Sarah E. Belton
Supervising Deputy Attorney General
Virginia Corrigan (SBN 292035)
Rebekah A. Fretz (SBN 300478)
Vilma Palma Solana (SBN 267992)
Julia Harumi Mass (SBN 189649)
Deputy Attorney General
State Bar No. 189649
 1515 Clay Street, 20th Floor
 P.O. Box 70550
 Oakland, CA 94612-0550
 Telephone: (510) 879-3300
 Fax: (510) 622-2270
 E-mail: Julia.Mass@doj.ca.gov

*Attorneys for Plaintiff State of California*

IN THE UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| **State of California, et al.,**<br><br>Plaintiffs,<br><br>v.<br><br>**ALEJANDRO MAYORKAS,** in his official capacity as Secretary of Homeland Security, **et al.,**<br><br>Defendants. | 2:19-cv-07390-DMG (AGRx)<br><br>**SUPPLEMENTAL DECLARATION OF LUIS H. ZAYAS IN SUPPORT OF PLAINTIFFS' PRELIMINARY INJUNCTION MOTION**<br><br>Date: July 23, 2021<br>Time: 10:00 a.m.<br>Courtroom: 8C<br>Judge: Dolly M. Gee<br>Trial Date: N/A<br>Action Filed: August 26, 2019 |

SUPPLEMENTAL DECLARATION OF LUIS H. ZAYAS

I, Luis H. Zayas, declare as follows:

1. I am a resident of the State of Texas. I am over the age of 18 and have personal knowledge of all the facts stated herein. If called as a witness, I could and would testify competently to the matters set forth below.

2. My qualifications are unchanged since I submitted a declaration in support of Plaintiffs' Motion for a Preliminary Injunction on August 30, 2019 [ECF No. 32-2, pp. 50-109].

3. I have reviewed the declarations of Ms. Leecia Welch and Mr. Carlos Holguín to be filed concurrently with this supplemental declaration. Based on my review of these materials, my clinical and research experience, my experiences in observing children in immigration custody detailed in my first declaration, and the scientific literature on the effects of immigration detention on children and adolescents cited below, as well as recent literature on the interplay of immigration and the corornavirus (COVID-19), I can state that the conditions described in certain of the Emergency Intake Sites (EIS) pose significant mental health and developmental risks for children of all ages detained in such settings.

4. Although I understand that not all of the EIS facilities are structured this way, the use of extreme congregate care—housing hundreds of children together in one room, in rooms with dozens of children per room, or in tents, with limited space, activities, and services—in several of the facilities falls short of "common sense" practice for managing children and does not begin to approach the best professional child welfare standards. Based on what I have discerned from reading the aforementioned declarations, it appears that there are no standards being followed that would protect children in these massive congregate settings.

5. To explain the detrimental effects of such massive congregate housing of children as young as those in the "tender age" classification to older teens

approaching the age of majority (18 years), it is helpful to separate the numerous issues that children are facing in the EISs.

    a) <u>Child Hygiene, Development, and Health.</u> In the Dallas facility, sleeping arrangements were the use of white cots placed in vast rows in large conference rooms that appear inadequate for healthy rest. At Fort Bliss, hundreds of children sleep on tightly spaced cots in large tents. These arrangements are described as noisy, unsettling, and lacking in privacy, leading one child to describe feeling "asphyxiated" among so many people. Children described spending most of their days in the tents or rooms where they sleep, sometimes in bunk beds so cramped that a child could not sit up in a bottom bunk. In such conditions, there are concerns about COVID exposure and infection.

    b) <u>Educational, Recreational, and Adaptive Training.</u> The declarations are relatively silent on the provision of education to children but state that English language instruction ranged from 15 minutes to 90 minutes a day, depending on setting. Even in the best of circumstances, telephone calls and recreational activities were limited, but often they were shortened or non-existent. Neither declaration refers to teaching children adaptive skills, such as U.S. customs, laws, U.S. currency, sales taxes, transportation systems, or similar topics that would help the children, especially teenagers, with assimilation.

    c) <u>Staffing and Staff Preparation.</u> In any childcare facility, whether day care or residential care, minimum standards of staff credentials must be established and observed, based upon the level of involvement with the youth. Cafeteria staff and food handlers must pass basic qualifications as should security and custodians. With greater levels of intensity and exposure to children, such as youth care workers,

educational staff, clinicians in health and mental health, staff must all meet standards for their roles with children. The documents I reviewed did not provide any insights into staff credentials or training.

Ms. Welch describes the Dallas site as home to 2270 boys 13-17 who had been there from 9 to 13 days and, sometimes, having spent 4 to 7 days in CBP facility prior to arriving in Dallas. Despite egregious conditions at the Donna Customs and Border Protection (CBP) facility, Ms. Welch concludes that contrasting a prolonged stay in a CBP facility and standardless care in emergency sites "offers a false dichotomy."

6. Arguably the most damaging of the situations faced by children in the EISs are the lengthy periods of time in which they are held with (a) no indicators or markers of their release to parents and other family members—particularly for those children who face delays in meeting with a case manager or other individual who can explain the reunification process, and (b) insufficient, unpredictable, and brief telephonic or video contact with parents and families. Ongoing uncertainty as to whether and when they will be released from the detention environment is significantly likely to negatively affect children's emotional and psychological conditions as described in detail below. This harm is compounded where policies and practices place stringent limits on children's contact with their families, such as limiting youth to one or two ten-minute phone calls weekly.

7. Each of my conclusions must be considered in the context of the children's ages and any medical conditions that pre-existed or occurred in detention. The rule of thumb is, the younger the child, the greater the vulnerability, and the greater the need for constant attention and care. With age comes cognitive, intellectual, emotional, and physical maturity, and therefore each of the concerns raised in this declaration must be fit within that context. However, the youngest

children, those from birth to six or seven years are the most vulnerable, followed by the middle childhood years from eight to twelve, and early (14-15), middle (16-17), and late adolescence (18-19). It is my understanding that one location, Pomona Fairplex EIS, with a potential capacity of 2,500, holds children as young as two years of age and that the Long Beach facility has reported instances of five and six year old children detained for a month or more. These are perhaps the most vulnerable grouping in the most unacceptable time periods in any detention facility, regardless of the level of adequacy in staffing and care. It is, simply put, the most damaging of all circumstances.

**Lifetime Mental Health and Developmental Issues Resulting from Detention**

8. Both my observations and reports in the extant scientific literature show that children and adolescents in immigration detention facilities report increased rates of deliberate self-harm and suicidal behavior, voluntary starvation, severe depression, sleep difficulties, somatic complaints, dissociation, anxiety, and Post-Traumatic Stress Disorder (PTSD) reactions, along with poor nutrition, regression in language development, bedwetting, and social withdrawal.[1,2,3,4] Often, children attribute their PTSD symptoms to events in detention.[5,6] The self-harm

---

[1] von Werthern, M., Robjant, K., Chui, Z., Schon, R., Ottisova, L., Mason, C., & Katona, C. (2018). The impact of immigration detention on mental health: a systematic review. *BMC psychiatry*, *18*(1), 382.

[2] Fazel, M., Karunakara, U., & Newnham, E. A. (2014). Detention, denial, and death: Migration hazards for refugee children. *The Lancet Global Health, 2*, e313-e314. NeMoyer, A., Rodriguez, T., Alvarez, K. (2019). Psychological Practice With Unaccompanied Immigrant Minors: Clinical and Legal Considerations. *Translational Issues in Psychological Science, 5,* 4–16.

[3] Coffey, G.J., Kaplan, I., Sampson, R.C., & Tucci, M.M. (2010). The meaning and mental health consequences of long-term immigration detention for people seeking asylum. *Social Science & Medicine, 70*(12), 2070-2079.

[4] Silove, D., Austin, P., & Steel, Z. (2007). No refuge from terror: The impact of detention on the mental health of trauma-affected refugees seeking asylum in Australia. *Transcultural Psychiatry, 44*, 359-393.

[5] Storm, T., & Engberg, M. (2013). The impact of immigration detention on the mental health of torture survivors is poorly documented--a systematic review. *Danish medical journal*, *60*(11), A4728-A4728.

[6] Steel, Z., Momartin, S., Bateman, C., Hafshejani, A., Silove, D. M., Everson, N., ... & Mares, S. (2004). Psychiatric status of asylum seeker families held for a protracted period in a remote

(continued…)

and suicidal ideation and action of detainees is often born of the boredom, sleeplessness, traumatic events, depression, and even psychotic symptoms that emerge during detention.[7] Under the conditions of inadequate nutrition, insufficient personal hygiene, lack of recreation, education, and other means of socialization, improper sleeping conditions and patterns, including sleep deprivation, the likelihood of the psychiatric symptoms mentioned above rises to clinical levels of concern. Many of the conditions present in the literature are present in the EISs visited by Mr. Holguin and Ms. Welch.

9. Immigration detention, per my observations and the literature, complicates children's development and rupture essential human attachments.[8] For the children in ORR-contracted facilities whose files I reviewed (N = 100) for *LVM v Lloyd et al.*, prolonged separation from families without any indicators or markers of when the youth would be released to their parents or other sponsors complicated the absence of consistent and predictable parental interaction and, not surprising to any mental health practitioner, left the youth with few resources to draw on for managing their emotions and behaviors. "Acting out" behaviors (e.g., aggressive, angry, combative) as well as internalizing behaviors (e.g., withdrawal, depression, suicidality) were evident among youth held for extended periods in detention facilities. In one case, an unnecessary delay in the release of a child who had been cleared for discharge to family exposed the youth to a documented instance of sexual abuse.

10. The psychological traumas experienced by children and youth in their home countries, during their travel to the United States, and upon their detention in

---

detention centre in Australia. *Australian and New Zealand journal of public health*, 28(6), 527-536.
[7] Zwi, K., Mares, S., Nathanson, D., Tay, A. K., & Silove, D. (2018). The impact of detention on the social–emotional wellbeing of children seeking asylum: a comparison with community-based children. *European child & adolescent psychiatry*, 27(4), 411-422
[8] Ducharme, J. (2018, June 21). Detaining Families May Also Cause Mental Health Issues. Retrieved from https://time.com/5317762/psychological-effects-detaining-immigrant-families/

the United States will require years of mental health services to alleviate. Although the trauma of violence in their home countries and harrowing migratory journeys have compromised their mental health, detention adds another layer of stress. By depriving children of the freedom they need to move along in a normal or typical developmental trajectory, detention exacerbates the psychological stress and injuries they may have brought from their past. Detention also delays mental health treatments and subjects already compromised individuals to more despair, uncertainty, and disruption of family structures and roles. The ongoing stress, despair, and uncertainty of detention—for even a relatively brief period of time—compromises the children's intellectual and cognitive development and contributes to the development of chronic illness in ways that may be irreversible.[9] Detention puts children at risk of recurrent and distressing memories, nightmares, dissociative reactions, prolonged psychological distress, and negative alterations in cognition. Younger children released from detention are at risk of experiencing nocturnal enuresis, separation anxiety, night terrors, and reenactment of traumatic events witnessed during detention.[10]

11. Adding complexity to this scenario is the historic COVID-19 pandemic within which the EISs are operating. These children are at a particularly treacherous crossroad with increased risk compared to the general population, coupled with lower likelihood of access to health care during and after their detention. In detention facilities, where there is evidence of infectious disease outbreaks, COVID puts detainees and staff at risk. Social distancing is likely not possible in these EISs because children are held in close proximity. Poor sanitation and hygiene are additional risk factors prevalent in such settings, which are known

---

[9] Lorek, A., Ehntholt, K., Nesbitt, A., Wey, E., Githinji, C., Rossor, E., & Wickramasinghe, R. (2009). The mental and physical health difficulties of children held within a British immigration detention center: A pilot study. *Child abuse & neglect*, *33*(9), 573-585.

[10] Huang, P. (2018, August 09). Health Impacts of Immigration Detention on Children. Retrieved from https://healthlaw.org/health-impacts-of-immigration-detention-on-children/

to be major contributors to transmission. Likewise, poor hygiene and the scarcity of personal protective equipment can contribute to the rapid spread in detention facilities. Another important factor is that many of the youth may have compromised immune systems due to malnourishment, chronic stress from trauma, harsh living conditions, and limited access to health services in their home countries.[11]

12. For adolescent development, when the sense of autonomy is emerging in preparation for adult roles, the loss of any autonomy—not just from parents, which all adolescents complain about, but by being detained and lacking basic freedom—will have devastating effects on the adolescents once they enter the world outside the detention center. There are several key dimensions of adolescent development that are affected by being held in detention. Physical maturation brings with it psychological concerns with things like body image and self-worth. A typical adolescent, one not in detention, will be able to exercise this development through sports and physical activities in school or community groups, providing them with a sense of mastery of their bodies. Social development is affected by detention as it does not offer the conditions under which an average teenager engages with the world, such as the selection of friends, membership in community organizations, interacting with a diverse group of adults and peers in schools, churches, stores and malls, or in jobs. Educationally and intellectually, adolescents' thinking, reasoning, and judgment, including self-regulation, are challenged, thus enhancing their cognitive, social and emotional skills. Unlike other adolescents in the communities to which they will be released or returned, youth in detention will have lost a part of these key developmental opportunities while in confinement with younger children and adults. The absence of these experiences thwarts the person's

---

[11] Garcini, L.M., Domenech Rodríguez, M.M., Mercado, A., & Paris, M. (2020). A tale of two crises: The compounded effect of COVID-19 and anti-immigration policy in the United States. *Psychological Trauma: Theory, Research, Practice, and Policy*, 12, S230–S232.

ascension into adult roles, such as employment, civic engagement, and parenting. Due to these experiences, adolescents are at risk of meeting clinical criteria for PTSD, depression, and suicidal ideation once released from detention.[12]

13. Holding children in detention is harmful to their mental health even if held for a short period of time.[13] Stays as short as 14 days can have deleterious effects on youth, depending on the nature of the institutionalization.[14] For example, a two-week hospital stay for an injury or rare illness is less damaging than a two-week stay in a detention facility in which privileges and freedom are restricted, family visits are mediated by screens or guards, or activities are heavily regulated. Ongoing detention will inevitably worsen the psychological conditions that children will show.

14. Institutional rearing (i.e., growing up in detention even for short periods of time)—and particularly following the traumatic circumstances of migration—is one of the most adverse environments that scientists have studied. This is commonly referred to in the literature as a "complex adverse experience."[15] The two distinct but powerfully determinant elements of detention are deprivation (i.e., absence of expected developmentally appropriate environmental inputs and complexity) and threat (i.e., the presence of experiences that represent an immediate or ongoing threat to the child's physical integrity and psychological security).[23] The conditions of chronic deprivation and threat affect neural or brain development which in turn determines cognitive and behavioral functioning in

---

[12] Mares, S., & Jureidini, J. (2004). Psychiatric assessment of children and families in immigration detention–clinical, administrative and ethical issues. *Australian and New Zealand journal of public health*, 28(6), 520-526.
[13] Foster, H., & Hagan, J. (2013). Maternal and paternal imprisonment in the stress process. *Social Science Research*, 42(3), 650-669.
[14] Kronick, R., Rousseau, C., & Cleveland, J. (2015). Asylum-seeking children's experiences of detention in Canada: a qualitative study. *American Journal of Orthopsychiatry*, 85(3), 287.
[15] van IJzendoorn, M. H., Palacios, J., Sonuga-Barke, E. J., Gunnar, M. R., Vorria, P., McCall, R. B., ... & Juffer, F. (2011). I. Children in institutional care: Delayed development and resilience. *Monographs of the Society for Research in Child Development*, 76(4), 8-30.

children, and increases the risk for PTSD.[16] PTSD is known to affect executive functions, or the brain's capacity to regulate and control cognitive processes including working memory, reasoning, problem solving, planning, and the ability to execute and shift attention between tasks.[17]

15. Youth held in detention are highly susceptible to the effects of stress and trauma on human physiology. Stress under prolonged and intense conditions activates the release of hormones—specifically those that aid in the flight-fight response and coping—that lead to structural and functional changes of some brain regions that are essential for self-regulation and other behaviors. The ongoing stress, despair, and uncertainty of detention impairs children's cognitive development and increases their vulnerability to chronic illnesses, such as asthma, gastrointestinal disorder, and cardiovascular diseases that often last into adulthood.[18] The symptoms common in institutionalized children are consistent with those of trauma as defined in the Diagnostic and Statistical Manual of Mental Disorders, which include recurrent and distressing memories, nightmares, dissociative reactions, prolonged psychological distress, avoidance of people or other reminders of the trauma, and negative alterations in cognition such as not being able to remember important events or aspects of the traumatic events.[19]

16. Moreover, the scientific literature shows the negative effects of children's detention or incarceration on their future psychological health. Since youth in immigration detention perceive it as incarceration and being criminalized, we can extrapolate from research showing that youth who were in juvenile

---

[16] Miller, A. B., Sheridan, M. A., Hanson, J. L., McLaughlin, K. A., Bates, J. E., Lansford, J. E., ... & Dodge, K. A. (2018). Dimensions of deprivation and threat, psychopathology, and potential mediators: A multi-year longitudinal analysis. *Journal of abnormal psychology*, *127*(2), 160.
[17] Olff, M., Polak, A. R., Witteveen, A. B., & Denys, D. (2014). Executive function in posttraumatic stress disorder (PTSD) and the influence of comorbid depression. *Neurobiology of Learning and Memory, 112*, 114-121.
[18] Evans, G. W., & Kim, P. (2013). Childhood poverty, chronic stress, self-regulation, and coping. *Child development perspectives*, *7*(1), 43-48.
[19] American Psychiatric Association (2013). *Diagnostic and statistical manual, Version V*. Washington, D: American Psychiatric Press.

9    Supplemental Declaration of Luis H. Zayas
Case No. 2:19-cv-07390-DMG

detention during their teen years are very likely to suffer from what are known as "comorbid" psychiatric disorders, that is, disorders that occur simultaneously.[20] Most commonly, the comorbidity involves major depression and anti-social behavior (oppositional defiant disorders) with alcohol abuse among males. The comorbidities for females are posttraumatic stress, anxiety, and anti-social personality disorder and substance abuse. Note that in this comorbidity, depression occurs with an externalizing disorder, such as oppositionalism which is a pattern of angry, irritable mood, argumentative and defiant behavior, particularly towards individuals in authority. Such externalizing behavior creates problems in school, the workplace, and community when the youth interacts with law enforcement. Therefore, we see that both internalizing and externalizing disorders are likely to be the outcomes of both maternal and child detention.[6, 21]

17. It is not only the external indicators of the effects of detention that should give us great reason for concern and worry. Adverse childhood experiences, such as trauma and detention, have detrimental effects on children's brain growth and neural development.[22] Research in the neurobiology of trauma and brain development shows that as childhood adversity increases, the likelihood of psychopathology also increases.[23] This is especially the case for the youngest of the tender aged children—infants, toddlers, and preschoolers—who young brains are in their most critical growth period, when the organ's wiring and architecture is being formed. Stress, deprivation, and adversity are ingredients for damaging

---

[20] Abram, K. M., Zwecker, N. A., Welty, L. J., Hershfield, J. A., Dulcan, M. K., & Teplin, L. A. (2015). Comorbidity and continuity of psychiatric disorders in youth after detention: a prospective longitudinal study. *JAMA psychiatry*, *72*(1), 84-93.
[21] Dallaire, D. H., Zeman, J. L., & Thrash, T. M. (2015). Children's experience of maternal incarceration-specific risks: Predictions to psychological maladaptation. Journal of Clinical Child & Adolescent Psychology, 44, 109-122.
[22] De Bellis, M. D., & Zisk, A. (2014). The biological effects of childhood trauma. *Child and adolescent psychiatric clinics of North America*, *23*(2), 185–vii. doi:10.1016/j.chc.2014.01.002
[23] McLaughlin, K. A., Sheridan, M. A., & Lambert, H. K. (2014). Childhood adversity and neural development: deprivation and threat as distinct dimensions of early experience. *Neuroscience & Biobehavioral Reviews*, *47*, 578-591.

essential brain functions that control personality, behavior, emotions, cognition (e.g., judgment, planning, problem-solving, intelligence, memory, concentration, and self-awareness); and key physical and sensory functions (e.g., hearing, speech and language, vision and spatial perception).

**Conclusion**

18. Taking the scientific background into consideration, in combination with my professional experience and the documents I have reviewed describing conditions at certain Emergency Intake Sites, I can state that children and youth detained in these large-scale facilities are facing significant harm due to the trauma of detention that they are experiencing. These children and youth are likely to experience the medical and mental health impacts described above as a result of the deprivation and constant threat of being detained in a facility in which they have no sense of their future, and in which they are exposed to any particular harms of mass detention that have been identified above. Based on my training and experience, such traumas will require ongoing mental health services to ameliorate, and will in some cases likely cause permanent harms, such as chronic illnesses that will require continuing treatment.

19. I have received no compensation for my participation in this case.

20. The opinions expressed in this declaration are my own and do not reflect the opinion of The University of Texas at Austin.

21. I reserve the right to amend or supplement this declaration as appropriate upon receipt of additional information or documents.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

DATED this 11th day of June, 2021 at Charlestown, Rhode Island.

*LUIS H. ZAYAS, PHD*